## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SAN MIGUEL HOSPITAL CORPORATION, d/b/a ALTA VISTA REGIONAL HOSPITAL, on behalf of itself and all others similarly situated,

Plaintiff

v.

JOHNSON & JOHNSON, JANSSEN PHARMACEUTICALS, INC. (f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA, INC.), GRÜNENTHAL USA, INC.; GRÜNENTHAL PHARMACEUTICALS, INC.; ALLERGAN FINANCE, LLC (f/k/a ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.), ALLERGAN SALES, LLC, ALLERGAN USA, INC., ABBVIE, INC., TEVA PHARMACEUTICALS USA, INC., CEPHALON, INC., WATSON LABORATORIES, INC., ACTAVIS PHARMA, INC. (f/k/a WATSON PHARMA INC.), ACTAVIS LLC (f/k/a ACTAVIS INC.), AMERISOURCEBERGEN DRUG CORPORATION, XCENDA L.L.C., ANDA, INC., CARDINAL HEALTH, INC., H.D. SMITH, LLC (f/k/a H.D. SMITH WHOLESALE DRUG CO.), MCKESSON CORPORATION, WALGREEN CO., WALGREEN EASTERN CO., INC., WALGREENS BOOTS ALLIANCE, INC., CVS HEALTH CORPORATION, CVS PHARMACY, INC., CVS INDIANA L.L.C., CVS RX SERVICES, INC., CVS ORLANDO FL DISTRIBUTION, L.L.C., CVS TN DISTRIBUTION, L.L.C., CVS HEALTH SOLUTIONS LLC, CVS HOLDING, INC., CVS WELLNESS REDISCOVERY LLC, WALMART INC. (f/k/a WAL-MART STORES, INC.), WAL-MART STORES EAST, LP, SAM'S EAST, INC., SAM'S WEST, INC., WSE MANAGEMENT, LLC, WSE INVESTMENT LLC, WAL-MART STORES EAST, LLC, and NORAMCO, INC.

Defendants

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................. 6

II.    JURISDICTION AND VENUE ..................................................... 13

III.   PARTIES ............................................................................................ 13

    A.    Plaintiff ..................................................................................... 13

    B.    Defendants ................................................................................ 13

        1.    Marketing Defendants .................................................... 13

            a.    Janssen and Associated Companies ..................... 13

            b.    Allergan and Associated Companies ................... 17

            c.    AbbVie .......................................................... 19

            d.    Teva .............................................................. 20

            e.    Unnamed Associates ........................................ 21

        2.    Distributor Defendants .................................................... 22

            a.    AmerisourceBergen ......................................... 22

            b.    Anda .............................................................. 23

            c.    Cardinal ........................................................ 23

            d.    H.D. Smith ..................................................... 24

            e.    McKesson ....................................................... 24

            f.    Walgreens ...................................................... 25

            g.    CVS ............................................................... 25

            h.    Walmart ........................................................ 26

        3.    Defendants' Agents and Affiliated Persons ...................... 28

IV.   DEFENDANTS   CREATED   ILLEGITIMATE   DEMAND   FOR OPIOIDS. ......................................................................................... 28

    A.    Opioids are dangerous and highly addictive narcotics. .................. 28

    B.    Defendants set out to change the best practices for the use of opioids. ................................................................................................ 29

    C.    Defendants spread falsehoods about the risks and benefits of prescription opioids. ................................................................. 33

        1.    Falsehood #1: The risk of addiction to opioids is low. ................... 33

        2.    Falsehood #2: It is easy to identify people at high risk for addiction. ............................................................................. 35

3.  Falsehood #3: Signs of addictive behavior are "pseudoaddiction" requiring more opioids...................................... 36

4.  Falsehood #4: Addicted patients are "untrustworthy" "abusers".................................................................................... 37

5.  Falsehood #5: Opioid withdrawal can be avoided by tapering. ...................... 38

6.  Falsehood #6: Opioid doses can be increased without limit or increased risk........................................................................... 39

7.  Falsehood #7: Long-term opioid use improves functioning. .......................... 40

8.  Falsehood #8: Opioids are safer than other pain medications...................... 41

9.  Falsehood #9: Ostensibly "abuse-deterrent" formulations are safer.......................................................................................... 42

10. Falsehood #10: Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain...................................... 43

11. Falsehood #11: Despite heightened risk factors, the elderly and veterans can safely use opioids.......................................... 43

D.  Defendants used a campaign of misinformation to publicize these falsehoods and convince prescribers, legislators, and the public of their truth. ....................................................................................... 45

1.  Defendants used "detailers" to disseminate their misrepresentations directly to prescribers................................... 46

2.  Defendants used Front Groups to promote greater opioid use. ........................................................................................ 47

    a.  American Pain Foundation.................................................... 48

    b.  American Academy of Pain Medicine and the American Pain Society................................................... 53

    c.  Federation of State Medical Boards ................................... 54

    d.  The University of Wisconsin Pain and Policy Study Group ............................................................................ 57

    e.  The Joint Commission............................................................ 57

    f.  Alliance for Patient Access ................................................... 60

    g.  American Geriatrics Society ................................................ 61

    h.  American Chronic Pain Association .................................. 63

    i.  C.A.R.E.S. Alliance ................................................................. 64

3.  The Marketing Defendants paid Key Opinion Leaders to deceptively promote opioid use........................................................ 65

    a.  Dr. Russell Portenoy............................................................. 65

    b.  Dr. Lynn Webster.................................................................... 67

  c. Dr. Perry Fine ............................................................................... 67

  d. Dr. Scott Fishman .......................................................................... 68

 4. Defendants disseminated their misrepresentations through Continuing Medical Education programs. ........................................ 69

 5. Defendants promoted specific opioid products to doctors and consumers. ...................................................................................... 70

 6. Defendants used unbranded advertising to promote opioid use. ................................................................................................... 74

 7. Defendants funded, edited, and distributed publications that supported their misrepresentations. ................................................ 77

 8. Defendants used speakers' bureaus and programs to spread their deceptive messages. ............................................................... 80

E. The Marketing Defendants misrepresented their involvement in promoting opioids. ................................................................................ 81

F. Defendants directly targeted hospitals. ............................................... 82

G. Deceptive marketing caused the epidemic of licit and illicit opioid use. ............................................................................................... 85

V. DEFENDANTS CAUSED THE OPIOID EPIDEMIC BY ILLEGITIMATELY INFLATING THE SUPPLY OF OPIOIDS. ..................... 87

A. Noramco produced active pharmaceutical ingredients for many of the Marketing Defendants' opioids. ................................................... 90

B. Defendants are required by law to take certain steps to identify and halt diversion of controlled substances. ........................................ 93

C. Controlled substances are carefully regulated because they are dangerous. ............................................................................................... 94

 1. Distributors have duties under the CSA. ........................................ 96

 2. Pharmacies have duties under the CSA. ......................................... 98

D. Defendants failed to comply with their CSA obligations to identify, report, and halt suspicious orders. ....................................................... 103

 1. Janssen ........................................................................................... 103

 2. Allergan .......................................................................................... 104

 3. AbbVie ............................................................................................ 105

 4. ABDC .............................................................................................. 106

 5. Anda ............................................................................................... 108

 6. Cardinal .......................................................................................... 111

 7. McKesson ........................................................................................ 114

 8. H.D. Smith ...................................................................................... 116

9.      Walgreens ............................................................................ 117

10.     CVS .................................................................................... 120

11.     Walmart .............................................................................. 121

E.   The National Retail Pharmacies dispensed opioids in violation of the
     CSA. ............................................................................................ 123

1.      Walgreens ............................................................................ 123

2.      CVS .................................................................................... 126

3.      Walmart .............................................................................. 127

F.   The Distributor Defendants have been investigated and fined
     repeatedly for failing to secure their supply chains, but refuse to change
     their ways. .................................................................................... 129

1.      ABDC .................................................................................. 129

2.      Anda .................................................................................... 130

3.      Cardinal ............................................................................... 130

4.      McKesson ............................................................................ 132

5.      Walgreens ............................................................................ 134

6.      CVS .................................................................................... 135

7.      Walmart .............................................................................. 137

G.   The Distributor Defendants misrepresented that they were complying
     with their duties to prevent diversion of opioids. ............................ 139

H.   The Distributor Defendants marketed the Marketing Defendants'
     opioids. ........................................................................................ 145

1.      ABDC .................................................................................. 146

2.      Cardinal ............................................................................... 148

3.      McKesson ............................................................................ 148

4.      Anda .................................................................................... 148

5.      H.D. Smith .......................................................................... 149

6.      Walgreens ............................................................................ 149

7.      CVS .................................................................................... 150

8.      Walmart .............................................................................. 152

I.   Defendants coordinated their flawed approach to preventing diversion
     through trade associations. ........................................................... 152

1.      Pain Care Forum ................................................................. 152

2.      Healthcare Distribution Alliance .......................................... 154

3.      National Association of Chain Drug Stores ........................... 157

VI.     THE OPIOID EPIDEMIC CREATED BY DEFENDANTS' DRIVING OF OPIOID DEMAND AND SUPPLY HAS HARMED PLAINTIFF AND OTHER HOSPITALS ................................................................. 158

VII.    DEFENDANTS WERE MEMBERS OF A JOINT ENTERPRISE DESIGNED TO DRIVE UP DEMAND FOR AND SUPPLY OF PRESCRIPTION OPIOIDS. .......................................................... 161

VIII.   CLASS ALLEGATIONS ............................................................................. 166

IX.     CAUSE OF ACTION ................................................................................. 170

        1.      Structure of the False Narrative Enterprise ...................................... 170

        2.      The Common Purpose and Scheme of the False Narrative Enterprise ..................................................................................... 171

        3.      Predicate Acts ............................................................................ 173

        4.      Pattern of Unlawful Activity ......................................................... 179

        5.      Consequences ............................................................................. 182

X.      PRAYER FOR RELIEF ........................................................................... 182

XI.     JURY DEMAND .................................................................................... 182

## COMPLAINT

Plaintiff San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital brings this Complaint against Defendants Johnson & Johnson; Janssen Pharmaceuticals, Inc. (f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica, Inc.); Grünenthal USA, Inc.; Grünenthal Pharmaceuticals, Inc.; Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.); Allergan Sales, LLC; Allergan USA, Inc.; AbbVie, Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc. (f/k/a Watson Pharma Inc.); Actavis LLC (f/k/a Actavis Inc.); AmerisourceBergen Drug Corporation; Xcenda L.L.C.; Anda, Inc.; Cardinal Health, Inc.; H.D. Smith, LLC (f/k/a H.D. Smith Wholesale Drug Co.); McKesson Corporation; Walgreen Co.; Walgreen Eastern Co., Inc.; Walgreens Boots Alliance, Inc.; CVS Health Corporation; CVS Pharmacy, Inc.; CVS Indiana L.L.C.; CVS Rx Services, Inc.; CVS Orlando FL Distribution, L.L.C.; CVS TN Distribution, L.L.C.; CVS Health Solutions LLC; CVS Holding, Inc.; CVS Wellness Rediscovery LLC; Walmart Inc. f/k/a Wal-Mart Stores, Inc.; Wal-Mart Stores East, LP; Sam's East, Inc.; Sam's West, Inc.; WSE Management, LLC; WSE Investment LLC; Wal-Mart Stores East, LLC; and Noramco, Inc. (collectively "Defendants") under the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968) ("RICO"); seeking judgment against Defendants and in favor of Plaintiff; compensatory damages; treble damages; pre-judgment and post-judgment interest; cost of suit; and equitable relief, including injunctive relief, and allege as follows:

## I.    INTRODUCTION

1.    Plaintiff operates a hospital that provides acute care, including treatment of opioid-dependent patients and patients suffering from opioid-related conditions.[1] These patients routinely

---

[1] "Opioid-related conditions" include but are not limited to opioid use disorder and overdose; psychiatric and mental health treatment; neonatal abstinence syndrome ("NAS") or other opioid-related conditions of newborns; illnesses associated with opioid use, such as endocarditis, hepatitis C, and HIV; surgical procedures that are more complex and expensive due to a patient's opioid use; illnesses or other conditions claimed by a person with opioid use disorder in order to obtain an opioid prescription; and any other condition identified in Plaintiff's records as related to opioid use and misuse.

seek services at Plaintiff's emergency room and occupy beds in Plaintiff's hospital. As a hospital operator, Plaintiff is legally and morally compelled to treat these patients, regardless of the cost of treatment.

2.      This crisis has a cause. Defendants cooperated to sell, ship, and dispense ever-increasing quantities of opioids. To create newfound demand for opioids, Defendants used misleading marketing to convince both doctors and patients that opioids could safely be prescribed for common ailments that cause chronic pain. To meet the artificially inflated demand, Defendants sold, shipped, and dispensed opioids in quantities that could not possibly have been medically justified and in the face of clear evidence that opioids were being diverted for illegitimate uses. Defendants' plan succeeded, and they reaped multibillion-dollar profits as a result.

3.      The origins of the opioid epidemic stretch back to the 1990s when Purdue released its blockbuster opioid, OxyContin. To ensure that OxyContin was widely adopted by the medical community, Purdue engaged in an extensive marketing campaign in which Defendants soon joined with a single coordinated message: opioids are safe and should be prescribed liberally for chronic pain.

4.      Purdue promoted a culture that misled doctors, patients, and the general public into believing opioids were a safe treatment for chronic pain:

    a.  In 1998, Purdue distributed 15,000 copies of an OxyContin video to physicians without submitting it to the FDA for review, an oversight later acknowledged by Purdue. After Purdue submitted a second version of the video, the FDA concluded that the video minimized the risks from OxyContin and made unsubstantiated claims regarding its benefits to patients.[2]

    b.  According to training materials, Purdue instructed sales representatives to assure doctors—repeatedly and without evidence—that "fewer than one percent" of patients who took OxyContin became addicted.[3]

---

[2] U.S. Gov't Accountability Office, GA-04-110, *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem* (2004), https://www.gao.gov/assets/gao-04-110.pdf.
[3] Patrick Radden Keefe, *The Family That Built an Empire of Pain*, New Yorker (Oct. 23, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain (hereinafter Keefe, *Family*).

c. Purdue had a speakers' bureau, and it paid several thousand clinicians to attend medical conferences and deliver presentations about the merits of its drug. Such spending was worth the investment: doctors who attended these seminars in 1996 wrote OxyContin prescriptions more than twice as often as those who didn't.[4]

d. The company advertised in medical journals, sponsored websites about chronic pain, and distributed a dizzying variety of OxyContin swag including fishing hats, plush toys, and luggage tags.[5]

e. Purdue also produced promotional videos featuring satisfied patients—like a construction worker who talked about how OxyContin had eased his chronic back pain, allowing him to return to work. The videos, which also included testimonials from pain specialists, were sent to tens of thousands of doctors. The marketing of OxyContin convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company.[6]

f. Purdue encouraged sales representatives to increase sales of OxyContin through a lucrative bonus system, which resulted in many visits to physicians with high rates of opioid prescriptions.

g. By 2003, DEA found that Purdue's "aggressive methods" had "very much exacerbated OxyContin's widespread abuse." Rogelio Guevara, a DEA senior official, concluded that Purdue had "deliberately minimized" the risks associated with the drug.[7]

5. Purdue's marketing initiated a "paradigm shift" in attitudes towards prescribing opioids for chronic pain.[8] After witnessing OxyContin's blockbuster success, "other pharmaceutical firms rushed to develop and promote their *own* long-acting painkillers."[9] They did so with "rank indifference to the dangers they posed."[10]

6. To further their scheme, Defendants conspired with Purdue and others to cause changes in the standard of care used by the medical profession (especially hospitals) for treating pain. This new (and ultimately unattainable) goal of eradicating all pain drove a rapid and sustained increase in prescriptions for opioids.

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] Patrick Radden Keefe, *Empire of Pain* 367 (2021) (hereinafter *Empire of Pain*).
[9] *Id.* at 245.
[10] *Id.* at 419.

7.      This conspiracy took the form of an association-in-fact for the unlawful purpose of propagating falsehoods about the safety and benefits of opioids and the manner in which they are or should be distributed and dispensed and distributing and dispensing opioids in violation of the Controlled Substances Act.

8.      Defendants' conduct was often the product of formal or informal agreements (such as contractual agreements to co-promote a branded opioid or joint funding of presentations or publications by Front Groups to promote opioid use generally) among Defendants and other associates.

9.      The result of Defendants' actions was synergistic—that is, conduct benefiting one Defendant or associate (e.g., by making a misleading representation about the safety of a particular branded opioid or by failing to report suspicious orders). The actions of one Defendant benefited all others so that each could (and did) profit from an enlarged market for opioid prescriptions.

10.     Defendants' organized campaign to increase the demand for opioids worked as planned. Opioid sales—less than $1 billion in 1992—ballooned to $8 billion in 2015.

11.     As demand rose, supply rose with it. The Drug Enforcement Administration ("DEA") sets quotas for the amount of controlled substances that can be manufactured (and hence distributed and dispensed) each year. Defendants engaged in a concerted campaign to convince regulators to raise these quotas to unprecedented heights, enabling Defendants to sell more and more opioids. At the same time, each Defendant was a distributor of opioids. Distributors have an obligation to detect and refuse to ship suspicious orders in order to prevent controlled substances from being diverted out of legitimate channels. Defendants failed to develop sufficiently robust systems to detect suspicious orders, collaborated with their customers on ways to avoid triggering review of orders as suspicious, and failed to halt shipment of potentially suspicious orders until the suspicion was dispelled.

12.     At the same time, the National Retail Pharmacies failed to fulfill their obligations under the CSA to only fill prescriptions written for a legitimate medical purpose by dispensing prescription opioids pursuant to such prescriptions that were not written for a legitimate medical purpose and by implementing policies and procedures that inhibited pharmacists' ability to detect and refuse to fill those prescriptions.

13.     Defendants' conduct constituted repeated, related, and continuous acts of mail fraud, wire fraud, and violations of the Controlled Substances Act. As these acts were committed to further the unlawful purpose of the Defendants' shared enterprise, they give rise to liability under the Racketeering Influenced Corrupt Organizations Act, which is the sole count alleged in this Complaint.

14.     The result of Defendants' collective conduct was a flood of opioids far in excess of what could possibly have been serving a legitimate need. In 2018, there were 51.4 opioid prescriptions written nationally for every 100 persons; in New Mexico the rate was 49.4 opioid prescriptions for every 100 persons.[11]

15.     It is inconceivable that so many opioid pills were medically justified. Simply put, Defendants had to have known that some of these opioids were being diverted—there were just too many being released into the community. Diversion leads to substance use disorder, overdose, and death.

16.     Opioids are powerful and highly addictive narcotics, and their use can result in serious medical complications, including opioid use disorder and fatal overdoses. This poses an ongoing crisis. According to the most recently available CDC data: "The number of people who died from a drug overdose in 2021 was over six times the number in 1999. The number of drug overdose deaths increased by nearly 16% from 2020 to 2021. Nearly 75% of the nearly 107,000 drug overdose deaths

---

[11] Nat'l Inst. on Drug Abuse, *New Mexico: Opioid-Involved Deaths and Related Harms* 2 (rev. Apr. 2020), https://nida.nih.gov/download/21976/new-mexico-opioid-involved-deaths-related-harms.pdf.

in 2021 involved an opioid." The rise in prescription opioid overdose deaths started in 1990s. While that rise has plateaued, there has been an ongoing rise in synthetic opioid overdose deaths since 2013. These opioids include tramadol and fentanyl.[12]

17.    According to the Office of National Drug Control Policy's Opioid Overdose Tracker, the rate of nonfatal opioid overdoses in New Mexico continues to be higher than the national average.[13] Similarly, in 2021, the rate of fatal overdoses due to prescription opioids in New Mexico was 12.6 per 100,000 persons, a rate second only to that of West Virginia.[14]

18.    Obtaining opioids pursuant to a valid prescription and taking them as directed is no shield. The prevalence of opioid misuse following prescription of opioids for chronic pain is between 21% and 29% and that the prevalence of addiction is between 8% and 12%.[15] For example, between 2009 and 2018, 671 people in Massachusetts had filled a prescription for a Purdue opioid and later died of an opioid-related overdose.[16] Similarly, a study by United Health showed that hundreds of thousands of its policyholders had been prescribed opioids and subsequently diagnosed with opioid use disorder ("OUD").[17]

19.    The progression from prescription opioids to the use of illicit drugs, particularly heroin and fentanyl, is well documented; approximately 75% of heroin users reporting that their initial drug use was through prescription opioids.[18]

---

[12]    *Understanding the Opioid Epidemic*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/opioids/basics/epidemic.html (last reviewed Sept. 12, 2023).

[13]    *Opioid Overdose Tracker*, NEMSIS, https://nemsis.org/opioid-overdose-tracker/ (last visited Sept. 12, 2023).

[14]    *SUDORS Dashboard: Fatal Overdose Data*, Ctrs. for Disease Control & Prevention (updated Aug. 25, 2023), https://www.cdc.gov/drugoverdose/fatal/dashboard/index.html (data from 32 reporting jurisdictions).

[15]    Kevin E. Vowles, *Rates of Opioid Misuse, Abuse, and Addiction in Chronic Pain: A Systematic Review and Data Synthesis*, 156 Pain 569 (2015), https://pubmed.ncbi.nlm.nih.gov/25785523/.

[16]    *Empire of Pain*, *supra*, at 381.

[17]    *Id.* at 419.

[18]    Theodore J. Cicero, et al., *The Changing Face of Heroin Use in The United States: A Retrospective Analysis of The Past 50 Years*, 71 JAMA Psychiatry (2014), https://www.seattle.gov/documents/departments/cityAttorney/opioidLitigation/FN9-JAMAPsychiatry-ChangingFaceHeroinUse.%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.pdf.

20.     Individuals with substance use disorder ("SUD") experience a variety of health consequences (including fatal and non-fatal overdoses) and engage in a variety of risky drug-seeking behaviors. Widespread substance misuse imposes costs on the community, including health care costs (a substantial portion of which are paid by hospitals like Plaintiff's).[19]

21.     Children born to mothers using opioids also suffer from neonatal abstinence syndrome ("NAS").[20] These infants will spend days or weeks in neonatal intensive care units while they painfully withdraw from the drugs. On average, a child suffering from NAS will stay in the hospital nearly 3.5 times as long as a child without NAS.[21] The average treatment cost for a child suffering from NAS is over three times that of a child who does not have NAS.[22] When untreated, NAS can be life-threatening.

22.     Plaintiff has directly paid the cost of the epidemic of opioid use and misuse caused by Defendants. The average cost of providing care for patients diagnosed with an opioid use disorder is eight times higher than for those without an opioid use disorder.[23] Plaintiff must still provide patients with complete care, but private and government insurance does not fully cover these increased costs. This financial impact on Plaintiff proceeds directly from Defendants' misconduct in driving inflated demand for and supply of prescription opioids.

---

[19] Alex Brill & Scott Ganz, Am. Enter. Inst., *The Geographic Variation in the Cost of the Opioid Crisis* 1–4, (2018), https://www.aei.org/wp-content/uploads/2018/03/Geographic_Variation_in_Cost_of_Opioid_Crisis.pdf.
[20] S.W. Patrick, et al., *Risk of Hospital Readmission Among Infants With Neonatal Abstinence Syndrome*, 5 Hosp. Pediatrics 513 (2015), https://doi.org/10.1542/hpeds.2015-0024.
[21] Tammy E. Corr & Christopher S. Hollenbeak, *The Economic Burden of Neonatal Abstinence Syndrome in the United States*, 112 Addiction 1590 (2017), https://pubmed.ncbi.nlm.nih.gov/28612362/.
[22] *Id.*
[23] Alan G. White, et al., *Direct Costs of Opioid Abuse in an Insured Population in the United States*, 11 J. Managed Care Pharmacy 469 (2005).

## II.    JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff's cause of action arises under the laws of the United States, specifically the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

24.    This Court has personal jurisdiction over Defendants because at all relevant times Defendants engaged in substantial business activities in New Mexico and purposefully directed their actions towards New Mexico, voluntarily submitted to the jurisdiction of New Mexico when obtaining a manufacturer, pharmacy, and/or distributor license, and have the requisite minimum contacts with New Mexico necessary to constitutionally permit this Court to exercise jurisdiction.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff was injured in this district and because Defendants marketed, sold, distributed, and/or dispensed prescription opioids in this district.

## III.    PARTIES

### A.    Plaintiff

26.    Plaintiff San Miguel Hospital Corporation, doing business as Alta Vista Regional Hospital, is a corporation chartered in the State of New Mexico, domiciled and doing business at 104 Legion Drive, Las Vegas, New Mexico, 87701.

### B.    Defendants

#### 1.    Marketing Defendants

##### a.    Janssen and Associated Companies

27.    Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

28.    Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of J&J. Janssen

Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which was formerly known as Janssen Pharmaceutica, Inc.

29.     J&J is the only company that owns over 10% of Janssen Pharmaceuticals, Inc.'s stock. Janssen Pharmaceuticals, Inc.'s profits inure to J&J's benefit. J&J controls the development, sale, and marketing of Janssen Pharmaceuticals, Inc.'s drugs. For example, according to its website, J&J's policies "govern[]" the "sales and marketing practices" for the "Johnson & Johnson family of companies," which includes Janssen Pharmaceuticals, Inc. J&J also "provides sales representatives with ongoing scientific training and product knowledge," as well as training on J&J policies.[24] J&J employees monitor and enforce Janssen Pharmaceuticals, Inc.'s compliance with J&J's policies. Janssen Pharmaceuticals Inc.'s website provides links to J&J's policies.[25] J&J corresponded with the U.S. Food and Drug Administration ("FDA") regarding Janssen's opioids and marketing practices.

30.     Janssen, like many other companies, has a corporate code of conduct, which sets forth the organization's mission, values, and principles. Janssen's employees are required to read, understand, and follow its Code of Conduct for Health Care Compliance. J&J imposes this code of conduct on Janssen as a pharmaceutical subsidiary of J&J. Documents posted on J&J's and Janssen's websites confirm J&J's control of the development and marketing of opioids by Janssen. Janssen's website, *Ethical Code of Conduct of Research and Development*, names only J&J and does not name Janssen anywhere within the document. The *Ethical Code of Conduct of Research and Development* posted on Janssen's website is J&J's company-wide ethical code, which J&J requires all subsidiaries to follow.[26]

31.     The *Every Day Health Care Compliance Code of Conduct* is a J&J company-wide document that describes Janssen as one of the "Pharmaceutical Companies of Johnson & Johnson" and as one

---

[24] *Position on Ethical Sales and Marketing*, Johnson & Johnson, https://www.jnj.com/about-jnj/policies-and-positions/our-position-on-ethical-sales-and-marketing (last updated May 2023).
[25] *See, e.g.*, *Transparency*, Janssen, https://www.janssen.com/transparency (last updated Aug. 25, 2023) (linking to J&J's Ethical Code of Conduct).
[26] *See id.*; *Ethical Code for the Conduct of Research and Development*, Johnson & Johnson, https://www.jnj.com/about-jnj/policies-and-positions/ethical-code-for-the-conduct-of-research-and-development (last updated May 2020).

of the "Johnson & Johnson Pharmaceutical Affiliates." It governs how "[a]ll employees of Johnson & Johnson Pharmaceutical Affiliates," including those of Janssen, "market, sell, promote, research, develop, inform, and advertise Johnson & Johnson Pharmaceutical Affiliates' products." All Janssen officers, directors, employees, and sales associates must certify that they have "read, understood and will abide by" the code. The code governs all the forms of marketing at issue in this case.[27]

32.     J&J and Janssen Pharmaceuticals, Inc. (collectively, "Janssen") are or have been in the business of manufacturing, selling, promoting, and/or distributing opioids (including Duragesic (fentanyl), Nucynta (tapentadol), and Ultram (tramadol)) throughout the United States and in New Mexico.

33.     Duragesic was not discontinued until March 2020 for some formulations and July 2022 for others. On information and belief, the product continued to be distributed into New Mexico until at least those dates.

34.     Janssen continues to manufacture, market, and sell Ultram, and, on information and belief, it continues to be distributed into New Mexico. Although tramadol, the active ingredient in Ultram, is an opioid and so inherently carries a risk of addiction, J&J was instrumental in having it approved by the FDA in 1995 as an unscheduled substance. J&J actively promoted tramadol as safer than other opioids. When evidence began to mount of significant problems with addiction and substance misuse related to tramadol, Janssen worked actively to prevent it from being added to the list of controlled substances. It was finally scheduled in 2014.

35.     According to the most recently available ARCOS data, Janssen opioids were distributed into New Mexico from 2006 to 2019.[28]

---

[27] Janssen: Pharmaceutical Companies of Johnson & Johnson, *Every Day Health Care Compliance Code of Conduct* (n.d.).
[28] The Automated Reports and Consolidated Ordering System (ARCOS) is "a data collection system in which manufacturers and distributors report their controlled substances transactions to the Drug Enforcement Administration (DEA)." This data is not ordinarily publicly available and has only become available as a result of the opioid litigation. The data is only available for the period from 2006 to 2019.

36.    Grünenthal is a German pharmaceutical company that concentrates on manufacturing, marketing, and selling prescription pain medications, including opioids. Among its many affiliates are two US subsidiaries: Defendant Grünenthal USA, Inc. and Defendant Grünenthal Pharmaceuticals, Inc. (collectively, with other Grünenthal entities, including the German parent, "Grünenthal").[29] Grünenthal USA, Inc. is a Delaware corporation with its principal place of business in New Jersey. Grünenthal Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in New Jersey.

37.    Grünenthal invented and developed tramadol, which it launched in 1981. J&J licensed the drug from Grünenthal and introduced in into the U.S. market as Ultram. Grünenthal also invented and developed tapanetadol, which it licensed to Janssen in 2003. Grünenthal then approved Janssen's transfer for the license in 2015 to Depomed.[30] Dissatisfied with Depomed's inability to increase sales of the opioid, Grünenthal agreed  in 2017 to transfer the license to Collegium in hopes of driving increased sales.[31] Collegium continues to market and sell Nucynta in the U.S. under the license from Grünenthal.

38.    Defendant Noramco, Inc. is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J until July 2016. Noramco, Inc. makes active pharmaceutical ingredients ("APIs") for opioid painkillers.

39.    Noramco has maintained a wholesale drug distributor license in New Mexico since at least 2016. This license remains active with an expiration date of December 31, 2025. On information and belief, opioids containing Noramco's API continue to be distributed in New Mexico.

---

[29] Grünenthal has other U.S.-based subsidiaries that are not named as defendants in this action.

[30] Press Release, Grünenthal Grp., Grünenthal GmbH Granted Its Consent to Transfer the Licsene Rights for Nucynta (tapentadol) in the U.S. from Janssen Pharmaceuticals, Inc. to Depomed, Inc. (Jan. 15, 2015).

[31] *New Partnership for the Commericalization of Nucynta in the U.S. Territory*, PR Newswire (Dec. 5, 2017), https://www.prnewswire.com/news-releases/new-partnership-for-the-commercialization-of-nucynta-in-the-us-territory-662000683.html.

### b. Allergan and Associated Companies

40.     Allergan plc is an Irish public limited company with its principal place of business in Dublin, Ireland.

41.     Defendant Allergan Finance, LLC is a Nevada limited liability company headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly owned subsidiary of Allergan plc.

42.     Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California.

43.     Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey. Allergan USA, Inc. is a wholly owned subsidiary of Allergan plc.

44.     Allergan plc; Allergan Finance, LLC; Allergan Sales, LLC; and Allergan USA, Inc. are collectively referred to as "Allergan."

45.     Defendant Watson Laboratories, Inc. ("Watson") is a Nevada corporation with its principal place of business in Corona, California.

46.     Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey.

47.     Defendant Actavis LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

48.     Watson, Actavis Pharma, and Actavis LLC are collectively referred to as "Actavis."

49.     Allergan and Actavis have manufactured, promoted, marketed, advertised, and sold branded opioids nationwide and in New Mexico, including Kadian (morphine) and Norco (hydrocodone/acetaminophen). Kadian and Norco were voluntarily discontinued at the end of 2020, but existing inventory continued to be shipped after that time.

50.     Actavis has maintained a wholesale drug distributor license in New Mexico since at least 2006. This license remains active with an expiration date of December 31, 2024. On information and belief, Actavis's prescription opioids continue to be distributed in New Mexico.

51.     Allergan has maintained a wholesale drug distributor license in New Mexico since at least 2018. This license remains active with an expiration date of December 31, 2023. On information and belief, Allergan's prescription opioids were distributed in New Mexico until the expiration of existing inventory following the discontinuation of Kadian and Norco.

52.     Watson received approval of the New Drug Application ("NDA") for branded Norco in February 1997 and sold and marketed this opioid.

53.     In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC) acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC; Actavis Kadian LLC; Actavis Pharma, Inc.; and Allergan USA, Inc.

54.     In 2012, Watson acquired Actavis, Inc., and the combined company took the Actavis name. Prior to its 2012 acquisition by Watson, Actavis produced twelve different generic opioids.

55.     In 2013, Actavis acquired Warner Chilcott plc; these two companies were combined and incorporated in Ireland as Actavis plc. In March 2015, Actavis plc purchased Allergan, Inc. and adopted the name Allergan plc.

56.     In 2016, Teva Ltd. acquired Actavis (i.e., Watson, Actavis LLC, and Actavis Pharma) from Allergan plc. Following the sale of Actavis to Teva, Allergan continued to sell Kadian and Norco until the discontinuation in late 2020.

57.     According to ARCOS data, Actavis and Allergan opioids were distributed into New Mexico from 2006 to 2019.

58.     As used in this Complaint, "Allergan" also refers to predecessor entities for whose conduct Allergan remains liable, including Actavis.

### c.  AbbVie

59.     Abbott Laboratories, Inc. is a subsidiary of Abbott Laboratories. Abbott Laboratories and Abbott Laboratories, Inc. are referred to collectively as "Abbott."

60.     In 2002, Abbott acquired the pharmaceutical assets of BASF SE, which included Knoll Pharmaceuticals (Knoll Pharmaceuticals and its successor entities are referred to as "Knoll").

61.     Defendant AbbVie, Inc. ("AbbVie"), is a Delaware corporation with its principal place of business in North Chicago, Illinois.

62.     AbbVie was formed for purposes of effecting a separation (the "AbbVie Spinoff" or the "Spinoff") of Abbott's pharmaceutical business (including all operations related to the manufacture and distribution of opioids) from Abbott's other operations. Effective January 1, 2013, AbbVie took title to all Abbott assets relating to its pharmaceutical business and assumed all liabilities relating to Abbott's pharmaceutical business.[32] Accordingly, AbbVie is liable for all pre-Spinoff liabilities of Abbott relating to its pharmaceutical business, including all opioid-related liabilities.

63.     In addition to being liable for certain of Abbott's pre-Spinoff conduct as a matter of contract and successorship law, AbbVie continued Abbott's practices, including upon information and belief, through the acts of its shared employees (including Jerry Eichorn, head of sales at Abbott in the 1990s who later became a senior marketing executive at AbbVie), and continued to engage in actionable conduct in relation to opioids.

64.     Prior to its acquisition by Abbott, Knoll manufactured, promoted, and sold the opioids Vicodin (hydrocodone/acetaminophen), Vicoprofen (hydrocodone/ibuprofen), and Dilaudid (hydromorphone). Prior to the Spinoff, Abbott manufactured and sold Vicodin, Vicoprofen, and

---

[32] Separation and Distribution Agreement by and between Abbott Laboratories and AbbVie Inc. (Nov. 28, 2012).

Dilaudid. Following the Spinoff, AbbVie continued to manufacture and sell Vicodin and Vicoprofin until it voluntarily discontinued them in late 2017.

65.     AbbVie has maintained wholesale drug distributor licenses in New Mexico since at least 2012. These licenses remain active with expiration dates of December 31, 2023, or December 31, 2024.

66.     According to ARCOS data, AbbVie opioids were distributed into New Mexico from 2006 to 2018.

67.     On May 23, 2020, AbbVie acquired Allergan plc, including Allergan Finance, LLC; Allergan Sales, LLC; and Allergan USA, Inc. along with Allergan's liability for its conduct associated with prescription opioids. Allergan continued to sell Norco and Kadian during the period of AbbVie's ownership.

### d. Teva

68.     Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli company with its principal place of business in Petach Tikva, Israel.

69.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in Pennsylvania and is a wholly owned subsidiary of Teva Ltd.

70.     Defendant Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In October 2011, Teva Ltd., acquired Cephalon, which became a wholly owned subsidiary of Teva Ltd.

71.     Teva Ltd., Teva USA, and Cephalon are collectively known as "Teva".

72.     Teva manufactured, promoted, advertised, distributed, and sold branded—Actiq (fentanyl) and Fentora (fentanyl)—and generic opioids in the United States and New Mexico.

73.    Teva has maintained wholesale drug distributor licenses in New Mexico since at least 2007. These licenses remain active with an expiration date of December 31, 2024. On information and belief, Teva's prescription opioids continue to be distributed in New Mexico.

74.    According to ARCOS data, Teva opioids were distributed into New Mexico from 2006 to 2019.

### e.  Unnamed Associates

75.    Mallinckrodt LLC, Mallinckrodt plc, and SpecGx LLC (collectively, "Mallinckrodt") manufactured, promoted, advertised, distributed, and sold branded and generic opioids. Mallinckrodt manufactures four branded opioids: Exalgo (hydromorphone), Roxicodone (oxycodone), Xartemis XR (oxycodone/acetaminophen), and Methadose (methadone). Mallinckrodt is also one of the largest manufacturers of generic opioids.

76.    Purdue Pharma, L.P.; Purdue Pharma, Inc.; and The Purdue Frederick Company (collectively, "Purdue") manufactured, promoted, advertised, distributed, and sold branded opioids, including opioids OxyContin (oxycodone), MS Contin (morphine), Butrans (buprenorphine), Hysingla ER (hydrocodcone), Dilaudid (hydromorphone), Dilaudid-HP (hydromorphone), and Targiniq ER (oxycodone/naloxone).

77.    Endo Pharmaceuticals Inc. is a wholly owned subsidiary of Endo Health Solutions, Inc. (collectively, "Endo"). Endo manufactured, promoted, advertised, distributed, and sold branded (Percocet, Opana, and Percodan) and generic opioids.

78.    Although not named as defendants because they are seeking reorganization under Chapter 11 of the Bankruptcy Code, Mallinckrodt, Purdue, and Endo participated with Defendants in the misconduct alleged in this action.

79.    Collectively, Janssen, Grünenthal, Teva, AbbVie, and Allergan are referred to as "Marketing Defendants." Throughout this Complaint, Mallinckrodt, Purdue, and Endo, although not

named as defendants in this action, are included as participants in any conduct alleged of the "Marketing Defendants" as a collective entity and in any conduct alleged of "Defendants" as a collective entity.

80.    Specific opioids manufactured by the Marketing Defendants are described in this Complaint as examples only. Plaintiff maintains that Defendants' liability arises from their conduct related to opioids generally and is not limited to opioid products specifically described in this Complaint.

### 2.    Distributor Defendants

81.    AmerisourceBergen, Cardinal, McKesson, and H.D. Smith distributed opioids nationwide and in New Mexico. Walgreens, CVS, and Walmart distributed opioids to their own retail stores nationwide and in New Mexico. All of these opioids were then purchased by consumers.

82.    The Distributor Defendants marketed and promoted opioids to pharmacies and, in some cases, hospitals, health care providers, and patients.

83.    Walgreens, Walmart, and CVS also dispensed and continue to dispense opioids to consumers in New Mexico and nationally. These entities also promoted opioids and served as a conduit between the manufacturers of opioids and customers.

### a.    AmerisourceBergen

84.    Defendant AmerisourceBergen Drug Corporation ("ABDC") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. As of August 30, 2023, ABDC and affiliated companies have been rebranded as Cencora.

85.    ABDC distributed and promoted prescription opioids throughout the United States and in New Mexico, including through its subsidiary, Defendant Xcenda L.L.C. ("Xcenda"), a Florida limited liability company.

86.    According to ARCOS data, ABDC distributed prescription opioids into New Mexico

from 2006 to 2019.

87.    ABDC has maintained wholesale drug distributor licenses in New Mexico since at least 2010. These licenses remain active with expiration dates ranging from December 31, 2023, to December 31, 2026. On information and belief, ABDC is using these licenses to continue distributing prescription opioids into New Mexico.

### b. Anda

88.    Defendant Anda, Inc. ("Anda") is a Florida corporation with its principal place of business in Weston, Florida.

89.    In October 2016, Defendant Teva Ltd. acquired Anda from Allergan plc.

90.    Anda has distributed and promoted prescription opioids throughout the United States and in New Mexico.

91.    According to ARCOS data, Anda distributed prescription opioids into New Mexico from 2006 to 2019.

92.    Anda has maintained wholesale drug distributor licenses in New Mexico since at least 2017. These licenses remain active with expiration dates ranging from December 31, 2023, to December 31, 2024. On information and belief, Anda is using these licenses to continue distributing prescription opioids into New Mexico.

### c. Cardinal

93.    Defendant Cardinal Health, Inc. ("Cardinal") is an Ohio corporation with its principal place of business in Dublin, Ohio.

94.    Cardinal distributed and promoted prescription opioids throughout the United States and in New Mexico.

95.    According to ARCOS data, Cardinal distributed prescription opioids into New Mexico from 2006 to 2019.

23

96.    Cardinal has maintained wholesale drug distributor licenses in New Mexico since at least 2012. These licenses remain active with expiration dates ranging from December 31, 2023, to December 31, 2024. On information and belief, Cardinal is using these licenses to continue distributing prescription opioids into New Mexico.

### d. H.D. Smith

97.    Defendant H.D. Smith, LLC (f/k/a H.D. Smith Wholesale Drug Co.) ("H.D. Smith") distributed prescription opioids throughout the United States and in New Mexico.

98.    H.D. Smith LLC's sole member is H.D. Smith Holdings, LLC, whose sole member is H.D. Smith Holding Company, a Delaware corporation with its principal place of business in Illinois. In January 2018, ABDC acquired H.D. Smith.

99.    According to ARCOS data, H.D. Smith distributed prescription opioids into New Mexico from 2008 until 2014. H.D. Smith continued to distribute opioids throughout the country after that time and until at least 2019, according to the most recently available ARCOS data.

### e. McKesson

100.    Defendant McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business in Irving, Texas.

101.    McKesson distributed and promoted prescription opioids throughout the United States and in New Mexico.

102.    According to ARCOS data, McKesson distributed prescription opioids into New Mexico from 2006 to 2019.

103.    McKesson has maintained wholesale drug distributor licenses in New Mexico since at least 2008. These licenses remain active with expiration dates ranging from December 31, 2023, to December 31, 2024. On information and belief, McKesson is using these licenses to continue distributing prescription opioids into New Mexico.

### f.  Walgreens

104.    Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Illinois.

105.    Defendant Walgreen Eastern Co., Inc. ("WEC") is a New York corporation with its principal place of business in Illinois.

106.    Defendant Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business in Illinois.

107.    Walgreen Co., WEC, and Walgreens Boots Alliance, Inc., are collectively referred to herein as "Walgreens."

108.    Walgreens promoted, distributed, and dispensed prescription opioids throughout the United States and in New Mexico.

109.    According to ARCOS data, Walgreens distributed prescription opioids into New Mexico from 2006 to 2014, and Walgreens dispensed prescription opioids in New Mexico from 2006 to 2019.

110.    Walgreens has held numerous retail pharmacy licenses in New Mexico. Its active licenses have expiration dates ranging from December 31, 2023, to December 31, 2024. On information and belief, Walgreens is using these licenses to continue dispensing prescription opioids in New Mexico.

### g.  CVS

111.    Defendant CVS Health Corporation is a Delaware corporation with its principal place of business in Rhode Island.

112.    Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island.

113.    Defendant CVS Indiana L.L.C. is an Indiana limited liability company.

114.    Defendant CVS Rx Services, Inc. is a New York corporation with its principal place of business in Chemung, New York.

115.    Defendant CVS Orlando FL Distribution, L.L.C. is a Florida limited liability company.

116.    Defendant CVS TN Distribution, L.L.C. is a Tennessee limited liability company.

117.    Defendant CVS Health Solutions LLC is a Delaware limited liability company.

118.    Defendant CVS Holding, Inc. is a New Mexico corporation with its principal place of business in New Mexico.

119.    Defendant CVS Wellness Rediscovery LLC is a New Mexico limited liability company.

120.    CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana L.L.C., CVS Rx Services, Inc., CVS Orlando FL Distribution, L.L.C., CVS TN Distribution, L.L.C., CVS Health Solutions LLC, CVS Holding, Inc., and CVS Wellness Rediscovery LLC are collectively referred to as "CVS."

121.    CVS distributed, dispensed, and promoted prescription opioids throughout the United States and in New Mexico.

122.    According to ARCOS data, CVS distributed prescription opioids into New Mexico from 2007 to 2019, and CVS dispensed prescription opioids in New Mexico from 2006 to 2019.

123.    CVS has held numerous retail pharmacy licenses in New Mexico since at least 2006. Its active licenses have expiration dates ranging from December 31, 2023, to December 31, 2024. On information and belief, CVS is using these licenses to continue dispensing prescription opioids in New Mexico.

### h. Walmart

124.    Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Arkansas and is the sole owner and member of Wal-Mart Stores East, LLC.

125.    Defendant, Wal-Mart Stores East, LP, is a Delaware limited partnership.

126.    Defendant Sam's East, Inc. d/b/a Sam's Club is an Arkansas corporation with a principal place of business in Arkansas. Sam's East is an indirectly, wholly owned subsidiary of Walmart Inc. The sole shareholder of Sam's East, Inc., is Defendant Sam's West, Inc. d/b/a Sam's Club which is a wholly owned direct subsidiary of Walmart Inc. and an Arkansas corporation. Sam's East, Inc., and Sam's West, Inc. jointly operate Sam's Club stores.

127.    Defendant WSE Management, LLC, is a Delaware limited liability company, and owns one percent of Wal-Mart Stores East, LP.

128.    Defendant WSE Investment LLC is a Delaware limited liability company and a ninety-nine percent owner of Wal-Mart Stores East, LP.

129.    Defendant Wal-Mart Stores East, LLC f/k/a Wal-Mart Stores East, Inc., is an Arkansas limited liability company and the sole owner and member of both WSE Management, LLC, and WSE Investment LLC.

130.    Walmart Inc., Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, Sam's East, Inc., Sam's West, Inc., WSE Management, LLC, WSE Investment LLC, and Wal-Mart Stores East, LLC, are collectively referred to as "Walmart."

131.    Walmart has distributed, dispensed, and promoted prescription opioids throughout the United States and in New Mexico.

132.    According to ARCOS data, Walmart distributed prescription opioids into New Mexico from 2007 to 2018, and Walmart dispensed prescription opioids in New Mexico from 2006 to 2019.

133.    Walmart has held numerous retail pharmacy licenses in New Mexico. Its active licenses have expiration dates ranging from December 31, 2023, to December 31, 2024. On information and belief, Walmart is using these licenses to continue dispensing prescription opioids in New Mexico.

134.    Defendants ABDC, Anda, Cardinal, H.D. Smith, McKesson, Walgreens, CVS, and Walmart are collectively referred to herein as the "Distributor Defendants." Walgreens, CVS, and

27

Walmart are collectively referred to herein as the "National Retail Pharmacies."

### 3.    Defendants' Agents and Affiliated Persons

135.    Defendants include the above-referenced entities as well as their predecessors, successors, affiliates, subsidiaries, partnerships, and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

136.    All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## IV.    DEFENDANTS CREATED ILLEGITIMATE DEMAND FOR OPIOIDS.

137.    Defendants worked together to create illegitimate demand for dangerous opioids. The use of these drugs had previously been confined to highly specialized hospital end-of-life- or cancer-care settings because opioids are highly addictive, and their use can and does result in fatal overdoses. Defendants launched a misinformation campaign to inflate the market for these drugs, peddling them as safe and appropriate for use to treat a range of chronic conditions and severely downplaying how addictive and dangerous they are. Defendants then flooded New Mexico and the United States with unreasonable, medically unjustifiable quantities of opioids and deliberately turned a blind eye to abuse and diversion of the drugs.

### A.    Opioids are dangerous and highly addictive narcotics.

138.    The use of opioids leads to physical dependency. If a physically dependent person stops taking opioids, the result is agonizing withdrawal.  Opioid use also leads to tolerance in which the brain physiologically adapts to the presence of opioids and then demands greater and greater doses over time to achieve the same effects.

139.    As a result, millions of people who have been prescribed opioids have developed SUDs.[33] According to the CDC, as many as 1 in 4 people receiving prescription opioids long term in a primary-care setting struggles with addiction.[34]

140.    As their need for opioids becomes more acute, many opioid users seek prescriptions from multiple doctors, buy black-market prescription opioids, or turn to drugs like heroin and illicitly produced fentanyl. Fentanyl and heroin carry extremely high risks of fatal overdose, and deaths caused by fentanyl and fentanyl analogs have skyrocketed in recent years.

**B.    Defendants set out to change the best practices for the use of opioids.**

141.    Defendants were aware that opioids pose significant risks and that the long-term safety and efficacy of opioids for chronic pain has never been established in medical literature. Nevertheless, in a deliberate plot to counter legitimate fears, Defendants intentionally and unlawfully engaged in a misinformation campaign about the risks and effects of opioid use.  They did so to convince prescribers and the public that opioids are appropriate—and even necessary—to treat common chronic conditions, such as back pain and headaches.

142.    The consensus in the medical community—prior to Defendants' concerted campaign of deception—was that opioids were not safe for long-term use or for the treatment of chronic pain. Opioids were reserved for specialized uses, such as treatment of cancer pain or palliative care at the end of life. But Defendants realized that they could profit if they could convince providers to prescribe opioids for common ailments.

---

[33] *See* Nat'l Inst. on Drug Abuse, *Medications to Treat Opioid Use Disorder Research Report* (rev. Dec. 2021), https://nida.nih.gov/download/21349/medications-to-treat-opioid-use-disorder-research-report.pdf.

[34] *Prescription Opioids*, Ctrs. for Disease Control & Prevention (last rev. Aug. 29, 2017), https://www.cdc.gov/opioids/basics/prescribed.html; *see also* Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked and Why It's So Hard to Stop* 22 (2016) (hereinafter, *Drug Dealer, MD*) ("[A]s many as 56 percent of patients receiving long-term prescription opioids for low back pain, for example, progress to addictive opioid use, including patients with no prior history of addiction.").

143.    The result of Defendants' push to normalize the treatment of chronic, noncancer pain with prescription opioids is clearly described by the Department of Veterans Affairs and the Department of Defense:

> Prior to the 1980s, O[pioid] T[herapy] was rarely used outside of severe acute injury or post-surgical pain, primarily due to concern for tolerance, physical dependence, and addiction. As the hospice and palliative care movement began defining end-of-life care in the U.S. during the 1980s and emphasizing the importance of pain relief, OT increasingly became a mainstay for cancer and end-of-life pain. Efforts to destigmatize the use of prescription opioids for chronic non-terminal pain encompassed primary care providers and the public. The efforts led to an unprecedented increase in opioid prescribing for chronic non-terminal pain. Chronic pain management became synonymous with L[ong-term] OT in the 1990s and the first decade of the 2000s with significant numbers of patients in pain clinics receiving LOT. Despite the absence of long-term safety or efficacy data, OT for chronic non-terminal pain became a mainstay of therapy.[35]

144.    This tentative expansion of opioid use for palliative care and cancer pain provided an opportunity that Defendants exploited directly through their characterization of the appropriate use and risk-benefit profile of their own products and indirectly through financing and influencing organizations that promoted increasing the use of opioids to treat an ever-wider variety of chronic conditions. With little to no evidentiary support, Defendants claimed that opioids posed little, if any, risk of addiction when used by patients in pain.

145.    Much of the early work in changing the approach to pain management was made possible through grants by the Robert Wood Johnson Foundation ("RWJF"), which funded initiatives to expand the use of prescription opioids to treat both end-of-life and cancer pain as well as chronic, nonmalignant pain. A primary grantee was the University of Wisconsin Pain & Policy Study Group

---

[35] The Opioid Therapy for Chronic Pain Work Group, U.S. Dep't of Veterans Affairs & U.S. Dep't of Defense, *VA/DoD Clinical Practice Guideline for Opioid Therapy for Chronic Pain* (3d ed. 2017), https://www.va.gov/HOMELESS/nchav/resources/docs/mental-health/substance-abuse/VA_DoD-CLINICAL-PRACTICE-GUIDELINE-FOR-OPIOID-THERAPY-FOR-CHRONIC-PAIN-508.pdf (emphasis added) (hereinafter *VA/DoD 2017 Opioid Guidelines*).

("UW-PPSG") that initially promoted opioid use for end-of-life and cancer care before expanding its advocacy to the use of opioids for other chronic conditions.

146.    One of the primary ways in which Defendants achieved their objective was by manipulating, funding, and, in some cases, founding ostensibly independent organizations to advocate for the wider use of opioids to treat all forms of chronic, noncancer pain, particularly through treatment guidelines.

147.    Such guidelines play a role in establishing best practices for clinicians. Recognizing this fact of modern medical practice, Defendants set their sights on three targets to change prescribing practices and the culture surrounding pain treatment: (1) the Joint Commission of the Accreditation of Healthcare Organizations ("JCAHO"), which established standards that hospitals had to follow to remain accredited; (2) the Federation of State Medical Boards ("FSMB"), which established model standards for doctor discipline; and (3) the Veterans Administration ("VA"), which directly ran a great number of hospitals and clinics. The goal was to convince these organizations to issue treatment guidelines encouraging the regular evaluation of pain and its treatment with prescription opioids.

148.    In this Defendants were successful. The VA and FSMB guidelines supporting the assessment of pain and its treatment via prescription opioids were issued in 1998. JCAHO and the opioid industry (through another front group, the National Pharmaceutical Council) issued joint guidelines in 1999. The changes in these guidelines were so significant from the then-current best practices that hospitals were given two years—until 2001—to implement them.

149.    The slogan, "pain is the fifth vital sign," illustrates just how radical this change was. The addition of pain, a subjective and effectively unquantifiable metric, to the list of vital signs essentially required doctors to treat pain as equivalently important to blood pressure or respiration rate because patients should always receive treatment to bring their vital signs back into a normal

range. In the context of an overburdened health care system, doctors of necessity turned to the fastest-acting tool at their disposal to reduce pain to an acceptable level: prescription opioids.

150.    In the interval before the JCAHO guidelines went into effect, UW-PPSG (funded by the RWJF and the drug industry) led a media campaign directed at doctors, hospitals, and patients to persuade them to adopt these novel practices. According to one expert:

> The funding is really what made it possible for the Pain & Policy Study Group to roll out this new paradigm around pain treatment . . . . Also, the Joint Commission was involved in that process, and they actually received content that was created by Purdue Pharma. That was disseminated to hospitals who were trying to make Joint Commission accreditation. They used videos produced by Purdue. They used documents created by Purdue in order to change the paradigm around opioid prescribing, including promoting opioid—including promoting pain as the fifth vital sign.

151.    As a result of the paradigm shift in the approach to treating chronic pain orchestrated by Defendants through their Front Groups, "Doctors were taught that prescribing opioids for chronic pain was evidence-based medicine even though there was no evidence to support it." Simply put, "these different factions manipulated and misrepresented, deliberately or otherwise, medical science to serve their own agendas."[36]

152.    The results of this paradigm shift in the best practices for the treatment of pain were widespread and affected nearly every aspect of medical practice:

a.    Articles were published in the media describing pain as the fifth vital sign, the assessment of pain as a required practice in hospitals and clinics around the country, and the elimination of pain as a patient right.

b.    Pain scores emphasized the absence of pain as a patient right and documented pain in patient records. Those records became the basis for enforcement activities resulting from JCAHO accreditation audits and effectively forced doctors to treat pain with opioids.

c.    The 1998 FSMB guidelines spurred prescriptions by removing the threat of discipline for doctors who prescribed opioids in violation of what had been

---

[36] *Drug Dealer, MD, supra*, at 57.

accepted best practices prior to Defendants' intervention. Reasonable physicians could conclude that failing to prescribe opioids would expose them to discipline.

d.  Medical schools began teaching pain as the fifth vital sign and the assessment and treatment of pain as part of the core curriculum.

e.  CMEs led by the opioid industry, their Front Groups, and KOLs regularly characterized the use of prescription opioids as best practices even to the exclusion of other recognized and less dangerous treatment modalities.

f.  Once a greater number of patients with chronic, noncancer pain were receiving opioid "therapy," best practices had to evolve to treat the resulting consequences: titration to higher doses for patients presenting with the industry-promoted concept of "pseudoaddiction" as well as higher doses and longer use of opioids when patients presented with withdrawal-like symptoms.

g.  The concept of blaming the patient for drug-seeking behavior took root. Patients moved to illicit heroin and other drugs to address their withdrawal cravings after states and regulatory authorities took steps to reduce opioid prescriptions and prosecute doctors running pill mills.

**C.    Defendants spread falsehoods about the risks and benefits of prescription opioids.**

153.    Defendants were aware that opioids pose significant risks and that the long-term safety and efficacy of opioids for chronic pain has never been established in medical literature. Nevertheless, Defendants intentionally and unlawfully engaged in a misinformation campaign to convince prescribers, legislators, and the public that opioids are appropriate—and even necessary—to treat chronic pain.

154.    The intended effect (which was, in fact, achieved) was to increase opioid prescriptions, thereby increasing Defendants' profit from manufacturing, distributing, and dispensing their opioids.

**1.    Falsehood #1: The risk of addiction to opioids is low.**

155.    Defendants were aware that opioids are highly addictive, that tolerance and physical dependency develop rapidly, and that prescription opioids confer an increased risk of addiction and overdose even in patients who take their medication as prescribed. By the mid-1990s, a number of studies had already demonstrated a high incidence of opioid use disorder among chronic pain patients.

156.    Each Marketing Defendant claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support that claim. None of them have acknowledged, retracted, or corrected their false statements.

157.    A common method, used by various Marketing Defendants, was to point to a one-paragraph letter to the editor published in the *New England Journal of Medicine* ("*NEJM*") in 1980.[37]

### ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154      Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

158.    While first Purdue and then other Marketing Defendants used it to assert that their opioids were not addictive, according to Dr. Jick, "that's not in any shape or form what we suggested in our letter."[38]

159.    The enormous impact of Defendants' misleading amplification of the Porter & Jick Letter was well documented in another letter published in the *NEJM* on June 1, 2017:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare

---

[37] Jane Porter & Hershel Jick, *Addiction Rare in Patients Treated with Narcotics*, 302 New Eng. J. Med. 123 (1980), https://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.
[38] Taylor Haney & Andrea Hsu, *Doctor Who Wrote 1980 Letter on Painkillers Regrets that It Fed Opioid Crisis*, NPR (June 16, 2017), https://www.npr.org/sections/health-shots/2017/06/16/533060031/doctor-who-wrote-1980-letter-on-painkillers-regrets-that-it-fed-the-opioid-crisi.

> with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.[39]

160.    The picture painted by the Porter & Jick Letter regarding short-term therapy in a hospital setting is not consistent with the evidence about long-term opioid therapy for chronic pain. A 2015 systematic review found that the prevalence of misuse following opioid prescriptions for chronic pain was between 21% and 29%, with a prevalence of addiction between 8% and 12%.[40]

### 2.    Falsehood #2: It is easy to identify people at high risk for addiction.

161.    Defendants asserted that even if some patients are at risk of opioid addiction, doctors can effectively identify those patients using screening tools or questionnaires and then manage the risk of addiction by imposing heightened monitoring on patients deemed "at risk."

162.    Defendants created and disseminated these tools to perpetuate the myth that only patients with easily identifiable traits are at risk for addiction and that, by implication, opioids are safe for everyone else.

163.    There is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of opioid use disorder, that high-risk patients identified through screening can take opioids over the long term without triggering opioid use disorder, even with enhanced monitoring, or that patients who are not identified through such screening can take opioids over the long term without significant danger of opioid use disorder.

164.    By ostensibly identifying patients likely to develop opioid use disorder, the tool gave doctors false confidence in their ability to safely prescribe opioids long-term.

---

[39] Pamela T.M. Leung, et al., *A 1980 Letter on the Risk of Opioid Addiction*, 376 N. Engl J. Med. 2194 (June 1, 2017), https://www.nejm.org/doi/full/10.1056/NEJMc1700150#t=article.
[40] Vowles, et al., *supra*.

### 3. Falsehood #3: Signs of addictive behavior are "pseudoaddiction" requiring more opioids.

165. Defendants claimed that the signs of opioid addiction were merely symptoms of "pseudoaddiction," meaning "behaviors (that mimic addictive behaviors) exhibited by patients with inadequately treated pain." Moreover, Defendants claimed that pseudoaddiction should be treated by giving patients higher doses of opioids. The message was that patients exhibiting classic signs of opioid misuse—for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids—did not have or were not developing opioid use disorder, but rather simply suffering from under-treatment of their pain.

166. In reality, such behaviors are frequently, if not usually, indications of opioid use disorder. Defendants knew there was no legitimate evidence to support their claim that doctors should treat signs of addiction as "pseudoaddiction." As late as 2015, an investigative review of medical studies concluded that empirical evidence supporting pseudoaddiction as a diagnosis distinct from addiction had still not emerged.[41]

167. Material supporting the concept of pseudoaddiction includes:

   a. APF's *A Reporter's Guide: Covering Pain and Its Management*

   b. AAPM's CME *The Truth About Pain Management*[42]

   c. FSMB's *Responsible Opioid Prescribing*

   d. *A Clinical Guide to Opioid Analgesia*, written by Drs. Fine and Portenoy and supported by Endo[43]

---

[41] Marion S. Greene & R. Andrew Chambers, *Pseudoaddiction: Fact or Fiction? An Investigation of the Medical Literature* 2 Curr. Addiction Rep. 310 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4628053/pdf/40429_2015_Article_74.pdf.
[42] *The Truth About Pain Management: The Interface of Pain and Addiction*, Am. Acad. Pain Med., https://web.archive.org/web/20080517184137/http://aapm.confex.com/aapm/2007am/techprogram/S1237.HTM (last accessed Aug. 23, 2025 as of May 17, 2008) (hereinafter, *The Truth*).
[43] Perry G. Fine & Russell K. Portenoy, *A Clinical Guide to Opioid Analgesia* 20, 34 (2004).

e. NIPC's *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, sponsored by Endo[44]

f. *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*, supported by Endo[45]

g. *Advances in Opioid Analgesia: Maximizing Benefit While Minimizing Risk*, supported by Endo[46]

h. Janssen's *Let's Talk Pain* website[47]

i. Purdue's *Clinical Issues in Opioid Prescribing* pamphlet posed on *PartnersAgainstPain.com*

j. The FAQ on *pain-topics.org*, funded by Mallinckrodt

k. Cephalon's brochure, *Making Pain Talk Painless: A Guide to Help You Talk with Your Doctor About Pain Management*[48]

l. Dr. Lynn Webster's *Avoiding Opioid Abuse While Managing Pain*, distributed by Endo

### 4. Falsehood #4: Addicted patients are "untrustworthy" "abusers".

168. As it became apparent that individuals were, in fact, misusing opioids that they had been prescribed, Defendants began to blame addiction, overdose, and death on "abuse," in effect

---

[44] Perry Fine, Nat'l Inst. on Pain Control, *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia* (2009).

[45] Bill H. McCarber, *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*, MedScape, https://www.medscape.org/viewarticle/469428

[46] B. Eliot Cole, *Advances in Opioid Analgesia: Maximizing Benefit While Minimizing Risk*, MedScape, https://www.medscape.org/viewarticle/552190_2.

[47] *Understanding Addiction*, Let's Talk Pain, https://web.archive.org/web/20120322234928/http://www.letstalkpain.org/real_story/addictions.html (last accessed Aug. 25, 2023 as of Mar. 22, 2012).

[48] *Making Pain Talk Painless: A Guide to Help You Talk with Your Doctor* (July 2006). This brochure was introduced into evidence in the February 20, 2019 deposition of John Hassler in the opioid litigation brought by the State of Oklahoma available at https://nick-mail.net/marginalia/opioid-cases/oklahoma-opioids-trial/1042898736-20190403-143708-.pdf.

blaming patients for their OUD—rather than accurately identifying the culprit as the marketing and resulting excessive prescription of dangerous opioids.

169.    As early as 2001, Richard Sackler, Purdue's president, wrote in a confidential email exculpating Purdue's marketing of OxyContin: "we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals."[49] He chose to stigmatize people who were hurt by Purdue's opioids, calling them "junkies."[50] Similarly, in December 2011, John Stewart, Purdue's CEO from 2007 to 2013, gave a speech titled *Providing Relief, Preventing Abuse*, which deceptively blamed addiction, overdose, and death on "abuse."

170.    Purdue and other Defendants knew that the tactic of blaming addiction on untrustworthy patients was a lie. The truth is that the real risk of opioid use disorder is not so limited. Purdue internally admitted: "This can happen to anyone—from a 50-year-old woman with chronic lower back pain to an 18-year-old boy with a sports injury, from the very wealthy to the very poor."

171.    Defendants' suggestion that the opioid epidemic is the result of bad patients who manipulate doctors to obtain opioids illicitly helped further their marketing scheme, but it is incorrect. While there are patients who obtain opioids in order to abuse them, they are a small minority. For example, patients who "doctor-shop"—i.e., visit multiple prescribers to obtain opioid prescriptions— are responsible for roughly 2% of opioid prescriptions.[51] The opioid epidemic is overwhelmingly a problem of false marketing and unconstrained distribution of the drugs—not problem patients.

### 5.    Falsehood #5: Opioid withdrawal can be avoided by tapering.

172.    Most patients who have been taking opioids regularly will, upon stopping treatment, experience physically and psychologically painful withdrawal. Defendants deceptively represented that

---

[49] Joanna Walters, *House of Pain: Who are the Sacklers Under Fire in Lawsuits Over Opioids* (July 26, 2019), https://www.theguardian.com/us-news/2019/jul/26/sacklers-opioids-purdue-pharma-oxycontin-opioids.
[50] *Id.*
[51] *Although Relatively Few, "Doctor Shoppers" Skew Opioid Prescribing*, Nat'l Inst. on Drug Abuse (May 27, 2014), https://web.archive.org/web/20230209135632/https://archives.drugabuse.gov/news-events/nida-notes/2014/05/although-relatively-few-doctor-shoppers-skew-opioid-prescribing.

withdrawal is easily managed by tapering a patient's dose of opioids and failed to disclose that withdrawal would be more severe and tapering less effective in patients who had used opioids for a prolonged period.

### 6.    Falsehood #6: Opioid doses can be increased without limit or increased risk.

173.    Defendants misleadingly claimed there was no ceiling on the amount of opioids that can be taken safely. With higher doses, and particularly with the addition of short-acting or immediate-release opioids, the risk of fatal overdose and other adverse effects grows.

174.    These misrepresentations were integral to the Marketing Defendants' promotion of prescription opioids, and they were directed, in key part, toward prescribers, including those working in hospitals. Because patients develop a tolerance to opioids' analgesic effects, achieving long-term pain relief requires constantly increasing the dose. Not only are stronger doses more expensive, but patients who take larger doses or who escalate to larger doses faster are much more likely to remain on opioids for a longer time. The increased revenue that results comes at the cost of increased adverse effects.[52]

175.    The Marketing Defendants' sales representatives aggressively pushed doctors to prescribe stronger doses of opioids. One common technique was to visit doctors regularly, gradually, and dangerously raising their comfort level with prescribing ever-higher doses of opioids. For example, one Purdue sales representative wrote about how his regional manager would drill the sales team on their upselling tactics:

> It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Q12h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Q12h, will you do that?" "Okay." "Doctor, what if that patient then came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q12h,

---

[52] *See* Heidi N. Overton, et al., *Opioid-Prescribing Guidelines for Common Surgical Procedures: An Expert Panel Consensus*, 227 J. Am. Coll. Surgeons 411 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6353661/pdf/nihms-989596.pdf.

> would you do that?" "I don't know, maybe." "Doctor, but you do
> agree that you would at least Rx the 40mg dose, right?" "Yes."

The next week the representative would see that same doctor and go through the same discussion

with the goal of selling higher and higher doses of OxyContin.

176.    Marketing Defendants were aware of the greater dangers high-dose opioids posed. In

2013, the FDA acknowledged "that the available data do suggest a relationship between increasing

opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive

association between high-dose opioid use and the risk of overdose and/or overdose mortality."[53]

### 7.    Falsehood #7: Long-term opioid use improves functioning.

177.    Defendants represented to patients and prescribers that long-term opioid use can

improve the quality of life of patients suffering from chronic conditions.

178.     Defendants knew that these claims were incorrect because they knew that there were

no controlled long-term studies establishing that opioids improve the quality of life in chronic pain

patients—or even that they are effective in improving patients' chronic pain over the long term.[54]

FDA warning letters to manufacturers have pointed out this lack of evidence.[55] These claims are based

on what the CDC has characterized as "insufficient evidence."[56]

---

[53] Letter from Janet Woodcock, Dir. of Ctr. for Drug Evaluation & Research, to Andrew Kolodny, President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf (responding to citizen petition regarding opioid prescribing) (hereinafter "Woodcock-Kolodny Letter").

[54] *Promoting Safer and More Effective Pain Management*, Ctrs. for Disease Control, https://www.cdc.gov/drugoverdose/pdf/guidelines_factsheet-patients-a.pdf; *2016 CDC Guideline*, *supra*, at 20.

[55] *See also* Warning Letter from Thomas Abrams, Dir., Div. of Mktg., Adver., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis US (Feb. 18, 2010), https://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., Div. of Mktg., Adver., & Commc'ns, U.S. Food & Drug Admin., to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008) (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.

[56] *2016 CDC Guideline*, *supra*, at 20.

179.    What evidence there is shows not only that opioids are ineffective for the treatment of chronic pain but also that they worsen patients' health. For example, a 2006 review found that opioids as a class did not demonstrate an improvement in functional outcomes over other non-addictive treatments.[57] The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that opioids for chronic pain may actually worsen pain and functioning . . . ."[58]

180.    In addition, Defendants knew that patients using opioids for chronic pain were at heightened risk of developing opioid use disorder and that long-term opioid use can cause debilitating deterioration in a patient's quality of life. As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[59]

### 8.    Falsehood #8: Opioids are safer than other pain medications.

181.    Defendants misleadingly claimed that opioids are safer than traditional painkillers like acetaminophen and nonsteroidal anti-inflammatory drugs ("NSAIDs") by exaggerating the risks of NSAIDs and trivializing, or simply omitting, the risks of opioids.

182.    These risks, which are not shared or are of much less concern with acetaminophen and NSAIDs, include hyperalgesia;[60] hormonal dysfunction;[61] decline in immune function; mental

---

[57] Andrea D. Furlan, et al., *Opioids for Chronic Noncancer Pain: A Meta-Analysis of Effectiveness and Side Effects*, 174 Can. Med. Ass'n J. 1589 (2006), https://www.cmaj.ca/content/cmaj/174/11/1589.full.pdf.
[58] Thomas Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, 374 New Eng. J. Med. 1503 (2016), https://www.nejm.org/doi/full/10.1056/NEJMp1515917 (hereinafter "*Reducing the Risks of Relief*").
[59] Andrea Rubinstein, *Are We Making Pain Patients Worse?*, 60 Sonoma Med. (Fall 2009).
[60] Woodcock-Kolodny Letter, *supra*.
[61] Harry W. Daniell, *Hypogonadism in Men Consuming Sustained-Action Oral Opioids*, 3 J. Pain 377 (2001), https://www.jpain.org/article/S1526-5900(02)00032-9/fulltext.

clouding, confusion, and dizziness; increased falls and fractures in the elderly;[62] neonatal abstinence

syndrome; and potentially fatal interactions with alcohol.[63]

183.    As a result, opioid prescriptions increased even as the percentage of patients visiting a

doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found

that opioid prescriptions increased from 11.3% to 19.6% of visits, while NSAID and acetaminophen

prescriptions fell from 38% to 29%.[64]

184.    In April 2007, Endo sponsored an article aimed at prescribers, which emphasized the

risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the

danger of extended use of NSAIDs. The article did not provide the same detail concerning the serious

side effects associated with opioids.[65]

### 9.    Falsehood #9: Ostensibly "abuse-deterrent" formulations are safer.

185.    As the opioid crisis intensified, Defendants capitalized on the problem they had

created—the widespread diversion and misuse of opioids—by delaying and marketing formulations

purported to deter abuse and diversion. These purportedly "abuse-deterrent formulations" ("ADFs")

make pills harder to crush, snort, or dissolve and inject.

186.    Websites and message boards reported a variety of ways to tamper with ADFs to

release their opioids immediately, thereby defeating the effectiveness of ADFs.

---

[62] *See* Bernhard M. Kuschel, et al., *The Risk of Fall Injury in Relation to Commonly Prescribed Medications Among Older People – A Swedish Case-control Study*, 25 Eur. J. Pub. Health 527 (2014), https://www.ncbi.nlm.nih.gov/pubmed/25085470.

[63] Karen H. Seal, et al., *Association of Mental Health Disorders with Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307 J. Am. Med. Ass'n 940 (2012), https://jamanetwork.com/journals/jama/fullarticle/1105046.

[64] Matthew Daubresse, et al., *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51 Med. Care, 870 (2013), https://insights.ovid.com/pubmed?pmid=24025657 ("For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady."); *see also* John N. Mafi, et al., *Worsening Trends in the Management and Treatment of Back Pain*, 173 J. Am Med. Ass'n Internal Med. 1573, 1573 (2013), https://www.ncbi.nlm.nih.gov/pubmed/23896698.

[65] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News(Apr. 2007), https://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf.

187.    The CDC Guidelines confirm that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse."[66]

188.    Defendants also knew that these formulations did nothing to reduce the likelihood that a patient taking a pill orally for medical use would develop opioid use disorder.

### 10.    Falsehood #10: Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain.

189.    Defendants disseminated the idea that short-acting or immediate-release opioids should be taken in conjunction with long-acting or extended-release opioids to treat "breakthrough pain" for a variety of common chronic conditions. While breakthrough pain is recognized in cancer patients, Defendants broadened the definition to include a transitory flare of moderate-to-severe pain that occurs in any patient with otherwise persistent pain.

190.    Some short-acting opioids used to treat breakthrough cancer pain contain fentanyl. Fentanyl treatments for breakthrough pain are deadly for people who are not already tolerant of opioids. They have never been accepted as a safe treatment for non-cancer chronic pain.

191.    As part of their campaign to expand the market for their opioid products, Defendants marketed high-risk fentanyl-based opioids to fill that "need" in patients taking opioids for chronic conditions, even though Defendants knew that the safety of such use had never been established and that fentanyl-based opioids come with heightened risk.

### 11.    Falsehood #11: Despite heightened risk factors, the elderly and veterans can safely use opioids.

192.    Defendants aggressively marketed opioids as safe and effective for high-risk groups. For example, Defendants marketed opioids to veterans, even though opioids can cause fatal

---

[66] Ctrs. for Disease Control & Prevention, *CDC Guideline for Prescribing Opioids for Chronic Pain, 2016*, Morbidity & Mortality Weekly Rep. (Mar. 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (hereinafter, "*2016 CDC Guidelines*").

interactions with benzodiazepines, a common treatment for PTSD. Defendants did so without addressing these risks.

193.    For instance, in 2009 the American Pain Foundation published *Exit Wounds: A Survival Guide to Pain Management for Veterans and their Families*; this publication was sponsored by Purdue, among others.[67] *Exit Wounds* described opioids as the "gold standard" of pain medications, as "often underused," and as drugs that can "increase [your] level of functioning." The publication further stated, "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications." *Exit Wounds* did not address the significant dangers of taking benzodiazepines with opioids. The book encouraged veterans that they "may need to push" doctors "hard" to get their preferred pain treatment. The publication further suggested that patients should plan for a "recurrence of pain" by "having a supply of a pain medication on hand."[68]

194.    Janssen and Purdue both paid for APF to distribute *Exit Wounds*.

195.    Defendants also aggressively marketed opioids to elderly patients, even though the elderly suffer the same risk of dependence and tolerance that other opioid users experience. In fact, opioid use by older adults comes with additional risks, such as mental confusion and falls. Older adults also often take multiple medications, which can lead to dangerous interactions between opioids and other drugs. And, as people age, medications affect them more strongly and leave their system more slowly.

196.    Elderly patients frequently suffer from osteoarthritis, but opioids are not approved to treat that condition. Purdue conducted a single study on osteoarthritis for its Butrans opioid, and it failed.[69] Nevertheless, to meet its business goals, Purdue trained its representatives to mislead doctors by promoting opioids for osteoarthritis without disclosing the failed trial.

---

[67] Derek McGinnis, *Exit Wounds: A Survival Guide to Pain Management for Veterans and Their Families* (2009).
[68] *Id.*
[69]    *Efficacy    and    Safety    Evaluated    in    Opioid-Experienced    Patients*,    Butrans,

197.    A non-credit educational program sponsored by Endo, *Persistent Pain in the Older Adult*, misleadingly claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days and that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

198.    Janssen co-sponsored an APF publication that sought to normalize opioid treatment for the elderly.[70]

* * * * * * *

199.    In sum, each of these misrepresentations regarding the use of opioids to treat chronic pain was either not supported by or was contrary to the scientific evidence. Through these and other misrepresentations, Defendants misinformed and continue to misinform the medical community and the public about the risks of opioid use.

### D.    Defendants used a campaign of misinformation to publicize these falsehoods and convince prescribers, legislators, and the public of their truth.

200.    Defendants did not merely spread their misinformation through their own employees and publications. They recognized that their message would more strongly influence prescribers if it appeared to come from purportedly independent sources. Defendants, therefore, used multiple, mutually reinforcing channels to spread their deceptive claims, including: (1) direct, targeted communications with prescribers by sales representatives or "detailers"; (2) "Front Groups" with the appearance of independence from the Marketing Defendants; (3) Key Opinion Leaders ("KOLs"), that is, doctors paid by the Marketing Defendants to promote their pro-opioid message; (4) mechanisms of disseminating their misleading messages through reputable organizations; (5) CME

---

https://web.archive.org/web/20230329233134/https://butrans.com/clinical-data/trial-results.html (last visited Aug. 25, 2023 as of Mar. 29, 2023).

[70] Am. Pain Found., *Special Considerations: Pain in Specific Populations* (Nov. 2008).

programs controlled and/or funded by the Marketing Defendants; (6) branded advertising; (7) unbranded advertising; (8) publications; and (9) speakers' bureaus and programs.

### 1. Defendants used "detailers" to disseminate their misrepresentations directly to prescribers.

201.    The Marketing Defendants employed numerous sales representatives (also called "detailers") to call and visit healthcare providers and deliver deceptive messages about opioids. These in-person sales calls are called "detailing."

202.    The Marketing Defendants identified and targeted susceptible prescribers by, for example, focusing on primary care doctors, who were more likely to prescribe drugs to chronic pain patients, but less likely to be educated about treating pain; such doctors were more likely to accept the Marketing Defendants' misrepresentations.

203.    Defendants trained these representatives to evade prescribers' questions regarding opioids' addictiveness and to misrepresent and conceal facts relating to opioid safety.

204.    Defendants prepared brochures, videos, and other marketing materials containing misrepresentations for sales representatives to distribute to providers during in-person visits.

205.    The Marketing Defendants devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, the Marketing Defendants spent $166 million to detail branded opioids to doctors. This amount is twice as much as the Marketing Defendants spent on detailing in 2000. The amount included $108 million spent by Purdue, $34 million by Janssen, $13 million by Teva, and $10 million by Endo. These companies would not have spent so lavishly had detailing not been effective at increasing the prescribing rates.

206.    For example, former Purdue sales representative Steven May explained that he and his coworkers were trained to "refocus" doctors on "legitimate" pain patients and to represent that "legitimate" patients would not become addicted. In addition, they were trained to say that 12-hour

dosing made the extended-release opioids less "habit-forming" than painkillers that need to be taken every four hours.[71]

207.    Janssen detailers took advantage of Ultram's unscheduled status to leave free samples with doctors to encourage the patients to begin to use (and continue to use the drug). There were numerous reports of physicians developing OUD from use of these free samples. During their presentations to doctors, Janssen's detailers frequently touted Ultram's supposed low or nonexistent potential for abuse and inaccurately compared its risks to those of NSAIDs.

208.    Detailing had the intent and effect of making the detailed prescriber more willing to prescribe not only the detailing manufacturer's opioids, but also opioids as a class of drugs.

**2.    Defendants used Front Groups to promote greater opioid use.**

209.    Defendants, led by the Marketing Defendants, spread misinformation through front groups that were created to appear to be independent, neutral, third parties (the "Front Groups"), but were in fact funded and influenced by Defendants.

210.    Some of the Front Groups were professional associations whose independence was compromised by their reliance on funding from Defendants and their use of that funded to engage in activities the promoted the greater use of prescription opioids. Examples of these sorts of Front Groups include the American Pain Society, the American Geriatrics Society, and the American Academy of Pain Medicine.

211.    Other Front Groups appeared to be patient advocacy groups, but were, in fact funded and supported almost entirely by Defendants and other manufacturers and marketers of prescription opioids and existed to promote the wider use of prescription opioids. Examples of these included the American Pain Foundation and the C.A.R.E.S. Alliance.

---

[71] David Remnick, *How OxyContin Was Sold to the Masses* (Steven May interview with Patrick Radden Keefe), New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the-masses.

212.     These Front Groups released patient education materials, treatment guidelines, and CMEs that, despite the absence of evidence, overstated the benefits and understated the risks of using opioids to treat chronic pain. [72] Defendants then used, referenced, and distributed these ostensibly neutral materials to support for their marketing claims.

213.     Treatment guidelines released by Front Groups are especially influential with primary care physicians and family doctors whose lack of specialized training in pain management made them more reliant on and less able to evaluate these guidelines.

214.     Defendants funded these Front Groups in order to ensure supportive messages from seemingly neutral and credible third parties, and this funding did, in fact, ensure such supportive messaging.

215.     A 2017 U.S. Senate investigation found that the Marketing Defendants made millions of dollars' worth of contributions to various Front Groups.[73] The Front Groups "amplified or issued messages that reinforce[d] industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain."[74] The report also found that these groups "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over prescription and misbranding."[75]

### a.  American Pain Foundation

216.     The most prominent of the Front Groups was the American Pain Foundation ("APF").

---

[72] U.S. Senate Homeland Sec. & Governmental Affairs Comm., Ranking Members' Office, *Fueling an Epidemic, Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* 2 (Feb. 12, 2018), https://www.hsdl.org/?abstract&did=808171 (hereinafter *Fueling an Epidemic Part Two*).
[73] *Id.* at 3.
[74] *Id.* at 12–15.
[75] *Id.* at 12.

217.    Although APF held itself out as an independent patient advocacy organization, it was funded almost entirely by the pharmaceutical industry. For instance, it received 88% of its funding in 2010 from drug manufacturers, including Janssen and Cephalon. In all, APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. By 2011, APF was entirely dependent on incoming grants from Purdue, Cephalon, Endo, and others to avoid using its line of credit.

218.    This funding was not disinterested. As Purdue told APF in 2001, the basis of a grant to the organization was Purdue's desire to invest in nonprofits that shared its business interests. As a result, APF submitted grant proposals seeking to fund activities and publications suggested by Defendants and assisting in marketing projects for Defendants.

219.    This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives. A "Master Consulting Services" Agreement executed September 14, 2011, gave Purdue substantial rights to control APF's work related to a specific promotional project. The agreement also gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason.

220.    APF's Board of Directors was largely comprised of doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events.

221.    APF also developed materials and initiatives intended to influence prescribers and patients through the media. For example, APF published *A Reporter's Guide: Covering Pain and Its Management*, which claimed that "the potential for addiction is low for the vast majority of patients using opioids for the long-term management of chronic pain." The guide argued that under-treatment of pain is a greater concern than addiction and asserted that, "[u]nless a patient has a past or current history of substance abuse, the potential for addiction is low." It warned reporters that "misunderstandings" about physical dependence and tolerance "reinforce the stigma surrounding

legitimate medical use of these medicines" and "fuel fears of addiction" that "may impinge on patient access to these medications."

222.    APF published a guide sponsored by Cephalon and Purdue, *Treatment Options: A Guide for People Living with Pain*, and distributed 17,200 copies of this guide in 2007 alone. This guide contains multiple misrepresentations regarding opioid use, including that opioids are an appropriate first-line therapy for chronic pain.[76]

223.    *Treatment Options* also represented the risk of death as a reason to avoid NSAIDs and warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. Under a heading asking "[s]hould I take these pain medicines?", the publication claimed that "NSAIDs can cause life-threatening side effects in some persons" and that "[t]here are 10,000 to 20,000 deaths each year because of the side effects of this class of medicines,"[77] when the actual figure is closer to 3,200.[78] In contrast, *Treatment Options* posed no such question about the appropriateness of opioids. Rather, the publication stated that opioids could be "increased over time" and that there was "no ceiling dose as there is with the NSAIDs."[79] This comparison is deceptive because opioids also pose severe and life-threatening effects, particularly at higher doses, and more people die each year from opioid use than from NSAID use.

224.    The publication dismissed the concern that an "average person" could become addicted to opioids and blamed this concern for doctors' hesitation to write opioid prescriptions and for the fact that opioids were, as a result, "under-used." It also claimed that withdrawal can be

---

[76]    Am. Pain Found., *Treatment Options: A Guide for People Living with Pain*, https://web.archive.org/web/20220812235117/https://ce4less.com/Tests/Materials/E019Materials.pdf (last visited Aug. 25, 2023 as of Aug. 12, 2022) (hereinafter *Treatment Options*).

[77]    *Id.*

[78]    Robert E. Tarone, et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. Therapeutics 17 (2004), https://pubmed.ncbi.nlm.nih.gov/14704592/.

[79]    *Treatment Options, supra.*

prevented by slowly reducing the dose, without addressing that many people have an extremely difficult time weaning themselves off opioids once they become physically dependent.[80]

225.    Cephalon supported another APF publication called *Target Chronic Pain Notebook*.[81] This publication was cited in later KOL materials, such as "Consensus Panel Recommendations" regarding breakthrough pain (which were themselves based on a meeting that was also supported by Cephalon), which promoted the idea of using immediate-release opioids to treat "breakthrough" pain in patients without cancer.

226.    APF also developed the National Initiative on Pain Control (the "NIPC"), which ran a facially unaffiliated website, *painknowledge.org*. NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field. NIPC published unaccredited[82] prescriber education programs, including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing the programs' content; and distributing NIPC materials. Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or on *painknowledge.org*. Endo estimated it would reach 60,000 prescribers through NIPC.[83]

227.    This website proclaimed that "[p]eople who take opioids as prescribed usually do not become addicted" and that opioid dosages should be raised until "you are on the right dose of medication for your pain," without addressing the dangers that high doses of opioids present to patients. The website listed certain adverse effects from opioids but omitted the severe adverse effects

---

[80] *Id.*

[81] Am. Pain Found., *Target Chronic Pain Notebook* (rev. ed. Mar. 2008), https://nebula.wsimg.com/392ead060392f7d4fe593c5417233921?AccessKeyId=BFACF0D24D833A99FAF8&dispositi on=0&alloworigin=1.

[82] Accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies.

[83] Endo Pharmaceuticals, *Risk Minimization Action Plan for OPANA ER (Oxymorphone Hydrochloride) Extended-Release Tablets* (June 2007) (hereinafter, *Opana REMS*).

of hyperalgesia, immune system and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. *Painknowledge.org* represented that, with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."[84] The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

228.    *Pain: Opioid Facts*, a brochure available on *Painknowledge.org*, stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."[85]

229.    APF was often called upon to provide "patient representatives" for the Marketing Defendants' promotional activities, including for Janssen's *Let's Talk Pain*.

230.    Endo utilized APF to spread its message by supporting the publication of *Reading This Could Help Ease Your Pain: Pain Action Guide*, which included misrepresentations such as "Pain medications rarely cause addiction. . . . Unless you have a history of substance abuse, there is little risk of addiction when these medications are properly prescribed by a doctor and taken as directed."[86]

231.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use. This publication also claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and

---

[84]    *Pain:    Opioid    Therapy*,    painknowledge.org, https://web.archive.org/web/20101007083722/http://painknowledge.org/patiented/pdf/B697_%20Patient%20Hand out_FINAL.pdf (last accessed July 13, 2021 as of Jan. 19, 2012).
[85]    *Pain:    Opioid    Facts*,    painknowledge.org, https://web.archive.org/web/20120112051109/http://www.painknowledge.org/patiented/pdf/Patient%20Education %20b380_b385%20%20pf%20opiod.pdf (last accessed July 14, 2021 as of Jan. 19, 2012).
[86] Am. Pain Found., *Reading This Could Help Ease Your Pain: Pain Action Guide* (2000).

health-related quality of life for chronic pain patients. But the article cited as support stated the contrary, noting the absence of long-term studies and concluding, "For functional outcomes, the other analgesics were significantly more effective than were opioids."

### b. American Academy of Pain Medicine and the American Pain Society

232.    The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies that received substantial and regular funding from Defendants who were thus able to wield influence over them.

233.    Through 2019, AAPM received lavish funding totaling nearly $10 million from opioid manufacturers. Purdue paid $2,798,769; J&J paid $570,174; Janssen paid $562,674; Insys paid $52,725; and Teva and Cephalon contributed over $1 million. In 2011 alone, AAPM received $1.3 million from pharmaceutical companies.

234.    As to APS, Purdue paid $3,418,210; J&J paid $1,793,906; Endo paid $5,208,065; and Janssen paid $60,000. Altogether, opioid manufacturers contributed over $12 million through 2019.[87]

235.    AAPM's past presidents include Drs. J. David Haddox, Scott Fishman, Perry G. Fine, and Lynn Webster, all of whom have well-documented connections to opioid manufacturers. In this way, Defendants were able to influence AAPM.

236.    In 1997, AAPM and APS jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk of addiction to opioids was low.[88] The consensus statement remained on AAPM's website until 2011.

---

[87] Sen. Chuck Grassley & Sen. Ron Wyden, Senate Fin. Comm., *Findings from the Investigation of Opioid Manufacturers' Financial Relationships with Patient Advocacy Groups and Other Tax-Exempt Entities* 19–37 (Dec. 16, 2020) (hereinafter *December 2020 Senate Bipartisan Opioids Report*).
[88] Am. Acad. of Pain Med. & Am. Pain Soc'y, *The Use of Opioids for the Treatment of Chronic Pain* (1997).

237.    The AAPM offered a CME on *The Truth About Pain Management* in conjunction with a 2007 annual meeting where the chief lecturer had financial ties to Cephalon and Purdue.[89]

238.    AAPM and APS issued their own guidelines in 2009 (the "2009 Guidelines") with Defendants' assistance, prompting, involvement, and funding. The 2009 Guidelines recommended the use of opioids to treat chronic pain and the use of screening tools to identify patients at a purportedly high risk of addiction. The panel made these recommendations even though *none* of its recommendations were "supported by high quality evidence," and only four of its 25 recommendations were supported "by even moderate quality evidence."[90]

239.    Attesting to Defendants' influence, 14 of the 21 panel members, including KOLs Drs. Fine and Portenoy, received support from the Marketing Defendants: six from Purdue, eight from Teva, nine from Janssen, and nine from Endo.[91]

240.    The Marketing Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of supporting evidence, the Marketing Defendants' involvement, or their financial backing of the guidelines' authors. For example, a 2009 speaker presentation prepared by Endo, *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain*, used the 2009 Guidelines while omitting their disclaimer about the lack of evidence for recommending the use of opioids for chronic pain.

241.    Cephalon promoted the 2009 Guidelines for use of opioids for noncancer patients.

### c.  Federation of State Medical Boards

---

[89] *The Truth*, *supra*.
[90] Roger Chou, et al., Am. Pain Soc'y & Am. Acad. of Pain Med. Opioids Guidelines Panel, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 J. Pain 113 (2009), https://www.jpain.org/action/showPdf?pii=S1526-5900%2808%2900831-6.
[91] *Id.*

242.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. These boards have the power to license doctors, investigate complaints, and discipline physicians.

243.    The FSMB finances opioid- and pain-specific programs through grants from Defendants. For instance, the FSMB sponsored an online CME available for credit entitled *Extended Release and Long Acting Opioids: Assessing Risks, Safe Prescribing* that included some of the misrepresentations described above.[92]

244.    Since 1998, the FSMB has been developing guidelines for the use of opioids for treating pain. The 1998 version, *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* (the "1998 Guidelines")[93] was produced "in collaboration with pharmaceutical companies." Purdue paid $100,000 for the printing and distribution of FSMB's Guidelines.[94]

245.    The 1998 Guidelines taught that opioids are "essential" for treating chronic pain, including as a first-line therapy.[95] A 2004 iteration of the 1998 Guidelines made the same claims.[96]

246.    The Marketing Defendants used the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline. FSMB thus turned doctors' fear of discipline on its head.

247.    FSMB's 2007 publication, *Responsible Opioid Prescribing*, was backed largely by drug manufacturers, including Purdue, Endo, Cephalon, and Abbott. This publication was also supported

---

[92] Opioid CME, CME List, https://www.cmelist.com/opioid-cme/ (last visited Aug. 25, 2023).
[93] *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*, Fed. St. Med. Bds. (May 1998), https://web.archive.org/web/19990202032433/http://www.fsmb.org/pain.htm (last accessed July 13, 2021 as of Feb. 2, 1999) (hereinafter *1998 FSMB Guidelines*).
[94] John Fauber, *Follow the Money: Pain, Policy, and Profit*, MedPage Today (Feb. 19, 2012), https://www.medpagetoday.com/neurology/painmanagement/31256.
[95] *1998 FSMB Guidelines*.
[96] *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*, Fed. St. Med. Bds. (May 2004), https://web.archive.org/web/20050103015118/http://www.fsmb.org/ (click "Pain Policy Research Center"; then click "Model Policy") (last accessed July 13, 2021 as of Jan. 3, 2005).

by APF and AAPM; Dr. Fishman wrote the text[97] and Dr. Fine served on the Board of Advisors.[98] *Responsible Opioid Prescribing* made claims similar to those in the 1998 Guidelines. This publication inaccurately claimed that "[m]ultiple clinical studies" showed that opioids improved daily function, psychological health, and overall quality of life for those suffering from chronic pain.[99]

248.    The FSMB website described *Responsible Opioid Prescribing* as the "leading continuing medical education (CME) activity for prescribers of opioid medications."[100] Endo sales representatives distributed copies of *Responsible Opioid Prescribing* with a special introductory letter from Dr. Fishman. Evidencing its influence, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards.[101] Copies were also given away for free by Mallinckrodt's C.A.R.E.S. Alliance.[102]

249.    A 2012 update still assured physicians that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins."[103]

250.    The Marketing Defendants made additional contributions to the FSMB to further their misleading advertising. For example, Purdue paid FSMB $822,400.06 over 8 years.[104] Cephalon paid FSMB a total of $180,000 in 2007, 2008, and 2011.[105] Endo paid FSMB $371,620 over a 5-year period.[106] Mallinckrodt paid FSMB $100,000 in 2011.[107]

---

[97] In the same year as this publication appeared, Dr. Fishman received funding from Abbott.

[98]                *Project                Sponsors*,                Fed'n                St.                Med.                Bds., https://web.archive.org/web/20071112193505/http://www.fsmb.org/RE/PAIN/projectsponsors.html (last accessed July 13, 2021 as of Nov. 12, 2007).

[99] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* (2007) (hereinafter, *Responsible Opioid Prescribing*).

[100]        *Responsible        Opioid        Prescribing:        A        Clinician's        Guide*,        Fed'n        St.        Med.        Bds., https://web.archive.org/web/20130115014329/http://www.fsmb.org/book/ (last accessed July 13, 2021 as of Jan. 15, 2013).

[101]        Email        from        Dr.        Scott        Fishman        to        Charles        Ornstein        (Dec.        15,        2011), https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf.

[102] *C.A.R.E.S. Alliance Tools*, *supra*, at 8.

[103] *Id.*

[104] Letter from Humayun J. Chaudhry, President and CEO, FSMB, to the Hon. Max Baucus and Hon. Charles Grassley, U.S. Senate (June 8, 2012), https://s3.documentcloud.org/documents/3109089/FSMB-Response-Letter-to-US-Senate.pdf.

[105] *Id.*

[106] *Id.*

[107] *Id.*

### d.  The University of Wisconsin Pain and Policy Study Group

251.    The Pain and Policy Study Group at the University of Wisconsin was instrumental in providing purportedly scientific and academic rationale for increased use of prescription opioids. Led by two non-physicians: Aaron Gilson (who holds a PhD in social welfare) and David Joranson (who holds a masters in social work), the PPSG relentlessly advocated for the removal of restrictions designed to monitor and keep careful controls over the use of dangerous prescription opioids. The group's goal was to increase the use of prescription opioids by downplaying consequences associated with the widespread availability of prescription opioids, including misuse and substance use disorder.

252.    All the while, the UW-PPSG was accepting millions of dollars from opioid manufacturers, including Purdue and the Robert Wood Johnson Foundation, closely affiliated with and receiving financial support from J&J and its stock.

253.    UW-PPSG used resources, particularly from the RWJF, to pressure the Joint Commission to change its standards for treating pain. UW-PPSG also pressured FSMB to change its model regulations on pain treatment. Both of these changes were designed to and had the effect not merely of increasing attention to pain, but of requiring its treatment with prescription opioids.

### e.  The Joint Commission

254.    The Joint Commission f/k/a the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO" prior to 2007 and "Joint Commission" thereafter) is the oldest and largest healthcare standards-setting and performance-improvement organization in the United States.

255.    Hospitals view losing Joint Commission accreditation as a disaster because the loss of accreditation means losing an automatic right to participate in Medicare and Medicaid and can also cause private insurers to refuse to pay for hospital care.[108]

---

[108] Terry Richards, *Consultant: Loss of Hospital Accreditation Can Be Catastrophic* (Sept. 27, 2018), https://www.valdostadailytimes.com/news/local_news/consultant-loss-of-hospital-accreditation-can-be-catastrophic/article_169da87d-3eb5-5aca-a4ee-f32409481b07.html.

256.    Defendants made it their primary goal in the late 1990s to influence JCAHO to enact standards making pain the "fifth vital sign," thereby encouraging (and in some cases all but requiring) the use of opioids to treat hospital patients' pain.

257.    The Marketing Defendants advanced their campaign of deception to influence JCAHO to enact favorable pain standards through Front Groups such as APF, APS, and UW-PPSG, whose efforts to advocate for the assessment and treatment of pain and to minimize the risks of addiction from opioids were financed primarily by the Robert Wood Johnson Foundation, an organization that still holds a significant amount of J&J stock.

258.    Supported by these entities and the efforts of the Marketing Defendants, JCAHO enacted Pain Standards in 1999. Because the JCAHO Standards totally transformed the standard of care for treating pain in hospitals and other healthcare organizations, their effective date was delayed until 2001. In the interim, JCAHO, the Marketing Defendants, and Front Groups and KOLs supported by the Marketing Defendants engaged in a well-financed effort to persuade hospitals, prescribers, and even consumers to adopt the messages embodied in the new standards: opioids should be used to treat pain and were not addictive when so used.

259.    The Marketing Defendants provided additional financial support to JCAHO while it was developing a pain care guide and other materials to be distributed to hospitals and pain care providers that reflected the JCAHO Standards. Purdue reported paying over $2.1 million directly to JCAHO from 2000 to 2002, including $560,000 in 2000; $981,359 in 2001; and $582,649 in 2002. J&J contributed $14,919 in 2001 and $498,791 in 2011.

260.    In 2000, Purdue sponsored a JCAHO book that falsely claimed that "there is no evidence that addiction is a significant issue when persons are given opioids for pain control."[109] It also misleadingly called doctors' concerns about addiction side effects "inaccurate and exaggerated."[110]

261.    In October 2001, Purdue paid $58,272 to fund a JCAHO publication, *Pain Assessment and Management: An Organizational Approach*. In August 2000, Purdue also paid $85,000 to fund two JCAHO videos for "Pain Management in Special Populations: Geriatric and Disease Related Pain."[111]

262.    In 2001, Janssen provided $66,000 in funding to JCAHO for the "Pain Management: An Overview for Clinicians" audioconference.[112]

263.    The National Pharmaceutical Counsel ("NPC") paid $155,104 between 2001 and 2002 for JCAHO to develop "a monograph designed as a reference for clinicians, quality professionals, researchers and others involved in performance assessment, improvement, education, and policy decisions related to pain management within healthcare organizations."[113] This monograph, *Pain: Current Understanding of Assessment, Management and Treatments*, was published in December 2001 and required assessment of pain in all patients.[114]

264.    Abbott provided support for JCAHO and instructed its sales force to leverage the new pain guidelines, which had been made part of the accreditation requirements for hospitals, by reminding doctors and hospitals that if they did not treat pain, they could risk the hospital's accreditation.

---

[109]    Sonia Moghe, *Opioid History: From 'Wonder Drug' to Abuse Epidemic*, CNN (Oct. 13, 2016), https://www.cnn.com/2016/05/12/health/opioid-addiction-history/ (hereinafter *Wonder Drug*).
[110]    *Id.*
[111]    *December 2020 Senate Bipartisan Opioids Report, supra*, at 6.
[112]    *Id.*
[113]    *Id.* (quoting letter from Mark Chassin, President, The Joint Commission, to Sen. Baucus & Sen. Grassley (June 2012)).
[114]    Nat'l Pharm. Council & Joint Comm'n on Accreditation of Healthcare Orgs., *Pain: Current Understanding of Assessment, Management, and Treatments* (Dec. 1999), https://www.npcnow.org/sites/default/files/media/Pain-Current-Understanding-of-Assessment-Management-and-Treatments.pdf.

265.    According to records of the Joint Commission, Abbott contributed to the Joint Commission in March 2003 for "honoraria and related expenses" concerning "Topic: JCAHO Standards Related to Sedation, Pain Management and Restraint issues" and additional funds in October 2010 for "honoraria and related expenses" concerning "Topic: How Quality Measures are Developed and Used by Providers/Payer."

266.    The result of the change that the JCAHO standards prompted by the activities of the Marketing Defendants and their Front Groups was to increase opioid prescribing and administration within hospitals, which were effectively forced to comply with these new standards.

267.    The result of the change that the JCAHO standards prompted by the activities of the Marketing Defendants and their Front Groups was to increase opioid prescribing and administration within hospitals, which were effectively forced to comply with these new standards.

### f.    Alliance for Patient Access

268.    Founded in 2006, the Alliance for Patient Access ("AfPA") styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[115] It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[116] As of June 2017, the AfPA listed 30 "Associate Members and Financial Supporters," including J&J, Endo, Mallinckrodt, Purdue, and Cephalon.

269.    AfPA's board members have also received substantial funding from pharmaceutical companies.[117] For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu") received

---

[115] Anne Marie Hummel, *New Treatments Provide Hope for Respiratory Patients*, Am. Ass'n for Respiratory Care (May 19, 2021), https://www.aarc.org/an21-new-treatments-provide-hope-for-respiratory-patients/; *see also About AfPA*, Alliance for Patient Access, https://allianceforpatientaccess.org/about (last visited Aug. 25, 2023). References herein to AfPA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.

[116] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access Uses Journalists and Politicians to Push Big Pharma's Agenda*, Health News Rev. (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/.

[117] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, https://projects.propublica.org/docdollars/.

more than $800,000 from 2013 through 2015 from pharmaceutical companies—nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from Endo, Purdue, Cephalon, and nonparty Insys. Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed an Insys opioid.[118] Other board members have included Dr. Robert A. Yapundich, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by Cephalon and Mallinckrodt; Dr. Jack D. Schim, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including Endo, Mallinckrodt, and Cephalon; Dr. Howard Hoffberg, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including Endo, Purdue, Mallinckrodt, and Cephalon; and Dr. Robin K. Dore, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

270.    Among its activities, AfPA issued a white paper, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse.*[119] The white paper criticizes prescription monitoring programs, which are vital tools in reducing diversion and opioid misuse.

### g. American Geriatrics Society

271.    The American Geriatrics Society ("AGS") was another Front Group with systematic connections to the Marketing Defendants. The Marketing Defendants used the AGS to target the elderly by advocating for increased treatment of the elderly with opioids.

272.    AGS was a large recipient of contributions from the Marketing Defendants, including Endo, Purdue, and Janssen. Between 1997 and 2012, Purdue contributed a total of $443,548, and J&J contributed $565,626.[120] Purdue paid an additional $11,785 from 2012 to 2017[121] and provided $40,000

---

[118] Andy Marso, *FBI Seizes Records of Overland Park Pain Doctor Tied to Insys*, Kan. City Star (July 19, 2017), https://www.kansascity.com/news/business/health-care/article162569383.html.
[119] Inst. for Patient Access, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse*, (Oct. 2013), http://alliancebpm.wpengine.com/wp-content/uploads/2016/05/2014-11-13-pt-white-paper-final-1-1-pdf.pdf.
[120] *December 2020 Senate Bipartisan Opioids Report, supra*, at 22–23.
[121] *Fueling an Epidemic Part Two, supra*, at 4.

in "corporate roundtable dues" to AGS's Health in Aging Foundation, an affiliated 501(c)(3) organization between 2012 and 2015.[122]

273.    AGS contracted with Purdue, Endo, and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 called *The Management of Persistent Pain in Older Persons* ("2002 AGS Guidelines"),[123] and again in 2009, this time called *Pharmacological Management of Persistent Pain in Older Persons* ("2009 AGS Guidelines").[124] Purdue, Janssen, and Endo also participated in the production of these guidelines, whose authors included a number of paid consultants to Endo, Janssen, Purdue, and Cephalon.  Purdue sponsored CMEs based on these guidelines.

274.    The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy." The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable even in patients with a prior history of drug abuse.[125] These Guidelines further advised that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." These recommendations are not supported by any study or other reliable scientific evidence.

275.    AGS's common purpose with the Marketing Defendants is evidenced by the fact that AGS's internal discussions in August 2009 reveal that it did not want to receive up-front funding from drug companies as that would suggest drug company influence. Instead, AGS opted to accept commercial support to disseminate pro-opioid publications.

276.    Members of the AGS Board of Directors were doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events.

---

[122] Letter from Nancy E. Lundebjerg, CEO, Am. Geriatrics Soc'y, to Sen. Claire McCaskill (Oct. 11, 2017).
[123] AGS Panel on Persistent Pain in Older Persons, *The Management of Persistent Pain in Older Persons*, 50 J. Am. Geriatrics Soc'y S205 (2002), https://pubmed.ncbi.nlm.nih.gov/12067390/.
[124] AGS Panel on Pharmacological Management of Persistent Pain in Older Persons, *The Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331 (2009), https://www.ncbi.nlm.nih.gov/pubmed/19573219 (hereinafter *2009 AGS Guidelines*).
[125] *Id.* at 1342.

277.    AGS, along with AAPM, served as a "partner" in a 2009 Janssen-sponsored publication, *Finding Relief: Pain Management for Older Adults*, which was distributed by Janssen's sales force.[126]

278.    *Finding Relief* described the addictive qualities of opioids as a myth and mischaracterized dose limitations as "disadvantages" of alternative pain management medications without discussing the risks associated with increasing opioid dosages. *Finding Relief* described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "increase[d] risk of heart attack and stroke." The only adverse effects of opioids listed are constipation and "upset stomach or sleepiness," which the brochure claims will go away.[127]

### h. American Chronic Pain Association

279.    After the American Chronic Pain Association ("ACPA") was founded in 1980, it became influenced by the opioid industry. The organization received funding from opioid makers, medical device manufacturers, and companies that market opioid therapies for opioid-related conditions. These payments funded materials that "appear to help sell products sold by opioid manufacturers, discussed opioid therapy while sidestepping the addictive nature of drugs, and attributed responsibility for overdoses for people who misuse opioids."[128]

280.    Between 2012 and 2018, contributions to ACPA totaled $3,193,795 and included the following amounts from the Marketing Defendants: Teva ($1,005,975); Endo ($399,250); Purdue ($386,470); J&J ($120,000); Mallinckrodt ($55,775); Janssen ($25,000); and Cephalon ($10,000).[129]

---

[126] Am. Acad. of Pain Med., *Finding Relief: Pain Management for Older Adults* (2009) (hereinafter *Finding Relief*).
[127] *Id.*
[128] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 10–12 (and authorities cited therein).
[129] *Id.* at 31.

281.    Between 2013 and 2016, 10 members of ACPA's Advisory Board received more than $140,000 from opioid manufacturers.

### i.    C.A.R.E.S. Alliance

282.    In 2010, Mallinckrodt created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, which it describes as a "patient safety initiative which provides education and tools to healthcare professionals and patients to support responsible opioid prescribing and safe use."[130] Materials distributed by the C.A.R.E.S. Alliance include unbranded publications promoting the use of opioids to treat noncancer chronic pain that do not disclose the link to Mallinckrodt. For example, by 2012 the C.A.R.E.S. Alliance was promoting the book *Defeat Chronic Pain Now!* to doctors and patients.[131]

283.    False claims and misrepresentations in *Defeat Chronic Pain Now!* include:

a.    "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

b.    "It is currently recommended that every chronic pain patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy." "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

c.    "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

d.    "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

e.    "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."[132]

---

[130]    C.A.R.E.S. All., *Fact Sheet* (Feb. 2011), https://www.justice.gov/sites/default/files/usao-ndga/legacy/2011/03/02/C.A.R.E.S.%20Alliance%20Fact%20Sheets.pdf.
[131] C.A.R.E.S. All., *C.A.R.E.S. Alliance Tools: Catalog and Order Form* 13 (n.d.) (hereinafter *C.A.R.E.S. Alliance Tools*).
[132] Charles Argoff & Bradley Galer, *Defeat Chronic Pain Now!: Groundbreaking Strategies for Eliminating the Pain of Arthritis, Back and Neck Conditions, Migraines, Diabetic Neuropathy, and Chronic Illness* (2010).

284.    Dr. Fishman published a glowing review of *Defeat Chronic Pain Now!*.[133]

285.    The C.A.R.E.S. Alliance worked closely with other front groups. For example, the Alliance offered to send doctors free copies of *Clinical Guidelines for the Use of Opioid Therapy in Chronic Noncancerous Pain*, written by APS and the AAPM.[134] In addition, a portion of the sales of *Defeat Chronic Pain Now!* were donated to APF.[135]

\* \* \* \* \* \* \*

286.    The Front Groups succeeded in spreading Defendants' misinformation about opioids. Their publications and messages were widely available, caused inappropriate opioid prescribing, and many remain available today. The Marketing Defendants' false messages through the Front Groups have thus continued to this day.

### 3.    The Marketing Defendants paid Key Opinion Leaders to deceptively promote opioid use.

287.    The Marketing Defendants also spread misinformation through purported medical experts, known as Key Opinion Leaders ("KOLs"), whom the Marketing Defendants paid to deliver deceptive messages because of their ability to influence their peer prescribers. Although funded by the Marketing Defendants, the KOLs were used to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals. This use of KOLs was designed to lend legitimacy to their opinions, making doctors and their patients more likely to accept their claims.

### a.  Dr. Russell Portenoy

288.    Dr. Portenoy promoted the use of opioids and minimized their risks as a spokesperson for Purdue and other Marketing Defendants. A respected leader in the field of pain treatment, Dr.

---

[133] *Defeat Chronic Pain Now Website, supra.*
[134] C.A.R.E.S. All., *C.A.R.E.S. Alliance Tools: Catalog and Order Form* 6 (n.d.).
[135] *Defeat Chronic Pain Now*, http://www.defeatchronicpainnow.com/ (last visited Aug. 25, 2023) (hereinafter *Defeat Chronic Pain Now Website*).

Portenoy was highly influential. Dr. Andrew Kolodny, co-founder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure. The megaphone for Portenoy is Purdue, which flies in people to resorts to hear him speak. It was a compelling message: 'Docs have been letting patients suffer; nobody really gets addicted; it's been studied.'"[136]

289.    As one organizer of CME seminars who worked with Portenoy and Purdue pointed out, "had Portenoy not had Purdue's money behind him, he would have published some papers, made some speeches, and his influence would have been minor. With Purdue's millions behind him, his message, which dovetailed with their marketing plans, was hugely magnified."[137]

290.    Dr. Portenoy has now admitted that he minimized the risks of opioids[138] and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[139]

291.    A Purdue email from 2004 noted that National Pain Education Council ("NPEC"), an organization also supported by Janssen, used "the same speakers [who] spoke for us at regional and national meetings."[140] Dr. Portenoy was co-chair of the NPEC,[141] which, according to an internal Janssen document, was used to assist in marketing Duragesic.[142]

292.    A 2007 fundraising prospectus from Dr. Portenoy's program shows that his program received millions of dollars over the preceding decade in funding from Endo, Abbott, Cephalon, Purdue, and J&J.

---

[136] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* 134 (2015).
[137] *Id.* at 136.
[138] Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, New Yorker (Nov. 8, 2013), https://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic.
[139] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall Street J. (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[140] Email from Harry Lazarus to Joseph DaBronzo, et al. (Mar. 24, 2004, 9:12 AM).
[141]    *About   NPEC*,   Nat'l   Pain   Educ.   Council, https://web.archive.org/web/20080517231127/http://www.npecweb.org/aboutnpec.asp?id=15&selMenu=2,0    (last visited Aug. 25, 2023 as of May 17, 2008).
[142] *Duragesic (Fentanyl Transdermal System) CII: 2003 Business Plan Summary* 10, 13 (n.d.).

293.    Janssen worked with other defendants to use common KOLs. In an internal Purdue email, an executive reported on a conversation with Dr. Portenoy in 2001: "Russ [Portenoy] said that Janssen called and has called others to try to help deal with this media blitz and protect the pain movement."[143]

### b.  Dr. Lynn Webster

294.    Dr. Lynn Webster was president of AAPM in 2013 and was a Senior Advising Editor of *Pain Medicine*, the AAPM's journal.[144] Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, he received significant funding from Defendants (including nearly $2 million from Cephalon).

295.    Dr. Webster created and promoted the *Opioid Risk Tool*, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids.[145] Versions of this tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.

296.    In 2011, Dr. Webster presented a webinar sponsored by Purdue titled *Managing Patients' Opioid Use: Balancing the Need and the Risk*. This webinar misleadingly taught that risk screening tools, urine testing, and patient agreements will prevent "overuse of prescriptions" and "overdose deaths."

297.    Dr. Lynn Webster served on the Mallinckrodt's Advisory Board and performed a study of Mallinckrodt's drugs that the company relied on in its marketing materials.

### c.  Dr. Perry Fine

---

[143] Email from Paul Goldenheim to Howard Udell, et al. (Mar. 1, 2001).
[144] *CRI Lifetree Chief Medical Directors Dr. Lynn Webster Named President of the American Academy of Pain Medicine (AAPM)*, Scorr Marketing (Apr. 23, 2013), https://www.scorrmarketing.com/news/cri-lifetree-chief-medical-director-dr-lynn-webster-named-president-of-the-american-academy-of-pain-medicine-aapm/; Elaine Silvestrini, *Profiting from Pain*, Drug Watch, https://www.drugwatch.com/featured/opioid-crisis-big-pharma/ (last modified June 29, 2021).
[145] Lynn Webster & Rebecca Webster, *Predicting Aberrant Behaviors in Opioid-Treated Patients: Preliminary Validation of the Opioid Risk Tool*, 6 Pain Med. 432 (2005).

298.    Dr. Fine's ties to the Marketing Defendants are well documented. He has authored articles, testified in court cases and before state and federal committees, and argued against legislation restricting the prescription of high doses of opioids to noncancer patients. He has served on Purdue's advisory board, consulted for Janssen, and participated in CME activities for Endo; he has served in similar capacities for several other drug companies. He co-chaired the APS-AAPM Opioid Guideline Panel, served as treasurer of AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and sat on the board of directors of APF.[146]

299.    Drs. Fine and Portenoy co-wrote the Endo-supported *A Clinical Guide to Opioid Analgesia*, which downplayed risks such as respiratory depression and addiction. This publication also promoted and the myth that "long-term opioid therapy of an older population with no history of substance abuse is rarely associated with de novo development of abuse or addiction."[147]

### d.    Dr. Scott Fishman

300.    Dr. Fishman's ties to the opioid drug industry are multitudinous. He has served as an APF board member and as AAPM president and has participated yearly in numerous CME activities for which he received "market rate honoraria." He has authored publications, including seminal guides on opioid prescribing, which were funded by the Marketing Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to noncancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest.[148]

301.    He received funding from Janssen, Endo, Cephalon, and Purdue.

---

[146] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306 J. Am. Med. Ass'n 1445 (2011), https://jamanetwork.com/journals/jama/article-abstract/1104464 (hereinafter *Incomplete Financial Disclosures*).
[147] Perry G. Fine & Russell K. Portenoy, *A Clinical Guide to Opioid Analgesia* 20, 34 (2004).
[148] *Incomplete Financial Disclosures*, *supra*; Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry.

302.    In one guide, Dr. Fishman downplayed the risk of addiction and defended the concept of pseudoaddiction: "I draw a distinction between a 'chemical coper' and an addict."[149]

### 4.    Defendants disseminated their misrepresentations through Continuing Medical Education programs.

303.    One way the Marketing Defendants aggressively distributed their false message to the medical community was through countless continuing medical education ("CME") programs. In some cases, Defendants created educational organizations to develop the CMEs; in other cases, Defendants supported Front Groups and KOLs to develop and provide CMEs. Defendants controlled the content of these presentations. CMEs spread Defendants' false messages to doctors under the guise of neutral educational programs.  Defendants deliberately maintained this illusion of neutrality.

304.    Endo and Purdue sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

305.    CMEs directly supported by Endo included *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*,[150] and *Advances in Opioid Analgesia:  Maximizing Benefit While Minimizing Risk*.[151] The programs promoted the use of opioids for pain from osteoarthritis, neuropathy, and back pain. Endo listed "[d]ifferentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" as an element to be considered when awarding grants to CME providers.[152]

306.    Abbott financially supported the development and hosting of AAPM CMEs entitled *Opioid Therapy for Chronic Pain: Safe and Effective Prescribing* (2007) and *Essentials of Pain Medicine* (2008).

---

[149] Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication* 45 (2012).
[150] McCarber, *supra*.
[151] Cole, *supra*.
[152] *Opana REMS*, *supra*.

**5.    Defendants promoted specific opioid products to doctors and consumers.**

307.    The Marketing Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Marketing Defendants published print advertisements in a broad array of medical journals. The Marketing Defendants collectively spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they had spent in 2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

308.    The Marketing Defendants' advertising also targeted consumers. The Marketing Defendants knew that physicians were more likely to prescribe a drug if a patient specifically requested it.[153] Endo's research, for example, found that direct-to-consumer advertising resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. The Marketing Defendants thus increasingly took their campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physicians' offices.

309.    At most (if not all) pertinent times in the past 30 years, hydrocodone/acetaminophen (e.g., Vicodin, Norco, Lortab) has been the most prescribed painkiller of any kind. One reason for the brisk sales was that, until 2014, it was a Schedule III drug (rather than Schedule II, as it is today). As such, prescriptions could be refilled by patients without additional written prescriptions. In fact, Knoll (now AbbVie) made this part of the basis for its promotion of Vicodin in the 1980s and 1990s. Knoll marketed Vicodin as "The Highest Potency Pain Relief You Can Still Phone In." Knoll used such advertising on trinkets and toys.

---

[153] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it compared with 1% of those making no specific request. John B. McKinlay, et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52 Med. Care 294 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4151257/.

310.    A Kadian prescriber guide deceptively represented that Kadian is more difficult to abuse and less addictive than other opioids. The guide included the following misleading statements: (1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users"; and (2) "KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action"; (4) "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine"; (5) "Long duration of action"; (6) and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state."

311.    In a 2010 training manual for the Kadian sales force, Allergan trained sales representatives to tell providers that opioid patients have a low risk of addiction, many opioid patients are merely experiencing pseudoaddiction, and opioid withdrawal is a minor concern.[154] The manual also trained the representatives that, for most patients, chronic opioid therapy "markedly improved" functioning, a claim that is unsubstantiated.

312.    Allergan misleadingly told patients whose bodies became "tolerant" at their current dose that "[t]his is not addiction," but rather indicated that a "dose adjustment" was required.[155]

313.    Allergan received a warning letter from the FDA for circulating a Kadian Co-Pay Assistance Program Brochure to patients. The FDA found that the brochure contained unsubstantiated claims of effectiveness.[156] In this warning letter, FDA observed that the promotional materials "impl[ied] that Kadian is appropriate for use in a broader range of patients than it is approved to treat." The FDA found this "particularly concerning considering the serious and potentially fatal risks associated with the drug."[157]

---

[154] *See* Actavis Elizabeth, *Kadian Learning System* (July 1, 2010).
[155] *Learn More About Customized Pain Control with Kadian* (cited in Statement of Charges and Notice of Hearing, *In re Teva Pharm. Indus., Ltd.*, No. 2020-0032-C (N.Y. Dep't Fin. Servs. Aug. 17, 2020)).
[156] *See* Letter from Thomas Abrams, Dir., Div. of Drug Mtkg., Advertising, and Commc'ns, to Doug Boothe, CEO, Actavis US (Feb. 18, 2010) (hereinafter "Kadian Warning Letter").
[157] *Id.*

314.    Starting in the mid-1990s, Janssen's promotion of Duragesic shifted from a focus on cancer pain to chronic pain generally. As of May 1994, there was a "[s]hift away from limiting consideration to only malignant patients" to "[p]romotion of around-the-clock control highlights benefits of 72 hour efficacy in limiting breakthrough pain associated with oral medications." From April 1995 to September 1995, Janssen's "Core Campaign Journal Ad" for Duragesic used the headline "Why Interrupt These Moments With Oral Opioid Dosing?" and the tagline "Chronic Pain Control That Goes On."[158]

315.    In a 1998 letter, the FDA declared as "false and misleading" Janssen's claim that Duragesic "stops the pain. Not the patient." The FDA stated, "Janssen's statement implies that the use of Duragesic is not associated with any impairment of mental or physical abilities. Janssen has not submitted data to substantiate such a claim."[159]

316.    A Duragesic Business Plan for 2001 stated that Duragesic's "vision" was to be the "first choice of chronic pain patients for around-the clock-therapy." The Plan noted that "[n]on-malignant market is the growth opportunity," but it also stated just below this point that "DURAGESIC data is non-existent." Another analysis in the same document stated that "opioid acceptance for non-malignant pain" was an opportunity for Duragesic, but that "limited clinical data" was a weakness. Elsewhere in the same plan is the statement "need non-malignant pain data (lower back, OA [osteoarthritis]/RA [rheumatoid arthritis])."[160]

317.    A 2001 patient booklet for Duragesic confidently but misleadingly declared: "Addiction is relatively rare when patients take opioids appropriately."[161]

---

[158] *Duragesic: Positioning Evolution Overview* 7, 11 (June 1, 2002) (hereinafter *Positioning Evolution*).
[159] *Id.*
[160] *Duragesic 2001 Business Plan* (Aug. 2000).
[161] *Patient Booklet: Your Questions and Answers* 22.

318.    In or about 2002, Janssen developed another ad campaign promoting Duragesic as improving patients' functioning and work productivity that included misrepresentations that Duragesic was "[c]hronic pain relief that supports functionality" and "[i]mprove[s] . . . physical and social functioning." Photos on the four ads depicted the following:

    a.   a man (presumably the father of the bride) laughing with the bride with the caption: "This day will be a lifelong memory. I'm glad chronic pain won't be a part of it."

    b.   two hands kneading a loaf of bread with the caption: "1,360 loaves . . . and counting. Work, uninterrupted."

    c.   the torso of a "blue-collar" man holding a bowling ball with the caption: "506 strikes . . . and counting. Game, uninterrupted."

    d.   a man holding a packing box with the caption: "Work. Plan. Stand. Sit. Bend. Stretch. Move. Carry."[162]

319.    In a 2004 warning letter, the FDA found this ad campaign to be "misleading."

320.    In Janssen's Nucynta and Nucynta ER 2012 Business Plan, an aspect of the marketing strategies associated with "differentiation" was to "Generate data to support lower abuse potential."[163] Such data was never obtained.

321.    AbbVie's predecessor, Knoll, was admonished by FDA for promotional materials for Vicoprofen that conveyed an inaccurate impression that the drug could be used to treat chronic pain on a long-term basis and to treat conditions such as osteoarthritis.

322.    Abbott advertised Vicodin to use to treat chronic pain such as osteoarthritis pain and low back pain in brochures intended for providers.

---

[162] *Positioning Evolution, supra.*
[163] *Nucynta & Nucynta ER 2012 Business Plan* (Dec. 12, 2012).

### 6. Defendants used unbranded advertising to promote opioid use.

323.    The Marketing Defendants also aggressively promoted opioids through "unbranded advertising" that generally touted the benefits of opioids without specifically naming a particular brand-name drug. In doing so, Defendants were able to evade FDA scrutiny of their promotion.

324.    Because unbranded advertising is not required to provide balanced disclosures about a product's limits and risks, it was an effective tool to expand the overall acceptance of and demand for chronic opioid therapy. By expanding the market for opioids generally, unbranded advertising benefited manufacturers of both generic and branded opioids.

325.    Purdue's pain-management website, *inthefaceofpain.com* contained testimonials from several dozen "advocates," including healthcare providers, urging more pain treatment. The website presented the advocates as neutral and unbiased, but an investigation by the New York Attorney General later revealed that Purdue had paid them hundreds of thousands of dollars.[164]

326.    Janssen funded, edited, participated in the development of, and controlled the content of misleading materials published by front groups, including the unbranded APF initiative "Let's Talk Pain." The "Let's Talk Pain" website included misinformation about opioids, such as that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding addiction." The website also featured a video interview, edited by Janssen personnel, which claimed that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative.[165] This website was accessible online until at least 2012.

---

[164] Assurance of Discontinuance under Executive Law Section 63, Subdivision 15, No. 15-151, *Purdue Pharma, L.P..* (N.Y. Att'y Gen. Aug. 19, 2015), https://ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf.

[165]    *The       Let's       Talk       Pain       Show*,       Let's       Talk       Pain, https://web.archive.org/web/20120324220752/http://www.letstalkpain.org/talkshow/ (last accessed July 13, 2021 as of Mar. 24, 2012).

327.    Purdue's unbranded website, *PartnersAgainstPain.com*,[166] lied about the risks of addiction from the treatment of chronic pain with opioids by stating as a "Fact" that "Fears about psychological dependence are exaggerated when treating appropriate pain patients with opioids."

328.    As early as 2001, CVS worked with Purdue and its unbranded marketing arm, Partners Against Pain ("PAP"), to challenge these (later proven) allegations that Purdue's OxyContin was being abused at alarming rates. Purdue and its partners, including CVS, used Purdue's PAP website to claim that the risk of addiction associated with OxyContin was very small.

329.    On an unbranded website, *www.painaction.com*, Endo misleadingly represented that "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for them," downplaying the significant risk of addiction that opioids present.

330.    One Endo-sponsored brochure, *Understanding Your Pain: Taking Oral Opioid Analgesics*, stated that "[t]aking opioids as prescribed for pain relief is not addiction" and "[a]ddiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problems." In the same publication, Endo stated that the following test should guide patients in determining whether they are addicted to opioids: "Ask yourself: would I want to take this medicine if my pain went away? If you answer no, you are taking opioids for the right reasons – to relieve pain and improve your function. You are not addicted." The same brochure promoted the concept that "you may also need to take a short-acting opioid in between" doses of a long-acting opioid "for any increase in pain." In the Q&A Section, the pamphlet indicated that, if a patient develops "tolerance" to opioids, "it does not mean you will 'run out' of pain relief," because "[y]our dose can be adjusted, or another medicine can be prescribed." The same section posed a similar question: "If I take the opioid now, will it work later when I really need it?"

---

[166] *Partners Against Pain* consisted of both a website, styled as an "advocacy community" for better pain care, and a set of medical education resources distributed to prescribers by sales representatives. It existed until at least 2015 and was a vehicle for Purdue to downplay the risks of addiction from long-term opioid use.

The response: "The dose can be increased . . . You won't 'run out' of pain relief." In recommending increasing opioid dosage as a response to tolerance, Endo did not address the risks that accompany high-dose opioid use.[167]

331.    In this same pamphlet, Endo answered the hypothetical patient question, "What should I know about opioids and addiction?" by creating a false dichotomy between addiction ("a chronic brain disease") and opioid therapy ("Taking opioids for pain relief"). It explains that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems. Taking opioids as prescribed for pain relief is not addiction." This publication was edited by Dr. Portenoy.[168]

332.    In another pamphlet for patients, *Taking a Long-Acting Opioid: What Does It Mean to Me?*, Endo misrepresented the distinctions between physical dependence, tolerance, and addiction to downplay the risk that patients would become addicted to opioids.[169]

333.    A Janssen unbranded website, *PrescribeResponsibly.com*, stated that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."[170] The website further stated that the risk of opioid addiction "can usually be managed" through tools such as opioid agreements between patients and doctors.[171] The website recommends four-to-fourteen question screeners that purportedly help physicians identify and address possible opioid misuse.[172]

---

[167] Margo McCaffery & Chris Pasero, *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K. Portenoy ed., 2004).
[168] *Id.*
[169] Endo Pharmaceuticals, *Taking a Long-Acting Opioid: What Does It Mean to Me?* (2008).
[170] Keith Candiotti, *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, https://web.archive.org/web/20181119235909/http://www.prescriberesponsibly.com:80/articles/opioid-pain-management (last accessed July 13, 2021 as of Nov. 19, 2018).
[171] Howard A. Heit & Douglas L. Gourlay, *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, https://web.archive.org/web/20171003105720/http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (last accessed July 13, 2021 as of Jan. 6, 2019).
[172] Kenneth L. Kirsh & Steven D. Passik, *Assessing Patients with Pain Using Evaluation Tools*, Prescribe Responsibly, https://web.archive.org/web/20190120012152/http://www.prescriberesponsibly.com/articles/patient-pain-assessment (last accessed July 13, 2021 as of Jan. 20, 2019).

334.    Allergan distributed a brochure that stated that the risk of opioid addiction was "less likely if you never had an addiction problem," misleadingly implying that the risk of addiction was low and that individuals at higher risk of addiction could be easily identified.

### 7.    Defendants funded, edited, and distributed publications that supported their misrepresentations.

335.    The Marketing Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was calculated to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals, rather than scientific standards, and was intended to persuade prescribers and consumers that the benefits of long-term opioid use outweighed the risks.

336.    To accomplish their goal, the Marketing Defendants—sometimes through third-party consultants and/or Front Groups—commissioned, edited, and arranged for the placement in academic journals of favorable but deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy. The Marketing Defendants also frequently relied on unpublished data or posters, neither of which are subject to peer review, but were presented as valid scientific evidence.

337.    Janssen funded studies and placed them in medical journals to support its marketing efforts. Janssen also used external studies in ways that were misleading.

338.    One of the studies was "Evaluation of Long-term Efficacy and Safety of Transdermal Fentanyl in the Treatment of Chronic Noncancer Pain" by Milligan et al.[173] Janssen advised its sales

---

[173] Kenneth Milligan, et al., *Evaluation of Long-Term Efficacy and Safety of Transdermal Fentanyl in the Treatment of Chronic Noncancer Pain*, 2 J. Pain 197 (2001), https://pubmed.ncbi.nlm.nih.gov/14622817/.

force that the study's authors stated that Duragesic provided "sustained, long-term pain control" even though the study had found that one-third of its subjects did not respond to Duragesic.

339.    Canadian health authorities had previously commented to Janssen that the studies it submitted in support of the use of Duragesic for chronic pain, including the Milligan study, involved only patients who were already taking potent opioids before entering the studies. The Canadian authorities further noted that "the treatment of opioid naive patients with transdermal fentanyl for postoperative pain has resulted in deaths due to respiratory depression in the past." In its reply, Janssen stated, "We acknowledge that the experience in opioid naive non-cancer patients is limited." No such acknowledgment was made in Janssen's bulletin to its sales force about the Milligan study.

340.    Janssen also did not advise its sales force in the bulletin that the stability of pain control achieved in the study came at the cost of nearly doubling the mean dose of Duragesic over 12 months.[174] A Janssen scientist raised concerns with the Milligan study, sending an email stating she wanted to "reiterate" concerns that had been raised regarding using the Milligan study "to make an argument for efficacy." She noted that "these studies not [sic] the appropriate design neither the end points to make a case for efficacy." Janssen did not disclose these concerns to its sales force. Nor did Janssen disclose that the Milligan study was supported by a grant from the Janssen Research Foundation and that the lead author had received financial support from Janssen.

341.    Janssen also provided its sales force with a 1997 study by Simpson et al. entitled "Transdermal Fentanyl as Treatment for Chronic Low Back Pain."[175] Janssen advised its sales force that the study results suggested "that patients on Duragesic treated for chronic low back pain report greater improvement in pain relief and disability than those who received oral opioids" and that "use of Duragesic may be associated with less disability caused by chronic lower back pain." In professional

---

[174] Memo to 275 Sales Force, et al., from Medical Services, Sales Training, Duragesic Brand Team (Sept. 21, 2001).
[175] Richard K. Simpson Jr., et al., *Transdermal Fentanyl as Treatment for Chronic Low Back Pain*, 14 J. Pain Symptom Mgmt. 218 (1997), https://pubmed.ncbi.nlm.nih.gov/9379069/.

file cards and other materials used by sales representatives, Janssen likewise cited the Simpson study for its claim that Duragesic "[d]emonstrated effectiveness in chronic back pain with additional patient benefits" and claimed that "[a]ll patients who experienced overall benefit from Duragesic would recommend it to others with chronic low back pain."[176]

342.    In its September 2004 warning letter to Janssen, the FDA found that the Simpson study was "inadequate to support th[ese] claim[s], because it was an open-label, single-arm trial with no control group" and further stated, "We are not aware of substantial evidence or substantial clinical experience to support th[ese] claim[s]." The FDA found these claims to be "unsubstantiated effectiveness claims" and that these and other misleading claims on the file card were "serious" violations and constituted misbranding. The FDA requested that Janssen "immediately cease dissemination" of these claims and come up with a plan for corrective action.[177]

343.    Janssen also used scientific literature to support misleading claims regarding the supposed low abuse potential of tramadol. Despite significant contrary evidence (that ultimately led to tramadol's classification as a controlled substances), a Janssen-funded study compared the abuse liability of tramadol, NSAIDs, and hydrocodone, perversely concluding that, despite the significant differences in physical and psychological effects, that the abuse potential of tramadol and NSAIDs was equivalent.[178]

344.    At a 2004 Orlando, Florida meeting of the AAPM, KOL Dr. Lynn Webster presented a Cephalon-sponsored study that promoted the use of fentanyl-based short-acting opioids to address

---

[176] *See Duragesic Hospital Sales Force Cycle III Presentation* (Sept. 17, 2002).

[177] Warning Letter from Thomas W. Abrams, Director, DDMAC, to Ajit Shetty, CEO, Janssen Pharmaceutica (Sept. 2, 2004), https://millerlawpc.com/wp-content/uploads/2017/10/Opioid-Complaint-Exhibits-51-111.pdf (as Exhibit 60).

[178] Edgar H. Adams, et al., *A Comparison of the Abuse Liability of Tramadol, NSAIDs, and Hydrocodone in Patients with Chronic Pain*, 31 J. Pain & Symptom Mgmt. 465 (2006), https://cdhs.udel.edu/files/2022/08/A-Comparison-of-the-Abuse-Liability-of-Tramadol-NSAIDs-and-Hydrocodone-in-Patients-with-Chronic-Pain.pdf.

breakthrough pain in patients with chronic noncancer pain.[179] Cephalon then used this study in its sales trainings.

345. One of the key studies on which Cephalon relied to create a market for its short-acting fentanyl products was "Prevalence and Characteristics of Breakthrough Pain in Opioid-Treated Patients with Chronic Non-Cancer Pain," written by Dr. Portenoy and other Cephalon consultants. The study promoted the idea of using "rescue dosing" of short-acting opioids for patients with chronic pain unrelated to cancer.[180] Cephalon cited this study in branded and unbranded marketing.

346. As late as 2018, Teva scientists, writing with co-authors working at ABDC's Xcenda subsidiary, published a study promoting the notion that the risk of opioid abuse is limited to a "sub-population" of those taking opioids long-term for chronic noncancer pain.[181]

### 8. Defendants used speakers' bureaus and programs to spread their deceptive messages.

347. In addition to making sales calls, the Marketing Defendants' detailers also identified doctors to serve, for payment, on speakers' bureaus and to attend programs with speakers and meals paid for by the Marketing Defendants.

348. These speaker programs and associated speaker trainings served three purposes: (1) as an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; (2) as an opportunity for doctors to be selected to attend forums at which the drug companies could further market to the speaker; and (3) as an opportunity for the doctors to market to their peers.

349. The Marketing Defendants graded their speakers, and future opportunities were based on speaking performance, post-program sales, and product usage.

---

[179] Lynn Webster, Oral Transmucosal Fentanyl Citrate (OTFC) for the Treatment of Chronic Noncancer Pain: A Retrospective Survey of 100 Patients, Presentation at 21st Annual Meeting of the Am. Acad. of Pain Med. (Mar. 3-7, 2004).
[180] Russell K. Portenoy, et al., *Prevalence and Characteristics of Breakthrough Pain in Opioid-Treated Patients with Chronic Non-Cancer Pain*, 7 J. Pain 583 (2006), https://pubmed.ncbi.nlm.nih.gov/16885015/.
[181] Anna D. Coutinho, et al., *Long-term Opioid Users with Chronic Noncancer Pain: Assessment of Opioid Abuse Risk and Relationship with Healthcare Resource Use*, 14 J. Opioid Mgm't 131 (2018), https://pubmed.ncbi.nlm.nih.gov/29733099/ (hereinafter *Long-term Opioid Users with Chronic Noncancer Pain*).

\* \* \* \* \* \* \*

350.    The Marketing Defendants used the techniques described above in order to place the misleading messages (also described above) before doctors, patients, and health care payors. The intention and effect of this blitz of messaging was to increase opioid prescribing regardless of the consequences for public health and safety.

### E.    The Marketing Defendants misrepresented their involvement in promoting opioids.

351.    When accused of failing to monitor the distribution of hydrocodone and physicians prescribing excessive amounts, Abbott deliberately downplayed its role in driving the demand for hydrocodone by highlighting only the market share of its branded drugs. "Abbott's Vicodin brand accounts for less than 1 percent of all prescriptions filled for hydrocodone with acetaminophen products."[182] This statement misrepresented the role of Abbott's marketing in driving demand for hydrocodone products, even those that were generic.

352.    AbbVie reiterated a similar self-serving misrepresentation two years later: "AbbVie provides funding to numerous anti drug abuse organizations. Additionally, AbbVie advocates for responsible prescribing by healthcare professionals and appropriate use of Vicodin by legitimate patients through various educational efforts."[183]

353.    In August 2019, J&J stated to *Time* magazine that it did not cause the opioid crisis because its products "accounted for less than one percent of the total opioid prescriptions in Oklahoma as well as the United States." In April 2022, a J&J representative made a public statement that "[t]he company's actions related to the marketing and promotion of important opioid prescription

---

[182] Frank Eltman, *Victim's Kin in NY Pharmacy Killing Announce Suit*, San Diego Union-Tribune (Feb. 9. 2012, 3:38 AM), https://www.sandiegouniontribune.com/sdut-victims-kin-in-ny-pharmacy-killing-announce-suit-2012feb09-story.html.
[183] *Heroin: From Prescription to Addiction (Part 14)*, CBS News (June 27, 2014, 4:05 PM), https://www.cbsnews.com/amp/boston/news/heroin-from-prescription-to-addiction-part-14/.

medications were appropriate and responsible."[184] These statements misrepresent J&J's marketing strategies, particularly the company's work to change the standard of care surrounding opioid use generally.

354.    On August 30, 2019, Allergan claimed in a press release that "it recognizes the seriousness of the opioid abuse problem. Allergan has a history of supporting – and continues to support – the safe, responsible use of prescription medications."[185] On November 22, 2022, Allergan claimed that its "promotion and marketing of opioid medications were responsible and appropriate."[186] These statements misleadingly state that Allergan's marketing was not intended to illegitimately increase sales of dangerous opioids while ignoring or minimizing their risks.

355.    The Marketing Defendants' misrepresentations misled the public and ultimately delayed and frustrated an adequate response to the opioid crisis.

## F.    Defendants directly targeted hospitals.

356.    From the beginning, hospitals were directly targeted by the Marketing Defendants. Hospitals received mail and electronic communications from the Marketing Defendants containing the misrepresentations described above.

357.    Although this targeted is most apparent in the revised JCAHO pain standards that the Marketing Defendants orchestrated in order to promote opioid use, targeting of hospitals began even earlier.

---

[184] Leah Willingham, *Johnson & Johnson Subsidiary Settles West Virginia Opioid Lawsuit for $99 Million*, PBS (Apr. 18, 2022, 3:58 PM), https://www.pbs.org/newshour/health/johnson-johnson-subsidiary-settles-west-virginia-opioid-lawsuit-for-99-million.

[185] *Allergan Announces Settlement with Two Ohio Plaintiffs in Federal Opioid Litigation*, AbbVie (Aug. 30, 2019), https://news.abbvie.com/news/press-releases/news-type/corporate-news/allergan-announces-settlement-with-two-ohio-plaintiffs-in-federal-opioid-litigation.htm.

[186] *Statement on Allergan Nationwide Settlement to Resolve Opioid-Related Claims*, AbbVie (Nov. 22, 2022), https://news.abbvie.com/news/media-statements/statement-on-allergan-nationwide-settlement-to-resolve-opioid-related-claims.htm.

358.    Internal documents from the 1995 "OxyContin Launch" orchestrated by Purdue and Abbott identified (1) hospital pharmacists as among their "audience," (2) hospitals among their "institutional targets," (3) an objective of "[f]ormulary acceptance in 75% of hospitals for first twelve months," and (4) an objective of developing a "successful distribution program" to hospitals. Purdue used Abbott's sales force to market OxyContin directly to doctors working in hospitals.

359.    The importance of targeting hospitals is illustrated by a study that "demonstrated that patients who receive an opiate prescription within 7 days of surgery are 44% more likely to still be using the medication one year after surgery than patients who do not receive an opioid prescription."[187]

360.    This marketing push was successful. Abbott, in a 1997 document, indicated that prescriptions written by "Abbott MD's" comprised 25% of all OxyContin prescriptions. Sales of OxyContin went from a mere $49 million in its first full year on the market to $1.2 billion in 2002.[188]

361.    In 1995, Abbott had concluded that the use of OxyContin for postoperative pain was inappropriate. Despite these concerns, Abbott recognized that a commercial relationship with Purdue to promote the purchase of vast amounts of OxyContin could be very profitable for Abbott.

362.    On January 1, 1996, Abbott entered into a "Co-Promotion Agreement" with Purdue to market OxyContin using a dedicated sales force focused on hospitals and their doctors. This agreement was in operation from 1996 to 2002, following which Abbott continued to receive a residual payment of 6% of net sales up through at least 2006.

363.    Internal documents from the 1995 "OxyContin Launch" indicate that Purdue and Abbott also intended it for a "secondary market . . . for non-malignant pain (musculoskeletal, injury

---

[187] Cheryl Genord, et al., *Opioid Exit Plan: A Pharmacist's Role in Managing Acute Postoperative Pain*, 57 J. Am. Pharmacists Ass'n S92 (Jan. 2017), https://www.japha.org/article/S1544-3191(17)30016-X/fulltext (hereinafter *Opioid Exit Plan*).
[188] David Armstrong, *Secret Trove Reveals 'Crusade' to Make OxyContin a Blockbuster* (Sept. 22, 2016), https://www.statnews.com/2016/09/22/abbott-oxycontin-crusade/.

and trauma)" and that it must be "reinforced that we do not want to niche OxyContin just for cancer pain."

364.    Abbott's head of pain care sales, Jerry Eichhorn, taught his staff of sales representatives that OxyContin would "minimiz[e] the risk of dependence" and "lower[] euphoria," when, in fact, he had little knowledge of pharmacology and no basis for these statements.

365.    Instead of being forthcoming with information regarding the addictive nature of OxyContin, Abbott instructed its sales force representatives to avoid any discussion of abuse or diversion unless the detailed physician specifically brought the subject up first.[189]

366.    Abbott assisted Purdue in expanding the market for OxyContin by recruiting doctors to participate in studies on new uses of OxyContin. These studies were used to convince other doctors to prescribe OxyContin. For instance, in November 1997, Abbott distributed an "OxyContin post PCA" study to promote OxyContin use following surgery.

367.    Abbott's training materials described the statement regarding "iatrogenic addiction" (addiction arising out of a legitimate prescription) not as a warning about risk, but simply a "reminder to the physician that addiction as a result of legitimate medical use is very uncommon, and not to mistake tolerance, physical dependence, or attempt by the patient to obtain adequate analgesia as signs of addiction."

368.    Abbott provided its sales representatives with an OxyContin visual aid entitled "24 hours of pain relief THE HARD WAY," which included a graph depicting blood plasma concentrations of OxyContin over time as flatter than they actually were. The piece also asserted that "100% of all clinical patients were dosed Q 12 H in clinical trials," which was not true.

369.    Abbott provided its sales representatives with reprints to give to doctors, one of which was a piece written by Purdue's KOL, Dawn Marcus. The Marcus article advocated using long-acting

---

[189] *Id.*

opioids for the treatment of chronic pain and stated, without citation, "While studies report drug abuse/dependence/addiction is 3 to 19 percent of chronic pain patients, true addiction (psychologic dependency) is uncommon with the use of long-acting opioids for chronic pain."[190]

**G.     Deceptive marketing caused the epidemic of licit and illicit opioid use.**

370.     Pharmaceutical marketing and promotion is effective at changing the habits of prescribers and consumers.[191] Pharmaceutical manufacturers would be very unlikely to spend the large sums that they do on marketing were it not effective. The promotional activities described above thus drove an increase in opioid prescriptions.

371.     Because marketing opioids to doctors was effective at making chronic opioid therapy a commonplace and often first-line treatment, opioid prescription rates have increased. While previously a small minority of opioid sales, today between 80 and 90% of opioids (measured by weight) are used for chronic pain.

372.     The increasing number of opioid prescriptions has led to increased rates of opioid misuse because there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[192] The opioid epidemic is thus "directly related to the increasingly widespread misuse of powerful opioid pain medications."[193]

---

[190]   Dawn A. Marcus, *Treatment of Nonmalignant Chronic Pain*, 61 Am. Fam. Physician 1331 (2000), https://www.aafp.org/afp/2000/0301/p1331.html.

[191]   *See, e.g.*, *How Drug Marketing May Influence Prescriptions*, Nat'l Inst. of Health (May 23, 2017), https://www.nih.gov/news-events/nih-research-matters/how-drug-marketing-may-influence-prescriptions; *Spending on Consumer Advertising for Top-Selling Prescription Drugs in U.S. Favors Those with Low Added Benefit*, Johns Hopkins Bloomberg Sch. of Pub. Health (Feb. 7, 2023), https://publichealth.jhu.edu/2023/spending-on-consumer-advertising-for-top-selling-prescription-drugs-in-us-favors-those-with-low-added-benefit.

[192]   Richard C. Dart, et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 New Eng. J. Med. 241 (2015), https://www.nejm.org/doi/pdf/10.1056/NEJMsa1406143.

[193]   *See* Robert M. Califf, et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Engl. J. Med. 1480 (2016), https://www.nejm.org/doi/full/10.1056/NEJMsr1601307.

373.     The increase in prescriptions (driven by aggressive marketing) leads to increased rates of overdose. In a 2016 report, the CDC explained, "Opioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for most overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to revers[ing] the epidemic of opioid drug overdose deaths and prevent[ing] opioid-related morbidity."[194]

374.     The progression from prescription opioids to the use of illicit drugs, particularly heroin (and, more recently, fentanyl), is well documented.[195]

375.     In a November 2019 study by the National Bureau of Economic Research, researchers from the University of Pennsylvania, the University of Notre Dame, and the Rand Corporation examined how the marketing of OxyContin at its introduction in 1996 affected the opioid crisis. At that time, certain states' regulations made the drug easier to prescribe, and Purdue concentrated its marketing efforts in those states.

376.     The study found that in states where Purdue focused its initial misleading marketing messages, OxyContin distribution was nearly twice as high as in similarly situated states with more stringent prescription requirements in which Purdue did not market aggressively.[196]

377.     The authors found that by 2000 the false marketing campaign had led to OxyContin sales 2.5 times higher in the targeted states than in the non-targeted states. Hence, the authors concluded that Purdue's false marketing had a direct effect on sales of OxyContin.[197]

---

[194] Rose A. Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 643 Morbidity & Mortality Wkly. Rep. 1378 (2016), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.
[195] Theodore J. Cicero, et al., *The Changing Face of Heroin Use in The United States: A Retrospective Analysis of The Past 50 Years*, 71 J. Am. Med. Ass'n Psychiatry 821 (2014), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874575.
[196] Abby E. Albert, et al. "Origins of the Opioid Crisis and Its Enduring Impacts," NBER Working Papers 26500, Nat'l Bureau of Econ. Research (2019), https://www.nber.org/system/files/working_papers/w26500/w26500.pdf.
[197] *Id.* at 20.

378.    The authors also studied misuse and overdose death trends over time. When looking at overdose deaths, the authors found low overdose death rates across the non-targeted states and much higher rates in the states where Purdue had concentrated its false marketing.

379.    Based on their careful analysis, the authors concluded that the differences were attributable to Purdue's marketing.[198]

380.    Although this study used the natural experiment created by Purdue's decision to avoid marketing OxyContin in certain states, its conclusion applies to opioid marketing more broadly because the study demonstrates a quantifiable effect of the intensity of opioid marketing on adverse outcomes (e.g., overdose rates).

## V.    DEFENDANTS CAUSED THE OPIOID EPIDEMIC BY ILLEGITIMATELY INFLATING THE SUPPLY OF OPIOIDS.

381.    All Defendants worked—with great success—toward their shared goal of creating a market for, and then selling, far more opioids than could possibly have been medically appropriate or safe.

382.    The Marketing and Distributor Defendants structured their contracts to give the Distributor Defendants strong financial incentives to sell as many opioids as possible. The Distributor Defendants benefitted from rebates or "chargebacks" that increased as the sales of pharmaceuticals increased. Joined by this powerful joint incentive to sell as many opioids as possible, the two groups of Defendants cooperated to increase opioid sales.

383.    This cooperation included the Distributor Defendants' active role in promoting the use of opioids to treat chronic pain. It also included creating the illusion that the Distributor Defendants had erected effective controls against the diversion of opioids. The Distributor

---

[198] *Id.* at 37 (emphasis added).

Defendants created this illusion by repeatedly misleading the public and regulators into thinking that they had enacted safeguards, as they were required to do under the CSA.

384.    This course of conduct was deliberate. In a *60 Minutes* interview, former DEA agent Joe Rannazzisi described Defendants' industry as "out of control," stating, "What they wanna do, is do what they wanna do, and not worry about what the law is.  And if they don't follow the law in drug supply, people die.  That's just it.  People die." The interview continued:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen. They control  probably 85 or 90 percent of the drugs going downstream.
>
> [INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping  drugs into American communities that were killing people.
>
> JOE RANNAZZISI: That's not an implication, that's a fact. That's exactly what they did.

Another DEA veteran stated that these companies failed to make even a "good faith effort" to "do the right thing." He explained, "I can tell you with 100 percent accuracy that we were in there on multiple occasions trying to get them to change their behavior. And they just flat out ignored us."[199]

385.    The National Retail Pharmacies violated the CSA by dispensing extremely large amounts of opioids from their retail pharmacy stores under circumstances in which diversion was highly likely, if not inevitable, while misleading the public that they were working to prevent diversion.

386.    Armed with knowledge of their own sales and shipments and industry-wide data, Defendants knew or should have known that the quantity of opioids being distributed far exceeded any possibly medical need—even if the wider market for chronic pain had been entirely legitimate (which it was not). Defendants knew or should have known that a significant number of opioids were

---

[199] Jennifer Zimpfer Vaughan, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress – By Correspondent Bill Whitaker* (Oct. 17, 2017), https://www.linkedin.com/pulse/ex-dea-agent-opioid-crisis-fueled-drug-industry-jennifer/.

being diverted from legitimate medical uses. Opioid shipments continue to be far greater than medically justified.

387.     Sources of information placing Defendants on notice that the volume of opioids they were shipping must have been excessive include:

a.  Detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy, and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

b.  In-person detailing to promote and provide products and services, which allows them to observe the red flags of diversion; and

c.  Knowledge of the volume of its own sales for the Distributor Defendants, who each play such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area.

388.     The Distributor Defendants filled orders for the pharmacies dispensing extraordinarily large volumes of opioids.  ARCOS data shows shipments to top dispensing pharmacies between 2006 and 2019:

- Prime Therapeutics (Albuquerque): ABDC, Anda, Cardinal, McKesson, H.D. Smith, Teva
- Menaul Compounding Pharmacy (Albuquerque): ADBC, Anda, Cardinal
- Highland Pharmacy (Albuquerque): ABDC, Anda, Cardinal, McKesson
- Walgreens (Las Cruces – E. Lohman Ave.): Anda, Cardinal, Walgreens
- Lovelace Outpatient Pharmacy (Albuquerque): Anda, Cardinal, McKesson
- Del Norte Pharmacy (Santa Fe): ABDC, Anda,
- Walgreens (Albuquerque – Montgomery Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens
- Walgreens (Almogordo): ABDC, Anda, Cardinal, Walgreens
- Walgreens (Rio Rancho): ABDC, Anda, Cardinal, McKesson, Walgreens
- NCS Healthcare (Albuquerque): McKesson
- Walgreens (Espanola): ABDC, Anda, Cardinal, McKesson, Walgreens
- Roden-Smith Pharmacy (Clovis): McKesson, ABDC
- Walgreens (Las Cruces – N. Main St.): ABDC, Anda, Cardinal, Walgreens
- Walgreens (Albuquerque – Menaul Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens
- Walgreens (Las Cruces – El Paseo Rd.): ABDC, Anda, Cardinal, Walgreens
- Walgreens (Farmington): ABDC, Anda, Cardinal, McKesson, Walgreens
- Walgreens (Roswell): ABDC, Anda, Cardinal, McKesson, Walgreens

- Davis-Fleck Drugs (Truth or Consequences): ABDC, Anda, Cardinal
- Walgreens (Albuquerque – Coors Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens
- Walgreens (Albuquerque – Wyoming Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens

389.    The Distributor Defendants distributed eye-popping quantities of opioids into New Mexico. As measured in milligram morphine equivalents, between 2006 and 2019:

- ABDC – 6,523,360,936 MMEs (21.85% of the market)

- McKesson – 6.281,989,884 MMEs (21.04% of the market)

- Cardinal – 5,976,117,915 MMEs (20.02% of the market)

- Walgreens – 3,339,901,115 MMEs (11.19% of the market)

- Walmart – 1,704,752,742 (5.71% of the market)

- CVS – 585,085,776 (1.96% of the market)

390.    The increase in the supply of opioid flowing into the community caused the opioid epidemic. Drugs cannot be misused if they are not available. By working to ensure that far more opioids were available in the community than could ever have been needed for legitimate medical purposes, Defendants provided a necessary condition for the opioid epidemic.

## A.    Noramco produced active pharmaceutical ingredients for many of the Marketing Defendants' opioids.

391.    J&J and Janssen were not only involved in the marketing of their prescription opioids, they also produced the active pharmaceutical ingredients for prescription opioids through two subsidiaries: Tasmanian Alkaloids PTY, LTD ("Tasmanian Alkaloids") and Noramco, Inc. ("Noramco"). In this role, J&J was the main source of a necessary ingredient to the prescription painkillers being marketed, distributed, and dispensed and thus had profound financial incentives to expand the market for opioid products.

392.    As wholly owned subsidiaries, Noramco's and Tasmanian Alkaloid's profits inured to J&J's benefit, and J&J was able to and, in fact, did exercise control over Noramco's actions in manufacturing active pharmaceutical ingredients ("APIs") for sale to the other Marketing Defendants.

393.    J&J's promotion of opioids (both branded and unbranded) had the effect of increasing opioid sales, which increased sales of Noramco's API, thereby benefitting J&J.

394.    In the early 1990s, J&J, through Noramco, began discussions with Purdue Pharmaceuticals regarding the anticipated future demand for opioid painkillers, including those opioid painkillers with oxycodone as the primary active ingredient.[200]

395.    In or around 1994, Tasmanian Alkaloids began a research project with the purpose of creating a poppy plant with enhanced thebaine content; thebaine is a precursor from which oxycodone and hydrocodone can be produced. The purpose of the project was to meet the "anticipated demand" for oxycodone-based opioids, including OxyContin. The new poppy, called the "Norman", allowed a dramatic increase in the production of oxycodone, which in turn allowed a dramatic increase in the production, marketing, and sale of oxycodone-based products.[201]

396.    In or around 1996, Tasmanian Alkaloids began a program to entice Tasmanian farmers to grow the new poppy, including with prizes like a Mercedes, Jaguar, and BMW. Tasmanian Alkaloids bought the poppies from farmers and then shipped concentrated poppy products to the United States where Noramco processed the raw materials into oxycodone, hydrocodone, and other opioid APIs.[202]

397.    Tasmanian Alkaloids and Noramco, together, became world leaders in the supply of oxycodone and other thebaine-based products. As of 2015, roughly 65% of all oxycodone consumed in the United States was distributed by Noramco.[203]

---

[200] Peter Whoriskey, *How Johnson & Johnson Companies Used a 'Super Poppy' to Make Narcotics for America's Most Abused Opioid Pills* (Mar. 26, 2020), https://www.washingtonpost.com/graphics/2020/business/opioid-crisis-johnson-and-johnson-tasmania-poppy/ (hereinafter *Super Poppy*).
[201] *Id.*
[202] *Id.*
[203] *Id.*

398.    As a condition of supplying oxycodone, Noramco requested assurances from Purdue that the latter would be able to manufacture and sell significant quantities of oxycodone-based products. Ultimately, Purdue relied largely on Noramco's thebaine for its production of OxyContin.[204]

399.    Noramco continued to develop "improved" versions of the poppy. In 2009, it created a new variety that produced an even higher amount of thebaine than the Norman poppy.

400.    The poppy was farmed in abundance.

401.    At all relevant times, J&J and Noramco had reason to know that their stockpiles of the Tasmanian poppy were dangerous and subject to diversion. The International Narcotics Control Board specifically discouraged J&J and Noramco from holding big stockpiles of the poppy due diversion into the production of heroin, whose market was (as of 2014) more than four times the size of the opiate painkillers market. Until its sale, J&J and Noramco continued to create excess stockpiles for shipment to the United States, without sufficient regard for the heroin market and with sole focus on the lucrative opioid market in the United States.

402.    Noramco and J&J successfully lobbied DEA to exclude the thebaine that Noramco and J&J were importing into the United States from coverage under certain treaties. They did so by representing that the risk posed by large quantities of thebaine was low because it was not a substance that could be abused in its raw form, ignoring the fact that all the thebaine being imported would be turned into prescription opioid medications that could be and were misused.[205]

403.    In 2015, at the time when J&J was attempting to sell off Noramco and Tasmanian Alkaloids, J&J prepared a marketing brochure representing that:

   a.    The purchaser had the opportunity to "[a]cquire the #1 supplier of Narcotic AOSs in the United States" and "[b]ecome a key supplier to the world's largest multi-source generics";

---

[204] *Id.*
[205] *See id.*

b. The Noramco portfolio of products, (with net trade sales in 2014), included Oxycodone ($94 million); hydrocodone ($52 million); buprenorphine ($20 million); morphine ($20 million); codeine ($18 million); and other products, for a global 2014 sales of $258 million;

c. Noramco's U.S. market share of these products in 2014 was as follows: oxycodone (65%); hydrocodone (54%); codeine (60%); and morphine (60%);

d. "Tasmanian Alkaloids produces over 40% of the world's supply of Narcotic Raw Materials";

e. "Tasmanian Alkaloids has the highest content poppies for key alkaloids"; and

f. Noramco and Tasmanian Alkaloids, located in four countries around the world (Wilmington, Delaware; Athens, Georgia; Tasmania, Australia; and Schaffhausen, Switzerland) had 483 full-time equivalent employees, including 28 employees shared with J&J.[206]

404. This brochure also represented that "Noramco has long-term agreements and/or majority controlled substance share with all 7 of the top US generic companies." The marketing materials represented, as to "typical supply terms:"

a. Agreements cover multiple controlled substance products (4 or more);

b. Agreements are for more than 80% of customer's volume; and

c. Terms are for 3 to 5 years minimum with rolling renewals.[207]

405. J&J sold Noramco and Tasmanian Alkaloids in or around 2016.[208]

**B.**   **Defendants are required by law to take certain steps to identify and halt diversion of controlled substances.**

406. All Defendants failed to secure the opioid supply chain and prevent diversion.

407. The Marketing Defendants had access to information about prescribers and facilities that prescribed clearly inappropriate amounts of opioids and yet did nothing about it. From at least 2002, Purdue maintained a database of healthcare providers suspected of inappropriately prescribing

---

[206] *Noramco World Wide Narcotics Franchise* (Oct. 2015).
[207] *Id.*
[208] *Super Poppy*, *supra.*

OxyContin or other opioids. Physicians could be added to this database based on observed indicators of illicit prescribing such as excessive numbers of patients, cash transactions, patient overdoses, and unusual prescribing of the highest-strength pills, which were a prime target for diversion.[209] It described these prescribers collectively as "Region Zero" and even generated a map correlating these prescribers with poison control calls and pharmacy thefts. Despite its awareness of the spatial association between these high prescribers, overdose, and criminality, Purdue made a conscious decision not to report these prescribers to authorities.

### C.    Controlled substances are carefully regulated because they are dangerous.

408.    The CSA creates a category of drugs, known as "controlled substances," that are subject to strict federal monitoring and regulation based on their potential for abuse.  Controlled substances are categorized into five schedules based on several factors, including whether they have a currently accepted medical use to treat patients, their abuse potential, and the likelihood they will cause dependence if abused.  A drug becomes a "controlled substance" when it is added to one of these schedules.

409.    Schedule I drugs are those deemed not to have an accepted medical use.  The remaining schedules—Schedules II through V—are relevant to this case.  The drugs in these schedules have legitimate medical purposes and, in the case of Schedules II through IV, require a prescription. *See* 21 U.S.C. § 829.

410.    Schedule II lists controlled substances that have "a high potential for abuse"; that, if abused, "may lead to severe psychological or physical dependence"; but that nonetheless have "a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions."  *See* 21 U.S.C. § 812(b)(2).  Schedule II includes opioid painkillers such as oxycodone, hydrocodone, and methadone.  *See* 21 C.F.R. § 1308.12.

---

[209] Purdue, *Identifying Possible Diversion* (Oct. 15, 2002).

411.    Schedule III lists controlled substances that have "a potential for abuse less than the drugs or other substances in schedules I and II"; that, if abused, "may lead to moderate or low physical dependence or high psychological dependence"; but that nonetheless have "a currently accepted medical use in treatment in the United States." *See* 21 U.S.C. § 812(b)(3). Schedule III includes buprenorphine, a medication approved to treat opioid use disorder. *See* 21 C.F.R. § 1308.13.

412.    Schedule IV lists controlled substances that have "a low potential for abuse relative to the drugs or other substances in schedule III"; that, if abused, "may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule III"; but that nonetheless have "a currently accepted medical use in treatment in the United States." *See* 21 U.S.C. § 812(b)(4). Schedule IV includes alprazolam (commonly sold under the brand name Xanax), diazepam (commonly sold under the brand name Valium), and lorazepam (commonly sold under the brand name Ativan). *See* 21 C.F.R. § 1308.14. Each of these three drugs belongs to a class of medications called benzodiazepines, which act on the brain and nerves to produce a calming effect. Schedule IV also includes carisoprodol, a muscle relaxant that is often sold under the brand name Soma, and zolpidem, an insomnia medication that is often sold under the brand name Ambien. Carisoprodol and benzodiazepines are components of dangerous drug "cocktails" sought by individuals known to abuse or misuse prescription drugs.

413.    Schedule V lists controlled substances that have "a low potential for abuse relative to the drugs or other substances in schedule IV"; that, if abused, "may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule IV"; but that nonetheless have "a currently accepted medical use in treatment in the United States." *See* 21 U.S.C. § 812(b)(5). Schedule V includes certain dosages of promethazine-codeine. *See* 21 C.F.R. § 1308.15.

414.    Through the CSA, Congress sought to prevent diversion and misuse of controlled substances. To accomplish this goal, the CSA created a "closed" system for regulating and monitoring controlled substances, under which it is unlawful to distribute, dispense, or possess any controlled substance except in a manner authorized by law. The CSA and its implementing regulations govern every step in the handling of certain drugs, from their production in a manufacturing facility to their distribution from a warehouse, and from their prescription by a medical practitioner to their dispensing by a pharmacy filling a prescription.

415.    The system is "closed" in that each part of the supply chain—including manufacturers, distributors, prescribers, and pharmacies—must register with DEA and comply with the CSA and its implementing regulations. *See* 21 U.S.C. §§ 822(a)(2), 823(f).

416.    Entities who register with DEA (known as "registrants") agree to comply with the CSA and its regulations, and may manufacture, distribute, prescribe, or dispense controlled substances only to the extent authorized by their registration and the law. *See* 21 U.S.C. §§ 822(a)–(b), 823(f).

**1.    Distributors have duties under the CSA.**

417.    The CSA defines a "distributor" as a person or an entity that delivers (other than by administering or dispensing) a controlled substance. The CSA defines "delivery" as the "actual, constructive, or attempted transfer of a controlled substance…." *See* 21 U.S.C. §§ 802(8), (11). The Marketing Defendants as well as the Distributor Defendants are "distributors" under the CSA.

418.    Many pharmacies obtain controlled substances from independent distributors, but the National Retail Pharmacies served as their own drug distributors until 2014 (CVS, Walgreens) and 2018 (Walmart).

419.    Distributors of controlled substances are required by the CSA to register with DEA and to maintain effective controls against the diversion of controlled substances for illegitimate uses. *See* 21 U.S.C. § 823(b)(1) (requiring the Attorney General, in registering a distributor, to consider

whether the distributor has shown "maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."). The Attorney General has delegated this authority to DEA. *See* 28 C.F.R. § 0.100; 21 C.F.R. § 1300.01.

420.    Under the CSA, it is unlawful for a distributor to distribute a controlled substance "[e]xcept as authorized by this subchapter." 21 U.S.C. § 841(a) ("Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally (1) to . . . distribute . . . a controlled substance").

421.    The CSA provides the Attorney General broad authority to "promulgate and enforce any rules, regulations and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this subchapter." 21 U.S.C. § 871(b); *see also* 21 U.S.C. § 821 ("The Attorney General is authorized to promulgate rules and regulations …. relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances…"). The Attorney General has issued numerous regulations establishing an extensive regulatory regime. *See* 21 C.F.R. §§ 1300.01-1321.01.

422.    The Attorney General, by regulation, has long required distributors to design and operate a system to detect suspicious orders of controlled substances, and to report those orders to DEA. *See* 21 C.F.R. § 1301.74(b). This provision reads, in full:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

In other words, orders that are unusual in one of those three ways—size, pattern, or frequency—are deemed "suspicious orders," and a distributor must detect and report them to DEA. "Suspicious orders," however, are not limited to those three categories, which are non-exclusive.

423.    If a distributor fails to detect and report a suspicious order, it violates the law. Under 21 U.S.C. § 843(a)(4)(A), it is unlawful for any person, including a distributor, to "knowingly or intentionally . . . furnish false or fraudulent information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II . . . ."

424.    Defendants have a duty to report suspicious orders in order to prevent diversion. In addition to reporting all suspicious orders, Defendants must also stop shipment on any order which is flagged as suspicious; they may only ship orders that were flagged as suspicious if, after conducting due diligence, the recipient determines that the order is not likely to be diverted into illegal channels.[210] This duty was made clear by DEA as early as the 1990s, was reiterated by DEA to Defendants by letters in 2006 and 2007, and has been confirmed by the courts.

### 2.    Pharmacies have duties under the CSA.

425.    The National Retail Pharmacies operated pharmacies that "dispensed" controlled substances. "Dispensing" means delivering a controlled substance to an end user pursuant to a physician's prescription. *See* 21 U.S.C. § 802(10); 21 C.F.R. §§ 1300.01, 1306.03(a).

426.    The CSA designates pharmacies as "practitioners" that are permitted to handle controlled substances "in the course of professional practice or research." *See* 21 U.S.C. § 802(21).

427.    Pharmacies that wish to dispense controlled substances are required under the CSA to register with the Attorney General. *See* 21 U.S.C. § 823(f). The Attorney General has delegated this authority to DEA. *See* 28 C.F.R. § 0.100; 21 C.F.R. § 1300.01.

428.    DEA reviews applications for registration (and renewals of registration) by pharmacies and, where necessary, pursues revocations of registrations. In deciding whether to issue or deny a

---

[210] *See* Southwood Pharm., 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharm., Inc. v. Drug Enforcement Admin.*, 861 F.3d 206 (D.C. Cir. 2017).

registration for a pharmacy, DEA considers various factors, including whether the applicant for a registration has complied with the laws relating to controlled substances and its other conduct related to public health and safety. *See* 21 U.S.C. § 823(f).

429.     Pharmacists who dispense controlled substance as an "agent or employee" of a pharmacy registered with DEA need not register individually with DEA. *See* 21 U.S.C. §§ 822(c)(1), 823(f).

430.     In general, the CSA prohibits pharmacies from dispensing most controlled substances without a "prescription issued by a practitioner." *See* 21 U.S.C. § 829(a)–(b).

431.     The CSA makes it unlawful "for any person … to … dispense a controlled substance in violation of section 829." 21 U.S.C. § 842(a)(1).

432.     The Attorney General has promulgated, in 21 C.F.R. Part 1306 ("Prescriptions"), rules for when prescriptions may be filled pursuant to a prescription in accordance with 21 U.S.C. § 829. *See* 21 C.F.R. § 1306.01 ("Rules governing the issuance, filling, and filing of prescriptions pursuant to [21 U.S.C. § 829] are set forth generally in this section and specifically by the sections of this part.").

433.     As relevant here, Part 1306 sets forth three rules pharmacies must follow when dispensing controlled substances. For each controlled-substance prescription, a pharmacist must (1) determine that the prescription was issued by a medical practitioner adhering to the usual course of his or her professional practice, (2) determine that the prescription is for a legitimate medical purpose, and (3) in filling the prescription, adhere to the usual course of his or her own professional pharmacy practice.

434.     The National Retail Pharmacies were required to adhere to these three requirements in their roles as pharmacies dispensing controlled substances.

435.    21 C.F.R. § 1306.04(a) defines certain requirements for a controlled-substance prescription to be valid or "effective" and imposes obligations on both the medical practitioner who issues the prescription and the person who fills the prescription.

436.    To be valid or effective, a prescription for a controlled substance must meet two requirements.  First, it must be issued by a medical practitioner acting in the usual course of his professional practice.  *See* § 1306.04(a).  For example, a prescription is not issued for a legitimate medical purpose if it is issued or sought for nonmedical use or abuse by a patient.

437.    While section 1306.04(a) imposes a responsibility on prescribers (medical practitioners) to issue valid prescriptions, it also imposes a "corresponding responsibility" on the pharmacist who fills the prescription to independently determine that the prescription is meets these requirements.  *See* § 1306.04(a).  The pharmacist's corresponding responsibility includes identifying and attempting to resolve red flags, to document the resolution if the red flag is resolved, and to refuse to fill the prescription if the red flag is not resolved.

438.    A third relevant rule that a pharmacist must follow in filling prescriptions for controlled substances is found in section 1306.06, which requires that the pharmacist's conduct must adhere to the usual course of his or her professional practice as a pharmacist.  *See* 21 C.F.R. § 1306.06.

439.    Pharmacists are professionals who must be licensed by the states in which they practice.  A basic licensing requirement common across states is a Doctor of Pharmacy ("Pharm.D.") degree, which is granted upon successful completion of a doctoral-level program that typically requires three to four years of study.  After successfully attaining a Pharm.D. degree, practicing pharmacists must pass two licensing exams.

440.    Pharmacists are trained about the role they play in preventing prescription drug abuse and diversion.  For example, the Accreditation Council for Pharmacy Education, which publishes accreditation standards and guidelines for Pharm.D. programs, requires that the Pharm.D. curriculum

include a discussion of the laws regulating pharmacy practice and the mitigation of drug abuse and diversion.

441.    In evaluating the validity of a controlled-substance prescription, pharmacists cannot rely exclusively on the mere fact that it was issued by a medical practitioner. A pharmacist must consider any signs that a prescription may be invalid or that the controlled substances may be abused or misused.

442.    Pharmacists call these signs of invalidity "red flags." Red flags may arise based on the prescriber who issued the prescription (e.g., where a prescriber issues many more prescriptions of opioids for higher quantities than do comparable prescribers), the prescription itself (e.g., where the combination of drugs prescribed is frequently sought by individuals known to abuse or misuse prescription drugs for nonmedical purposes), or the individual presenting the prescription (e.g., where a patient repeatedly seeks early refills).

443.    One of the key professional responsibilities of a pharmacist, when presented with a prescription for controlled substances, is to identify and resolve any "red flags" before filling the prescription. This responsibility is well recognized in the professional field of pharmacy. It is discussed in the training of pharmacists, by pharmacists at professional conferences, and in training materials prepared by pharmacy boards.

444.    This responsibility also has been recognized as an important safeguard against the abuse of controlled substances. For example, in 2014, the National Association of Boards of Pharmacy released a video called "Red Flags," which observed that "by recognizing red flags to help establish the validity of a prescription, the pharmacist becomes the last line of defense in preventing misuse." The video states, "problem prescriptions can often be identified by using common sense, practicing good pharmacy, and looking for red flags that suggest the prescription may not be legitimate."

445.    When a pharmacist identifies red flags but can resolve them, the pharmacist has an additional professional responsibility: to document the resolution of the red flags.  In other words, pharmacists were trained that, when presented with a controlled-substance prescription bearing a significant red flag, they needed—as part of the usual course of professional pharmacy practice—to investigate and either (a) resolve the red flag before dispensing *and* document the resolution, or (b) refuse to fill the prescription. The documentation ensures that the information about the red flag and its resolution is available for future reference, and the absence of documentation can indicate that the pharmacist did not successfully resolve the red flag.

446.    Because this obligation—to identify any red flags relating to a prescription for controlled substances, to resolve them before filling the prescription, and to document any resolution of red flags—is a well-recognized responsibility of a pharmacist in the professional practice of pharmacy, failing to fulfill this responsibility is a violation of 21 C.F.R. § 1306.06, which requires that a pharmacist's conduct, when filling controlled-substance prescriptions, must adhere to the usual course of his or her professional practice as a pharmacist.

447.    The CSA makes it unlawful "for any person … subject to the requirements of Part C [21 U.S.C. §§ 821–32] to distribute or dispense a controlled substance in violation of section 829." 21 U.S.C. § 842(a)(1) (emphasis added).  A person dispensing controlled substances not in compliance with any of the three requirements identified above violates 21 U.S.C. § 829 and thus 21 U.SC. § 842(a)(1).

448.    When a corporation's agents or employees violate the rules for dispensing controlled substances, the corporate entity may be held liable for the civil penalty.  Corporations must comply with the CSA when they engage in activities covered by the CSA or its implementing regulations, such as operating a pharmacy that dispenses controlled substances. *See* 21 U.S.C. §§ 822(b), 823(f). While the CSA, in 21 U.S.C. § 842(a)(1) and (c)(1), makes a "person" liable for civil penalties, a corporate

entity may be the "person" that fills prescriptions through its agents, as the CSA's regulations expressly define "person" to include corporations. *See* 21 C.F.R. §§ 1300.01, 1306.02.

**D.    Defendants failed to comply with their CSA obligations to identify, report, and halt suspicious orders.**

449.    Each Defendant, as a distributor of controlled substances, violated the requirements under the CSA to prevent diversion by operating a program that would identify, report, and not ship suspicious orders of prescription opioids without adequate investigation.

**1.    Janssen**

450.    From 2005 through at least 2018, Janssen never reported a suspicious order to DEA.[211]

451.    Janssen only monitored for orders of unusual size and failed to ever monitor for frequency and/or pattern in real-time.[212] The rigid formula was insufficient to detect all suspicious orders, and the thresholds were set too high to effectively identify even all orders of unusual size.

452.    Beginning in 2005, Janssen received chargeback data that would have provided visibility into the orders of its opioids by downstream customers. Since at least 2011, Janssen had access to 852 data (wholesalers' inventory and total sales out to their customers) and un-blinded 867 data (wholesalers' total sales out to their customers broken out by outlet). Consistent utilization of third-party data to monitor sales of Janssen's opioids was necessary to identify potential diversion and should have been used for that purpose.[213]

---

[211] Deposition of Michele R. Dempsey (Jan. 22, 2019, and Mar. 8, 2019) at 487:2–488:18 (hereinafter "Dempsey Deposition); *see also* Terrence W. Woodworth, The Drug & Chemical Advisory Group, *Evaluation of the Suspicious Order Monitoring System for Johnson & Johnson* 14 (Jan. 8, 2018) ("It appears that the JOM SOM has not reported a suspicious order for controlled substances as suspicious during its entire time in operation.").

[212] Dempsey Deposition at 433:21–455:13.

[213] *See id.* at 104:3–16, 123:11–124; *see also id.* at 122:16–123:9, 132:18–134:11 ("[W]hen an order, a controlled substance order, goes through the order monitoring program, if it is deemed to be questionable, customer service planning is involved in reaching out to the customer to understand why it is not a typical order. And this data is used to -- in some cases, as justification to show that downstream inventory is low and it required additional information -- this order was justified for release.").

## 2.    Allergan

453.    Allergan and Actavis failed to maintain effective controls to prevent diversion, failed to design and operate an adequate SOM system, and failed to take reasonable steps to prevent the Allergan entities' products from being diverted.

454.    Actavis had the same rudimentary threshold-based SOM system in place from November 2000 through October 2012, during which it sold both generic opioids and branded Kadian (after 2008). The SOM was deficient because it was not cumulative, because Actavis did not investigate each order that the system flagged, and because less than 1% of the orders flagged by the system were ever stopped before shipment. There was only one order between 2008 and 2017 that was ever deemed to be suspicious and reported to DEA as such.

455.    The 2000–2012 Actavis system flagged only orders unusual in size; it did not flag orders unusual in frequency or unusual in pattern in real time. Actavis's rigid formula did not accurately detect all suspicious orders. The system did not utilize any downstream customer information available to Actavis, did not differentiate among NDC codes for drugs with a higher risk of diversion, and did not automatically stop orders from shipping. Actavis began using a statistics-based, more modern SOM system on October 1, 2012.[214]

456.    At a 2012 meeting, DEA told Actavis employees that some pharmacies in Florida, to which individuals were traveling and seeking 15 mg and 30 mg oxycodone tablets, "had purchased well in excess of a million dosage units per year. This is an obvious concern to DEA and must be addressed by Actavis."[215] DEA also requested that Actavis visit pharmacies receiving large quantities of Actavis opioid and monitor both its customers and its customer's customers.

---

[214] Actavis, *Actavis Suspicious Order Monitoring – DIRECT Customer Sales SOP*; Email from Maria Lesny to Ryan Blackburn (Oct. 4, 2012 at 11:06 AM).
[215] Memo from Barbara J. Boockholdt, Chief, Regulatory Section, Off. of Diversion Control, to Joseph T. Rannazzisi, Depty Asst. Admin., Off. of Diversion Control (Nov. 5, 2012) (reporting on the September 12, 2012 meeting).

457.    From 2000 to 2016, Watson, then Actavis (after the 2012 merger), and then Allergan (after the 2015 merger) used an SOM system with a threshold-based automated inventory component. Like the pre-merger Actavis system, it only looked for orders of unusual size and not for frequency and/or pattern in real time. The rigid formula used did not satisfy the obligation to detect and investigate suspicious orders. The automated portion of the system did not utilize any downstream customer information available, did not differentiate among NDC codes for drugs with a higher risk of diversion, and only manually stopped orders from shipping. The companies' failure to identify suspicious orders was known among their employees. It was these same employees that cut or reduced orders in order to avoid filling a suspicious order report.

458.    On information and belief, Allergan continued to have a deficient SOM system to prevent diversion of these opioids until it discontinued their manufacture.

### 3.    AbbVie

459.    Until at least 2007, AbbVie's suspicious order monitoring program was explicitly not designed to detect or report orders of suspicious frequency or pattern; it was only designed to identify orders above a certain threshold.

460.    Although AbbVie purports to review each controlled substance order that is placed, the review procedure in place as of 2014 continued to emphasize order size based on a threshold as the primary determinant of whether an order was suspicious.

461.    AbbVie's system could allow shipment of orders without review for whether they were suspicious. AbbVie noticed this deficiency in 2016, but initially refused to implement changes immediately, citing expense as a reason.

462.    AbbVie's suspicious order monitoring was operated by customer service, not by regulatory personnel.

463.    Even when orders were held for investigation, they were released based on brief explanations from customers (such as "demand has increased") with no requirements for documentation or other supporting evidence. Customers to whom orders were released with this minimal investigation include Anda and Walgreens.

### 4.    ABDC

464.    ABDC's CSA compliance program suffered from serious systemic defects that enabled significant CSA violations.

465.    ADBC grossly underfunded its CSA compliance program.

466.    ABDC adopted, but did not adequately implement, Know Your Customer policies, which facilitated ABDC's servicing of problematic customers. ABDC allowed sales personnel—who were incentivized to recruit and retain customers—to conduct due diligence rather than compliance personnel. According to the testimony of a retired ABDC sales representative in West Virginia, their bonuses were based on total sales to their pharmacies.

467.    In addition, sales representatives were inadequately trained to identify and halt ABDC's sales of controlled substances to pharmacies where diversion was occurring. For example, a DEA suspension order concerning one of ABDC's Ohio customers, East Main Street Pharmacy, documented deaths that occurred as a result of a failure to prevent diversion. Julie Fuller, the ABDC sales representative responsible for East Main Street Pharmacy, testified in the suspension proceedings. Notwithstanding obvious signs of illegal activity, including the fact that more than half of the pharmacy's prescriptions were written by an out-of-area doctor who was writing high volumes of controlled substances, Fuller "acknowledged that the purpose of her visits was not 'to observe [the pharmacist]' in the practice of pharmacy but to get his business."[216] Subsequent to the suspension

---

[216] East Main Street Pharmacy; Affirmance of Suspension Order, 75 Fed. Reg. 66149 (Oct. 27, 2010), https://www.govinfo.gov/content/pkg/FR-2010-10-27/pdf/2010-27096.pdf.

proceedings, Fuller signed a Declaration, where she stated that ABDC only provided her with general sales training and did not provide any training or information on (a) how to identify questionable pharmacy behavior like suspicious dispensing, sales, or prescription filling practices; (b) how to report concerns regarding those behaviors; or (c) how to ensure that account managers only signed up and maintained accounts with legitimate pharmacies. These failures led to diversion at the pharmacy.

468. In violation of its own policies, ABDC did not obtain the diligence information necessary to assess the possible risks associated with prospective customers.

469. ABDC ignored, or failed to address, red flags of diversion and other problems, including when alleged diligence information conflicted with a customer's actual practices.

470. Examples of egregious cases identified in an investigation by New York's Attorney General included:

a. A pharmacy at or above the 99th percentile in terms of both the number of opioid orders and total opioid weight, at which, between 2014 and 2016, more than 10% of its prescriptions were written by prescribers who were later indicted or convicted of opioid-related prescribing and distribution charges; ABDC reported nearly 200 suspicious order reports from this pharmacy in 2013-2014, and as of 2018, it was still serving as this pharmacy's primary opioid distributor;

b. A pharmacy where, between 2013 and 2017, 77% of its prescriptions, on average, were written by prescribers who were later indicted or convicted, including 90% in 2014, and to which ABDC appears to have only stopped shipping in 2017; and

c. A Bronx pharmacy that exceeded the 95th percentile for the percentage of oxycodone volume shipped for five years straight (2012 to 2016), where on average 58% of its opioid prescriptions were paid for in cash (99th percentile), where for three consecutive years (2013 to 2015) approximately half of all opioid scripts were written by prescribers who were later convicted, and which, as of 2018, was still a customer of ABDC.[217]

471. ABDC designed its Order Monitoring Program to flag for review only orders that exceeded certain statistical thresholds. ABDC's original Order Monitoring Program applied high

---

[217] Memorandum Opinion, *Lebanon Cty. Emps.' Retirement Fund v. AmerisourceBergen Corp.*, No. 2019-0527-JTL (Del. Ch. Ct. Jan. 13, 2020), https://courts.delaware.gov/Opinions/Download.aspx?id=300360.

thresholds for identifying suspicious orders, and ADBC sometimes raised thresholds upon request. This program relied exclusively on numerical thresholds and did not monitor for other suspicious practices such as orders of unusual frequency or pattern.

472.    Beginning in 2014, ABDC created a revised Order Monitoring Program that sharply cut the number of suspicious-order reports to DEA. This program flagged only orders that were both unusual in size and pattern or of extraordinarily unusual pattern. ABDC designed this program recognizing that it would flag fewer orders for review and report fewer orders to DEA.

473.    The human review element of the ABDC Order Monitoring Program was grossly insufficient. For a portion of the relevant period, ABDC tasked insufficiently trained distribution center personnel—not compliance personnel—with reviewing many suspicious orders, including opioid orders. Even when flagged orders were reviewed by alleged compliance personnel, ABDC devoted inadequate resources towards that task, resulting in cursory, if not non-existent, reviews. ABDC's order reviewers did not have access to information and did not receive adequate training needed to conduct investigations.

474.    ABDC allowed Walgreens to "police their own orders and block any order that would exceed [ABDC]'s threshold thus triggering a suspicious order being sent to DEA from [ABDC]." Additionally, when ABDC received orders from Walgreens "outside the expected usage," Walgreens and ABDC met to discuss adjusting thresholds or using "soft blocking." Contrary to DEA guidance and its own stated policy, ABDC also shared the threshold limits set by its "order monitoring program" with Walgreens and provided Walgreens with weekly SOM statistics. ABDC generally would not act on Walgreens orders that exceeded its thresholds without first talking to Walgreens.

### 5.    Anda

475.    Anda's SOM program was designed and implemented deficiently in numerous ways. Those deficiencies include: 1) routinely shipping orders in excess of the monthly threshold it assigned

customers, for which it was cited by DEA; 2) routinely increasing when a customer placed an order that exceeded the threshold; 3) making the increased threshold permanent, even if the reason for the increase was temporary; 4) shipping suspicious orders without reporting them to DEA; 5) clearing suspicious orders for a number of vague reasons which did not actually involve investigation; and 6) understaffing its compliance department.

476.    Though Anda often internally identified orders or stores of concern when pitching clients or deciding whether to continue or expand business with these clients, there is no evidence that Anda ever reported a suspicious order related to any chain customer, including Walgreens. Until at least 2017, Anda used a "screen-out" threshold system of monitoring that rejected orders above a threshold and did not track when a customer attempted to order above that threshold.[218]

477.    Anda routinely increased its customers' thresholds when they placed an order that exceeded the threshold. Once adjusted upwards, the new limits would become permanent, even if the reason for the increase was temporary.

478.    Anda repeatedly ignored red flags. When Walgreens's Jupiter, Florida distribution center shut down, Anda became Walgreens's exclusive secondary distributor of Schedule II controlled substances in 2013. Anda agreed to do so even though Anda had conducted an audit of Walgreens showing that many Walgreens stores had red flags of diversion. When an Ohio customer was admonished by DEA for lacking SOM systems, Anda continued to approve huge shipments to the customer. In fact, it repeatedly increased the customer's thresholds from 75,000 units per month per chemical to 200,000 units per month.

479.    Between 2007 and 2012, Anda did not report a single suspicious order to DEA.

---

[218] *See* Letter from Ronald W. Buzzeo to Robert L. Brown, Director of Regulatory Compliance, Anda (Nov. 12, 2015); Operations Committee Meeting Minutes (Sept. 29, 2010); Email from Emily Schultz to Donna Cupp (Jan. 17, 2021, 1:55 PM); Email from Shaeen Suraj-Persad to Vicki Mangus (Mar. 26, 2013, 12:52 PM).

480.    Anda's policy was to clear suspicious orders for a number of standard reasons without actually investigating. The list of acceptable reasons for which suspicious orders could be cleared was vague, thereby allowing clearance for just about any reason. When DEA told Anda in 2011 that it should start an onsite inspection program, Anda never did.

481.    Anda's compliance department was severely understaffed. Anda's compliance program had just six employees as compared to the 216 employees in the sales department. This means that each compliance officer would have to review 722 suspicious orders per month to keep up with the workload. Anda's own documents evidence its failed SOM program: in 2011, Anda had 9,624 customers without appropriate due-diligence materials to whom Anda was still shipping opioids.

482.    Anda communicated with other distributors about SOM processes and compared systems. For example, in 2008, Anda's CEO answered Cardinal's questions about Anda's Schedule II increase limit process, telling Cardinal exactly how Anda flags suspicious orders. In 2012, Anda obtained a description of McKesson's SOM Program from Rite Aid. An analysis of the program concluded that, under McKesson's program, a new customer could hypothetically start the year with a monthly Schedule II limit of 1000 and by the end of the year have a limit as high as 86,500. In 2012, Anda and Rite Aid discussed the metrics McKesson used for "automatically" increasing Oxy limits, noting that McKesson's formula is "flawed" and will result in having "an issue with a store before you actually realize there is an issue." Anda never reported the flaws in McKesson's SOM program to DEA.[219]

---

[219] Email from Al Paonessa III to Peter Kerrane (Aug. 9, 2008, 12:06 AM); Email from Michael Cochrane to Albert Paonessa (Sept. 11, 2008, 2:31 PM).

### 6.    Cardinal

483.    Cardinal's written policies for compliance were and are contained in Standard Operating Procedures ("SOPs") that apply to its various operating and sales departments. These SOPs were first implemented in 2008 and have since undergone several revisions.

484.    These policies were not coordinated within the context of a consistent, unified umbrella policy to prevent the diversion of controlled substances, resulting in employees governed by one of the SOPs being unaware of the obligations imposed by other SOPs on other employees, even when effective anti-diversion measures required that understanding and coordination. Furthermore, these documents are not readily available even to the employees charged with implementing them.

485.    In addition, Cardinal's SOPs and policies contained numerous gaps that would have prevented them from effectively preventing diversion, even if enforced. For example, these policies:

   a.  Allowed new accounts with no formal mechanism to ensure review and approval by a supervisor;

   b.  Allowed onboarding of new accounts even where customers failed to provide requested information about other suppliers, dispensing data, and top prescriber information;

   c.  Allowed compliance staff to release a customer's first order in excess of its monthly threshold, regardless of whether the customer made other orders in excess of the same drug threshold at the same time; and

   d.  Allowed compliance staff to approve on boarding Cardinal's Failure to Effectively Prevent Diversion in Practice.

486.    At all relevant times, Cardinal failed to employ qualified compliance staff to implement these policies, failed to adequately train those compliance staff or its sales representatives concerning Cardinal's anti-diversion duties, and failed to enforce even the defective policies it had in place.

487.    Cardinal failed to install qualified personnel in key compliance positions. For example, Cardinal's front-line "New Account Specialists" and "Analysts," responsible for onboarding new customers and monitoring existing customers, respectively, were routinely recruited from the ranks of

the company's existing pool of administrative assistants. These employees, who had no experience in regulatory compliance, were generally supervised by pharmacists or other professionals with no prior experience in supervising investigative functions.

488.    Moreover, Cardinal failed to provide meaningful training to either these unqualified compliance personnel or sales representatives. Instead, Cardinal expected the compliance staff to "learn on the job" through informal in-person "team meetings." Due to the lack of proper training and clear guidelines, compliance staff did not fully understand critical components of their jobs and often developed their own procedures and benchmarks for reviewing customers.

489.    Unsurprisingly, these unqualified and untrained staff routinely failed to follow even the most basic procedures required under the company's various SOPs. In addition, Cardinal allowed customers to reinstate their accounts through the new account onboarding process despite having compliance red flags.

490.    In 2012 and 2013, Cardinal took significant steps to renew focus on increased sales at the cost of a robust and responsible compliance structure, thereby keeping as customers pharmacies that it knew or should have known were high risk for diversion of opioids. For example, Cardinal:

    a.  Continuously reduced the due diligence information collected from prospective and existing customers, diluting the customer questionnaire, removing the requirements to collect photos of the pharmacies, and ceasing to ask about top prescribers;

    b.  Expanded the geographic scope of investigators with essential regional knowledge of, for example, top prescribers and their locations relative to the pharmacies where their prescriptions were being filled, thus reducing the investigators' efficacy;

    c.  Restricted the information reviewed from site visits by first removing the investigator comment section and for a time eliminating written reports entirely; and

    d.  Demoted, moved to non-compliance functions, or let go several staff members who articulated an interest in expanding the company's compliance functions, aggressively scrutinizing pharmacy customers, and/or terminating problematic customers.

491.    Cardinal routinely failed to follow the SOPs for detecting, monitoring, and reporting suspicious orders. Cardinal's compliance staff routinely released orders in excess of a customer's threshold without conducting the follow-up investigation and providing the detailed written justification called for by the SOPs.

492.    Even where Cardinal did block customers' orders and report them as suspicious, it routinely took no steps to suspend or terminate those customers and instead allowed them to continue receiving their threshold amount of opioids month after month thereafter, regardless of whether the customer continued to make suspicious orders.

493.    Between 2012 and 2017, for example, Cardinal reported twelve or more opioid related suspicious orders for at least one year-the equivalent of one per month-for hundreds of pharmacies nationwide. Those pharmacies had several known red flags in their shipment orders and prescription data. More than half of these pharmacies: (a) exceeded the 90th percentile in their states in terms of opioid volume shipped; (b) exceeded the 90th percentile in their states in terms of oxycodone volume shipped; and (c) exceeded the 90th percentile in their states in terms of median strength of opioids prescribed per day. Nonetheless, even after reporting twelve or more opioid-related suspicious orders for one of these pharmacies, Cardinal continued to ship opioids, on average, for more than three years.

494.    Examples of egregious cases identified in an investigation by a state attorney general included:

   a. A pharmacy in the 99th percentile in the state, to which Cardinal reported an average of 85 suspicious orders per year for five years, the equivalent of more than once a week, yet as of 2018, as of 2018, this pharmacy continued to receive opioids from Cardinal.

   b. A pharmacy in the 95th percentile in the state, to which Cardinal, from 2012 to 2018, shipped more than 20,000 grams of opioids, the equivalent of about thirteen 30mg oxycodone pills for every person in the county.

   c. A pharmacy in the 90th percentile where more than 20% of its customers have received opioid prescriptions by three or more doctors in a six-year period, and to

which Cardinal continued to ship opioids after other distributors had issued 223 SORs.

d.  A pharmacy in the 99th percentile where approximately 60% of prescriptions were written by prescribers who were later indicted or convicted, and to which Cardinal has failed to issue a single SOR as of December 2017.

495.    Even if Cardinal had conducted due diligence to investigate its high-volume opioids customers, Cardinal's failure to implement any system to store and share information about their suspicious customers and/or suspicious prescribers would have compromised the effectiveness of any such investigation.

### 7.    McKesson

496.    McKesson failed to comply with its obligations under the CSA to prevent diversion of controlled substances.

497.    The egregiousness of McKesson's failure to report suspicious orders is shown by the quantity of orders McKesson did report as suspicious once it finally decided to start fulfilling its reporting obligation. McKesson reported almost no suspicious orders of opioids from 2008 to 2013, but in 2015, McKesson reported a total of 230,000 suspicious orders.[220] Hundreds of thousands of orders did not suddenly become suspicious overnight. They had always been suspicious and simply not reported.

498.    McKesson's program was riddled with flaws and loopholes that rendered them substantially ineffective. Specifically, at various points, the program:

a.  Directed that customers' monthly threshold limits be set by reference to customers' prior ordering volumes, without requiring investigation of those volumes' appropriateness, effectively building all prior diversion activity into the company's future shipments of opioids to those customers;

b.  Allowed customers to resolve investigations into orders in excess of their monthly threshold and into requests to increase monthly thresholds by self-reporting the answers to three yes or no questions, without requiring validation of those answers;

---

[220] *McKesson Board of Directors' Response to International Brotherhood of Teamsters* 24 (n.d.).

c. Failed to require key indicators of diversion as part of the company's due diligence of pharmacies, including but not limited to obtaining prescriber-level information;

d. Exempted some customers from scrutiny who consistently placed orders in excess of their threshold;

e. Alerted customers when they were nearing their monthly threshold limit for opioid products;

f. Failed to adequately design and operate a system to disclose suspicious orders to DEA; and

g. Required little to no diligence on chain-pharmacy orders, so as to maintain these large customer accounts regardless of the consequences.

499. McKesson never required pharmacies to provide prescriber-level dispensing data when granting threshold increases or investigating suspicious orders. Moreover, when compliance staff did receive prescriber-level data and identified suspicions about particular pharmacies based on doctors for whom they filled prescriptions, the company lacked any system by which it could identify other pharmacies that filled prescriptions for the same physicians. McKesson deliberately blinded itself to that key data—resulting in continued shipments of opioids to many pharmacies that the company should have scrutinized due to the prevalence of suspicious prescribers whose prescriptions were being filled in those locations.

500. McKesson has acknowledged these failures. Speaking about certain pharmacies in West Virginia that McKesson belatedly terminated after supplying them with excessive quantities of opioids for years, McKesson's CEO admitted, "[i]n hindsight, I would have liked to have seen us move much more quickly to identify the issues with these pharmacies."[221]

---

[221] *Combatting the Opioid Epidemic: Examining Concerns about Distribution and Diversion*, Hearing before the Subcomm. on Oversight & Investigations of the Comm. On Energy & Commerce, No. 115-124 (May 8, 2018), https://www.govinfo.gov/content/pkg/CHRG-115hhrg31601/html/CHRG-115hhrg31601.htm (hereinafter *Combatting the Opioid Epidemic*).

### 8. H.D. Smith

501. From 2006 to 2008, H.D. Smith's SOM program was manual, rather than automated. Starting in 2006, H.D. Smith began working on an automated compliance system, but this "system" was never really a viable automated system, just iterations and attempts.

502. In or around 2008, H.D. Smith began developing a computer-based suspicious-order-monitoring program, which H.D. Smith called "CSOMP." Under CSOMP, H.D. Smith's suspicious-order-monitoring reports, which might have identified suspicious orders, were not reviewed until after the flagged orders had been shipped.

503. CSOMP did not consider opioid order pattern or frequency. H.D. Smith's SOM program permitted automated release of all orders by new pharmacies during a 90- to 120-day period, allowing them to "ramp up," even when they exceeded order volume limits. When opioid orders neared threshold limits, the orders were still released without further investigation or reporting, allowing the customer to build a high-volume-sales "history." In fact, in order to avoid reporting a suspicious order to DEA, H.D. Smith would notify customers when they approached their threshold limits, allowing customers to request threshold increases and avoid triggering thresholds. Additionally, those thresholds for reporting were based on the client's prior sales. So, if a client spent more, their limit could be reset to that higher point.

504. Issues with CSOMP requiring modifications and fixes to address broken functionality continued until at least February 2015. These issues included stopping only one large controlled drug order at a time for review, while allowing a smaller order for the same customer to be filled while larger order was being reviewed; allowing 448 people within H.D. Smith to release holds in CSOMP; having a lack of tools to detect orders of unusual frequency or pattern; and having multiple accounts assigned to one customer or DEA number, each of which was assigned thresholds (i.e., 3 accounts; 3x the threshold limit for that customer).

505.     An H.D. Smith employee with responsibilities for CSOMP monitoring who resigned in February 2015 explained her concerns with H.D. Smith's SOM system. In an exit interview, Lori Kirbach stated, "the company is and has been breaking the law for some time." Specifically, Ms. Kirbach stated that "CSOMP has not been working correctly since OPUS Go Live and that no one will listen to them when they bring it up. Compliance is releasing orders that they should not be releasing." She added that the "DEA is about two years behind in looking at CSOMP data and it[']s only a matter of time before they catch up to us and questions are asked." Ms. Kirbach also added that her manager "often said not to put certain issues (such as the CSOMP issue) in email so in the event the company is ever sued, and the email is produced" other employees could "deny any knowledge."

506.     Another H.D. Smith employee, P.J. VanderMeersch, Compliance Specialist, wrote in September 2013: "we are absolutely not compliant with Federal Regulations, and we know we aren't."

### 9.    Walgreens

507.     Walgreens's corporate officers not only turned a blind eye; they also provided pharmacists with incentives through a bonus program that compensated them based on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens's attitude that profit outweighed compliance with drug laws or the health of communities.[222]

---

[222] Order to Show Cause & Immediate Suspension of Registration, *In re Walgreens Co.* (Drug Enf't Admin. Sept. 13, 2012) (hereinafter "2012 Walgreens ISO"); Jenn Abelson, et al., *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids*, Wash. Post (Nov. 7, 2019), https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/.

508.    Walgreens admitted that its Suspicious Order Monitoring Program failed to halt suspicious order because it "would continue to send additional product to [a Walgreens store] without limit or review which made possible the runaway growth of dispensing products like oxycodone."

509.    Walgreens's program from 2010 to 2012 had significant gaps or loopholes which caused Walgreens to continue to provide its stores with suspicious quantities of controlled substances, including the following:

a.    Walgreens continued to neglect to incorporate a store's orders of controlled substances from outside distributors into the determination of whether a given order was suspicious. This allowed stores to circumvent the effect of orders being cut by Walgreens distribution centers because stores could simply place the cut portion of the order with an outside distributor.

b.    Walgreens allowed interstoring (obtaining drugs from other Walgreens stores) of controlled substances until April 2013 but did not account for interstoring when identifying suspicious orders.

c.    Walgreens's SOM algorithm only considered 13 weeks of sales data and would recalibrate the thresholds if there was a gradual increase in sales. Only a sudden spike in sales would result in orders getting cut.

d.    In addition to their regular periodic orders for controlled substances from the Walgreens distribution centers, Walgreens stores were permitted to place ad hoc "PDQ" ("pretty darn quick") orders for controlled substances outside of their normal order days. The limits and automatic reductions Walgreens placed on stores' orders to distribution centers did not apply to PDQ orders, such that a store could, for instance, hit its weekly limit for a particular controlled substance and then place daily PDQ orders for the same drug, resulting in total order amounts far exceeding the monthly cumulative order limits put in place by Walgreens's SOM program. Walgreens did not remove oxycodone from PDQ ability until October 2012; other Schedule II controlled substances were not removed from PDQ until even later.

e.    Walgreens only examined its stores individually rather than comparing them to one another. The result was that a store that historically had a pattern of excessively large orders could continue making excessively large orders.

f.    Walgreens had the ability to remove entire stores and products from SOM review.

g.    Even when Walgreens began cutting orders over a certain limit, stores could simply "call the DC" to obtain a "manual work around" the purported limit. The distribution centers did not have the ability to evaluate the information necessary to determine the propriety of any such overrides.

510.    One example of the sorts of information that was available and considered, but not acted upon, is found in emails from January 10–11, 2011 between a Walgreens DC employee and Barbara Martin, identified by Walgreens as being one of two employees primarily responsible for performing due diligence on suspicious orders in the 2009–2012 time period under the new SOM system. The DC employee noted "several stores that are ordering huge quantities of 682971 [30 mg oxycodone] on a regular basis," and with respect to a single store, "we have shipped them 3271 bottles [of 30 mg oxycodone] between 12/1/10 and 1/10/11. I don't know how they can even house this many bottles to be honest. How do we go about checking the validity of these orders?" Ms. Martin noted that the store had average weekly sales of 36,200 dosage units, which was equal to 362 bottles per week, stating, "I have no idea where these stores are getting this type of volume. The last pharmacy I was manager at did about 525 rxs/day and we sold about 500 tabs a month (5 bottles)." Ms. Martin then told the DC employee that she could call the district pharmacy supervisor to see if he "may be able to shed some light on the subject." Even though questions had been raised about this store ordering volume in January 2011, the very next month, Walgreens filled and shipped orders totaling another 285,800 dosage units of 30-milligram oxycodone to the same pharmacy.[223]

511.    Of the orders that were the subject of these email exchanges, DEA specifically found that "[b]ased on the evidence available to DEA, none of these orders were reported to DEA as suspicious and all appear to have been shipped, without any further due diligence to verify their legitimacy."[224]

512.    Walgreens also used its substantial market share to aggressively (and often successfully) lobby its distributors to increasingly raise ordering thresholds for its pharmacies and worked to have suspicious orders placed by its pharmacies filled by not reported to DEA.

---

[223] *See* 2012 Walgreens ISO, *supra.*
[224] *Id.*

### 10.    CVS

513.    CVS failed to maintain an effective suspicious order monitoring system or to complete necessary due diligence.

514.    Before 2009, CVS did not have a Suspicious Order Monitoring ("SOM") system. Instead, CVS relied on the gut instincts of "Pickers and Packers" of the drugs in the distribution center to identify "really big" orders that they believed were simply too large.

515.    As of November 2011, CVS had a "CVS DEA compliance coordinator" in name only. A former CVS employee who held the position at that time has said that this was only "for reference in SOPs," not her real job. For "personnel purposes," she was never considered the CVS DEA compliance coordinator. Moreover, she had nothing to do with suspicious order monitoring, other than "updating the SOP with what was provided for the program."

516.    CVS failed to remedy fatal flaws in the system it slowly developed. In 2009, CVS began using a computer algorithm that flagged potentially suspicious orders needing additional investigation. But this program was still deficient. It monitored by drug, not by active ingredient, meaning that changes in a drug's description or name caused historical data, necessary for valid calculations, to be lost. It also failed to consider orders from distributors outside of CVS.

517.    Meanwhile, even if orders were flagged, CVS did not conduct appropriate due diligence on them. Even though the SOM program would identify between 200 and 500 suspicious orders a day, the CVS employee would only have time to do a "deep dive" on 5-6 orders per day.

518.    As late as July 2013, internal e-mails reflect that CVS's primary tool for investigations used stale data that made any analysis, "for the most part, irrelevant and pointless."

519.    Not until mid- to late 2014 did CVS fully implement the new SOM system. That same year, all CVS distribution centers stopped distributing Schedule II opioids at the wholesale level.

520.    CVS worked with other defendants to avoid monitoring and reporting suspicious orders. CVS understood that for Cardinal and McKesson to meet their due-diligence obligations under the CSA, they would need access to CVS's dispensing information. CVS refused to provide dispensing information about doctors or patients unless it was requested by DEA.

521.    Prior to 2013, Cardinal and McKesson performed due diligence differently for CVS than for other pharmacies. Instead of distributors contacting or visiting CVS stores, as with other pharmacies, they contacted CVS's loss-prevention offices at corporate headquarters. This meant that CVS controlled all "due diligence investigations" of its opioid orders. CVS prevented distributors from independently determining appropriate order thresholds for opioids at CVS stores, reserving the right to adjust threshold quantities and percentages to values CVS deemed appropriate.

### 11.    Walmart

522.    From 2000 to approximately May 2018, Walmart self-distributed tens of millions of shipments of controlled substances to Walmart-branded and Sam's Club-branded pharmacies. In this role, Walmart violated the CSA.

523.    Walmart had access to a wealth of information and data such that it could readily have designed a system to adequately detect suspicious orders. Walmart's self-distribution to its own pharmacies gave it extensive knowledge and data about dispensing patterns and order. Walmart also had information on the millions of orders for controlled substances its pharmacies placed with—and received from—independent distributors.

524.    For years, Walmart knew of significant defects with its policies and procedures for detecting and reporting suspicious orders but failed to fix them.

525.    Prior to August 2015, Walmart had a rudimentary suspicious-order monitoring system that failed to adequately detect and report suspicious orders. This system failed to detect and report orders of unusual size, unusual frequency, or unusual pattern. At the same time, Walmart ignored signs

of diversion from its own pharmacies, such as concerns expressed by pharmacists to compliance personnel about prescriptions written by "pill mill" prescribers and illegal diversion occurring inside Walmart stores. Walmart also failed to adequately staff and train its compliance personnel and shipped flagged orders before compliance personnel could examine them. Walmart routinely failed to investigate flagged "orders of interest" and report any order that Walmart was unable to clear to DEA. Walmart often failed to document its evaluation of flagged orders, which deprived it of crucial information needed to assess subsequent orders.

526.    From August 2015 through November 2017, Walmart adopted a modified system for detecting and reporting suspicious orders. Despite these modifications, many of the same flaws remained. Walmart continued to fail to report unusually large orders. Walmart set hard limits for pharmacies that had already placed suspicious order only to then disregard those hard limits and ship suspicious quantities of controlled substances.

527.    Walmart's SOM was so deficient that it failed to report at least hundreds of thousands of suspicious orders. From June 26, 2013, to November 29, 2017, Walmart sent its pharmacies 15.2 million orders of Schedule II controlled substances and Schedule III narcotics. In that time, it reported only 204 suspicious orders. By comparison, McKesson, when receiving orders from Walmart pharmacies, reported more than 13,000 suspicious orders in the same period.[225]

528.    This failure to detect and report suspicious orders deprived Walmart of the opportunity to timely address its unlawful conduct, which was contributing to the opioid epidemic.

---

[225] Complaint, *United States v. Walmart Inc.*, No. 20-1744-CFC (D. Del. filed Dec. 22, 2020), https://www.justice.gov/opa/press-release/file/1347906/download (hereinafter "Walmart DOJ Complaint").

### E.    The National Retail Pharmacies dispensed opioids in violation of the CSA.

#### 1.    Walgreens

529.    Walgreens sold massive quantities of opioids by failing to maintain effective controls against abuse and diversion and taking affirmative steps to undermine its own opioid diversion controls and those of others.

530.    In Española, New Mexico, a single Walgreens pharmacy dispensed 12.4 million opioid pills between 2006 and 2019—841 pills for each and every person in Española during that time. Española remains trapped in the grip of a fierce opioid epidemic.[226]

531.    Walgreens designed anti-diversion compliance programs, including Suspicious Order Monitoring and Good Faith Dispensing, that had significant flaws, were designed to minimize their impact on opioid sales to its stores, and yielded to Walgreens's higher priority to generate profit. These compliance programs and policies were a low corporate priority, understaffed, fundamentally unsound, applied inconsistently, or completely ignored.

532.    According to DEA, Walgreens's pharmacies "filled customer prescriptions that they knew or should have known were not for legitimate medical use."[227] Walgreens pressured pharmacists to fill an increasing volume of opioid prescriptions, even if it meant filling ones that the pharmacist had concerns about.

533.    Walgreens compensated its pharmacists based on the volume of controlled substances they filled, including CII opioids. It told its pharmacists that concerns about whether a prescription should be dispensed do not "relieve you from trying to attain the numbers that have been set for you."

---

[226] Jeffrey Fleishman, *Can This Town Save Itself from Fentanyl Addiction? The Race to Turn Around a Threatened Community*, L.A. Times (Mar. 29, 2023), https://www.latimes.com/world-nation/story/2023-03-29/the-deadly-fentanyl-scourge-in-a-new-mexico-town.

[227] *Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act*, U.S. Dep't Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled (hereinafter *Walgreens Agrees to Pay*).

534.    For years, Walgreens did not have any method to determine if its pharmacists were complying with its dispensing policies and no process for disciplining noncompliant pharmacists. Walgreens offered no employee training regarding controlled substance dispensing or detecting red flags for opioid abuse and diversion, even after it implemented policies regarding such.

535.    Walgreens's determination to bury evidence of noncompliance in the service of profit goals has continued. When a Walgreens consultant interviewed Walgreens pharmacy employees, they drafted a report finding that employees "sometimes skirted or completely ignored" proper procedures to meet corporate metrics and committed "errors resulting from stress." The consultants reported that they "heard multiple reports of improper behavior" that were "largely attributed to the desire" to meet a corporate metric known as "promise time," which ensures that patients get prescriptions filled within a set amount of time. Upon reviewing a draft of the report, senior leaders at Walgreens directed the consultants to remove some of the damaging findings, which the consultant company ultimately did, even though the consultant's employees stated requests to remove information from slides conflicted with their business ethics. At around this same time, Walgreens awarded the consultant company a $1.5 billion contract.[228]

536.    DEA found evidence that Walgreens had a corporate policy encouraging increased sales of oxycodone:

> In July 2010, Walgreens's corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies and produced an 11-page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June. The spreadsheet was sent to Walgreens's market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "*look at stores on the bottom end . . . . We need to make sure we aren't turning legitimate scripts away. Please reinforce.*" A corporate market director of pharmacy operations did reinforce this message to Florida market pharmacy supervisors, highlighting that their "*busiest store in Florida*"

---

[228] Ellen Gabler, *At Walgreens, Complaints of Medication Errors Go Missing*, N.Y. Times (Feb. 21, 2020), https://www.nytimes.com/2020/02/21/health/pharmacies-prescription-errors.html.

was filling almost 18 oxycodone prescriptions per day, yet "*We also have stores doing about 1 a day. Are we turning away good customers?*"[229]

537.     In 2011, a Walgreens project to "Increase Rx Sales and prescription Counts" instructed pharmacies to "improve C2 business," i.e., dispense more Schedule II controlled substances. This focus on increasing controlled-substance dispensing, including opioids, continued even after DEA investigation and $80 million fine. For example, in 2014, the Rx Integrity department created a "Pharmacist Controlled Substance Dispensing Opportunities" tool to "identify pharmacists that are dispensing a low rate of controlled substances" and help pharmacists "feel more comfortable in filling controlled substances," specifically focusing on pharmacists dispensing low rates of opioids like "hydromorphone, oxycodone, methadone . . . hydrocodone," and the cocktail drugs comprising the rest of the "holy trinity" of abuse, such as "carisoprodol . . . [and] alprazolam."

538.     Walgreens sold huge amounts of dangerous combinations of controlled substances, despite recommendations from its Director of Rx Integrity, who stated, "there is no[] clinical proof that a cocktail works other than to potentiate [i.e., enhance] the opiate." Despite internal warnings not to fill cocktail prescriptions because DEA considered them a red flag, no restrictions were put in place regarding dispensing of these dangerous combinations.

539.     Walgreens refused to allow pharmacies to ban filling prescriptions for controlled substances written by certain healthcare providers, even if there was verifiable evidence that the provider was operating an illegal pill mill. In fact, Walgreen regularly continued to fill prescriptions for such prescribers, long after evidence (such as having worked at clinics shut down by law enforcement) was already available.

540.     Walgreens filled prescriptions for controlled substances that were missing essential required information, such as the prescriber's DEA number.

---

[229] 2012 Walgreens ISO, *supra*.

541.    Walgreens ignored evidence of patient doctor shopping and instead filled overlapping prescriptions from different doctors for the same controlled substances.

### 2.    CVS

542.    CVS sold massive quantities of opioids by failing to maintain effective controls against abuse and diversion and taking affirmative steps to undermine its own opioid diversion controls and those of others.

543.    CVS lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion, even as they evolved over time. Not until 2012 did CVS create guidelines explaining in more detail the "red flags" or cautionary signals that CVS pharmacists should be on the lookout for to prevent diversion and to uphold their corresponding responsibilities to ensure that all dispensed controlled substances are issued for a legitimate medical purpose. Even so, CVS's conduct and the volume it dispensed thereafter indicates that its policies were not applied.

544.    CVS's performance metrics pressured pharmacists to put profits ahead of safety. CVS's metrics system lacked any measurement for pharmacy accuracy or customer safety. They did, however, prioritize speed and volume, including by requiring pharmacists to meet wait- or fill-time expectations. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. Opioid prescriptions were even included in the volume goals until 2013, and after that time, the pressure from the metrics' focus on profitability remained. These policies remained in place even as the epidemic raged. Even in 2020, pharmacists described CVS as the "most aggressive chain in imposing performance metrics."[230]

---

[230] See Ellen Gabler, *How Chaos at Pharmacies Is Putting Patients at Risk*, N.Y. Times, (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

545.     Under these circumstances, a pharmacist is likely to be too rushed to check for red flags for diversion, such as prescription "cocktails" or other combinations of highly abused drugs.

546.     DEA explained these red flags for diversion to CVS in December 2010 at a meeting with CVS's representatives and counsel. DEA identified "red flags . . . that a pharmacy should be familiar with in order to carry out its corresponding responsibility to ensure that the controlled substances are dispensed for a legitimate medical purpose."[231]

547.     Examples of red flags that DEA identified during its meeting with CVS include:

- Many customers receiving the same combination of prescriptions (i.e., oxycodone and alprazolam)
- Many customers receiving the same strength of controlled substances (i.e., 30 milligrams of oxycodone with 15 milligrams of oxycodone and 2 milligrams of alprazolam)

- Many customers paying cash for their prescriptions; many customers with the same diagnosis codes written on their prescriptions (i.e., back pain, lower lumbar, neck pain, or knee pain)

- Individuals driving long distances to visit physicians and/or to fill prescriptions.[232]

548.     CVS's lack of adequate policies and procedures to protect against diversion and its failure to enforce policies because of its focus on speed resulted in CVS pharmacies drastically oversupplying their communities.

### 3.    Walmart

549.     Walgreens sold massive quantities of opioids by failing to maintain effective controls against abuse and diversion and taking affirmative steps to undermine its own opioid diversion controls and those of others.

550.     In Silver City New Mexico, a single Walmart pharmacy dispensed 8 million opioid pills between 2006 and 2018—732 pills for each and every person in Silver City during that time.

---

[231] Declaration of Joe Rannazzisi in *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145 (D.D.C. 2012).
[232] *Id.*

551.    Walmart impeded its pharmacists' ability to comply with legal requirements for dispensing controlled substances.

552.    Walmart managers pressured pharmacists to fill prescriptions as quickly as possible.

553.    Walmart's compliance unit chose not to give its pharmacists the information and authority it knew they needed to comply with its rules. Consistent with the CSA, Walmart's own policy required pharmacists to identify and resolve red flags and to document any resolution of red flags. After Walmart was accused of dispensing violations, it committed to adopting a nationwide compliance program to identify red flags and prevent diversion. While Walmart's compliance unit did compile red-flag information, it chose not to disseminate that information to pharmacists.

554.    Meanwhile, Walmart forbade its pharmacists from refusing to fill, as a blanket matter, all prescriptions issued by pill-mill prescribers. A 2011 document from Walmart Regulatory Affairs regarding the "Proper Prescriber-Patient Relationship" stated: "Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not issued based on a valid prescriber-patient relationship or a valid medical reason before refusing to fill."[233] Walmart only began to allow blanket refusals to fill in 2017.

555.    Because Walmart refused until 2017 to allow blanket refusals, Walmart created a situation in which inappropriate dispensing of opioids was inevitable. Walmart pharmacists could not simultaneously comply with Walmart's demand to fill prescriptions quickly and its demand that each prescription from a pill-mill doctor be separately rejected and documented on a refusal-to-fill form.[234]

556.    Even after Walmart pharmacists identified pill-mill prescribers who were issuing invalid prescriptions, Walmart kept filling their prescriptions. For instance, despite individual Walmart

---

[233] Jesse Eisinger & James Bandler, *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment.*, ProPublica, (Mar. 25, 2020), https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment (hereinafter, "Eisinger & Bandler").
[234] Walmart DOJ Complaint, *supra*.

stores refusing to fill his prescriptions, Walmart pharmacies in states across the country, including in Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, and Wisconsin, filled opioid prescriptions from one Miami, Florida physician, R.M. Walmart filled more than 300 controlled-substance prescriptions written by R.M. from June 2015 through May 2016. R.M. was indicted by a federal grand jury in November 2015 for violations of federal controlled-substance laws. Walmart therefore continued to fill prescriptions for controlled substances written by R.M. six months after he was indicted.[235]

557.    Walmart also filled many invalid prescriptions that were the same or similar to other prescriptions Walmart pharmacists had previously identified as invalid for the same customer.

**F.    The Distributor Defendants have been investigated and fined repeatedly for failing to secure their supply chains, but refuse to change their ways.**

558.    The Distributor Defendants' failure to secure their opioid supply chains and prevent drug diversion has resulted in years of governmental investigations, which the Distributor Defendants have settled for hundreds of millions of dollars. Notwithstanding these settlements and the egregious wrongdoing they uncovered, the Distributor Defendants continued to violate their duties.

**1.  ABDC**

559.    In 2007, DEA issued an immediate suspension order against an ABDC distribution center in Orlando, Florida for failing to maintain effective controls against hydrocodone diversion. As part of the agreement to restore the Orlando facility's license to ship controlled substances, ABDC publicly stated that it would "implement an enhanced and more sophisticated order monitoring program" nationwide.[236]

---

[235] *Id.*
[236] AmerisourceBergen, *AmerisourceBergen Signs Agreement with DEA Leading to Reinstatement of Its Orlando Distribution License*

560.    In 2012, DEA subpoenaed ABDC regarding the company's failure to protect against diversion of controlled substances into non-medically necessary channels.[237]

561.    In 2022, the Department of Justice filed a civil complaint against ABDC for its continued violations of the CSA through at least 2021.

### 2.    Anda

534.    An Anda subsidiary voluntarily surrendered its DEA registration, which authorized it to distribute controlled substances, to avoid further enforcement actions.[238]

535.    Anda was sued by and settled with the Attorneys General of West Virginia and New York regarding its opioid distribution practices.[239]

### 3.    Cardinal

536.    In 2007 and early 2008, DEA issued Warrants for Inspections, Orders to Show Cause, and Immediate Suspension Orders against four Cardinal distribution facilities for failure to maintain effective controls against diversion of hydrocodone.

537.    In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion (the "2008 Cardinal Settlement Agreement").[240] These allegations included failing to report to DEA thousands of suspicious orders of hydrocodone.[241] As part of this settlement, Cardinal agreed to

---

*to Distribute Controlled Substances* (June 22, 2007), https://www.sec.gov/Archives/edgar/data/1140859/000119312507141013/dex991.htm.
[237] Jeff Overley, *AmerisourceBergen Subpoenaed by DEA Over Drug Diversion,* Law360 (Aug. 9, 2012), https://www.law360.com/articles/368498/amerisourcebergen-subpoenaed-by-dea-over-drug-diversion.
[238] Ranking Member's Off., U.S. Senate Homeland Sec. & Gov'tal Affairs Comm., *Fueling an Epidemic: Report Three* (2018), https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-A%20Flood%20of%201.6%20Billion%20Doses%20of%20Opioids%20into%20Missouri%20and%20the%20Need%20for%20Stronger%20DEA%20Enforcement.pdf
[239] *State Reaches $4.2M Settlement with Five Drug Companies*, W. Va. Record (June 23, 2016), https://wvrecord.com/stories/510936977-state-reaches-4-2m-settlement-with-five-drug-companies. *New York Attorney General Announces Settlement with Three Distributors Amid Long Island Trial* (July 20, 2021), https://www.law.com/newyorklawjournal/2021/07/20/new-york-attorney-general-announces-settlement-with-three-opioid-distributors-amid-long-island-trial/?slreturn=20210706151323.
[240] *Cardinal Health Inc., Agrees to Pay $34 Million to Settle Claims that it Failed to Report Suspicious Sales of Widely-Abused Controlled Substances*, U.S. Dep't Just. (Oct. 2, 2008), https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.
[241] *Id.*

"maintain a compliance program designed to detect and prevent diversion of controlled substances as required by the CSA and applicable DEA regulations."[242]

538.     However, in 2012, DEA issued an immediate suspicion order against a Cardinal facility in Florida for failure to maintain effective controls against diversion of oxycodone.[243]

539.     To settle this action, Cardinal agreed that it had (i) failed to maintain effective controls against the diversion of controlled substances, including failing to conduct meaningful due diligence; (ii) failed to detect and report suspicious orders; and (iii) failed to adhere to the provisions of the 2008 Cardinal Settlement Agreement.[244] As part of the 2012 settlement, Cardinal agreed to cease distributing controlled substances from this facility for two years.[245]

540.     On December 23, 2016, Cardinal agreed to pay $34 million to resolve allegations that it violated federal law by failing to report suspicious orders of controlled substances.[246] In the settlement agreement, Cardinal acknowledged it had failed to:

  a.  "timely identify suspicious orders of controlled substances and inform DEA of those orders, as required by 21 C.F.R. § 1301.74(b)";

  b.  "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. § 1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. §842(a)(5)"; and

---

[242] *Id.*

[243] Order to Show Cause and Immediate Suspension of Registration, *Cardinal Health* (U.S. Drug Enf't Admin. Feb. 2, 2012); *DEA Suspends Pharmaceutical Wholesale Distributor and Retailers' Ability to Sell Controlled Substances*, U.S. Dep't Just. (Feb. 6, 2012), http://s3.amazonaws.com/fcmd/documents/documents/000/003/349/original/Cardinal_Health_-_DEA_Suspension_of_Lakeland_FL_12DEAPR.pdf?1429557281.

[244] Administrative Memorandum of Agreement (May 14, 2012), https://www.thehealthlawfirm.com/uploads/Cardinal%20Health%20-%20Memo%20of%20Agreement.pdf.

[245] *Cardinal Health Brings Resolution to Litigation with DEA Settlement*, Cardinal Health (May 15, 2012), https://s1.q4cdn.com/238390398/files/doc_news/2012/CAH_News_2012_5_15_General_Releases.pdf.

[246] Settlement Agreement (Dec. 20, 2106), https://media.bizj.us/view/img/10285208/cardinal-health-settlement.pdf; *United States Reaches $34 Million Settlement with Cardinal Health for Civil Penalties Under the Controlled Substances Act*, U.S. Drug Enf't Admin. (Dec. 27, 2016), https://www.dea.gov/press-releases/2016/12/27/united-states-reaches-34-million-settlement-cardinal-health-civil.

c. "execute, fill, cancel, correct, file with DEA, and otherwise handle DEA 'Form 222' order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. §828 and 21 C.F.R. Part 1305."

### 4.    McKesson

541.    In late 2005, DEA began investigating McKesson for filling large quantities of hydrocodone and oxycodone orders for rogue internet pharmacies. In January 2006, DEA notified McKesson that it had identified more than 2 million doses of hydrocodone delivered by McKesson to several rogue internet pharmacies during a three-week period.[247]

542.    On May 2, 2008, McKesson agreed to pay more than $13 million in civil penalties for filling hundreds of suspicious opioid orders. McKesson also entered into an Administrative Memorandum of Agreement with DEA, which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program."[248]

543.    As part of McKesson's 2008 Settlement with DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future," including specific measures delineated in a "Compliance Addendum" to the Settlement.[249]

544.    Despite this promise, McKesson paid $150 million in 2017 to resolve another investigation into its violations of the CSA. This investigation concluded that McKesson's desire for increased sales and retaining its customers overrode its obligations to report suspicious orders and jeopardized the health and safety of people around the country. Among other things, the investigation revealed that McKesson's system for detecting suspicious orders was so ineffective that, in a five-year

---

[247] Memorandum from Michael Mapes to Joseph Rannazzisi (Jan 23, 2006).
[248] Settlement and Administrative Memorandum of Agreement (May 2, 2008) (hereinafter, "McKesson 2008 Settlement").
[249] *Id.*

period, it filled more than 1.6 million orders, but reported just 16 orders as suspicious.[250] The investigators found that McKesson's distribution centers "were supplying pharmacies that sold to criminal drug rings."[251]

545.    McKesson admitted that it "did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in DEA Letters" and that it failed to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations under the 2008 Agreements, the CSA, and 21 C.F.R. § 1301.74(b)."[252]

546.    McKesson further admitted that it had "distributed controlled substances to pharmacies even though those [McKesson] Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04(a)." McKesson admitted that it had "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations."[253]

547.    As part of the 2017 McKesson Settlement Agreement, McKesson agreed that its authority to distribute controlled substances from 12 distribution centers would be partially suspended

---

[250] *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, U.S. Dep't Just. (Jan. 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

[251] Lenny Bernstein & Scott Higham, *'We Feel Like Our System Was Hijacked': DEA Agents Say Huge Opioid Case Ended with a Whimper*, Wash. Post (Dec. 17, 2017), https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html.

[252] Settlement Agreement and Release (Jan. 5, 2017), https://www.justice.gov/opa/press-release/file/928471/download.

[253] *Id.* at 3, 4.

for several years.[254]

> 5.    **Walgreens**

548.    In May 2006, DEA sent Walgreens a Letter of Admonition, finding that Walgreens's "formulation . . . for reporting suspicious ordering of controlled substances was insufficient."[255]

549.    On April 7, 2011, Walgreens entered into a Settlement Agreement with DEA regarding allegations of non-compliance with the Controlled Substance Act wherein Walgreens had agreed to "maintain a compliance program to detect and prevent diversion of controlled substances."[256]

550.    On September 13, 2012, DEA issued an Immediate Suspension Order and Order to Show Cause for Walgreens's Jupiter DC. DEA found that the distribution center failed to comply with DEA regulations that required it to report suspicious drug orders Walgreens received from its retail pharmacies, resulting in at least tens of thousands of violations, particularly concerning massive volumes of prescription opiates.[257]

551.    According to DEA, Walgreens's corporate headquarters pushed to increase oxycodone sales at Walgreens's Florida pharmacies and provided bonuses for pharmacy employees based on the number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales.[258]

552.    In February 2013, DEA issued similar Subpoenas and Warrant of Inspection on the Perrysburg DC. Walgreens employees made plans in preparation for the Perrysburg DC being "shut down" by DEA, like the Jupiter DC.[259]

553.    On June 10, 2013, Walgreens entered into a Settlement and Memorandum of Agreement ("MOA") with DEA to resolve outstanding allegations involving the Walgreens

---

[254] *Id.* at 3.

[255] Letter from Robert L. Corso, Special Agent in Charge, Detroit Field Division, U.S. Drug Enf't Admin., to Todd Polarolo, Distrib. Ctr. Manager, Walgreen Company (May 17, 2006).

[256] Admin. Memo. of Agreement (Apr. 7, 2011).

[257] 2012 Walgreens ISO, *supra.*

[258] *Id.*

[259] Letter from Alice S. Fisher, Philip J. Perry, Latham & Watkins LLP, and David S. Weinstein, Clarke Silverglate, P.A., to C. Lee Reeves, II, Scott Lawson, Wayne Groves, Drug Enf't Admin. (Feb. 20, 2013).

distribution centers and pending actions concerning six Walgreens retail pharmacies. Walgreens agreed to pay $80 million to resolve DEA's claims that Walgreens allowed controlled substances, including oxycodone, to be diverted into the black market. In addition, Walgreens agreed to surrender its Jupiter DC's registration to distribute or dispense controlled substances for two years. As part of the MOA, Walgreens admitted that Walgreens's "suspicious order reporting for distribution to certain pharmacies did not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007, and December 27, 2007.[260]

### 6.    CVS

554.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[261]

555.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."[262]

556.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores

---

[260] Settlement & Memo. of Agreement (June 10, 2013); *Walgreens Agrees to Pay*, *supra*.
[261] *CVS to Pay $11 Million To Settle Civil Penalty Claims Involving Violations of Controlled Substances Act*, U.S. Dep't Just. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled.
[262] *United States Reaches $22 Million Settlement Agreement with CVS For Unlawful Distribution of Controlled Substances*, U.S. Dep't Just. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled forged prescriptions with invalid DEA numbers and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone even though these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had record-keeping deficiencies.[263]

557.    In February 2016, CVS paid $8 million to settle allegations made that from 2008 to 2012, CVS stores in Maryland filled prescriptions with no legitimate medical purpose.[264]

558.    In June 2016, CVS agreed to pay $3.5 million to resolve allegations that 50 of its stores in Massachusetts and New Hampshire violated the Controlled Substances Act by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[265]

559.    In July 2017, CVS paid a fine of $5 million in a settlement with DEA and United States to resolve allegations that its pharmacies in the Eastern District of California failed to keep and maintain accurate records of controlled substances. CVS admitted that the numerous retail stores covered by this settlement violated their record-keeping obligations.[266]

560.    In August 2018, CVS paid a civil penalty of $1 million to resolve record-keeping violations at CVS Pharmacy locations throughout the Northern District of Alabama.[267]

---

[263] *Drug Diversion Claims Against CVS Health Corp. Resolved With $450,000 Civil Settlement*, U.S. Dep't Just. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

[264] *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. Dep't Just. (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawful-distribution-controlled.

[265] *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacists Filled Fake Prescriptions*, U.S. Dep't Just. (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions.

[266] *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. Dep't Just. (July 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act.

[267] *CVS Pharmacy Pays $1 Million Penalty in Settlement with DOJ for violations of the Controlled Substances Act*, U.S. Dep't Just. (Aug. 21, 2018), https://www.justice.gov/usao-ndal/pr/cvs-pharmacy-pays-1-million-penalty-settlement-doj-violations-controlled-substances-act.

### 7. Walmart

561.    Walmart received more than 50 Letters of Admonition from DEA for its dispensing practices from 2000 to 2018.

562.    In 2007 and 2008, Walmart paid two settlements to resolve actions arising from CSA violations—one for filing unlawful prescriptions and the other for record-keeping violations.

563.    Federal prosecutors took action against five Walmart and Sam's Club Pharmacies in Texas, alleging that they failed to maintain records required by the CSA.[268] A U.S. Attorney further explained that "[b]ecause of the pharmacies' lack of proper record keeping, a variety of Schedule II, III, IV and V controlled substances were lost or stolen and possibly diverted."[269]

564.    Following its settlement of this action in 2009, Walmart claimed that the agreement only pertained to a handful of stores in that state and claimed that Walmart was "eager to comply with the law." A Walmart spokesperson further claimed, "We take record keeping seriously[,]" and "[w]e continuously review our processes at our pharmacies to ensure they are accurate and in full compliance with the law."[270]

565.    In 2009, DEA issued a Show Cause order seeking to revoke the registration of a Walmart pharmacy in California. The order alleged that the pharmacy:

> (1) improperly dispensed controlled substances to individuals based on purported prescriptions issued by physicians who were not licensed to practice medicine in California; (2) dispensed controlled substances . . . based on Internet prescriptions issued by physicians for other than a legitimate medical purpose and/or outside the usual course of professional practice . . . ; and (3) dispensed controlled substances to individuals that [the pharmacy] knew or should have known were diverting the controlled substances.

---

[268] Associated Press, *Wal-Mart Settles Drug Records Accusation* (Jan. 7, 2009), https://chainstoreage.com/news/wal-mart-settles-drug-records-accusations (hereinafter *Walmart Settles*)
[269] Richard Connelly, *Now We Know Why Wal-Mart Has That Smiley Face*, Hous. Press (Jan. 7, 2009), https://www.houstonpress.com/houston/Print?oid=6724828.
[270] Associated Press, *Wal-Mart Settles Drug Records Accusation* (Jan. 7, 2009), http://prev.dailyherald.com/story/?id=262762.

566.    To resolve the 2009 proceeding, Walmart entered into an MOA with DEA in 2011. It stayed in effect through March 2015. Upon information and belief, the failures described in the 2011 MOA were not limited to California but reflected systemic failures at the corporate level. Indeed, the 2011 MOA required Walmart to adopt a national compliance program that applied to "all current and future Walmart Pharmacy locations." It also required Walmart to collect reports from its pharmacists when those pharmacists determined that controlled-substance prescriptions were invalid and refused to fill them.

567.    The 2011 MOA specifically required that Walmart implement procedures to make certain that pharmacists identified red flags:

> The program shall include procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping, requests for early refills, altered or forged prescriptions, prescriptions written by doctors not licensed to practice medicine in the jurisdiction where the patient is located, and prescriptions written for other than a legitimate medical purpose by an individual acting outside the usual course of his professional practice.

568.    During the four-year term of the 2011 MOA, Walmart required pharmacists to document a refusal to fill on a refusal-to-fill form. Walmart received these forms and so learned about problematic prescribing practices. Yet, Walmart did not use the information on them to alert its pharmacists about possible or known pill-mill prescribers. Walmart did not even do so for nearby stores to which a customer was likely to take a refused prescription. It was particularly important for Walmart to do this because its pharmacists did not always work overlapping shifts and some of its pharmacists "floated" between several stores, thereby reducing the pharmacists' ability to communicate their concerns directly to one another.

569.    In October 2018, the DOJ had evidence that Walmart pharmacies in Texas dispensed opioids that killed customers who overdosed on the drugs. "The pharmacists who dispensed those opioids had told the company they didn't want to fill the prescriptions because they were coming from

doctors who were running pill mills," but their pleas "for help and guidance from Walmart's corporate office" fell on deaf ears.[271]

570.    A Texas federal prosecutor, in connection with an investigation that began in 2016, concluded, "Walmart had a national problem."[272]

571.    The investigation reportedly revealed that between 2011 and 2017, "Walmart pharmacists repeatedly filled prescriptions that they worried were not for legitimate medical purposes, including large doses of opioids and mixtures of drugs DEA considered red flags for abuse." They did so even though Walmart pharmacists "raised alarms to the company's national compliance department about doctors."[273]

572.    More recently, Walmart reportedly claimed to be cooperating with a federal investigation and "taking action to fix its opioid dispensing practices." In fact, however, Walmart subsequently "acknowledged that it halted its cooperation in mid-2018."[274]

573.    The enforcement actions against Walmart culminated in December 2020 when the DOJ filed an action against Walmart for violations of the CSA.

G.    **The Distributor Defendants misrepresented that they were complying with their duties to prevent diversion of opioids.**

574.    Defendants misrepresented to the public that they were complying with their statutory duty to identify, halt, and report suspicious orders of opioids. In so doing, they deceptively concealed their role in creating and perpetuating the opioids crisis. Defendants' repeated payments of fines and other enforcements actions indicates that these statements were false.

575.    ABDC misleadingly claims on its website and in other public statements that it has an effective diversion control team and protocol and that its sophisticated "diversion control program"

---

[271] Eisinger & Bandler, *supra*.
[272] *Id.*
[273] *Id.*
[274] *Id.*

provides daily reports to regulators about the quantity, type, and receiving pharmacy of every order of controlled substances it distributes.[275]

576.    ABDC has taken the public position that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A company spokesperson also provided assurance that "[a]t [ABDC], we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."[276]

577.    ABDC continues to maintain that it "takes its legal obligations seriously. We have designed and operate a system to disclose customers' suspicious orders of controlled substances to the Drug Enforcement Administration."[277] This statement misleadingly implies that ABDC has always complied with its CSA obligations.

578.    Cardinal touted its anti-diversion practices and purported anti-diversion monitoring programs and publicly stated in settlements that it would take reasonable measures to prevent diversion. Cardinal had stated that its "sophisticated, state-of-the-art anti-diversion program includes advanced analytics, technology and on-the-ground deployment of investigators to evaluate pharmacies, scrutinize customers and orders, as well as identify, block and report orders of prescription-controlled substances that do not meet our strict anti-diversion criteria."[278]

---

[275] *Safe and Secure Distribution of Controlled Substances*, AmerisourceBergen (Sept. 2019), https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/fighting-the-opioid-epidemic/abc_opioidreport_sept2019.pdf; Letter from Amanda B. Robinson, Morgan Lewis & Bockius, to Sen. Claire McCaskill (July 3, 2018), https://www.hsgac.senate.gov/imo/media/doc/AmerisourceBergen%20Response%20Ltr%20to%20McCaskill%20re%20Opioids%20Report.pdf.

[276] *Records Show Rural West Virginia Flooded with Painkillers*, Ins. J. (June 6, 2016), https://www.insurancejournal.com/magazines/mag-features/2016/06/06/410426.htm#.

[277] AmerisourceBergen, *Safe and Secure Distribution of Controlled Substances* (Feb. 2022), https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/fighting-the-opioid-epidemic/ab_safesecuredistroreport_sept2019.pdf.

[278] *Cardinal Health Statement on Multi-State Inquiry by Attorneys General*, Cardinal Health (Sept. 18, 2017), https://newsroom.cardinalhealth.com/2017-09-18-Cardinal-Health-Statement-On-Multi-State-Inquiry-By-Attorneys-General.

579.    Cardinal claims, "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."[279] Cardinal likewise claims to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse."

580.    Along the same lines, it claims to "maintain a sophisticated, state-of-the-art program to identify, block and report to regulators those orders of prescription-controlled medications that do not meet [its] strict criteria."[280] A Cardinal executive recently claimed that Cardinal uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[281] Given the sales volumes and the company's history of violations, either this executive was wrong, or, if Cardinal had such a system, it ignored the results.

581.    Cardinal continues to make misleading statements regarding its history of compliance with its obligations to detect and prevent diversion:

> In addition to the new requirements of the injunctive relief terms of the national agreement discussed above, we have maintained a controlled substance monitoring program for many years to help us combat the diversion of controlled substances for improper use. Our controlled substance monitoring program includes a state-of-the-art, constantly adaptive, rigorous system supported by program specialists who monitor and investigate suspicious orders using advanced analytics and other tools. We operate a strict and uncompromising system to spot, stop, and report to regulators suspicious orders of prescription controlled substances, including opioids. As threats evolve, we are constantly adapting our system to prevent the diversion and misuse of medications. We operate in good faith and our goal is to get it right. Through our program to date, Cardinal Health

---

[279] *Corporate Citizenship*, Cardinal Health, https://www.cardinalhealth.com/en/about-us/corporate-citizenship.html (as of July 19, 2021).
[280] *Issues that Matter: How State Attorneys General Are Tackling the Opioid Crisis*, CBS News (Oct. 18, 2017), https://www.cbsnews.com/news/pennsylvania-attorney-general-josh-shapiro-issues-that-matter/.
[281] Lenny Bernstein, et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'* (Oct. 22, 2016), https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

> representatives have conducted hundreds of thousands of site inspections of our pharmacy customers nationwide and thousands of pharmacies have been identified that do not meet our standards, and we refuse to do business with them.[282]

This statement misleadingly implies that Cardinal has always complied with its CSA obligations, despite multiple enforcement actions demonstrating that Cardinal has not.

582.    McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent diversion.

583.    McKesson has also publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and that it is "deeply passionate about curbing the opioid epidemic in our country."[283]

584.    As part of its 2008 settlement with DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future"[284]

585.    As stated on McKesson's website:

> McKesson is committed to maintaining – and continuously enhancing – strong programs designed to detect and prevent opioid diversion within the pharmaceutical supply chain. In addition to reporting controlled substances transactions to DEA on a regular basis, we have invested significant amounts of time and financial resources into our Controlled Substance Monitoring Program (CSMP).[285]

This statement misleadingly implies that McKesson has not had deficient suspicious order monitoring programs.

---

[282] *Addressing the Opioid Crisis: Board Engagement and Governance*, Cardinal Health, https://www.cardinalhealth.com/en/about-us/environmental-social-governance/policies-and-principles/board-engagement-and-governance.html (last visited Aug. 18, 2023).

[283] Scott Higham, et al., *Drug Industry Hired Dozens of Officials from DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post (Dec. 22, 2016), https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html

[284] McKesson 2008 Settlement, *supra*.

[285] *McKesson's Controlled Substance Monitoring Program*, McKesson, https://www.mckesson.com/About-McKesson/Fighting-Opioid-Abuse/Controlled-Substance-Monitoring-Program/ (last visited Aug. 24, 2023).

586.    At a May 8, 2018, hearing before the House Energy and Commerce subcommittee, H.D. Smith refused to take any responsibility for the massive amounts of opioids it shipped to West Virginia, the state which at the time had the highest overdose rate in the United States. At the time, J. Christopher Smith, former President and CEO, stated, "H.D. Smith conducted itself responsibly and discharged its obligations."[286]

587.    In connection with a DEA settlement, Walgreens publicly stated that it would maintain a compliance program to detect and monitor diversion, including training its pharmacists on red flags for diversion, but it has failed to implement a program to adequately do so.[287] Walgreens continues to maintain that it "has taken a number of actions over many years to respond to the opioid crisis . . . including . . . [d]eploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose,"[288] while ignoring the existence of corporate policies that actively encouraged dispensing controlled substances.

588.    CVS CEO Larry Merlo described his company as "America's front door to health care with a presence in nearly 10,000 communities across the country," which allowed it to "see firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction and misuse."[289] According to its website:

> CVS Health® has made a commitment to help address the misuse of prescription opioids by designing programs and collaborating with community leaders, policymakers, law enforcement, health care professionals and others to increase community-based educational programs related to opioid misuse, create safe prescription drug disposal sites, expand access to life-saving antidotes and advocate for targeted and effective policies, locally and nationally.[290]

---

[286] *Combatting the Opioid Epidemic, supra.*
[287] Settlement & Memo. of Agreement (June 10, 2013).
[288] *Walgreens Announces Agreement in Principle for Multi-State Opioid Settlement Framework*, Walgreens (Nov. 2, 2022), https://news.walgreens.com/press-center/news/walgreens-announces-agreement-in-principle-for-multi-state-opioid-settlement-framework.htm.
[289] *See, e.g.*, David Salazar, *CVS Health Unveils New PBM, Pharmacy Efforts to Curb Opioid Abuse*, (Sept. 21, 2017), https://drugstorenews.com/pharmacy/cvs-health-unveils-new-pbm-pharmacy-efforts-curb-opioid-abuse.
[290] *Our Opioid Response*, CVS, https://www.cvshealth.com/impact/healthy-community/our-opioid-response.html (last visited Aug. 23, 2022).

CVS's statement fails to mention CVS's own role in promoting and enabling the widespread use of prescription opioids.

589.    Through nationwide advertising, Walmart presented a public image of the safety and excellence of all the pharmacists the company hired. For example, in a recruitment video for pharmacists on Walmart's YouTube channel, the company shows Walmart pharmacists speaking about working at the company: "the safety and the excellence we carry to our patients is phenomenal," adding that "the culture that our company has [is] respect for the individual, service, and excellence, and, of course, we always have integrity." The commercial also states that Walmart's pharmacists "strive for excellence" and are "passionate about providing quality healthcare."[291]

590.    Walmart's website states, "Our pharmacists are trained to check for indicators of potential concern before filling each prescription,"[292] a statement that ignores Walmart's repeated efforts to impede its own pharmacists' ability to do so.

591.    Defendants made some of these statements and material omissions through their trade organizations, including the Healthcare Distribution Alliance as well as the National Association of Chain Drugstores, of which Walgreens, Walmart, and CVS are or have been members.[293] Each of the Distributor Defendants are members of the HDA and its predecessor entities.

592.    Defendants' misrepresentations misled the public and ultimately delayed an adequate response to the opioid crisis.

---

[291]    Walmart, *Your Career as a Walmart Pharmacist*, YouTube (Sept. 25, 2014), https://www.youtube.com/watch?v=9VD12JXOzfs.

[292] *Stewardship*, Walmart, https://corporate.walmart.com/stewardship (last visited Aug. 18, 2023)

[293]    *NACDS Member Retailers (US-based)*, Nat'l Ass'n Chain Drug Stores, https://www.nacds.org/membership/directories/chain-companies/ (last visited Aug. 25, 2023); Sandra Levy, *CVS Health Breaks with NACDS, Remains Committed to Advancing, Supporting Value of Pharmacy*, Drug Store News (July 4, 2022), https://drugstorenews.com/cvs-health-breaks-nacds-remains-committed-advancing-supporting-value-pharmacy.

**H.**     **The Distributor Defendants marketed the Marketing Defendants' opioids.**

593.     The Distributor Defendants actively assisted the Marketing Defendants in marketing their opioid products.

594.     Distributors' efforts date back decades. For example, a 1991 article described efforts by the National Wholesale Druggists Association ("NWDA") to work collaboratively with manufacturers, noting how "wholesalers and manufacturers showed their optimism about the future of wholesale drugs," in light of a "spirit of intercompany teamwork open[ing] up new opportunities for everyone involved . . . ."[294] Outgoing NWDA chairman Joseph Polastri was also quoted as stating that "suppliers and wholesalers have a common economic incentive to work more closely together."[295]

595.     In 1991, the NWDA organized official, high-level meetings between wholesalers and manufacturers. These visits were reported to have prompted discussions about using wholesaler sales representatives "to pass along technical product information to pharmacists, hospitals, third-party payers and perhaps even to selected doctors"; several manufacturers also expressed interest "in tapping into wholesaler telemarketing capabilities."[296]

596.     Manufacturers such as Purdue were members of the NWDA starting from the early 1990s. In a statement prepared by Purdue at the NWDA's request, Purdue acknowledged the role that distributors' marketing efforts played in its OxyContin launch, noting that "wholesaler incentive programs and advertising allowances," "wholesaler dating," and a variety of promotional programming offered by distributors (such as "deal catalogs," "retail tote stuffers," "screen savers," and "telemarketing") all helped Purdue exceed expectations within just the first five months of OxyContin's availability. As Purdue explained, "[t]hrough the support of our wholesaler trading

---

[294] Val Cardinale, *New Spirit of Partnering Rejuvenates Wholesalers*, 135 Drug Topics 23 (Dec. 16, 1991).
[295] *Id.*
[296] *NWDA Senior Management Teams Will Visit 30 Drug Companies by End Of Year; Wholesaler-Only Advisory Boards Have Been Established By 14 Drug Firms*, Pink Sheet (Nov. 25, 1991).

partners, availability at the retail level greatly contributed to this success." Distributor Defendants also helped facilitate the promotion of the Marketing Defendants' products at the retail level. For example, in describing services offered by McKesson and by ABDC's predecessor entity, Bergen Brunswig, Purdue noted: "Utilizing the drug wholesaler, incentives will be offered to facilitate placement of OxyContin at the retail level."

597.    The Distributor Defendants also provided discount cards to induce consumers to purchase the Marketing Defendants' opioids. As a 2017 internal Purdue document explains, "[t]here is evidence associating cash payment with opioid abuse and diversion" and "[d]iscount cards can lower the out of pocket cost for a cash prescription without revealing the identity of the card user." Thus, Purdue recognized, as the Distributor Defendants should have recognized, that discount cards usable with cash payment for prescriptions facilitated abuse and diversion.

598.    The Distributor Defendants invested in overcoming resistance from insurance and health plans to pay for opioids prescribed for chronic, noncancer conditions. Strategies to overcome insurers' refusal to cover opioids included call centers to help patients navigate the insurance and insurance appeals process, as well as working with doctors on the same issues.

## 1. ABDC

599.    ABDC broadly advertised its promotional services to the Marketing Defendants. If hired by a Marketing Defendant, ABDC provided targeted communications to customers through a variety of marketing media to distinguish the Marketing Defendant's product.

600.    In the late 1990s, ABDC (through its predecessor Bergen Brunswig) assisted Purdue in promoting OxyContin by installing a "glimmer button" in ordering software used by pharmacists. If the pharmacist selected one of twenty-five competitor opioids to order, the glimmer button would pop up suggesting that the pharmacist order OxyContin.

601.    ABDC was also able to use Xcenda subsidiary to further its purpose of distributing and selling more prescription opioids than could possibly have been legitimate.

602.    Xcenda worked with Teva to determine which pharmacies purchased the most Fentora and to target them to encourage the purchase of more Fentora.

603.    In 2013, four Xcenda researchers published a study that concluded that it might be possible to identify patients at the highest risk for opioid-related adverse drug events following post-surgical opioid therapy and so indicate when opioids should be avoided.[297] This misleadingly suggested that patients in whom opioids were safe to use could be easily identified.

604.    Teva paid for Xcenda to conduct and write a study, which concluded that, despite a significantly higher risk of prescription opioid use leading to overdose, accident, or injury in patients with a history of alcohol abuse or dependence, patients with such histories were still appropriate candidates for opioid therapy for chronic, noncancer pain.[298]

605.    A second Teva-funded study performed and written by Xcenda promoted the use of long-acting opioids in chronic noncancer pain patients.[299]

606.    Yet another study funded by Teva (and over which Teva had a right to review the full manuscript) concluded that there was an identifiable group of chronic pain patients predisposed to a higher risk of opioid misuse, but failed to identify specific factors that placed patients at greater risk. The study suggested that it was reasonable to merely implement increased monitoring of at-risk

---

[297] E. Richard Kessler, et al., *Cost and Quality Implications of Opioid-Based Postsurgical Pain Control Using Administrative Claims Data from a Large Health System: Opioid-Related Adverse Events and Their Impact on Clinical and Economic Outcomes*, 33 Pharmacotherapy 383 (2013), https://pubmed.ncbi.nlm.nih.gov/23553809/.

[298] Pamela E. Landsman-Blumberg, et al., *Burden of Alcohol Abuse or Dependence Among Long-Term Opioid Users with Chronic Noncancer Pain*, 23 J. Managed Care & Specialty Pharmacy 718 (2017), https://www.jmcp.org/doi/pdf/10.18553/jmcp.2017.23.7.718.

[299] Pamela E. Landsman-Blumberg, et al., *Health Care Resource Use and Cost Differences by Opioid Therapy Type Among Chronic Noncancer Pain Patients*, 10 J. Pain Res. 1713 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533567/pdf/jpr-10-1713.pdf.

patients rather than seek out non-opioid therapy for their chronic pain.[300] Three of the five authors were Xcenda employees; the remaining two were Teva employees.

### 2.    Cardinal

601.    Cardinal marketed opioids by direct-to-consumer marketing, direct mail marketing, email marketing, marketing in customer newsletters, telemarketing, advertisements on its ordering platform, and pharmacy rebates.

602.    Cardinal's promotional services offered to the Marketing Defendants also included programs to train KOLs. Cardinal also offered to provide KOLs to deliver web-based conference programs promoting a drug manufacturer's products. Further, Cardinal offered a proprietary database of providers to whom the Marketing Defendants could send email blasts and presentation material to promote their products. Cardinal provided these services to promote opioids sold by the Marketing Defendants.[301]

603.    Cardinal provided marketing assistance to Allergan, Endo, and Janssen

### 3.    McKesson

604.    McKesson promoted opioids for Allergan and Janssen and administered Purdue's savings card program for OxyContin.

### 4.    Anda

605.    Anda marketed AbbVie's Vicodin following the transition of Vicodin to a branded generic. The banner ad appeared on Anda's ordering system used by Anda's customers to select products.

---

[300] *Long-term Opioid Users with Chronic Noncancer Pain*, *supra*.

[301]        *See        Non-Personal        Promotion*,        Cardinal        Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/non-personal-promotion.html    (last    visited    Aug.    25,    2023);    *Provider    Consulting*,    Cardinal    Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/provider-consulting.html    (last    visited    Aug.    25,    2023);    *Provider    Engagement*,    Cardinal    Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/provider-engagement.html (last visited Aug. 25, 2023).

### 5.    H.D. Smith

606.    H.D. Smith agreed to market AbbVie's Vicodin following the transition of Vicodin to a branded generic.

### 6.    Walgreens

607.    Purdue leveraged its relationship with Walgreens and their mutually beneficial goal of growing the opioid business to ensure that Purdue had input into the "corporate guidelines" that Walgreens's pharmacists were "expected to follow" when it came to dispensing prescription opioids.

608.    Starting in at least 1999, Purdue sponsored Walgreens's continuing education programs designed to encourage stores to "get on the Pro Pain Management Band Wagon." At the beginning of each Purdue-sponsored meeting, a particular Walgreens pharmacist made a presentation on his store and the program implemented. His store actively advertised to area doctors and patients that they were a "full-service" pain management pharmacy. Purdue praised the pharmacist's actions as "fantastic."

609.    Walgreens's Market Director of Pharmacy Operations recommended that Walgreens's District Managers and Pharmacy Supervisors attend a continuing education program titled *The Pharmacists' Role in Pain Management: A Legal Perspective*, which was available online at RxSchool.com.[302] The program was eventually made mandatory.

610.    This program was one in a long line of pharmacist "education" programs that Purdue developed as part of its strategy to disseminate "a new school of thought" about opioids. Through these programs, Purdue and Walgreens disseminated fraudulent information that redefined the red flags of abuse or diversion in an effort to correct pharmacists' supposed "misunderstanding" about pain patients and the practice of pain management. Purdue took what it called an "aggressive role" in educating Walgreens's pharmacists on pain-management issues.

---

[302] *See Walgreen Co. Controlled Substance Anti-Diversion and Compliance Program* (July 17, 2012).

611. Walgreens's Market Director of Pharmacy Operations also recommended an Endo-sponsored continuing education program, *Navigating the Management of Chronic Pain: A Pharmacist's Guide*, which disseminated manufacturer messaging designed to broaden the market for opioids. For example, it stated, "according to most reports, approximately 30% of the population lives with chronic pain" and citing another CE presentation sponsored by APS. It also claimed that "most opioid adverse effects can be managed with careful planning and patient education." It went on to discuss "fears and prejudices" related to addictive behaviors that "unnecessarily limit" opioid use, described as "opiophobia," which the piece claimed was the result of "misunderstandings regarding the concepts of addiction, physical dependence, and tolerance."

612. One of the presenters for this Endo-sponsored program was Kenneth C. Jackson. Mr. Jackson was also a frequent speaker and KOL for Purdue. In addition, he co-authored a Purdue-sponsored pharmacists' program, *Use of Opioids in Chronic Noncancer Pain*. Released in April 2000, it was designed to eliminate "misconceptions about addiction, tolerance and dependence."

### 7. CVS

613. To grow the demand for prescription opioids, CVS participated in the marketing, advertising, and promotion of opioid products with and on behalf of opioid manufacturers.

614. For example, CVS made at least one pitch to Insys, a company whose senior executives were criminally convicted for their unlawful marketing, to help promote a liquid form of fentanyl. CVS touted the reach of its communications and explained the science behind its marketing, advertising, and promotional services. Through CVS's NEWScript program, CVS claimed to be perfectly poised to assist with new-product launches. CVS even offered Insys the chance at having a literature display in its patient waiting rooms and to help Insys "target patients" using its signature ExtraCare consumer loyalty card database.

615.    CVS also worked with Purdue to ensure that CVS pharmacists were trained by Purdue on many of Purdue's misleading marketing messages. Purdue's and CVS's tactics included distributing what an internal Purdue memo describes as "our . . . Brochure" purporting to teach pharmacists how to identify fraudulent prescriptions; requiring new CVS hires to view what Purdue describes as "our written CE [continuing education] programs"; and planning to co-host additional programs to indoctrinate pharmacists with Purdue's misrepresentations concerning opioids. CVS's ties to PAP and Purdue were so deep that CVS even used PAP's and Purdue's logos on a cover letter when providing the aforementioned guide to CVS pharmacists.

616.    The Purdue memo describing these tactics reveals that they were supported by CVS's leadership, including its directors of quality improvement and regulatory compliance and its Manager of Professional Practices.

617.    CVS worked with Endo to increase patient adherence to continued use of opioids. CVS had a crucial role in carrying out one of the key sales tactics in Endo's 2012 business plan.

618.    Through a company called Catalina Health ("Catalina"), Endo was able to target OxyContin patients in areas where Opana ER had preferred formulary status. Catalina in turn worked to create a brand-loyalty program that kept new patients on their opioids. CVS, through its pharmacy-retention programs, sent letters to the patients' homes to encourage them to stay on Opana.

619.    The agreement between CVS and Endo was formalized in an agreement to promote, market, and advertise Endo's opioid products via its "CVS Carecheck Plus Patient Education Service." CVS not only contractually agreed to promote Opana ER to its customers (i.e., patients) at the point of sale, it even insisted upon reviewing and **approving** the specific messaging used.

620.    CVS helped Actavis promote its opioids by working with Cardinal's Marketing and Business Development team on programs designed to offer rebates and off-invoice discounts on products, with the aim being to "move [] product."

### 8. Walmart

621.    Walmart teamed up with Purdue to spread misinformation about prescription opioids. As early as 1995, Purdue and Walmart launched presentations utilizing pro-opioid KOLs to pharmacists across the country. As Purdue described: "The Program [on pain management] will originate from Walmart's Studios in Bentonville, AR and sent by satellite to more than 2,000 stores across the country. It is expected that as many as 4,000 pharmacists and district manages will either attend the session or view the video tape."

### I.    Defendants coordinated their flawed approach to preventing diversion through trade associations.

622.    Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum and the Healthcare Distribution Alliance.

### 1. Pain Care Forum

623.    The Pain Care Forum ("PCF") is a coalition of drugmakers, trade groups, and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. Lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

624.    The PCF, whose members included members included Purdue, Abbott, Endo, J&J, Teva, Grünenthal, the HDMA, NACDS, FSMB, and APPM, allowed the Marketing Defendants and the Distributor Defendants to engage in coordinated conduct to ensure an oversupply of opioids.

625.    In 2007, APF and Purdue collaborated on talking points for use at a Pain Care Forum meeting. Some of these talking points included "[o]verly restrictive regulatory policies impeded pain relief"; "doctors and people with pain" who "believe that opioid medications are addictive" constituted "barriers to effective pain care"; and opioid medications "give relief—not a 'high.'"[303]

---

[303] *Treatment Options*, *supra* at 5.

626. PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[304]

627. HDMA actively worked with other PCF members on various initiatives. This was particularly evident in activities by HDMA and NACDS to pass a 2014 bill in Congress limiting DEA's authority to enforce the CSA against distributors. HDMA and NACDS coordinated this activity with other members of the PCF, including Purdue. Indeed, a Purdue representative emailed a Cardinal employee to congratulate him on their collective efforts in support of the bill.

628. In 2008, an ABDC employee emailed Purdue about ABDC participating alongside Purdue in the Pain Care Forum.

629. Members of the PCF worked together in an attempt to delay or halt the rescheduling of hydrocodone combination products such as Norco and Vicodin from Schedule III to Schedule II because the rescheduling, by imposing stricter requirements for prescribing and dispensing, would reduce sales. This effort was ultimately unsuccessful as hydrocodone was rescheduled in 2014.

630. Members of the PCF also worked together to undermine the effectiveness of the opioid REMS program through a task force chaired by APF. In 2007, the FDA received new authority to better regulate dangerous medicines via Risk Evaluation and Mitigation Strategies (REMS) programs. Under a REMS, prescribers of a medication must receive special training and be listed on a registry before their prescriptions for that medication can be filled. In 2009, the FDA announced that it was going to pursue REMS programs for long-acting and extended-release opioids. Manufacturers knew that if prescribers had to have a separate REMS certification for each individual drug, sales would fall significantly as prescribers would switch to lower-risk products to avoid the administrative barriers of a REMS product. The Marketing Defendants, coordinating by means of the

---

[304] Matthew Perrone, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, Ctr. for Pub. Integrity (Sept. 19, 2017), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

PCF, convinced the FDA to adopt a unique "class-wide" REMS so that prescribers would only have to be certified once rather than for each different product. The ER/LA REMS was also unique in the 24 companies (manufacturers of the products subject to the REMS) would then collaborate to operate the massive program. This unusual structure allowed the Marketing Defendants to minimize the impact of the ER/LA REMS on their sales.

### 2.    Healthcare Distribution Alliance

631.    Cardinal, ABDC, McKesson belong to a trade association known until 2016 as the Healthcare Distribution Management Association ("HDMA"), and now known as the Healthcare Distribution Alliance ("HDA").[305] The HDA is also a member of the PCF.

632.    The HDA and its members eagerly sought the active membership and participation of the Marketing Defendants by advocating the many benefits for members, including "strengthen[ing] your alliances."[306] AbbVie, Endo, J&J, Mallinckrodt, Par, Purdue, and Teva are or have been members of the HDA.[307]

633.    The closed meetings of the HDA's councils, committees, task forces, and working groups provided the Marketing Defendants and the Distributor Defendants the opportunity to work closely together, confidentially, to develop and further their common purpose.

634.    An outstanding example of this occurred in 2012. DEA issued an interim suspension of the license of a Cardinal distribution facility. At issue was an 803% increase in opioid sales to a pharmacy that Cardinal had already been fined for selling opioids to. In response, Cardinal filed a motion for a temporary restraining order. Shortly thereafter, on April 6, 2012, Cardinal, ABDC, and

---

[305] *Our People*, Healthcare Distrib. All., https://www.hda.org/our-people/ (last visited Aug. 25, 2023).
[306] *Manufacturer Membership Benefits*, Healthcare Distrib. All., https://web.archive.org/web/20220326010637/https://www.hda.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx (last accessed Aug. 25, 2023 as of Mar. 26, 2022).
[307] *Manufacturer*, Healthcare Distrib. All., https://web.archive.org/web/20221003150121/https://www.hda.org/about/membership/manufacturer (last access Aug. 25, 2023 as of Oct. 3, 2022).

McKesson met under the auspices of the HDA to "plot a course forward."[308] Their plan, which they concocted jointly, was to involve a media campaign, focus groups to explore messaging that would paint the distributors in a positive light, a crisis playbook that included a written plan for responding to various scenarios (including registration suspension and a diversion lawsuit),[309] and a plan to arrange a congressional inquiry designed to paint DEA as "misdirected."

635. Another example occurred in 2013 at an HDMA meeting where Cardinal representatives told representatives from other distributors (including ABDC and McKesson) that Cardinal did not report suspicious orders to DEA because there was no advantage to Cardinal in making the required reports.

636. Defendants also participated, through the HDA, in webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices. For example, on April 27, 2011, the HDA offered a webinar to "accurately and effectively exchange business transactions between distributors and manufacturers. . . ." On information and belief, the Marketing Defendants used this information to gather high-level data regarding overall distribution and to direct the Distributor Defendants on how to most effectively sell prescription opioids.

637. Publications and guidelines issued by the HDA confirm that Defendants utilized their HDA membership to form agreements. Specifically, in the fall of 2008, the HDA published *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (the "Industry Compliance Guidelines") regarding diversion.[310] As the HDA explained in an amicus brief,

---

[308] *See also* Healthcare Mgm't & Distrib. All., *HDMA Political Strategy for DEA Suspicious Orders Matter* (n.d.).
[309] Healthcare Mgm't & Distrib. All., *Crisis Playbook: An Interactive Guide to Crisis Communications* (n.d.), https://wp-stat.s3.amazonaws.com/graphics/opioid-files/pdfs/440.pdf (last visited Aug. 25, 2023).
[310] Healthcare Distrib. Mgm't All., *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (n.d.).

the Industry Compliance Guidelines were the result of "[a] committee of [HDA] members contribut[ing] to the development of this publication" beginning in late 2007.[311]

638.    This statement and the Industry Compliance Guidelines themselves support the allegation that Defendants utilized the HDA to form agreements about their approach to the distribution of controlled substances. As John M. Gray, President/CEO of the HDA, stated to the Energy and Commerce Subcommittee on Health in April 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."[312] Defendants all found the same balance: an overwhelming pattern and practice of failing to identify, report, or halt suspicious orders or to prevent diversion.

639.    In an amicus brief filed by the HDA and the NACDS, Defendants represented that they were complying with their duties to identify suspicious orders by utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information available to them in the ordering process; taking action when particular orders or series of orders raised red flags because of size, frequency, or departure from patterns; and monitoring for unusual behavior by pharmacies. In this brief, they asserted:

> a.    "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."
>
> b.    "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process." [313]

---

[311] *Amicus Curiae* Brief of Healthcare Distribution Management Association in Support of Cardinal Health's Motion for Injunction Pending Appeal 5, *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. filed Mar. 7, 2012).

[312] Statement of John M. Gray, Pres. & CEO, Healthcare Distrib. Mng't Ass'n (Apr. 7, 2014), https://docs.house.gov/meetings/IF/IF14/20140407/102093/HHRG-113-IF14-Wstate-GrayJ-20140407.pdf.

[313] Brief for Healthcare Distribution Mgmt. Association and National Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.*, No. 15-1335, 2016 WL 1321983, at *3–4, *25 (D.C. Cir. Apr. 4, 2016).

These statements were designed to give the false impression that Defendants were not deliberately turning a blind eye to egregious signs of diversion among their pharmacy customers.

### 3.    National Association of Chain Drug Stores

640.    The National Association of Chain Drug Stores ("NACDS") is a trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies. Its members and affiliate members also include stakeholders such as manufacturers, other distributors, and other trade organizations.

641.    NACDS has continued to support the efforts of the National Retail Pharmacies to whitewash their role in creating and sustaining the opioid epidemic. In a recent amicus brief, NACDS asserted: "Although it is a commonly recognized that pharmacists and pharmacies were not responsible for the crisis, NACDS members are doing their part to prevent the diversion of prescription medications, reduce drug abuse, and save lives."[314]

642.    NACDS filed an amicus brief supporting Walmart's motion to dismiss in the December 2020 DOJ action.[315]

643.    NACDS also delayed effective progress towards establishing effective industry standards regarding red flags for dispensing prescription opioids. The National Retail Pharmacies, working through NACDS, met to discuss developing such standards but ultimately decided not to adopt standards out of a fear that if they did not comply with their own standards, they would be subject to enforcement actions or litigation.

644.    Taken together, the interaction and length of the relationships between and among the Marketing Defendants and the Distributor Defendants reflect a deep level of interaction and

---

[314] Brief of the Nat'l Ass'n of Chain Drug Stores as *Amicus Curiae* in Support of Defendants' Motion to Dismiss, *United States v. Walmart Inc.*, No. 20-1744-CFC (D. Del. filed Mar. 3, 2021), https://corporate.walmart.com/media-library/document/2021-03-03-the-national-association-of-chain-drug-stores-nacds-amicus-brief/_proxyDocument?id=00000177-fe2b-def1-a37f-fefb01180000.
[315] *Id.*

cooperation between two groups in a tightly knit industry. Defendants operated as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

## VI.    THE OPIOID EPIDEMIC CREATED BY DEFENDANTS' DRIVING OF OPIOID DEMAND AND SUPPLY HAS HARMED PLAINTIFF AND OTHER HOSPITALS.

645.    Hospitals—legally and morally—are compelled to treat patients with opioid-related conditions and, as a result, have been directly and monetarily damaged by the opioid epidemic. Hospitals have incurred and will continue to incur millions of dollars in losses for their treatment obligations in connection with patients with OUD.

646.    The number of such patients has increased as a direct result of Defendants' unlawful marketing, distribution, and sale of opioids.

647.    This conduct has caused Plaintiff to expend more resources in the treatment of OUD patients, in comparison to non-OUD patients with similar diagnoses. When comparing the OUD patient cohort with the non-OUD patient cohort, with similar codes for diagnoses and treatments, the ratio of payments received—including from private payors—to charges billed is lower for the OUD cohort than the non-OUD cohort. These operational losses coincide with the increase of opioids circulating in the community and increases in the OUD patient population.

648.    These impacts do not arise merely from patients who do not pay their bills. Instead, the financing mechanisms of modern healthcare set particular rates for particular types of treatment. If treatment becomes more complicated or expensive (as it does in patients with opioid dependency or opioid use disorder as a comorbidity), then a healthcare provider's rate of realization declines. For example, it is increasingly common for individuals with opioid use disorder to present at a hospital with endocarditis, treatment for which may involve surgery followed by intravenous antibiotic treatment. This treatment requires the installation of an IV port in the patient; typically, a patient with such a port will be released and will receive their intravenous antibiotics on an outpatient basis.

However, because IV ports provide a ready route for intravenous drug use, the standard of care for patients with IV ports who have a concurrent opioid use disorder is to conduct the entire course of treatment on an inpatient basis, with an associated addition burden on the hospital's operations.

649.    During admission, hospital professionals routinely consult with patients to assess which medications the patients are taking at home. Due to Defendants' conduct, hospitals can no longer trust patients to self-report their prescriptions. Hospitals' inability to rely on their patients' self-reporting and having to take additional steps to independently verify their patients' purchases (such as by examining the PDMP) impose additional burdens on hospitals.

650.    Additionally, individuals with OUD have presented and continue to present themselves to Plaintiff claiming to have illnesses and medical problems in order to obtain opioids. Plaintiff has incurred and continues to incur operational impacts related to the time and expense of identifying, diagnosing, testing, or otherwise attempting to treat these individuals.

651.    Hospitals must treat opioid users who present in need of emergency care, a fact of which Defendants were aware. This obligation arises under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which requires hospital emergency departments that accept payments from Medicare to provide care to anyone seeking treatment for a medical condition, regardless of citizenship, legal status, or ability to pay. Under EMTALA, participating hospitals may not transfer or discharge patients needing emergency treatment except with the informed consent or stabilization of the patient or when their condition requires transfer to a hospital better equipped to administer the treatment. Similarly, if a pregnant opioid-dependent person presents for treatment, under EMTALA, the hospital must provide care for both the opioid-dependent parent and the opioid-dependent baby.

652.    This is no small burden. In 2017, an estimate 1.5 million emergency room visits were related to OUD.[316]

653.    Plaintiff has purchased and continue to purchase and administer opioids marketed and sold by Defendants. Defendants have marketed and continue to market their opioid products directly to Plaintiff and other hospitals. Plaintiff is a direct customer and victim of Defendants' fraudulent and unlawful marketing. Plaintiff and others have purchased opioids from Defendants, have used them as deceptively marketed by Defendants, and have suffered damages as a direct and proximate result of Defendants' acts and omissions as described in this Complaint. Plaintiff would not have purchased the quantity of opioids it purchased had Plaintiff known the truth about Defendants' false marketing scheme, i.e. that Defendants' claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

654.    The financial impact of the opioid epidemic on hospitals, including Plaintiff, includes, but is not limited to, the following:

    a.    operational losses suffered in connection with providing treatment to patients suffering from opioid-related conditions as the reason for presentation for care and/or as a comorbidity;

    b.    operational losses associated with patient counseling with respect to pain management, necessitated by overprescription to the general population and dissemination of false and misleading information to prospective patients and others; as hospitals and other providers question their patients' self-reporting, it necessitates that further steps be taken in all phases of diagnosis, treatment, and counseling;

    c.    the loss of revenue incurred by hospitals as a consequence of their obligation to provide care to patients suffering from opioid-related conditions;

    d.    costs of opioids purchased by hospitals themselves, which were direct targets of Defendants' marketing campaigns;

    e.    costs of training personnel in the proper treatment of drug overdoses;

---

[316] Utsha G. Khatri, et al., *Variation in Emergency Department Visit Rates for Opioid Use Disorder: Implications for Quality Improvement Initiatives*, 51 Am. J. Emergency Med. 331 (2022).

    f.    costs associated with training staff in the application of naloxone;

    g.    operational losses suffered in relation to infants born with opioid-related medical conditions or born dependent on opioids due to drug use by mothers during pregnancy, including the costs of creating and maintaining special facilities and costs associated with increased staffing to observe infant behavior and adjust doses of medication used to manage withdrawal symptoms;

    h.    costs associated with staff burnout, particularly in neonatal intensive care units, where staff suffer from PSTD, compassion fatigue, anger, addiction, and suicide;

    i.    costs of providing additional personnel to respond to security concerns created by patients and others suffering from opioid abuse and dependency;

    j.    costs of purchasing and maintaining additional equipment necessitated by the increased demands placed on hospitals as a result of the opioid epidemic and the expanded services hospitals provided in response; and

    k.    costs of providing special programs over and above ordinary hospital services.

655.    Defendants' continued unlawful conduct has caused a repeated and continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed, nor have all the damages been incurred until the wrongdoing ceases. Defendants' wrongdoing and unlawful activity have not ceased.

## VII.    DEFENDANTS WERE MEMBERS OF A JOINT ENTERPRISE DESIGNED TO DRIVE UP DEMAND FOR AND SUPPLY OF PRESCRIPTION OPIOIDS.

656.    Defendants did not accomplish their goal of driving up demand for and inappropriately increasing the supply of prescription opioids by acting alone. Instead, they collaborated with one another and with other entities, such as Teva, Endo, Purdue, and Mallinckrodt. It was this concerted action that caused the harm to Plaintiff alleged herein.

657.    Defendants had a common object to promote the manufacture, sale, distribution, dispensing, and use of prescription opioids. Defendants had a meeting of the minds and entered into an agreement on this common object. They had a common interest in this purpose, as each profited from sales of opioids.

658.    In pursuit of this common object, Defendants committed numerous unlawful acts.

659.    Much of this conduct took the form of contributions to KOLs and Front Groups. In effect, funding KOLs and Front Groups allowed Defendants to pool their resources to promote mutually beneficial propaganda about the benefits and risks of prescription opioids to treat chronic, noncancer pain.

660.    KOLs supported by multiple Defendants included:

    a.    Kathy Foley (Cephalon, Janssen, Purdue)

    b.    Lynn Webster (Teva, Cephalon, Endo, Purdue, Mallinckrodt)

    c.    Perry Fine (Cephalon, Janssen, Endo, Purdue)

    d.    Russell Portenoy (Cephalon, Janssen, Endo, Abbott, Purdue)

    e.    Charles Argoff (Teva, Janssen, Endo)

    f.    Scott Fishman (Janssen, Endo, Abbott, Mallinckrodt, Purdue)

    g.    Steven Stanos (Janssen, Endo, Abbott)

    h.    Paul Arnstein (Janssen, Mallinckrodt)

    i.    Kenneth Jackson (Endo, Purdue)

661.    Front Groups financially supported by multiple Defendants included:

    a.    APF (Cephalon, Teva, Janssen, Endo, Purdue, Abbott)

    b.    AAPM (Cephalon, Teva, Janssen, Endo, Allergan, AbbVie, Purdue)

    c.    APS (Janssen, J&J, Endo, Purdue, Abbott)

    d.    AGS (Janssen, J&J, Endo)

    e.    JCAHO (Janssen, J&J, Endo, Abbott, Purdue)

    f.    FSMB (Cephalon, Teva, Endo, Mallinckrodt, Purdue, Abbott)

    g.    AfPA (Cephalon, Teva, J&J, Endo, AbbVie, Mallinckrodt, Purdue)

    h.    ACPA (Cephalon, Teva, Janssen, Endo, AbbVie, Mallinckrodt)

    i.    PCF (Cephalon, Teva, J&J, Endo, Actavis, Abbott, Purdue, Grünenthal, ABDC (through HDA), Cardinal (through HDA), McKesson (through HDA), CVS (through NACDS), Walgreens (through NACDS), Walmart (through NACDS))

    j.    NPC (Teva, J&J, Allergan, Mallinckrodt, Purdue)

    k.    HDA (Teva, J&J, Endo, Mallinckrodt, Purdue, Cardinal, ABDC, McKesson)

    l.    NACDS (Walgreens, CVS, Rite Aid, Walmart)

662.    Publications, websites, and CMEs developed and supported by multiple Front Groups and Defendants included:

    a.    *Responsible Opioid Prescribing* (Cephalon, Endo, Purdue, and FSMB)

    b.    *Treatment Options: A Guide for People Living with Pain* (Cephalon, Purdue, APF)

    c.    *Exit Wounds* (Endo, Purdue, APF)

    d.    *Guidelines for the Pharmacological Management of Persistent Pain in Older Persons* (Endo, Janssen, Purdue, AGS, APF)

    e.    *Pain Action Guide* (Endo, APF)

    f.    *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia* (Endo, NIPC)

    g.    *Special Considerations: Pain in Specific Populations* (Janssen, APF)

    h.    *Painknowledge.org* (Endo, APF, NIPC)

    i.    *Finding Relief: Pain Management for Older Adults* (Janssen, AAPM, AGS)

    j.    *Let's Talk Pain* (Janssen, APF)

    k.    *Partners Against Pain* (Purdue, CVS, APF)

    l.    *A Policymaker's Guide to Understanding Pain & Its Management* (Purdue, APF)

    m.    *Overview of Management Options* (Purdue, Endo)

663.    In addition, Defendants engaged in a variety of activities to support the inappropriate and excessive use of opioids, including:

    a.    Abbott and Purdue engaged in the co-promotion of OxyContin to physicians working in hospitals.

    b.    Janssen and Purdue agreed not to disparage one another's products or ineffective anti-diversion practices even though they knew that these strategies were driving excessive use and abuse of prescription opioids.

    c.    Janssen and Purdue worked together on a joint marketing effort called "Project Pearl," which including marketing for Ultram.

d.  Janssen licensed, sold, and aggressively marketed Grünenthal's opioids: tramadol and tapentadol;

e.  ABDC provided marketing assistance to Endo, Janssen, and Purdue to encourage pharmacies to order and dispense larger quantities of prescription opioids.

f.  Teva and ABDC worked together through ABDC's Xcenda subsidiary to publish scientific articles promoting the use of opioids and minimizing their risks.

g.  Cardinal provided marketing assistance to Allergan, Endo, Janssen, and Purdue to promote their prescription opioids.

h.  McKesson provided marketing assistance to Allergan, Janssen, and Purdue to promote their prescription opioids.

i.  Anda and H.D. Smith provided or agreed to provide marketing assistance to AbbVie in marketing Vicodin.

j.  Cardinal and ABDC used the HDA to develop a coordinated response to defeat increasing regulatory interest in their controlled substance distribution.

k.  ABDC and Cardinal agreed to give Walgreens favorable treatment in their SOM programs, thereby enabling Walgreens pharmacies to place and have filled suspicious orders that should have been halted, investigated, and not shipped.

l.  Cardinal and McKesson agreed to give CVS favorable treatment in their SOM programs, thereby enabling CVS to place and have filled suspicious orders that should have been halted, investigated, and not shipped.

m.  Walgreens assisted Purdue in marketing OxyContin by allowing Purdue to have input into Walgreens's dispensing policies and by requiring its pharmacists to view "educational" material provided by Endo.

n.  Mallinckrodt assisted Walgreens in shifting its controlled-substance distribution immediately to Cardinal following warnings and subpoenas issued to Walgreens's Perrysburg, Ohio distribution center.

o.  Walgreens worked with Cardinal and ABDC to develop contingency plans to maintain the high supply of opioids to its pharmacies in the event that Walgreens lost its license to distribute Schedule II substances from its Jupiter, Florida DC.

p.  In 2013, Walgreens entered a ten-year agreement with ABDC.[317] ABDC was described as able to gain "purchasing synergies" from Walgreens through the

---

[317] As a part of its distribution agreement, Walgreens gained purchase rights to ABDC equity, allowing it to further participate in the prescription opioid shipment boom in America. Walgreens subsequently exercised these purchase rights, ultimately owning approximately 28% of ABDC. As part of the transaction, Walgreens can nominate up to two members of ABDC's Board of Directors. Currently, Walgreens's Co-Chief Operating Officer sits on the ABDC Board.

companies' relationship. According to ABDC's most recent 10-K, Walgreens now accounts for 33% of AmerisourceBergen's revenue.[318]

q.  CVS worked with Purdue to disseminate the false message that the risk of addiction and potential for abuse associated with opioid use were very small. CVS allowed Purdue to train CVS's pharmacists with Purdue's promotional materials on OxyContin, which contained misrepresentations about the risks of using opioids.

r.  CVS entered an agreement with Endo to promote, market, and advertise Endo's opioid products to consumers. CVS took on key responsibilities in marketing Endo's opioids to patients, including sending letters to targeted patients' homes, in order to increase patient adherence to continued use of opioids.

s.  CVS worked with Cardinal to create programs that offered rebates and off-invoice discounts on Actavis's opioids in order to promote and increase sales of these opioids.

t.  Walmart and Purdue worked together as early as 1995 to launch pro-opioid presentations featuring KOLs to pharmacists across the country.

u.  Walmart and McKesson formed ClarusOne Sourcing Services LLP in 2016 to source generic pharmaceuticals and provide strategic sourcing services.

664.  Although some Defendants have ceased engaging in some of the conduct alleged in this Complaint (e.g., by discontinuing certain opioid products), the False Narrative Enterprise is ongoing. No Defendant has tried to leave the enterprise and indeed, Defendants continue to forward the goals of the enterprise by, among other things, making false statements concerning their historical record and current practices of compliance with their duties to prevent excess use and diversion of prescription opioids.

665.  Defendants conduct was not merely parallel; Defendants actively chose to support one another. For instance, when issues began to arise about abuse and diversion of Purdue's OxyContin, an internal Janssen email stated, "It was not [Janssen's] policy to advance language that would attack a competitor's product." [319] The email stressed the "need to have enough foresight to look towards

---

[318] AmerisourceBergen Corporation, *Form 10-K* (Nov. 19, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001140859/44edc41e-d63c-4a49-81ce-619723b2ee77.pdf.
[319] Email from Bruce Colligen to Dennis Fitzgerald (Apr. 20, 2001).

the future of pain management."[320] In other words, what is bad for Purdue is bad for Janssen. This is, of course, in addition to J&J's interest in Purdue as a customer for Noramco APIs.

666.    At about the same time, Purdue sent a memorandum to its "Entire Field Force" instructing them about the agreement that Purdue and Janssen reached to not disparage one another's products or to raise competitors' drug diversion problems:

> This past week, we received a complaint from Janssen's president indicating that our representatives are discussing various ways in which the Duragesic patch is abused and diverted. . . . While abuse and diversion reports for OxyContin, Duragesic, and other pharmaceutical preparations may be part of the printed and electronic press, this knowledge or information should not be discussed or used as part of the promotion of OxyContin. . . . Janssen Pharmaceuticals and Purdue have agreed that should either company have representatives who promote product out of label or out of policy, the name of the representative will be provided to the other company for investigation and disciplinary action if necessary. . . . I trust that this memo is clear.

## VIII.    CLASS ALLEGATIONS

667.    Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on its own behalf and on behalf of all others similarly situated, as representative of the following Proposed Class:

> All acute care hospitals in the United States that treated patients with opioid use order for four years preceding the commencement of this action. Excluded from the Class are any hospitals directly or indirectly owned or operated by Defendants or Defendants' affiliated entities.

668.    Available datasets identify acute care hospitals in the United States, rendering the members of the Proposed Class readily identifiable.

669.    According to CMS records, there are thousands of acute care hospitals in the United States, rendering the class so numerous that individual joinder of the members is impracticable. The members of the Proposed Class are geographically dispersed throughout the United States.

---

[320] *Id.*

670.    There are questions of law and of fact common to all members of the Proposed Class as described below.

671.    Plaintiff's claims are typical of those of the Proposed Class as all members of the Proposed Class have suffered an operational impact on their hospitals from the opioid epidemic created by Defendants' racketeering enterprise. Plaintiff's claims and those of the Proposed Class are based on identical legal theories concerning Defendants' conduct, which was common as to all members of the Proposed Class Plaintiffs and the members of the Proposed Class seek damages for the same sort of injuries to their operations caused by Defendants' conduct.

672.    Plaintiff and its counsel will fairly and adequately represent the interests of the members of the Proposed Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the members of the Proposed Class. Plaintiff's counsel are highly experienced in the prosecution of class actions and complex litigation, including litigation against Defendants on behalf of numerous hospitals in various states throughout the country. Plaintiff's counsel have the financial resources necessary to adequately and vigorously litigate this class action.

673.    A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the members of the Proposed Class. Plaintiff and the members of the Proposed Class have been harmed in identical ways by Defendants' conduct. Although the members of the Proposed Class have each suffered extensive damages, these damages are still likely smaller than the expense and complexity of litigating on an individual basis against the numerous Defendants involving in the racketeering enterprise alleged in this Complaint. Therefore, it is unlikely than any individual hospital would be able to obtain effective redress for the wrongs committed against that hospital by these Defendants.

674.    Common questions of law and fact predominate over individual questions. These questions include:

a.   Did the Marketing Defendants manufacture prescription opioids?

b.   Did Defendants make misleading statements regarding the risks and benefits of prescription opioids?

c.   Did Defendants distribute prescription opioids?

d.   Did Defendants distribute prescription opioids without conducting adequate due diligence?

e.   What is the scope of Defendants' duties under the Controlled Substances Act?

f.   Did Defendants receive suspicious orders for prescription opioids?

g.   Did Defendants fill suspicious orders of prescription opioids?

h.   Did Defendants report suspicious orders of prescription opioids to DEA and other regulators?

i.   Did the National Retail Pharmacies enact policies that pharmacists at individual stores were required to follow?

j.   Did the National Retail Pharmacies receive prescriptions for opioids?

k.   Did prescriptions received by National Retail Pharmacies for opioids contain red flags?

l.   Did the National Retail Pharmacies investigate prescriptions for opioids to resolve the presence of red flags?

m.   Did the policies and procedures in place at the National Retail Pharmacies cause pharmacists to fill prescriptions that should not have been filled due to the presence of red flags that were not investigated?

n.   Was the False Narrative Enterprise an association-in-fact that existed?

o.   Was each Defendant a member of the False Narrative Enterprise?

p.   Did the False Narrative Enterprise engage in activities beginning in the 1990s?

q.  Were Front Groups, KOLs, and pill mills members of the False Narrative Enterprise?

r.  Did the False Narrative Enterprise have an unlawful purpose to propagate falsehoods about the safety and benefits of opioids and the way they are or should be distributed and dispensed and to distribute and dispense opioids in violation of the Controlled Substances Act?

s.  Did members of the False Narrative Enterprise engage in wire fraud?

t.  Did members of the False Narrative Enterprise engage in mail fraud?

u.  Did Defendants violate the CSA in the way they distributed prescription opioids, including by failing to identify, report, and not ship suspicious orders?

v.  Did the National Retail pharmacies violate the CSA in the way they dispensed prescription opioids, including by filling red flag prescriptions?

w.  Did Defendants conspire to support the conduct of the False Narrative Enterprise?

x.  Did Defendants benefit financially from their membership in the False Narrative Enterprise?

y.  Did the conduct of the False Narrative Enterprise give rise to the opioid epidemic?

675.    In the alternative, this Court should certify an issues class under Rule 23(c)(4). Factual and legal questions regarding Defendants' conduct, including whether the False Narrative Enterprise existed and whether Defendants were members of it, whether Defendants committed predicate acts constituting a pattern of racketeering activity, and whether Defendants engaged in a conspiracy are common questions that can be efficiently and appropriate answered on classwide basis as to every member of the Proposed Class.

## IX.    CAUSE OF ACTION

### Violation of Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968)

676.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

677.    This claim alleges violations of 18 U.S.C. §§ 1962(c)–(d).

678.    At all relevant times, Plaintiff and the members of the Proposed Class were capable of holding legal or beneficial interest in property and so were each a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

### 1.    Structure of the False Narrative Enterprise

a. **Name:** At all relevant times, there existed an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4), 1962(c) – to wit, an association-in-fact comprised of each of the Defendants – referred to herein as "The False Narrative Enterprise."

b. **Continuity**: The activities of the False Narrative Enterprise were continuous, beginning in the 1990s and continuing until at least within four years prior to the filing of this Complaint.

c. **Effect on Commerce**: The False Narrative Enterprise was engaged in, and its activities affected, interstate or foreign commerce.

d. **Membership**: The False Narrative Enterprise reflected several types of participants, not all of which were complicit, and not all of which are named as Defendants:

   i. **The Marketing Defendants and Associates**. The Marketing Defendants (including unnamed co-conspirators Purdue, Endo, and Mallinckrodt) engaged in fraudulent conduct to promote greater use of prescription opioids, engaged in fraudulent and unlawful conduct related to the distribution of opioids, and conspired with other Defendants who were engaging in the same conduct.

   ii. **The Front Groups and KOLs**. The Marketing Defendants used the Front Groups and KOLs to stoke demand for opioids by falsely creating the impression of independent, third-party, authoritative validation of the Marketing Defendant' false claims.

iii. **Distributor Defendants.** The Distributor Defendants are ABDC, Anda, Cardinal, H.D. Smith, McKesson, Walgreens, Walmart, and CVS; they joined the False Narrative Enterprise with full awareness and complicity and acted in concert with the Marketing Defendants. The Distributor Defendants engaged in fraudulent conduct to promote greater use of prescription opioids, engaged in fraudulent and unlawful conduct related to the distribution of opioids, and conspired with other Defendants who were engaging in the same conduct.

iv. **National Retail Pharmacies.** In addition to their conduct as Distributor Defendants, the National Retail Pharmacies (Walgreens, Walmart, and CVS) engaged in fraudulent and unlawful conduct related to dispensing of prescription opioids and conspired with other Defendants who were engaging in the same conduct.

v. **Noramco.** Noramco engaged in fraudulent and unlawful conduct related to the production and importation of active pharmaceutical ingredients for prescription opioids and conspired with the Marketing Defendants to increase the supply of prescription opioids.

vi. **Corrupt Physicians and Pharmacies, a/k/a Pill Mills.** These participants prescribed and dispensed opioids illegally and without a legitimate medical purpose, in violation of their legal obligations.

## 2. The Common Purpose and Scheme of the False Narrative Enterprise

679. The lawful purpose of the False Narrative Enterprise was the sale of pharmaceuticals in interstate and/or foreign commerce. Its unlawful purpose was (1) to propagate falsehoods about the safety, risks, and benefits of opioids and the way they are or should be distributed and dispensed and (2) to distribute and dispense opioids in violation of the Controlled Substances Act.

680. Knowing that their products were highly addictive as well as ineffective and unsafe for the treatment of chronic pain, Defendants formed the False Narrative Enterprise and engaged in a scheme to unlawfully increase their profits and sales through (1) repeated and systematic misrepresentations about the safety and efficacy of opioids for treating chronic pain and (2) ongoing disregard of their duties to identify, investigate, halt, and report diversion of prescription opioids.

681.    At all relevant times, Defendants conducted (managed) or participated, directly or indirectly, in the conduct (management) of the False Narrative Enterprise, through a pattern of unlawful or otherwise prohibited activity. In addition to participating in a RICO-violative enterprise, Defendants, with full knowledge and purpose, conspired, in violation of 18 U.S.C. § 1962(d), to violate § 1962(c).

682.    There was regular communication between the Marketing Defendants, the Front Groups, and KOLs in which information was shared, misrepresentations coordinated, and payments exchanged. Typically, the coordination, communication, and payment occurred through the repeated and continuing use of the wires and mail. The Marketing Defendants, Front Groups, and KOLs functioned as a continuing unit for the purpose of implementing the False Narrative Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

683.    As public scrutiny and media coverage revealed how opioids ravaged communities throughout the United States, the Front Groups and KOLs did not challenge the Marketing Defendants' misrepresentations, seek to correct their own previous misrepresentations, terminate their role in the False Narrative Enterprise, or disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

684.    The Marketing Defendants could not have accomplished the purpose of the False Narrative Enterprise without the assistance of the Front Groups and the KOLs, who were perceived as "neutral". Without the work of the Front Groups and the KOLs in spreading misrepresentations about opioids, the False Narrative Enterprise could not have achieved its common purpose.

685.    The impact of the False Narrative Enterprise's scheme is still in place, i.e., opioids continue to be prescribed and used for chronic pain, and the epidemic continues to injure Plaintiff and consume Plaintiff's resources.

686.    As a result, the Marketing Defendants, Front Groups, and KOLs were all willing participants in the False Narrative Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

687.    The False Narrative Enterprise had a hierarchical decision-making structure that was headed by Defendants and supported by the KOLs and Front Groups. The Marketing Defendants controlled representations made about their opioids, doled out funds to Front Groups and payments to KOLs, and ensured that representations made by KOLs and Front Groups were consistent with the Marketing Defendants' messaging. The Front Groups and KOLs in the False Narrative Enterprise were dependent on the Marketing Defendants both financially and for career development and promotion opportunities.

### 3.    Predicate Acts

688.    Defendants engaged in multiple, repeated, and continuous violations of:

a.    **Wire Fraud, 18 U.S.C. § 1343**. Defendants, in violation of § 1343, transmitted communications electronically to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of asserting or coordinating false claims regarding the benefits, risks, sale, distribution, and dispensing of prescription opioids with the overall aim of increasing sales of prescription opioids and collecting the resulting profits.

b.    **Mail Fraud, 18 U.S.C. § 1341.** Defendants, in violation of § 1341, transmitted communications by the mail to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of asserting or coordinating false claims regarding the benefits, risks, sale, distribution, and dispensing of prescription opioids with the overall aim of increasing sales of prescription opioids and collecting the resulting profits.

c.    **The Controlled Substances Act, 21 U.S.C. § 801, *et seq.*** Defendants, in violation of § 843(a)(4)(A), knowingly or intentionally failed to report suspicious orders of prescription opioids that they were required to report. Defendants, in violation of §§ 821, 822(b), 841(a), and 21 C.F.R. § 1301.74, distributed prescription opioids without authorization by knowingly failing to design and operate a system to detect suspicious orders of prescription opioids. Defendants, in violation of §§ 821, 822(b), 841(a), and 21 C.F.R. § 1301.71(a), distributed prescription opioids without authorization by knowingly failing to maintain effective controls against diversion of prescription opioids into other than legitimate medical, scientific, and industrial channels by, among other things,

shipping suspicious orders of prescription opioids without dispelling the suspicion. The National Retail Pharmacies, in violation of §§ 821, 822(b), and 841(a), knowingly dispensed prescription opioids without authorization by, among other things, failing to comply with the procedures mandated by 21 C.F.R. Part 1306. Defendants, in violation of § 843(b), knowingly or intentionally used a communication facility (including the mail and wires) to facilitate the commission of the above violations of the CSA. Each Defendant, in violation of § 846, willingly agreed with at least one other person to a plan to knowingly commit one or more of the above violations of the CSA.

689.    The False Narrative Enterprise's conduct in furtherance of the common purpose of the False Narrative Enterprise involved misrepresentations regarding the risk of substance misuse and opioid use disorder and safe use of prescription opioids for long-term chronic pain, lobbying to defeat measures to restrict over-prescription, efforts to criticize or undermine CDC guidelines, and efforts to limit prescriber accountability.

690.    Each of the Marketing Defendants used the mail and wires to exert control over the False Narrative Enterprise and participate in the operation or management of the affairs of the False Narrative Enterprise, directly or indirectly, in the following ways:

a.  Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids, electronic and print advertisements about opioids, sales and promotional training materials about opioids, and CMEs and speaker presentations about opioids that understated the risks and overstated the benefits of long-term use;

b.  Making inaccurate assertions that their promoting of prescription opioids had always been done in a manner that was safe and nonmisleading;

c.  Selecting, cultivating, promoting and paying KOLs and Front Groups based solely on their willingness to communicate and distribute the Marketing Defendants' messages about the use of opioids for chronic pain;

e.  Providing substantial opportunities for KOLs and Front Groups to participate in and/or publish research studies on topics the Marketing Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

f.  Paying KOLs to serve as consultants or on the Marketing Defendants' advisory boards, to serve on the advisory boards and in leadership positions of Front Groups, and to give talks or present CMEs;

g.   Paying significant amounts of money to leaders and individuals associated with Front Groups;

h.   Donating to Front Groups to support talks or CMEs;

i.   Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

j.   Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

k.   Developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters, and the help of the Front Groups as publishers and supporters;

l.   Encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Marketing Defendants, such as the elderly, and then funding that distribution;

m.   Concealing their relationship to and control of Front Groups and KOLs; and

n.   Intending that Front Groups and KOLs would distribute through the U.S. mail and interstate wire facilities promotional and other materials that claimed opioids could be safely used for chronic pain.

691.    The Front Groups and KOLs also conducted and participated in the conduct of the

False Narrative Enterprise, directly or indirectly, by means of the mail and wires in the following ways:

a.   Promising and making misrepresentations regarding opioids and the Marketing Defendants' drugs that were consistent with the latters' messages;

b.   Distributing promotional and other materials that claimed that opioids could be safely used for chronic pain without risk (or with minimal risk) of opioid use disorder and that misrepresented the risk-benefit balance of using opioids for chronic pain;

c.   Amplifying messages favorable to increased opioid use—and ultimately, the Marketing Defendants' financial interests;

d.   Drafting and issuing guidelines and policies that minimized the risk of opioid use disorder and promoted opioids for chronic pain; and

e.   Concealing the connections among themselves and to the Marketing Defendants.

692.    The scheme devised and implemented by the Marketing Defendants and members of the False Narrative Enterprise amounted to a common course of conduct intended to increase sales of prescription opioids by encouraging the prescribing and use of opioids for chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

693.    To achieve the common goal and purpose of the False Narrative Enterprise, the Marketing Defendants and members of the False Narrative Enterprise hid from consumers, prescribers, regulators, and Plaintiff: the fraudulent nature of the Marketing Defendants' marketing scheme, the fraudulent nature of statements made by the Marketing Defendants and by their KOLs, Front Groups and other third parties regarding the safety and efficacy of prescription opioids, and the true nature of the relationship between the members of the False Narrative Enterprise.

694.    The Marketing Defendants and each member of the False Narrative Enterprise agreed, with knowledge and intent, to the overall objective of the enterprise and participated in the common course of conduct to commit acts of fraud in promoting prescription opioids.

695.    For the Marketing Defendants' scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that the Marketing Defendants each financed, supported, and worked through the same KOLs and Front Groups and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

696.    The Marketing Defendants' predicate acts had the purpose of increasing the widespread use of prescription opioids; this widespread use has substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue and profits for the Marketing Defendants. The predicate acts were committed or caused to be committed by the Marketing Defendants through their participation in the False Narrative Enterprise and in furtherance of its fraudulent scheme.

697.    Under the CSA, Defendants are duty bound to identify, report, and not ship suspicious orders of controlled substances.

698.    Defendants jointly agreed to disregard their duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs.

699.    At all relevant times, as described above and so as to generate unlawful profits, Defendants exerted control over, conducted and/or participated in the False Narrative Enterprise via the mail and wires by fraudulently claiming that they were complying with their duties to maintain effective controls against diversion, including duties to identify, investigate, and report suspicious orders of opioids, and by applying political and other pressure to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied for less stringent regulation of their marketing and distribution of pharmaceutical products.

700.    Defendants disseminated false and misleading statements to state and federal regulators via the mail and wires claiming that:

    a.  they were complying with their obligation to maintain effective controls against diversion of their prescription opioids;

    b.  they were complying with their obligation to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

    c.  they were complying with their obligation to report suspicious orders or diversion of their prescription opioids; and

    d.  they did not have the capability to identify suspicious orders of controlled substances.

701.    Defendants knowingly and intentionally furnished false or fraudulent information in their reports about suspicious orders, and/or omitted material information from reports, records and other documents required to be filed. Specifically, Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market and failed to take responsive action. This failure included the failure to report this information to the government

in violation of Defendants' CSA obligations and shipping orders under circumstances indicative of diversion, again in violation of the CSA.

702.    The National Retail Pharmacies had a duty under the CSA not to dispense prescription opioids in the presence of unresolved red flags and to enact and enforce policies and procedures to ensure that duty was and could be complied with. The National Retail Pharmacies violated these duties.

703.    Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce.

704.    Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with each other and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

705.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators, the public, and Plaintiff that Defendants were complying with their legal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The National Retail Pharmacies had the additional goal of deceiving regulators, the public, and Plaintiff that they were complying with their legal obligations to identify and refuse to fill prescriptions that violated the CSA and that they had in place policies and procedures that would allow this to happen.

706.    The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive

and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

### 4.    Pattern of Unlawful Activity

707.    Defendants' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud and violations of the CSA.

708.    The pattern of unlawful activity used by the False Narrative Enterprise involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful False Narrative Enterprise.

709.    These communications included essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the treatment of chronic pain, with the goal of profiting from increased sales of the Marketing Defendants' drugs induced by consumers', prescribers', regulators', and Plaintiff's reliance on the Marketing Defendants' misrepresentations. Each of these fraudulent mailings and interstate wire transmissions constitutes an unlawful act, and, collectively, these violations constitute a pattern of unlawful activity. The Marketing Defendants devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive, and effective use of opioids for chronic pain. The Marketing Defendants and members of the False Narrative Enterprise knew that these representations were not supported by actual evidence. The Marketing Defendants intended that that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance and for the purpose of executing their illegal scheme. By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain to prescribers, regulators, and the public, the Marketing Defendants, the Front Groups, and the KOLs engaged in a fraudulent and unlawful course of conduct constituting a

pattern of unlawful activity. The Marketing Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids' marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including:

    a. Marketing materials about opioids and their risks and benefits, which the Marketing Defendants sent to health care providers such as hospitals, were transmitted through the internet and television, published, and transmitted to Front Groups and KOLs located across the country and the State;

    b. Written representations and telephone calls between the Marketing Defendants, Front Groups, and KOLs regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

    c. E-mails, telephone, and written communications between the Marketing Defendants, the Front Groups, and KOLs agreeing to or implementing the False Narrative Enterprise;

    d. Communications between the Marketing Defendants, Front Groups, KOLs, and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the False Narrative Enterprise;

    e. Written and oral communications directed to state agencies, federal and state courts, and private insurers that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

    f. Receipts of increased profits sent through the U.S. Mail and interstate wire facilities - the wrongful proceeds of the scheme.

710.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Marketing Defendants that the Front Groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

711.    Defendants' use of U.S. Mail and interstate wires in conduct related to the distribution of opioids includes, but is not limited to, the transmission, delivery, or shipment of the following by Defendants, and/or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme, of the following:

    a. The prescription opioids themselves;

b. Documents and communications that facilitated the manufacture, purchase, and sale of prescription opioids;

c. Defendants' government registrations;

d. Documents and communications that supported and/or facilitated Defendants' government registrations;

e. Defendants' records and reports that were required to be submitted to regulatory authorities;

f. Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports, and correspondence;

g. Documents intended to facilitate or control the dispensing of prescription opioids, including the National Retail Pharmacies' nationwide policies and procedures for that controlled the conduct of individual retail pharmacies;

h. Documents for processing and receiving payment for prescription opioids;

i. Payments from the Distributor Defendants to the Marketing Defendants;

j. Rebates and chargebacks from the Marketing Defendants to the Distributor Defendants;

k. Payments from the National Retail Pharmacies to the other Distributor Defendants;

l. Payments from customers of National Retail Pharmacies for prescription opioids;

m. Payments to Defendants' lobbyists through the PCF;

n. Payments to Defendants' trade organizations, like the HDA and NACDS, for memberships and/or sponsorships; and

o. Deposits of proceeds from Defendants' manufacture, distribution, and dispensing of prescription opioids.

712. Defendants also participated in a pattern of violations of the federal Controlled Substances Act by refusing to comply with their obligations under the law to prevent diversion by, among other things, failing to halt and report suspicious orders of prescription opioids and creating policies and procedures that allowed suspicious prescriptions to be filled without adequate due diligence.

### 5.    Consequences

713.    By reason of the above-referenced violations of 18 U.S.C. § 1962(c)–(d), Plaintiff was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is entitled to assert this claim and to recover threefold the damages they sustained and the cost of the suit, including reasonable attorneys' fees, as well as such other appropriate relief as the Court may provide.

## X.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff asks that the Court:

A.    Certify the Proposed Class or the alternative issues class and appoint Plaintiff as the class representative;

B.    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and the class;

C.    Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff and the members of the class for all damages; treble damages; pre-judgment and post-judgment interest as provided by law and at the highest legal rate;

D.    Award such equitable relief against Defendants as the Court should find appropriate;

E.    Award Plaintiff its cost of suit, including reasonable attorneys' fees as provided by law; and

F.    Award such further and additional relief as the Court may deem just and proper under the circumstances.

## XI.    <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 16, 2023                     Respectfully Submitted,

Christopher A. Dodd
Brooke Jordy
**DODD LAW OFFICE, LLC**
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com
brooke@doddnm.com

Additional Counsel for Plaintiff Who Will Seek Admission *Pro Hac Vice*:

Steve Martino
**TAYLOR MARTINO, P.C.**
51 St. Joseph St.
Mobile, AL 36602
Telephone: (251) 433-3131
SteveMartino@taylormartino.com

John W. (Don) Barrett
David McMullan, Jr.
Richard Barrett
Sterling Aldridge
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
rrb@rrblawfirm.net
saldridge@barrettlawgroup.com

Warren Burns
Darren Nicholson
**BURNS CHAREST, LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dnicholson@burnscharest.com

Korey A. Nelson
Patrick Murphree
**BURNS CHAREST, LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
pmurphree@burnscharest.com

Charles J. LaDuca
David L. Black
Monica Miller
Jennifer E. Kelly
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202)789-3960
charles@cuneolaw.com
dblack@cuneolaw.com
monicam@cuneolaw.com
jkelly@cuneolaw.com

*Attorneys for Plaintiff*