# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAN MIGUEL HOSPITAL CORPORATION d/b/a ALTA VISTA REGIONAL HOSPITAL, on behalf of itself and all others similarly situated, | |
| Plaintiff | Case No. 1:23-cv-00903-KWR-JFR |
| | The Hon. Judge Kea Riggs |
| v. | |
| JOHNSON & JOHNSON, *et al.*, | |
| Defendants | |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION FOR FINAL CLASS CERTIFICATION, APPOINTMENT OF CLASS COUNSEL, FINAL APPROVAL OF SETTLEMENTS, APPROVAL OF PLAN OF ALLOCATION, AND <u>AWARD OF ATTORNEYS' FEES AND EXPENSES</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES .............................................................................................. v

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 5

I.    ACH OPIOIDS LITIGATION ................................................................ 5

II.   TERMS OF THE SETTLEMENTS ....................................................... 7

    A.   Distributors' Settlement Agreement ............................................ 7

    B.   Janssen Settlement Agreement .................................................... 7

    C.   Teva Settlement Agreement ......................................................... 7

    D.   Allergan Settlement Agreement ................................................... 8

    E.   General Terms .............................................................................. 8

III.   PRELIMINARY APPROVAL AND CLASS NOTICE ........................ 9

IV.   CAFA NOTICE ...................................................................................... 9

V.    RESPONSE OF THE SETTLEMENT CLASSES TO DATE................. 10

VI.   PROSECUTION OF THIS LITIGATION REQUIRED AN ENORMOUS AND RISKY INVESTMENT OF RESOURCES AND LABOR ....................... 10

ARGUMENT .................................................................................................................... 11

I.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASSES FOR SETTLEMENT PURPOSES ONLY ..................................................... 11

    A.   Numerosity .................................................................................. 13

    B.   Commonality ............................................................................... 13

    C.   Typicality ..................................................................................... 14

    D.   Adequacy of Representation ........................................................ 15

    E.   Predominance ............................................................................. 15

    F.   Superiority ................................................................................... 16

II.   INTERIM SETTLEMENT CLASS COUNSEL SHOULD BE APPOINTED AS SETTLEMENT CLASS COUNSEL ..................................................... 17

III.  PLAINTIFFS PROVIDED SUFFICIENT NOTICE TO THE PRELIMINARILY CERTIFIED SETTLEMENT CLASSES IN COMPLIANCE WITH RULE 23 AND DUE PROCESS ............................................................................................. 18

IV.  THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE AND MERIT FINAL APPROVAL ................................................................... 20

    G.   The Settlements Satisfy the Rule 23(e)(2) Factors ..................... 22

        1.   Class Plaintiffs and Interim Settlement Counsel Have Adequately Represented the Settlement Classes ........................................................... 22

2.   The Settlements Were Fairly Negotiated at Arm's Length ...................................... 24

3.   The Settlements Are Adequate in Light of the Costs, Risks, and Delay of Trial and Appeal ................................................................................................................................. 25

a.   Serious Legal and Factual Questions Placed the Litigation's Outcome in Doubt. 26

b.   Immediate Recovery Is More Valuable than the Mere Possibility of a More Favorable Outcome After Further Litigation .............................................................. 28

4.   The Method for Distributing Relief is Effective ...................................................... 29

5.   Attorneys' Fees and Expenses ................................................................................. 30

6.   The Settling Parties Have No Additional Agreement ............................................... 31

7.   Settlement Class Members Are Treated Equitably ................................................... 31

H.   The Settlements Satisfy the Remaining Factor Considered by Courts in the Tenth Circuit ................................................................................................................................. 32

V.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE .......... 32

VI.   THE REQUESTED COMMON FUND FEE IS REASONABLE AND SHOULD BE APPROVED ............................................................................................................................. 34

A.   The Requested Fee is a Reasonable Percentage of the Common Fund ....................... 34

B.   The *Johnson* Factors Support the Reasonableness of Interim Settlement Class Counsel's Fee Request ........................................................................................................ 36

1.   The significant monetary award obtained for the Settlement Classes supports the reasonableness of the fee award. (Factor 8) ..................................................................... 37

2.   The requested fee is consistent with fees awarded in similar cases. (Factor 12) ...... 39

3.   The requested fee is consistent with a customary fee. (Factor 5) ........................... 40

4.   These cases presented difficult factual issues and raised novel and complex questions of law. (Factor 2) ............................................................................................... 41

5.   Plaintiffs' team of attorneys have substantial experience in prosecuting high-stakes, complex litigation and pursued the case with extraordinary skill, zeal, and expertise. (Factors 3 & 9) ................................................................................................................... 41

6.   The fee being contingent on obtaining relief for the class and the significant risk undertaken by counsel justifies the fee request. (Factor 6) ............................................... 43

7.   Interim Settlement Class Counsel's expended time and labor were enormous. (Factor 1) ............................................................................................................................ 45

8.   Given the enormous time and resource commitments, and the significant risk to develop and litigate the ACH Opioids Litigation, few attorneys would have been willing to take it on. (Factor 10) ..................................................................................................... 45

9.   The demands of this case precluded Interim Settlement Class Counsel from other employment.  (Factor 4) ..................................................................................................... 46

VII.   THE COURT SHOULD AWARD PLAINTIFFS' COUNSEL'S EXPENSES AND NOTICE AND ADMINISTRATIVE COSTS ........................................................................... 47

A.    Plaintiffs' Counsel's Expenses ................................................................. 47

B.    Notice and Administrative Costs and Mechanisms for Submitting Future Expenses .. 48

CONCLUSION ................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acevedo v. Sw. Airlines Co.*,
  No. 1:16-CV-00024-MV-LF, 2019 WL 6712298 (D.N.M. Dec. 10, 2019) ...................... passim
*Amoco Prod. Co. v. Fed. Power Comm'n*,
  465 F.2d 1350 (10th Cir. 1972) ............................................................................................. 20
*Anderson v. Merit Energy Co.*,
  07-CV-00916-LTB-BNB, 2009 WL 3378526 (D. Colo. Oct. 20, 2009) ........................... 38, 40
*Anderson Living Tr. v. Energen Res. Corp.*,
  No. CV 13-909 WJ/CG, 2021 WL 1686491 (D.N.M. Apr. 29, 2021) .............................. passim
*Arkalon Grazing Ass'n v. Chesapeake Operating, Inc.*,
  275 F.R.D. 325 (D. Kan. 2011) .............................................................................................. 16
*Been v. O.K. Indus., Inc.*,
  CIV-02-285-RAW, 2011 WL 4478766 (E.D. Okla. Aug. 16, 2011) ........................... 41, 43, 46
*Bhasker v. Financial Indemnity Co.*,
  No. 1:17-cv-00260-KWR-JHR, 2023 WL 4534548 (D.N.M. July 13, 2023) ........................ 39
*Blum v. Stenson*,
  465 U.S. 886 (1984) ................................................................................................................ 34
*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ................................................................................................................ 34
*Brown v. Phillips Petroleum Co.*,
  838 F.2d 451 (10th Cir. 1988) ................................................................................. 36, 37, 38, 46
*Buttonwood Tree Value Partners, L.P. v. Sweeney*,
  No. SA-CV-1000537-CJCMLGX, 2014 WL 12586788 (C.D. Cal. May 15, 2014) ............... 18
*Candelaraia v. Health Care Serv. Corp.*,
  No. 2:17-cv-404-KG-SMV, 2020 WL 6875828 (D.N.M. Nov. 4, 2020) ......................... 39, 47
*Case v. Unified Sch. Dist. No. 233*,
  157 F.3d 1243 (10th Cir. 1998) .............................................................................................. 48
*CCG Holding Co. v. Hutchens*,
  773 F.3d 1076 (10th Cir. 2014) .............................................................................................. 16
*Cecil v. BP America Prod. Co.*,
  No. 16-CV-410-KEW, 2018 WL 8367957 (E.D. Okla. Nov. 19, 2018) ........................... 38, 43
*Charlie v. Rehoboth McKinley Christian Health Care Servs.*,
  No. CV 21-652 SCY/KK, 2023 WL 4591167 (D.N.M. July 18, 2023) ................................. 35
*Chavez Rodriguez v. Hermes Landscaping, Inc.*,
  No. 17-2142-JWB-KGG, 2020 WL 3288059 (D. Kan. June 18, 2020) ............................ 26, 28
*Chieftain Royalty Co. v. XTO Energy, Inc.*,
  2018 WL 2296588 (E.D. Okla. Mar. 27, 2018) ...................................................................... 42
*Cisneros v. EP Wrap-It Insulation, LLC*,
  No. CV 19-500 GBW/GJF, 2022 WL 2304146 (D.N.M. June 27, 2022) ...................... passim
*Cline v. Sonoco, Inc.*,
  333 F.R.D. 676 (E.D. Okla. 2019) .......................................................................................... 13
*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001) ..................................................................................................... 24

*DG v. Devaughn*,
  594 F.3d 1188 (10th Cir. 2010) ............................................................ 12, 13, 14

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ........................................................................................ 19

*Feerer v. Amoco Prod. Co.*,
  No. 95–0012, 1998 U.S. Dist. LEXIS 22248 (D.N.M. May 28, 1998) ................... 43

*Fowler v. Med. Man Techs., Inc.*,
  No. CV 23-640 WJ/SCY, 2024 WL 3498587 (D.N.M. July 18, 2024) .................... 35

*Freebird, Inc. v. Merit Energy Co.*,
  No. 10-1154-KHV, 2013 WL 1151264 (D. Kan. Mar. 19, 2013) .......................... 44

*Gottlieb v. Barry*,
  43 F.3d 474 (10th Cir. 1994) ......................................................................... 34, 35

*Gudenkauf v. Stauffer Communications, Inc.*,
  158 F.3d 1074 (10th Cir. 1998) ........................................................................ 37

*Horn v. Associated Wholesale Grocers, Inc.*,
  555 F.2d 270 (10th Cir. 1977) .......................................................................... 13

*In re Bank of America Wage and Hour Employment Litig.*,
  10-MD-2138-JWL, 2013 WL 6670602 (D. Kan. Dec. 18, 2013) ......................... 48

*In re Crocs, Inc. Sec. Litig.*,
  306 F.R.D. 672 (D. Colo. 2014) ........................................................................ 29

*In re Domestic Air Transp. Antitrust Litig.*,
  148 F.R.D. 297 (N.D. Ga. 1993) ....................................................................... 43

*In re Insulin Pricing Litig.*,
  No. 3:17-CV-699-BRMLHG, 2020 WL 5642002, (D.N.J. Sept. 22, 2020) ............. 18

*In re Integra Realty Res., Inc.*,
  354 F.3d 1246 (10th Cir. 2004) ........................................................................ 22

*In re King Res. Co. Sec. Litig.*,
  420 F. Supp. 610 (D. Colo. Aug. 10, 1976) ....................................................... 29

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
  271 F.R.D. 263 (D. Kan. 2010) ........................................................................ 17

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
  625 F. Supp. 2d 1133 (D. Colo. 2009) .............................................................. 27

*In re Syngenta AG MIR 162 Corn Litig.*,
  61 F.4th 1126 (10th Cir. 2023) ................................................................... passim

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................... 24

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  912 F. Supp. 2d 1178 (D.N.M. 2012) .......................................................... passim

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) .................................................................. passim

*In re: Motor Fuel Temperature Sales Practices Litig.*,
  07-MD-1840- KHV, 2016 WL 4445438 (D. Kan. Aug. 24, 2016) ......................... 37

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ...................................................................... passim

*Jones v. Diamond*,
  636 F.2d 1364 (5th Cir. 1981) .......................................................................... 44

*Kjessler v. Zaappaaz, Inc.*,
No. 4:17-CV-3064, 2018 WL 8755737 (S.D. Tex. Aug. 31, 2018) ........................ 18

*Koehler v. Freightquote.com, Inc.*,
12-2505- DDC-GLR, 2016 WL 3743098 (D. Kan. July 13, 2016) ......................... 38

*Lane v. Page*,
862 F. Supp. 2d 1182 (D.N.M. 2012) .......................................................... 37, 44, 45

*Lowery v. City of Albuquerque*,
No. CIV 09-0457 JB/WDS, 2013 WL 1010384 (D.N.M. Feb. 27, 2013) ......................... 24, 25

*Lucas v. Kmart Corp.*,
234 F.R.D. 688 (D. Colo. 2006) ......................................................... passim

*Lunsford v. Woodforest Nat'l Bank*,
No. 1:12-CV-103- CAP, 2014 WL 12740375 (N.D. Ga. May 19, 2014)................................. 42

*McNeely v. Nat'l Mobile Health Care, LLC*,
No. CIV-07-933-M, 2008 WL 4816510 (W.D. Okla. Oct. 27, 2008) ........................ 26, 27, 29

*Milonas v. Williams*,
691 F.2d 931 (10th Cir. 1982) ......................................................................... 13

*Montgomery v. Cont'l Intermodal Grp.-Trucking LLC*,
No. 19-940 GJF, 2021 WL 1339305 (D.N.M. Apr. 9, 2021) ........................................ passim

*Nakamura v. Wells Fargo Bank, Nat'l Ass'n*,
No. 17-4029-DDC-GEB, 2019 WL 2185081 (D. Kan. May 21, 2019) ......................... 35, 37, 40

*Nieberding v. Barrette Outdoor Living, Inc.*,
129 F. Supp. 3d 1236 (D. Kan. 2015)....................................................................... 40

*Ressler v. Jacobson*,
822 F. Supp. 1551 (M.D. Fla. 1992)......................................................................... 39

*Robles v. Brake Masters Sys., Inc.*,
No. CIV 10-0135 JB/WPL, 2011 WL 9717448 (D.N.M. Jan. 31, 2011) ................................. 40

*Rosenbaum v. MacAllister*,
64 F.3d 1439 (10th Cir. 1995) ......................................................................... 35

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
314 F.3d 1180 (10th Cir. 2002) ......................................................................... 15

*Rutter Wilbanks Corp. v. Shell Oil Co.*,
314 F.3d 1180 (10th Cir. 2002) ..................................................................... 15, 22

*Sears v. Atchison, Topeka & Santa Fe Ry., Co.*,
749 F.2d 1451 (10th Cir. 1984) ......................................................................... 20

*Shaw v. Interthinx, Inc.*,
No. 13- CV-01229-REB-NYW, 2015 WL 1867861 (D. Colo. Apr. 22, 2015)....................... 35

*Tennille v. Western Union Co.*,
785 F.3d 422 (10th Cir. 2015) ........................................................... 11, 19, 27, 29

*Trujillo v. State of Colo.*,
649 F.2d 823 (10th Cir. 1981) ......................................................................... 20

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)............................................................................... 13, 16

*Vaszlavik v. Storage Tech. Corp.*,
No. 95-B-2525, 2000 WL 1268824 (D. Colo. Mar. 9, 2000) ................................................. 47

*Wiggins v. Roberts*,
551 F. Supp. 57 (N.D. Ala. 1982) ........................................................................ 46

**Statutes**

28 U.S.C. § 1715 ............................................................................................................ 10
28 U.S.C. § 1715(b) ....................................................................................................... 10

**Other Authorities**

5 Newberg on Class Actions § 15:77 n.15 (5th ed. 2015) ............................................ 37
Manual For Complex Litigation 4th § 14:121 (2004) .................................................. 38
Manual for Complex Litigation, Fourth, § 14.121 ....................................................... 34
William B. Rubenstein, 4 *Newberg On Class Actions* § 3:10, at 272-73 (5th ed. 2011) .............. 13

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................... 11, 17
Fed. R. Civ. P. 23(a) ...................................................................................................... 11
Fed. R. Civ. P. 23(b) ................................................................................................. 11, 17
Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................ 19, 20
Fed. R. Civ. P. 23(e)(1)(B) ............................................................................................. 19
Fed. R. Civ. P. 23(e)(2) .............................................................................................. 21, 31
Fed. R. Civ. P. 23(g)(1)(B) ............................................................................................ 17
Fed. R. Civ. P. 23(h) ............................................................................................ 34, 38, 47

## INTRODUCTION

Class Plaintiffs,[1] on behalf of themselves and the preliminarily certified settlement classes of similarly situated entities described below (collectively, the "Settlement Classes"), and the Distributor Defendants[2], Janssen Defendants[3], Teva Defendants[4], and Allergan Defendants[5] (collectively, "Settling Defendants"; together with the Plaintiff, the "Settling Parties") have reached four separate Settlements totaling $651 million to resolve claims against the Settling Defendants for the benefit of the preliminarily certified Settlement Classes. The Settlements[6]

---

[1] As ordered by the Court, Class Plaintiffs for the Settlements consist of Plaintiff San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital and the plaintiff acute care hospitals in the following related state court cases: *Florida Health Sciences Center, Inc., et al. v. Richard Sackler, et al.*, Case No. 19-018882 (Cir. Ct. Broward Cnty., Fla.); *The DCH Health Care Authority, et al. v. Purdue Pharma, L.P., et al.*, Case No. CV-19-07 (Cir. Ct. Conecuh Cnty., Ala.); *Fort Payne Hospital Corporation, et al. v. McKesson Corporation, et al.*, Case No. 21-cv-2021-900016.00 (Cir. Ct. Conecuh Cnty., Ala.); and *Lester E. Cox Medical Centers d/b/a Cox Medical Centers, et al. v. Amneal Pharmaceuticals, LLC, et al.*, No. 6:22-cv-3192 (W.D. Mo.). Orders, ECF Nos. 277, 278. 279, 280. A list of Class Plaintiffs is attached as Exhibit A.

[2] Distributor Defendants means Cencora, Inc. ("Cencora," formerly AmerisourceBergen Corporation), Cardinal Health, Inc., ("Cardinal"), and McKesson Corporation ("McKesson"), including all Released Entities specified in the Distributor Class Action Settlement Agreement with Acute Care Hospitals ("Distributors Settlement Agreement") (ECF No. 276-1).

[3] Janssen Defendants means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc., including all Released Entities specified in the Janssen Class Action Settlement Agreement with Acute Care Hospitals ("Janssen Settlement Agreement") (ECF No. 276-2).

[4] Teva Defendants means Teva Pharmaceuticals Industries, Ltd., Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Actavis Pharma, Inc., Actavis LLC, Watson Laboratories, Inc. and Anda, Inc., including all Released Entities specified in the Teva Defendants Class Action Settlement Agreement with Acute Care Hospitals ("Teva Settlement Agreement") (ECF No. 276-3).

[5] Allergan Defendants means Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.); Allergan Sales, LLC; and Allergan USA, Inc., including all Released Entities specified in the Allergan Defendants' Class Action Settlement Agreement with Acute Care Hospitals ("Allergan Settlement Agreement") (ECF No. 276-4).

[6] All capitalized terms not otherwise defined herein shall have the meaning given to them in the Distributors' Settlement Agreement, the Janssen Settlement Agreement, the Teva Settlement Agreement, and the Allergan Settlement Agreement (collectively, "the Settlement Agreements" or "Settlements"). ECF Nos. 276-1, 276-2, 276-3, 276-4. All emphasis is added, and all citations are omitted, unless otherwise noted.

resulted from well-informed and arm's-length negotiations between highly experienced counsel possessing a thorough understanding of the strengths and weaknesses of the claims after years of extensive opioids-related litigation between acute care hospitals and the Settling Defendants. The Settling Parties reached their respective Settlements after comprehensive mediation processes conducted by a prominent national mediator, Fouad Kurdi, as well as, in the case of the Settling Distributors, Judge Sidney Schenkier.

The Court granted preliminary approval of the Settlements on October 30, 2024 and directed that notice of the Settlements be disseminated to the preliminarily certified Settlement Classes. The Court also preliminarily certified the respective Settlement Classes for settlement purposes only and appointed the undersigned as Interim Settlement Class Counsel. Class Plaintiffs now seek final certification of the Settlement Classes under each Settlement and Interim Settlement Class Counsel seek to be appointed as Settlement Class Counsel for each Settlement Class.

In its Orders, the Court held that the Settlements appeared fair, reasonable, and adequate, subject to further consideration at the Fairness Hearing. Orders, ECF Nos. 277, 278, 279, 280. The Court's assessment of the Settlements at preliminary approval was correct and should be extended to final approval. Interim Settlement Class Counsel have ensured that the Notice and Notice Package the Court ordered distributed in accordance with the Notice Plan were timely implemented by the Notice and Settlement Administrators, A.B. Data, Ltd. ("A.B. Data") and Cherry Bekaert Advisory, LLC ("Cherry Bekaert").[7]

---

[7] *See* Declaration of Brian Devery of A.B. Data, Ltd. In Support of Class Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation ("Devery Decl.") *generally*, attached as Exhibit B-1 to Declaration of Warren T. Burns in Support of Class Plaintiffs' Motion for Final Class Certification, Appointment of Class Counsel, Final Approval of Settlement, Approval of Plan of Allocation, and Award of Attorneys' Fees and Expenses ("Burns Decl.").

The Notice and Notice Package also set forth the Plan of Allocation that governs how Claims will be considered and how the net settlement proceeds will be allocated to Settlement Class Members who submit timely and valid claim forms to the Settlement Administrator ("Eligible Claimants"). The Plan of Allocation was prepared based on information provided by Plaintiffs' experts and in consultation with A.B. Data and Cherry Bekaert. The plan allocates funds between Eligible Claimants in two ways: (1) A Settlement Class Member may select a "Quick Pay" option under which the Settlement Class Member will receive a default amount of $5,000 total from all four Settlements,[8] or (2) A Settlement Class Member may elect to participate in the more detailed damages calculation using the Model set forth in the Plan of Allocation, which may result in an Allocated Amount greater (but not less) than the Settlement Class Member's Quick Pay Amount. Interim Settlement Class Counsel anticipate that all funds will be distributed to Settlement Class Members pursuant to the Plan of Allocation.

Interim Settlement Class Counsel have concluded that the Settlements and Plan of Allocation are fair, reasonable, and adequate, and in the best interest of each of the Settlement Classes. Burns Decl. at ¶ 26.[9] Fouad Kurdi, having mediated the Settlements, support them as being an excellent result for the Settlement Classes. *See* Kurdi Decl. at ¶ 8.[10] The Settlements and Plan of Allocation warrant the Court's final approval. Indeed, to date, no one has submitted an objection to any of the Settlements or the Plan of Allocation, and to date, no hospitals have opted out of any

---

[8] If one or more Settlements is not approved, or if a Class Member is ineligible for one or more Settlements, then the Quick Pay Amount owed shall be reduced, proportionally, based upon a comparison of the Up-Front Settlement Amount contributed by the Settling Defendant(s) in the Settlement(s) at issue with the total Up-Front Settlement Amounts of the four Settlements.

[9] Declaration of Warren T. Burns in of Class Plaintiffs' Motion for Final Class Certification, Appointment of Class Counsel, Final Approval of Settlement, Approval of Plan of Allocation, and Award of Attorneys' Fees and Expenses ("Burns Decl.") attached as Exhibit B.

[10] Declaration of Fouad Kurdi In Support of Class Plaintiffs' Motion for Final Approval of Settlements ("Kurdi Decl.") attached as Exhibit C.

of the Settlements. Accordingly, Class Plaintiffs respectfully request the Court grant final approval of the Settlements and the Plan of Allocation as fair, reasonable, and adequate.

The Settlements were reached only after the sustained effort of Plaintiffs' counsel—on a fully contingent basis with substantial risk and out-of-pocket expenses—including, but not limited to: surviving Defendants' motions to dismiss in multiple cases and *fora*; analyzing millions of pages of documents; taking and defending a great deal of depositions; briefing and arguing numerous discovery disputes; working closely with over a dozen experts; briefing and arguing issues on appeal; and vigorously preparing for trial in Alabama state court in July 2024. All this effort not only advanced the litigation, but it laid the foundation for Class Plaintiffs and the Settling Defendants to negotiate, and ultimately reach, the Settlements.

As compensation for their persistent and effective advocacy in the face of considerable opposition and risk, Interim Settlement Class Counsel respectfully request an award of the standard one-third fee of the $651 million total Settlement Amount plus interest earned on that Amount[11] (equating to a 1.58 multiplier to their collective lodestar).[12] Interim Settlement Class Counsel also request the Court award their incurred expenses and charges in the amount of $35,330,637.54 and order the amount of $72,569.85 to be paid to A.B. Data and $239,187.81 to be paid to Cherry Bekaert for costs incurred to implement the notice of pendency from the Settlement Funds. As shown below, these attorneys' fees and expenses requests are eminently justifiable under the facts and

---

[11] Together, the "Settlement Funds." The Settlement Funds include the Settlement Amount plus any interest that may accrue on the Settlement Amount from the date the Settlings Defendant(s) pay the Settlement Amount or any portion thereof. *See* Distributors Settlement Agreement (ECF No. 276-1) at § I(SS); Janssen Settlement Agreement (ECF No. 276-2) at § I(TT); Teva Settlement Agreement (ECF No. 276-3) at § I(SS); Allergan Settlement Agreement (ECF No. 276-4) at § I(WW).

[12] For the avoidance of doubt, Interim Settlement Class Counsel seeks one-third of the Settlement Funds in each Settlement Agreement individually, totaling to $217 million (plus interest) if all four Settlements become Final.

circumstances of this case, application of the *Johnson* factors, and the law and precedent in this District and the Tenth Circuit. *See Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974). For all the reasons set forth below and in the accompanying declarations, Interim Settlement Counsel respectfully submit that the requested attorneys' fees and expenses are fair and reasonable under the applicable legal standards and should be awarded by the Court.

## FACTUAL BACKGROUND[13]

### I.    ACH OPIOIDS LITIGATION

On October 16, 2023, Plaintiff San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital ("San Miguel"), an acute care hospital in Las Vegas, New Mexico, filed this putative class action against the Distributors, Janssen, Teva, and Allergan Defendants, amongst others. ECF No. 1. Plaintiff alleged, *inter alia*, that Defendants participated in a conspiracy that resulted in an epidemic of opioid addiction throughout the United States. *See id.* ¶ 2. Plaintiff alleged that it and the putative class were injured as a result of Defendants' actions. *See id.* ¶ 22. Defendants have and continue to deny Plaintiff San Miguel's allegations and any associated liability.

Interim Settlement Class Counsel represent hundreds of acute care hospitals throughout the nation, including the Class Plaintiffs. Burns Decl. at ¶¶ 3-6. Since 2017, acute care hospitals represented by Interim Settlement Class Counsel have been litigating claims similar to those alleged in this suit against these Defendants in numerous state and federal courts, including in the federal MDL proceedings, *In re National Prescription Opiate Litigation*, Case No. 1:17-md-2804, MDL 2804, (N.D. Ohio). *Id.* Collectively, Class Plaintiffs will refer to their ongoing litigation

---

[13] The facts summarized throughout this memorandum are generally set forth, and sometimes in more detail, in the accompanying Declaration of Warren T. Burns ("Burns Decl.") attached as Exhibit B.

related to the opioid crisis in multiple *fora* against Defendants as the ACH Opioids Litigation (or "Litigation").

Since 2017, Plaintiffs in the ACH Opioids Litigation have vigorously pursued their claims. *Id.* at ¶ 7. Their efforts have included multiple rounds of dispositive briefing as well as interlocutory and other appeals. *Id.* at ¶ 27. Some Plaintiffs have produced millions of pages of documents, and terabytes of data related to their treatment of patients diagnosed with opioid use disorder or related conditions. *Id.* Plaintiffs in the ACH Opioids Litigation have likewise reviewed voluminous discovery produced by Defendants. *Id.* Certain Plaintiffs have provided depositions of corporate representatives and employee witnesses. *Id.* During the ongoing ACH Opioids Litigation, Plaintiffs have also engaged over a dozen experts to provide testimony on issues relating to alleged liability and damages. *Id.* Before reaching the Settlement Agreements, the Settling Parties were preparing vigorously for a July 2024 trial of certain Settlement Class Members' claims in Alabama state court. *Id.* at ¶ 28.

Since 2022, Interim Settlement Class Counsel have been engaged in negotiations with Settling Defendants. *Id.* at ¶ 9. These negotiations involved numerous in-person and remote presentations to elucidate Plaintiffs' claims and the Settling Defendants' defenses. *Id.* Interim Settlement Class Counsel have participated in a total of over a dozen in-person mediation sessions and additional remote negotiation sessions with the different groups of Settling Defendants. *Id.* The Settling Parties were assisted in their negotiations through the dogged efforts of a prominent national mediator, Fouad Kurdi, as well as, in the case of the Settling Distributors, Judge Sidney Schenkier. *Id.* Mr. Kurdi was instrumental in settling disputes involving other litigants involved in *In re National Prescription Opiate Litigation*, *id.,* while Judge Schenkier is a former federal magistrate judge and well-respected Chicago-based mediator. After reaching agreement on key

terms, the Settling Parties have spent months negotiating and documenting final Settlement Agreements. *Id.* at ¶ 9-10. The Settling Parties are now before this Court to seek final approval of their Settlement Agreements.

## II. TERMS OF THE SETTLEMENTS

### A. Distributors' Settlement Agreement

The Distributors' Settlement Agreement provides that Plaintiffs and the certified Settlement Class will settle and release their claims against the Distributor Defendants in exchange for a non-reversionary $390 million cash payment from the Distributor Defendants (the "Distributors' Settlement Amount"). *See generally* Distributors' Settlement Agreement (ECF No. 276-1). The Distributors' total Settlement Amount was deposited into an Escrow Account on November 27, 2024. *Id.* at ¶ 11.

### B. Janssen Settlement Agreement

The Janssen Settlement Agreement provides that Plaintiffs and the certified Settlement Class will settle and release their claims against the Janssen Defendants in exchange for a non-reversionary $110 million cash payment from the Janssen Defendants (the "Janssen Settlement Amount"). *See generally* Janssen Settlement Agreement (ECF No. 276-2). The Janssen Settlement Amount was deposited into an Escrow Account on November 27, 2024. *Id.* at ¶ 12.

### C. Teva Settlement Agreement

The Teva Settlement Agreement provides that Plaintiffs and the certified Settlement Class will settle and release their claims against the Teva Defendants in exchange for a non-reversionary $126 million cash payment from the Teva Defendants (the "Teva Settlement Amount") and distribution of certain amounts of Naloxone Hydrochloride Nasal Spray. *See generally* Teva Settlement Agreement (ECF No. 276-3). On November 29, 2024, $1 million of the Teva Settlement Amount was deposited into an Escrow Account. *Id.* at ¶ 13. The remaining $125 million

will be deposited in accordance with the payment schedule set forth in Section IV(B) of the Teva Settlement Agreement. *Id.* The Teva Settlement Agreement also provides for the distribution of Naloxone Hydrochloride Nasal Spray, a medication designed to rapidly reverse opioid overdose, to Settlement Class Members valued at up to $49 million. *Id.*

### D. Allergan Settlement Agreement

The Allergan Settlement Agreement provides that Plaintiffs and the certified Settlement Class will settle and release their claims against the Allergan Defendants in exchange for a non-reversionary $25 million cash payment from the Allergan Defendants (the "Allergan Settlement Amount"). *See generally* Allergan Settlement Agreement (ECF No. 276-4). On November 22, 2024, $1 million of the Allergan Settlement Amount was deposited into an Escrow Account. *Id.* at ¶ 14. The remaining $24 million will be deposited in accordance with the payment schedule set forth in Section IV(B) of the Allergan Settlement Agreement. *Id.*

### E. General Terms

The Settlement Funds, which consist of the Settlement Amounts provided for in each Settlement, and all interest and accretions thereto, will be used to pay for notice and administrative costs,[14] reasonable fees and costs to the Escrow Agent, taxes and tax expenses, costs and expenses reasonably and actually incurred in soliciting claims and assisting with the filing and processing of such claims, and Plaintiffs' attorneys' fees and litigation expenses, as allowed by the Court.[15] The balance of the Settlement Funds (the "Net Settlement Funds") will be distributed pursuant to the Plan of Allocation to Settlement Class Members who submit timely and valid Claim Forms and/or Registration Forms to the Settlement Administrator.

---

[14] Up to an amount specified in each Settlement Agreement. *See infra*, note 15.

[15] *See* Distributors Settlement Agreement (ECF No. 276-1) at § VII(B); Janssen Settlement Agreement (ECF No. 276-2) at § VII(B); Teva Settlement Agreement (ECF No. 276-3) at § VII(B) Allergan Settlement Agreement (ECF No. 276-4) at § VII(B).

Interim Settlement Counsel anticipate that all funds will be distributed to Settlement Class Members pursuant to the Plan of Allocation. Burns Decl. at ¶ 15. There is no right of reversion under the Settlements and under no circumstances will any portion of a Settlement Amount be returned to the respective Settling Defendant(s) once that Settlement becomes Final. *Id.*

## III.    PRELIMINARY APPROVAL AND CLASS NOTICE

Plaintiff San Miguel filed its motion for preliminary approval of the Settlements on October 25, 2024, which the Court granted on October 30, 2025. ECF Nos. 277, 278, 279, 280. In the orders granting preliminary approval, the Court also appointed A.B. Data and Cherry Bekaert as the Notice and Claims Administrators and approved the form and manner of notice to Settlement Class Members. *Id.* The Notice Package approved by the Court has been implemented by A.B. Data and Cherry Bekaert. Since entry of the preliminary approval order, A.B. Data has (i) mailed 5,732 copies of  the Court-approved Notice Packet to potential Settlement Class Members (ii) emailed 1,224 copies (of which 1,201 were successfully delivered) of the Notice Packet to potential Settlement Class Members, and (iii) implemented the media plan to publish notice of the Settlement on certain websites, e-newsletters, and email blasts. Devery Decl. at ¶¶ 3-6. Moreover, Cherry Bekaert published a dedicated website, www.acutecarehospitalsettlement.com. *Id.* at ¶ 10. The settlement website provides information to Settlement Class Members about the Action and the Settlements and contains links to important case and settlement documents. *Id.* at ¶ 11. A.B. Data has also maintained a toll-free telephone number, with an interactive voice response system to provide potential Settlement Class Members with responses to frequently asked questions and important information regarding the litigation. *Id.* at ¶ 12. The banner ad notices also have resulted in more than 5,648,783 impressions served. *See id.* ¶¶ 7-9.

## IV.    CAFA NOTICE

Pursuant to 28 U.S.C. § 1715(b), "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement . . . ." In its orders preliminarily approving the Settlements, the Court ordered the Settling Defendants to provide this notice by November 4, 2024. EFC Nos. 277, 278, 279, 280. Accordingly, the Settling Defendants have complied with the Court's orders and the notice requirements of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715. Burns Decl. at ¶ 18.

## V.    RESPONSE OF THE SETTLEMENT CLASSES TO DATE

The deadline for Settlement Class Members to object to the Settlement is January 6, 2025, and the deadline for Settlement Class Members to file a claim is March 4, 2025. Interim Settlement Class Counsel will provide the Court with a final update on the response of the Settlement Classes in their February 3, 2025 filing, well before the March 4, 2025 final approval hearing. *Id.* at ¶ 22. To date, A.B. Data has received no Opt-Out Forms.  Devery Decl. at ¶ 14.

## VI.   PROSECUTION OF THIS LITIGATION REQUIRED AN ENORMOUS AND RISKY INVESTMENT OF RESOURCES AND LABOR

As described above, for nearly eight years, Interim Settlement Class Counsel devoted an enormous amount of time, energy, and resources prosecuting the ACH Opioids Litigation on a completely contingent basis to a successful resolution with the Settling Defendants. Burns Decl. at ¶ 42. They did so knowing these cases would require years of discovery, extensive motion practice, substantial dispositive motion challenges, and difficult and lengthy trials on the merits— all with a substantial risk of no recovery. *Id.* As further detailed in Sections VI and VII, Interim Settlement Class Counsel and their co-counsel worked a collective 211,938 hours and fronted over $35,330,637 in expenses prosecuting the ACH Opioids Litigation. *Id.* at ¶¶ 44, 48.

Regarding the Settlements, Interim Settlement Class Counsel prepared for and attended multiple mediation sessions with mediators Fouad Kurdi and Judge Sidney Schenkier, successfully negotiated the Settlements, drafted the Settlement Agreements with Settling Defendants' counsel, sought and obtained preliminary approval of the Settlements, retained and oversaw the Settlement Administrator and notice program, and prepared the pending motion for final approval of the Settlements. *Id.* at ¶¶ 9, 43. Interim Settlement Class Counsel have also been communicating with Settlement Class Members about the Settlements since the notice was distributed. *Id.* at ¶ 43. And Interim Settlement Class Counsel will continue to ensure proper distribution of the settlement proceeds and address any issues that arise after final approval of the Settlements. *Id.*

## ARGUMENT

I.    **THE COURT SHOULD CERTIFY THE SETTLEMENT CLASSES FOR SETTLEMENT PURPOSES ONLY.**

In its orders preliminarily approving the Settlements, the Court preliminarily found that the proposed Settlement Classes satisfy all relevant requirements under Federal Rules of Civil Procedure 23(a) and 23(b)(3), for certification for settlement purposes only. *See* ECF Nos. 277, 278, 279, 280. Plaintiffs now seek final certification of the Settlement Classes.

In considering a proposed class action settlement, federal courts determine whether certification of a settlement class would be appropriate under Rule 23. *See, e.g.*, *Tennille v. Western Union Co.*, 785 F.3d 422, 430 (10th Cir. 2015). Rule 23 has four factors for class certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). Rule 23(b) also examines whether common questions predominate over individual issues, and whether a class action is superior to other methods of litigation. *See* Fed. R. Civ. P. 23(b).

11

Federal courts have "considerable discretion" in making class certification decisions. *DG v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010). The Tenth Circuit defers to a trial court's certification ruling where "it applies the proper Rule 23 standard and its decision falls within the bounds of rationally available choices given the facts and law involved in the matter at hand." *Id.* (citation and internal quotations omitted).

Each Settlement Agreement provides that the parties to that Agreement stipulate to: (1) the certification of the Settlement Class for settlement purposes; (2) the appointment of Plaintiff and other identified acute care hospitals as the Settlement Class Representatives; and (3) the appointment of John W. ("Don") Barrett, Warren Tavares Burns, Steven A. Martino, Robert A. Clifford, Charles J. LaDuca, and Stephen B. Farmer as Settlement Class Counsel for the Settlement Class. Interim Settlement Class Counsel therefore seeks that the Court certify for each Settlement, a Settlement Class defined as follows:

> All Acute Care Hospitals in the United States that (i) are not owned or operated by a federal, state, county, parish, city, or other municipal government; and (ii) treated patients diagnosed with opioid use disorder and/or other opioid-related conditions at any time from January 1, 2009, through the date of entry of the Preliminary Approval Order.

*See, e.g.*, Distributors Settlement Agreement, ECF No. 276-1, § III.A.1. For the avoidance of doubt and as agreed between the Settling Parties to each Settlement Agreement, each proposed Settlement Class includes all entities listed on Exhibit A and all Plaintiffs in the Other Actions listed on Exhibit B to each of the Settlement Agreements. Exhibits A and B are non-exhaustive lists and do not purport to identify all members of the proposed Settlement Classes.

> Excluded from the Class[es] are any Acute Care Hospitals whose Released Claims have been released by any other settlement with the Settling Defendants.

*Id.* § III.A.2.

Certification of the Settlement Classes for settlement purposes furthers the interests of Settlement Class Members and the Settling Defendants by allowing the case to be settled on a class-wide basis.  The proposed Settlement Classes satisfy the requirements of Rule 23, and thus the Court should grant class certification for settlement purposes only.

### A.  Numerosity

Rule 23(a)(1) requires "the class [be] so numerous that joinder of all members is impracticable."  *See Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977) (holding class as small as 46 members is sufficient).  Here, each of the Settlement Classes consists of potentially over five thousand acute care hospitals dispersed throughout the nation, making joinder of all Settlement Class Members impracticable.  Devery Decl. at ¶ 4; *see Cline v. Sonoco, Inc.*, 333 F.R.D. 676, 682 (E.D. Okla. 2019) ("[T]he proposed class encompasses thousands of interest owners, which easily satisfies the numerosity requirement under Rule 23(a)(1).").  Numerosity, therefore, is satisfied.

### B.  Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."  A "common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1045 (2016) (citation omitted).  "Factual differences in the claims of class members should not result in a denial of class certification where common questions of law exist."  *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982).  The plaintiff need only show a single issue common to all members of the class.  *See DG*, 594 F.3d at 1195; William B. Rubenstein, 4 *Newberg On Class Actions* § 3:10, at 272-73 (5th ed. 2011).

As detailed fully in its complaint, Plaintiffs' claims involve numerous common questions of law and fact, including, depending on the Settling Defendant in question, *inter alia*:

13

- Did the Settling Defendants manufacture prescription opioids?

- Did Settling Defendants make misleading statements regarding the risks and benefits of prescription opioids?

- Did Settling Defendants distribute prescription opioids?

- Did Settling Defendants distribute prescription opioids without conducting adequate due diligence?

- What is the scope of Settling Defendants' duties under the Controlled Substances Act?

- Did Settling Defendants receive suspicious orders for prescription opioids?

- Did Settling Defendants fill suspicious orders of prescription opioids?

- Did Settling Defendants report suspicious orders of prescription opioids to DEA and other regulators?

- Did Settling Defendants engage in wire fraud?

- Did Settling Defendants engage in mail fraud?

- Did Settling Defendants corrupt an official proceeding?

First Amended Class Action Complaint, ECF No. 144, ¶ 1167. Accordingly, there is sufficient commonality as amongst the members of each of the Settlement Classes to warrant certification for settlement purposes.

### C. Typicality

Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class." To meet this requirement, "[e]very member of the class need not be in a situation identical to that of the named plaintiff." *DG*, 594 F.3d at 1195 (citation omitted). Rather, "[p]rovided the claims and Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." *Id.* at 1198-99.

The Class Plaintiffs' claims are typical of the claims of each of the Settlement Classes, because the Class Plaintiffs are acute care hospitals who treated patients diagnosed with opioid use disorder and/or other opioid-related conditions. The same legal theories and issues of fact underlie the claims of each of the Settlement Classes and the Class Plaintiffs. Accordingly, each of the Settlement Classes satisfy typicality.

### D. Adequacy of Representation

Rule 23(a)(4) requires plaintiffs to show they "will fairly and adequately protect the interests of the class." In the Tenth Circuit, adequacy is satisfied when (1) neither the plaintiff nor its counsel has interests that conflict with the interests of other class members, and (2) the plaintiff will prosecute the action vigorously through qualified counsel. *See Rutter Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188-89 (10th Cir. 2002). No conflicts exist between Plaintiffs or their counsel and other members of any of the Settlement Classes. To the contrary, Class Plaintiffs share the same incentive as the Settlement Classes to vigorously prosecute this case and obtain recovery.

Plaintiffs and Interim Settlement Class Counsel have vigorously prosecuted this case and related cases in multiple state and federal jurisdictions throughout the country. Interim Settlement Class Counsel are highly experienced in class actions. *See* Burns Decl. at ¶ 5. Interim Settlement Class Counsel have been appointed as lead counsel in multiple previous class actions. *Id.* The Class Plaintiffs and Interim Settlement Class Counsel satisfy adequacy of representation.

### E. Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" by asking "whether the common, aggregation-enabling, issues in the case are more prevalent or

important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted); *see also, e.g.*, *CCG Holding Co. v. Hutchens*, 773 F.3d 1076, 1087 (10th Cir. 2014) (same). "Classwide proof is not required for all issues." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014). "Instead, Rule 23(b)(3) simply requires a showing that the questions common to the class predominate over individualized questions." *Id.* Thus, when "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted). Where, as here, Class Plaintiffs and the Settlement Classes' claims stem from a "'common nucleus of operative facts,'" common issues predominate and certification is appropriate. *Arkalon Grazing Ass'n v. Chesapeake Operating, Inc.*, 275 F.R.D. 325, 331 (D. Kan. 2011) (citation omitted).

Each of the Settlement Classes readily satisfy predominance. Common questions regarding the existence of a RICO conspiracy, Settling Defendants' participation in the same, and causation all predominate over potential individual issues, to the extent any may be identified. Damages, too, will be subject to common proof. Burns Decl. at ¶ 27. Under the circumstances, predominance is satisfied in this case.

### F. Superiority

Rule 23(b)(3) requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." In considering the superiority of a class action, courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "In deciding whether to certify a settlement class, the Court need not inquire whether the case, if tried, would present difficult management problems under Rule 23(b)(3)(D)." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 271 F.R.D. 263, 269 (D. Kan. 2010).

Superiority is satisfied here. The claims asserted in the ACH Opioids Litigation are highly complex and require significant investment of time and capital by the acute care hospitals and their counsel. Burns Decl. at ¶ 8. Any individual case may take years to reach trial and then be subject to additional years of subsequent appeals. *Id.* Litigating individual cases likewise requires a significant commitment of court resources. A class action is the superior method of fair and efficient adjudication in this matter for purposes of implementing the Settlements.

## II. INTERIM SETTLEMENT CLASS COUNSEL SHOULD BE APPOINTED AS SETTLEMENT CLASS COUNSEL

Under Rule 23(g)(1)(A), the Court, when appointing class counsel, must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Here, Interim Settlement Class Counsel have gone above and beyond merely identifying and investigating potential claims—they have been pursuing the ACH Opioids Litigation for nearly eight years. Cases in the ACH Opioids Litigation resolved by the Settlement Agreements have been litigated between the Settling Parties in numerous federal and state *fora*. Burns Decl. at ¶ 30. Class Plaintiffs and Interim Settlement Class Counsel have responded to multiple rounds of

17

motion practice, including appeals of both dispositive and non-dispositive rulings. *Id.* at ¶ 27. Interim Settlement Class Counsel have reviewed voluminous discovery and taken depositions of representatives of certain of the Settling Defendants and third parties. *Id.* Further, Class Plaintiffs and Interim Settlement Class Counsel have retained and worked closely with over a dozen experts in preparing the underlying cases for trial. *Id.* Finally, the Settlement Agreements are the product of over two years of negotiations, mediated by one or more experienced mediators. *Id.* at ¶ 9. Given these years of litigation, Interim Settlement Class Counsel's knowledge of the applicable laws is comprehensive.

Moreover, Interim Settlement Class Counsel have significant experience prosecuting complex class actions, including RICO and antitrust class actions, in this district and circuit and throughout the country. *Id.* at ¶ 23. Courts around the country recognize the expertise and ability of proposed Settlement Class Counsel to effectively litigate complex class actions.[16]

Lastly, Interim Settlement Class Counsel have already committed considerable time and resources in prosecuting the ACH Opioids Litigation. As detailed further in Section VI, Interim Settlement Class Counsel have collectively devoted hundreds of thousands of hours to this Litigation and fronted tens of millions of dollars in expenses. Burns Decl. at ¶¶ 44, 48.

## III. PLAINTIFFS PROVIDED SUFFICIENT NOTICE TO THE PRELIMINARILY CERTIFIED SETTLEMENT CLASSES IN COMPLIANCE WITH RULE 23 AND DUE PROCESS

---

[16] *See, e.g.*, *In re Insulin Pricing Litig.*, No. 3:17-CV-699-BRMLHG, 2020 WL 5642002, at *7 (D.N.J. Sept. 22, 2020) (recognizing that Mr. Barrett has "substantial experience litigating complex commercial disputes including class action and antitrust matters"); *Kjessler v. Zaappaaz, Inc.*, No. 4:17-CV-3064, 2018 WL 8755737, at *5 (S.D. Tex. Aug. 31, 2018) (recognizing that "Mr. Burns and his firm have significant experience in anti[t]rust class actions"); *Buttonwood Tree Value Partners, L.P. v. Sweeney*, No. SA-CV-1000537-CJCMLGX, 2014 WL 12586788, at *3 (C.D. Cal. May 15, 2014) (agreeing with class counsel that the Cuneo Gilbert & Laduca firm has significant "experience with securities fraud class actions").

Under Rule 23(e)(1), a district court approving a class action settlement "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(c)(2)(B) also provides notice of a class settlement must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (class notice designed to fulfill due process requirements). Notice "must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Tennille*, 785 F.3d at 436.

As explained in Plaintiff San Miguel's motion for preliminary approval (ECF No. 276 at § III), the Court-approved Notice, Registration Form, Claim Form, and Summary Notice (the latter three together, the "Notice Package") satisfy these standards and have informed Settlement Class Members of all relevant case and settlement-related information. For these reasons, the Court's Preliminary Approval Orders found that the form and content of the notice program here, as well as the methods for notifying the Settlement Classes upon preliminary approval, "constitute the best notice to Settlement Class Members practicable under the circumstances" and "satisfy all applicable requirements of the Federal Rules of Civil Procedure (including Rule 23(c)-(e)), the United States Constitution (including the Due Process Clause), the Rules of this Court, and other applicable law." ECF Nos. 277, 278, 279, 280, at ¶ 13.

Here, the combination of: (i) mailing 5,732 copies of the Court-approved Notice Packet to potential Settlement Class Members; (ii) emailing 1,224 copies (of which 1,201 were successfully delivered) of the Notice Package to potential Settlement Class Members; (iii) implementing the media plan to publish notice of the Settlement on certain websites, e-newsletters, and email blasts; (iv) maintaining a toll-free telephone number, with an interactive voice response system and live

operators to provide potential Settlement Class Members with responses to frequently asked questions and important information regarding the litigation, and (v) establishing and managing the settlement website, www.acutecarehospitalsettlement.com,[17] is typical of notice plans approved in class action settlements, and likewise, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

In sum, the form, manner, and content of the Notice and Notice Package were the best practicable notice. Their contents were reasonably calculated to, and did, apprise Settlement Class Members of the pendency and nature of the Settlements and afforded them an opportunity to object.

## IV.    THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE AND MERIT FINAL APPROVAL

Settlement is strongly favored as a method for resolving disputes.  *See Sears v. Atchison, Topeka & Santa Fe Ry., Co.*, 749 F.2d 1451, 1455 (10th Cir. 1984); *see also Trujillo v. State of Colo.*, 649 F.2d 823, 826 (10th Cir. 1981) (citing "important public policy concerns that support voluntary settlements"); *Amoco Prod. Co. v. Fed. Power Comm'n*, 465 F.2d 1350, 1354 (10th Cir. 1972). This is particularly true in large, complex class actions such as the current case.  *See Acevedo v. Sw. Airlines Co.*, No. 1:16-CV-00024-MV-LF, 2019 WL 6712298, at *2 (D.N.M. Dec. 10, 2019) ("In the class action context in particular, there is an overriding public interest in favor of settlement because settlement of complex disputes minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources." (cleaned up)), *report and recommendation adopted,* No. 1:16-CV-00024-MV-LF, 2020 WL 85132 (D.N.M. Jan. 7, 2020). "In most situations, unless the settlement is clearly inadequate, its

---

[17] *See generally* Devery Decl.

acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."
*Montgomery v. Cont'l Intermodal Grp.-Trucking LLC*, No. 19-940 GJF, 2021 WL 1339305, at *3
(D.N.M. Apr. 9, 2021) (citation and internal quotations omitted).

Fed. R. Civ. P. 23(e)(2) provides that a class action settlement may be approved by the
court "only after a hearing and only on finding that it is fair, reasonable, and adequate," and
identifies the following factors to be considered by courts at final approval:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

(i)    the costs, risks, and delay of trial and appeal;

(ii)    the effectiveness of any proposed method of distributing relief to the class,
including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of
payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other

Fed. R. Civ. P. 23(e)(2).

Additionally, in deciding whether a settlement is "fair, reasonable, and adequate," courts
in the Tenth Circuit traditionally consider whether:

> (1) the settlement was fairly and honestly negotiated, (2) serious
> legal and factual questions placed the litigation's outcome in doubt,
> (3) the immediate recovery was more valuable than the mere
> possibility of a more favorable outcome after further litigation, and
> (4) the parties believed the settlement was fair and reasonable.

*Anderson Living Tr. v. Energen Res. Corp.,* No. CV 13-909 WJ/CG, 2021 WL 1686491, at *2 (D.N.M. Apr. 29, 2021), *report and recommendation adopted,* No. CV 13-909 WJ/CG, 2021 WL 1686492 (D.N.M. Apr. 29, 2021) (citing *Rutter & Wilbanks Corp.*, 314 F.3d at 1188 and *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1266 (10th Cir. 2004)). The Tenth Circuit's additional factors overlap with the Rule 23(e)(2) factors, with "[t]he fourth [] factor [being] the only factor that does not directly overlap with the Rule 23(e)(2) factors." *Cisneros v. EP Wrap-It Insulation, LLC*, No. CV 19-500 GBW/GJF, 2022 WL 2304146, at *11 (D.N.M. June 27, 2022). As a result, courts in this District primarily consider the Rule 23(e)(2) factors and separately discuss only the Tenth Circuit's fourth factor. *See, e.g.*, *id.*

The Court preliminarily determined that the Settlements totaling $651 million in cash meet these standards and are fair, reasonable, and adequate. ECF Nos. 277, 278, 279, 280, at ¶ 1. As discussed below, the Court's initial disposition was correct, as the Settlements easily satisfy each of the Rule 23(e)(2) and Tenth Circuit factors. Accordingly, Plaintiffs request the Court now grant final approval of the Settlements.

### G. The Settlements Satisfy the Rule 23(e)(2) Factors

#### 1. Class Plaintiffs and Interim Settlement Counsel Have Adequately Represented the Settlement Classes

Under this factor, the Court should consider that "the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base." Fed. R. Civ. P. 23 advisory committee's notes to 2018 amendment. Here, the breadth and volume of the work performed by the Class Plaintiffs and Interim Settlement Class Counsel cannot be understated.

Class Plaintiffs and Interim Settlement Class Counsel have adequately represented the preliminarily certified Settlement Classes as required by Rule 23(e)(2)(A). Cases in the ACH

Opioids Litigation resolved by the Settlement Agreements have been litigated between the Settling Parties in numerous federal and state *fora* for nearly eight years. Burns Decl. at ¶¶ 6, 42. Class Plaintiffs and Interim Settlement Class Counsel have responded to multiple rounds of motion practice, including appeals of both dispositive and non-dispositive rulings. *Id.* at ¶ 27. Class Plaintiffs have produced millions of pages of documents and have been deposed. *Id.* Interim Settlement Class Counsel have reviewed voluminous discovery and taken depositions of representatives of certain of the Settling Defendants and third parties. *Id.* Further, Class Plaintiffs and Interim Settlement Class Counsel have retained and worked closely with over a dozen experts to provide testimony on issues relating to alleged liability and damages. *Id.* Finally, the Settlement Agreements are the product of over two years of negotiations. *Id.* at ¶¶ 9-10. As a result of these extensive efforts, spanning thousands of hours of work and several years, Interim Settlement Class Counsel have achieved significant Settlements, totaling $651 million, with the Settling Defendants, which will provide immediate relief to the certified Settlement Classes. *See generally* Burns Decl.

Collectively, Interim Settlement Class Counsel have significant experience prosecuting complex class actions, including RICO class actions, in this district and circuit and throughout the country. *Id.* at ¶ 5. Interim Settlement Class Counsel have been appointed as lead counsel in multiple previous class actions. *Id.* Courts around the country recognize the expertise and ability of proposed Settlement Class Counsel to effectively litigate complex class actions. *See supra,* note 16.

In deciding adequacy of representation, "courts consider whether: (1) the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) the named plaintiffs and their counsel have prosecuted the action vigorously on behalf of the class." *Cisneros,*

2022 WL 2304146, at *4 (internal citations omitted).  Here, no conflicts exist, and the collective

tenacity and sophistication of Interim Settlement Class Counsel were instrumental in achieving the

substantial settlements, which will provide over $651 million, Naloxone product, and significant

and immediate relief to the Settlement Classes. Therefore, Class Plaintiffs and Interim Settlement

Class Counsel have provided adequate representation to the Settlement Classes.

### 2.  The Settlements Were Fairly Negotiated at Arm's Length

The second factor under Rule 23(e)(2)(B) overlaps with the first factor considered by courts

in the Tenth Circuit and assesses whether the settlement was fairly and honestly negotiated.  *See*

*Lowery v. City of Albuquerque*, No. CIV 09-0457 JB/WDS, 2013 WL 1010384, at *36 (D.N.M.

Feb. 27, 2013); *Anderson Living Tr.,* 2021 WL 3076910, at *3. Settlements reached after real

negotiations through representation by experienced counsel well-versed in the legal and factual

issues of the case support a finding of fair and honest negotiation. *See, e.g.*, *Montgomery,* 2021

WL 1339305 at *9; *Acevedo*, 2019 WL 6712298, at *2; *Lowery*, 2013 WL 1010384, at *36;

*Anderson Living Tr*, 2021 WL 3076910, at *3.

"[T]here is a presumption in favor of a finding that negotiations were fair when they were

conducted before a third-party mediator." *Cisneros*, 2022 WL 2304146, at *5. An experienced

mediator's involvement "in the settlement negotiations strongly supports a finding that they were

conducted at arm's-length and without collusion." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570,

576 (S.D.N.Y. 2008); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (noting

that a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings

were free of collusion and undue pressure").

Here, the Settlements are the product of arm's-length negotiations between the Settling

Parties, advised by their sophisticated counsel, who possessed more than sufficient evidence and

knowledge to allow them to make informed decisions about the strengths and weaknesses of their

respective cases. Burns Decl. at ¶ 29; Kurdi Decl. at ¶ 6. During mediation, the relevant legal issues were fully presented for the Settling Parties to effectively evaluate liability and damages. Burns Decl. at ¶ 29. As a result, the Settling Parties were well prepared for the serious negotiations that led to the Settlement Agreements and were well informed of the respective parties' arguments. *See Montgomery*, 2021 WL 1339305, at *9; *Acevedo*, 2019 WL 6712298, at *2; *Lowery*, 2013 WL 1010384, at *36; *Anderson Living Tr*, 2021 WL 3076910, at *3.

Moreover, the Settlement negotiations were conducted under the direct supervision of Fouad Kurdi, a highly experienced and well-respected mediator with highly relevant experience settling disputes associated with the *In re National Opiate Prescription Litigation* MDL. Burns Decl. at ¶ 9; Kurdi Decl. at 3. The negotiations with the Settling Distributors began with another mediator, Judge Sidney Schenkier, a former federal magistrate judge, who then worked together with Mr. Kurdi to bring the Settling Distributor negotiations to a conclusion. Settlement negotiations between Plaintiffs and the various Settling Defendants spanned a period of over two years, during which the parties to each mediation provided multiple presentations to each other and Plaintiffs met over a dozen times in person with different groups of Settling Defendants to facilitate discussions. Burns Decl. at ¶ 29. Accordingly, the Settlements achieved here should be presumed to be the result of arm's-length, fair, and honest negotiations. *See Cisneros*, 2022 WL 2304146, at *5.

### 3. The Settlements Are Adequate in Light of the Costs, Risks, and Delay of Trial and Appeal

"Although it is not the role of the Court at this stage of the litigation to evaluate the merits . . . it is clear that the parties could reasonably conclude that there are serious questions of law and fact that exist such that they could significantly impact the case if it were litigated." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693-94 (D. Colo. 2006) (citation and internal quotations omitted).

As strongly as the Settling Parties feel about the merits of their positions, each side recognizes that serious questions of law and fact exist in this case.

In assessing the Settlement Agreements, the Court should also balance the benefits afforded to the Settlement Classes, including the immediacy and certainty of a recovery, against the significant costs, risks, and delay of proceeding with the Litigation. *See* Rule 23(e)(2)(C)(i). This third factor is based on the premise that the Settlement Classes "[are] better off receiving compensation now as opposed to being compensated, if at all, several years down the line, after the matter is certified, tried, and all appeals are exhausted." *See Acevedo*, 2019 WL 6712298, at *3 (citing *McNeely v. Nat'l Mobile Health Care, LLC*, No. CIV-07-933-M, 2008 WL 4816510, at *13 (W.D. Okla. Oct. 27, 2008)). This consideration largely overlaps with the second ("'whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt'") and third factors ("'whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation'") traditionally considered by courts in the Tenth Circuit. *Chavez Rodriguez v. Hermes Landscaping, Inc.*, No. 17-2142-JWB-KGG, 2020 WL 3288059, at *2-3 (D. Kan. June 18, 2020); *see Cisneros*, 2022 WL 2304146, at *5 (explaining that all but the Tenth Circuit's fourth factor overlap with Rule 23's factors). Thus, courts consider these factors to be "subsumed under Rule 23's requirement that the settlement agreement's adequacy be measured against the 'costs, risks, and delay of trial and appeal' of the underlying case." *Chavez Rodriguez*, 2020 WL 3288059, at *2-3; *see, e.g.*, *Cisneros*, 2022 WL 2304146, at *5 (incorporating analysis of Rule 23 factors by reference into analysis of Tenth Circuit factors).

### a.  Serious Legal and Factual Questions Placed the Litigation's Outcome in Doubt.

The presence of serious legal and factual questions concerning the outcome of the ACH Opioids Litigation weighs heavily in favor of settlement, as "settlement outweighs the mere

possibility of future relief after protracted and expensive litigation." *See Montgomery*, 2021 WL 1339305, at *6; *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1133, 1138 (D. Colo. 2009). "Although it is not the role of the Court at this stage of the litigation to evaluate the merits, 'it is clear that the parties could reasonably conclude that there are serious questions of law and fact that exist such that they could significantly impact the case if it were litigated.'" *See Montgomery*, 2021 WL 1339305, at *9 (quoting *Lucas v. Kmart Corp.*, 234 F.R.D. at 693-94). The presence of questions of law and fact "tips the balance in favor of settlement because settlement, creates a certainty of some recovery, and eliminates doubt, meaning the possibility of no recovery after long and expensive litigation." *McNeely*, *LLC*, 2008 WL 4816510, at *13; *see also Tennille*, 785 F.3d at 435 (affirming final approval of settlement where "serious disputed legal issues" rendered "the outcome of th[e] litigation . . . uncertain and further litigation would have been costly").

The current proposed Settlements notwithstanding, there remain numerous factual and legal issues on which the Settling Parties intensely disagree. Settling Defendants deny that they have engaged in any wrongdoing as alleged by Plaintiffs, deny any liability whatsoever for any of the claims alleged by Plaintiffs, and deny that Plaintiffs have suffered any injuries or damages. Conversely, Plaintiffs have advanced numerous complex legal and factual issues under federal RICO statutes and various state laws in other *fora*.

The issues on which the Settling Parties disagree are many, but include: (1) whether any of the Settling Defendants engaged in conduct that would give rise to any liability under the federal RICO statutes; (2) whether the Settling Defendants have valid defenses to any such claims of liability; (3) the amount of damages suffered by reason of the Settling Defendants' alleged wrongdoing, as well as the methodology for estimating any such damages; (4) whether the Court

may properly certify a class for purposes of litigation; and (5) whether the Settling Defendants had other meritorious defenses to the alleged claims. Although Class Plaintiffs believe their claims would be borne out by the evidence presented at trial, they recognize that there are significant hurdles to proving liability or even proceeding to trial. Had the parties not reached the Settlement Agreements, the Court or a jury would ultimately be required to decide these issues, placing the litigation's ultimate outcome in doubt.

### b. Immediate Recovery Is More Valuable than the Mere Possibility of a More Favorable Outcome After Further Litigation

Considering the risks associated with continued litigation, as discussed above, the immediate, substantial relief offered by the Settlements "outweigh an uncertain result several years in the future." *Montgomery*, 2021 WL 1339305, at *10; *see id.* at *6 ("'[I]t has been held proper "to take the bird in the hand instead of a prospective flock in the bush."'"); *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1244 (D.N.M. 2012) ("'[t]o most people, a dollar today is worth a great deal more than a dollar ten years from now'") (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002)).

The ACH Opioids Litigation has been pending for nearly eight years. Burns Decl. at ¶ 31. The Settling Parties and courts in this and other jurisdictions will likely expend significant additional time, resources, and costs to proceed to trial, and the inevitable appeals will likely extend years into the future. *See Acevedo*, 2019 WL 6712298, at *3 ("Many more months and significant costs would be required for the parties and Court to complete the pretrial proceedings[.] … In short, the ultimate resolution of this action on the merits (and in turn, compensation to Settlement Class Members) via trial and appeal is indefinite at best."); *Chavez Rodriguez*, 2020 WL 3288059, at *3 (observing that "the costs and time of moving forward in litigation would be substantial"); *Lucas*, 234 F.R.D. at 694 ("If this case were to be litigated, in all probability it would be many

years before it was resolved."). Considering the complex legal and factual issues associated with continued litigation, there is an undeniable and substantial risk that, after years of continued litigation, the proposed Settlement Classes could receive an amount significantly less than the over $651 million provided by the Settlement Agreements, or nothing at all, for their claims against the Settling Defendants.

"By contrast, the proposed settlement agreement[s] provide the class[es] with substantial, guaranteed relief" now and in the future. *Acevedo*, 2019 WL 6712298, at *3 (D.N.M. Dec. 10, 2019) (quoting *Lucas*, 234 F.R.D. at 694 and citing *McNeely*, 2008 WL 4816510, at *13 (finding that the class "is better off receiving compensation now as opposed to being compensated, if at all, several years down the line, after the matter is certified, tried, and all appeals are exhausted.")). "[The] immediate recovery in this case outweighs the time and costs inherent in complex [] litigation, especially when the prospect is some recovery versus no recovery." *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 691 (D. Colo. 2014); *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 625 (D. Colo. Aug. 10, 1976); *accord Tennille v. W. Union Co.*, No. 09-cv-00938- JLK-KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014), *appeal dismissed*, 809 F.3d 555 (10th Cir. 2015). Thus, the recoveries under the Settlement Agreements, particularly when viewed in the context of the risks, costs, delay, and the uncertainties of further proceedings, weighs in favor of final approval of each of the Settlements.

### 4.  The Method for Distributing Relief is Effective

As demonstrated in Section III above and discussed in more detail in the Declaration of Brian Devery, the notice program and claims administration process have been and are effective. As also described in Section III, Class Plaintiffs and Interim Settlement Class Counsel provided the best notice practicable under the circumstances in accordance with the Preliminary Approval Orders (ECF Nos. 277, 278, 279, 280) and the requirements of Rule 23 and due process. The

settlement notice program approved by the Court included individual notice by email or First-Class Mail to all Settlement Class Members who could be identified through reasonable efforts and appearing on a list of nearly 5,800 hospitals providing emergency services. *See* Devery Decl. at ¶ 4. AB Data, Ltd. has also conducted targeted notice through relevant media. *Id. at* ¶¶ 6-9. In addition, a case-designated website has been created where settlement-related and other key documents are posted, including the Settlement Agreements, Notices, Plan of Allocation, Claims and Registration Forms, and Preliminary Approval Orders. *Id. at* ¶ 11.

Plaintiffs have proposed a fair and orderly claims administration process in which Settlement Class Members who wish to participate in one or more of the Settlements will complete and submit Registration and Claims Forms[18] in accordance with the instructions contained therein. Plan of Allocation, attached to Distributors Settlement Agreement (ECF No. 276-1) as associated Exhibit C. The Settlement Administrator will distribute the Net Settlement Funds to Authorized Claimants under a Court-approved Plan of Allocation. *See id.* As described in Section V below, the Plan of Allocation proposed here was prepared with information provided by Plaintiffs' experts, in consultation with the proposed Special Master, the Hon. Thomas Hogan, and is consistent with the ACH plans of allocation developed in the Purdue Pharma bankruptcy proceedings (Case No. 19-23649), and utilized thereafter in the Mallinckrodt, plc (Case No. 20-12522) and Endo (Case No. 22-22549) bankruptcy proceedings. The notice program, claims administration process, and Plan of Allocation are a thorough and effective method of distributing relief and further support final approval.

### 5. Attorneys' Fees and Expenses

---

[18] Class Members that opt to receive a "Quick Pay" Amount, *see supra* Section I, need only fill out a Registration Form. Class Members opting to receive a payment calculated from the Model must fill out a Registration Form and Claim Form.

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). Interim Settlement Class Counsel seek an award of attorneys' fees of a standard one-third of the total Settlement Funds, plus payment of Interim Settlement Class Counsels' expenses incurred in connection with the underlying litigation, plus interest earned on these amounts at the same rate as earned by the total Settlement Funds.

As detailed in Section VI below, the fee request is in line with fee awards that other courts in this District and the Tenth Circuit have approved in complex class actions. *See, e.g.*, *Cisneros*, 2022 WL 2304146, at *8 (approving attorneys' fees amounting to "one-third of the gross settlement amount" and explaining that "a contingent fee of one-third of the settlement amount in a class action is standard in this Court and other district courts in the Tenth Circuit."); *Anderson Living Tr.*, 2021 WL 3076910, at *7, *9 (approving attorneys' fees "constituting 40% of the settlement fund); *Montgomery*, 2021 WL 1339305, at *7 (approving of attorneys' fees amounting to "approximately 31.47% of the settlement fund"); *Acevedo*, 2019 WL 6712298, at *4 (approving attorneys' fees amounting to "33.33% of the gross recovery"); *In re Thornburg Mortg., Inc.*, 912 F. Supp. 2d at 1257 ("Fees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingency fee basis.").

### 6.   The Settling Parties Have No Additional Agreement

Rule 23(e)(2)(C)(iv) requires the disclosure of any other agreements. Plaintiffs do not have any additional agreements with any of the Settling Defendants.

### 7.   Settlement Class Members Are Treated Equitably

The final factor, Rule 23(e)(2)(D), looks at whether certified Settlement Class Members are treated equitably. As reflected in the Plan of Allocation, Settlement Class Members are treated equitably here. The Plan of Allocation provides all Settlement Class Members the opportunity to

submit a claim for an expedited Quick Pay amount. *See, e.g.*, Plan of Allocation, attached to Distributors Settlement Agreement (ECF No. 276-1) as associated Exhibit C, at 3. In the alternative, all Settlement Class Members may elect to participate in a more detailed damages calculation and allocation process utilizing objective factors detailed in the Plan of Allocation for one or more Settlements. *Id.* at 3-4. The Plan of Allocation does not discriminate among Settlement Class Members, treating all Settlement Class Members fairly.

### H. The Settlements Satisfy the Remaining Factor Considered by Courts in the Tenth Circuit

The final, additional factor courts in the Tenth Circuit consider is "'the judgment of the parties that the settlement is fair and reasonable.'" *Cisneros*, 2022 WL 2304146, at *11 (quoting *Rutter*, 314 F.3d at 1188). "Under this factor, 'the recommendation of a settlement by experienced plaintiffs['] counsel is entitled to great weight.'" *Id.* (internal citations omitted).

Interim Settlement Class Counsel—all senior attorneys at law firms with considerable experience in complex class actions—only agreed to settle the ACH Opioids Litigation after extensive investigation and rigorous arm's-length negotiations. Burns Decl. at ¶ 29. Additionally, as noted above, Class Plaintiffs and Interim Settlement Class Counsel have compared the substantial recovery the certified Settlement Classes will receive from the Settlements against the risks, delays, and uncertainties of continued litigation and appeals. Class Plaintiffs and Interim Settlement Class Counsel believe the Settlements are fair, adequate, and reasonable and should be approved. The Settling Defendants likewise believe that the Settlement to which each is a party should be approved. Because the above factors weigh in favor of the Settlements, Plaintiffs respectfully request that the Court grant final approval of the Settlements.

### V. THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

The proposed Plan of Allocation (attached to Distributors Settlement Agreement (ECF No. 276-1) as associated Exhibit C) details how the Net Settlement Funds are to be allocated among Eligible Claimants. The standard for approval of a plan of allocation is the same as the standard for approving a settlement: whether it is "fair, reasonable, and adequate." *See Lucas*, 234 F.R.D. at 695. In making this determination, courts give great weight to the recommendation of experienced counsel. *See id*. ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." (internal quotations and citation omitted)).

Here, the plan allocates funds between Eligible Claimants in two ways: (1) A Settlement Class Member may select a "Quick Pay" option under which the Settlement Class Member will receive a default amount of $5,000 total from all four Settlements,[19] or (2) a Settlement Class Member may elect to participate in the more detailed damages calculation using the Model set forth in the Plan of Allocation, which may result in an Allocated Amount greater (but not less) than the Settlement Class Member's Quick Pay Amount. Interim Settlement Class Counsel anticipate that all funds will be distributed to Settlement Class Members pursuant to the Plan of Allocation. Burns Decl. at ¶ 15.

The Plan of Allocation was prepared based on information provided by Plaintiffs' experts, in consultation with the Special Master, the Hon. Thomas Hogan, and is consistent with the ACH plans of allocation developed in the Purdue Pharma bankruptcy proceedings (Case No. 19-23649), and utilized thereafter in the Mallinckrodt, plc (Case No. 20-12522) and Endo (Case No. 22-22549)

---

[19] If one or more Settlements is not approved, or if a Class Member is ineligible for one or more Settlements by reason of a prior release, then the Quick Pay Amount owed shall be reduced, proportionally, based upon a comparison of the Up-Front Settlement Amount contributed by the Settling Defendant(s) in the Settlement(s) at issue with the total Up-Front Settlement Amounts of the four Settlements.

bankruptcy proceedings. There is no right of reversion under the Settlements and under no circumstances will any portion of a Settlement Amount be returned to the respective Settling Defendant(s) once that Settlement becomes final. *Id.* at ¶ 15.

Interim Settlement Class Counsel submit that this method of distributing settlement funds is fair, reasonable, and adequate, and warrants this Court's final approval.

## VI. THE REQUESTED COMMON FUND FEE IS REASONABLE AND SHOULD BE APPROVED

Rule 23 provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The purpose of the common fund doctrine is to compensate class counsel fairly and adequately for services rendered on the theory "that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1193 (10th Cir. 2023) (quoting *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994)) (internal quotations omitted). Accordingly, the Court has authority to award attorneys' fees and expenses from the Settlement Funds in this case.

### A. The Requested Fee is a Reasonable Percentage of the Common Fund

The prevailing method for determining attorneys' fees in common fund cases is awarding a percentage of the fund. *See* Manual for Complex Litigation, Fourth, § 14.121 ("The vast majority of courts . . . use the percentage-fee method in common-fund cases."). The Supreme Court has directed that "under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). And in this

Circuit, a percentage-of-the-fund is the preferred method of awarding attorney fees in common fund cases. *See In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th at 1193; *Anderson Living Tr.*, 2021 WL 3076910, at *7 ("In the Tenth Circuit, there is a preference for determining the reasonableness of a fee award in common fund cases utilizing 'the percentage of fund' method."); *Fowler v. Med. Man Techs., Inc.*, No. CV 23-640 WJ/SCY, 2024 WL 3498587, at *3 (D.N.M. July 18, 2024), *report and recommendation adopted*, No. CV 23-640 WJ/SCY, 2024 WL 3495063 (D.N.M. July 22, 2024) ("The Tenth Circuit has expressed a preference for the percentage-of-the-fund approach in common fund cases."); *Charlie v. Rehoboth McKinley Christian Health Care Servs.*, No. CV 21-652 SCY/KK, 2023 WL 4591167, at *6 (D.N.M. July 18, 2023); *Cisneros*, 2022 WL 2304146, at *7; *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995); *Gottlieb*, 43 F.3d at 482-83.

"The Tenth Circuit favors the common fund approach, as opposed to the lodestar method, because a percentage of the common fund is less subjective than the lodestar plus multiplier approach, matches the marketplace most closely, and is the better suited approach when class counsel were retained on a contingent fee basis, as in this case." *Shaw v. Interthinx, Inc.*, No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *5 (D. Colo. Apr. 22, 2015) (internal quotations and citation omitted). And in making a "percentage-fee determination, the court need not conduct a lodestar analysis to assess reasonableness." *Nakamura v. Wells Fargo Bank, Nat'l Ass'n*, No. 17-4029-DDC-GEB, 2019 WL 2185081, at *3 (D. Kan. May 21, 2019) (citations omitted); *Cisneros*, 2022 WL 2304146, at *7 (when determining reasonableness, "the Tenth Circuit neither requires a lodestar cross-check nor prefers it to the percentage of the fund method"). Indeed, "[d]istrict courts in New Mexico routinely approve attorneys' fees based on a percentage of fund method without a lodestar cross-check." *Montgomery*, 2021 WL 1339305, at *7 n.5 (collecting cases).

An award of attorneys' fees of one-third of the $651 million total Settlement Amount amounts to $217 million[20] and is consistent with this District's law and the Tenth Circuit's requirement that the fee be reasonable under review of the 12 *Johnson* factors.[21]

### B. The *Johnson* Factors Support the Reasonableness of Interim Settlement Class Counsel's Fee Request

Courts in this jurisdiction analyze the reasonableness of fee awards under Rule 23(h) using the well-known factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and approved by the Tenth Circuit:

(1)   the time and labor involved;
(2)   the novelty and difficulty of the questions;
(3)   the skill requisite to perform the legal services properly;
(4)   the preclusion of other employment by the attorney due to acceptance of the case;
(5)   the customary fee;
(6)   any prearranged fee—this is helpful but not determinative;
(7)   time limitations imposed by the client or other circumstances;
(8)   the amount involved and results obtained;
(9)   the experience, reputation, and ability of the attorneys;
(10)  the undesirability of the case;
(11)  the nature and length of professional relationship with the client; and
(12)  awards in similar cases.

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988) (citing *Johnson*, 488 F.2d 717-19, and noting that "federal courts have relied heavily on the [*Johnson*] factors . . . in

---

[20] To be sure, Interim Settlement Class Counsel seek an award of one-third of the total Settlement Funds, which includes interest accrued on the $651 million total Settlement Amount. *See supra,* note 11.

[21] The percentage-of-the-fund Class Counsel requests equates to a 1.58 multiplier to their collective lodestar, which is eminently reasonable. *See In re: Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) ("even if the Court were to reduce the lodestar a small amount, such that the multiplier here increased to 4 or 5, that multiplier would fall within the range of multipliers accepted by a number courts in megafund cases"); *see also In re Miniscribe Corp.*, 309 F.3d 1234, 1245 (10th Cir. 2002) (noting that "[t]he 2.57 multiplier . . . finds some support in other lodestar multiplier cases."); *Rothe v. Battelle Mem'l Inst.*, 2021 WL 2588873, at *11 (D. Colo. June 24, 2021) (awarding fee equating to a "3.61 multiplier on counsel's lodestar amount.").

calculating and reviewing attorneys' fees awards"). The weight to be given to each of the *Johnson*

factors varies from case to case, and each factor is not always applicable. *See id.* at 456 ("rarely

are all of the *Johnson* factors applicable; this is particularly so in a common fund situation"); *see*

*also Gudenkauf v. Stauffer Communications, Inc.*, 158 F.3d 1074, 1083 (10th Cir. 1998) ("We have

never held that a district court abuses its discretion by failing to specifically address each *Johnson*

factor."). The relevant *Johnson* factors are examined below and demonstrate that a one-third fee

award is appropriate here.[22]

### 1. The significant monetary award obtained for the Settlement Classes supports the reasonableness of the fee award. (Factor 8)

Here, the result obtained for the Settlement Classes is the most important factor in

determining an appropriate fee. *See Acevedo*, 2019 WL 6712298, at *4 ("Courts have consistently

held that the most important factor within this analysis is what results were obtained for the class."

(quoting *Lane v. Page*, 862 F. Supp. 2d 1182, 1254 (D.N.M. 2012)); *In re Syngenta AG MIR 162*

*Corn Litig.*, 61 F.4th at 1193 ("[T]he amount involved and the results obtained—may be given

greater weight when . . . the trial judge determines that  . . . the efforts of counsel were instrumental

in realizing recovery on behalf of the class" (quoting *Brown*, 838 F.2d at 456)) (ellipses in

original); *Nakamura*, 2019 WL 2185081, at *2 ("the result obtained deserves greater weight than

---

[22] The following factors are not generally applicable to class action litigation: (7) time limitations imposed by the client or the circumstances, and (11) the nature and length of the professional relationship with the client. Thus, this Motion does not analyze these factors. *See* 5 Newberg on Class Actions § 15:77 n.15 (5th ed. 2015) (relationship with client "has little relevance in the class setting given that the 'client' is the class."); *In re: Motor Fuel Temperature Sales Practices Litig.*, 07-MD-1840- KHV, 2016 WL 4445438, at *9 (D. Kan. Aug. 24, 2016) (noting that in the class action context, nature and length of the professional relationship with the client did not apply); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *4 (noting that in evaluating class action settlement approval, the seventh and eleventh *Johnson* factors did not apply). However, it should be noted that Interim Settlement Class Counsel has represented most of the Class Plaintiffs for years, and some for nearly eight years.

the other *Johnson* factors." (citing *Brown*, 838 F.2d at 456)). In common fund cases, the factor "given the greatest emphasis is the size of the fund created, because a common fund is itself the measure of success and represents the benchmark from which a reasonable fee will be awarded." Manual For Complex Litigation 4th § 14:121 (2004) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 23(h) Adv. Comm. Note (explaining for a "percentage" or contingency-based approach to class action fee awards, "results achieved is the basic starting point"); *see also Anderson v. Merit Energy Co.*, 07-CV-00916-LTB-BNB, 2009 WL 3378526, at *4 (D. Colo. Oct. 20, 2009) ("Numerous courts have recognized that in evaluating the various *Johnson* factors, the greatest weight should be given to the monetary results achieved for the benefits of the class." (citing *Brown*, 838 F.2d at 456)); *Cecil v. BP America Prod. Co.*, No. 16-CV-410-KEW, 2018 WL 8367957, at *4 (E.D. Okla. Nov. 19, 2018) ("[T]he eighth *Johnson* factor—the amount involved in the case and the results obtained—is the most important and weighs most heavily in support of the requested fee.").

The result obtained by the Settlements fully supports the requested fee. First, the Settlements avoid future uncertainties as to the claims against the Settling Defendants and collectively provide a guaranteed, non-reversionary cash recovery totaling $651 million. *See Koehler v. Freightquote.com, Inc.*, 12-2505- DDC-GLR, 2016 WL 3743098, at *7 (D. Kan. July 13, 2016) (settlement "avoids the uncertainty and rigors of trial and produces a favorable result for plaintiffs. This factor favors approval of the fee award."). Second, the Net Settlement Funds will be distributed to the Settlement Classes, with no funds reverting to the Settling Defendants. Burns Decl. at ¶ 15. In this RICO class action against the Settling Defendants—as in every RICO action— there was a significant risk that Plaintiffs would not be able to establish the elements of their claims, prove damages, or protect any award on appeal. The same is true for the other cases that

comprise the ACH Opioids Litigation. Additionally, the fact that the Settlement Classes were able to avoid the considerable uncertainty that any "battle of experts" at trial would inevitably have introduced further supports the reasonableness of the proposed fee award. *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (observing that, '[i]n the 'battle of experts,' it is impossible to predict with any certainty which arguments would find favor with the jury"). Furthermore, the Settling Defendants have a strong belief in the merits of their arguments and pressed them at every available turn. For example, Interim Settlement Class Counsel and the Distributor Defendants did not reach an agreement until just weeks before a 12-week trial was set to begin in Alabama state court in July 2024. Burns Decl. at ¶ 28. That Interim Settlement Class Counsel secured such a result in the face of the significant risks demonstrates that the requested fee of one-third is reasonable and fair.

Finally, the recovery here is sizeable, and against several of the most admired and recognized pharmaceutical companies in the world. This further confirms the reasonableness of the requested fee.

### 2. The requested fee is consistent with fees awarded in similar cases. (Factor 12)

An attorneys' fee award of one-third of the common fund is consistent with fees awarded by this Court,[23] as well as others in this Circuit and across the country,[24] in comparably high-risk complex class actions resulting in creation of an exceptional common fund. Indeed, "[c]ustomarily, courts in this District award fees in the range of 30% to 40% of any amount recovered." *Anderson Living*

---

[23] *See, e.g., Anderson Living Tr.*, 2021 WL 3076910 (40%); *Acevedo*, 2019 WL 6712298, at *4 (33.33%); *Candelaraia v. Health Care Serv. Corp.*, No. 2:17-cv-404-KG-SMV, 2020 WL 6875828, at *3 (D.N.M. Nov. 4, 2020) (35%); *Bhasker v. Financial Indemnity Co.*, No. 1:17-cv-00260-KWR-JHR, 2023 WL 4534548 (D.N.M. July 13, 2023) (33%).

[24] *See* Table 1: Examples of Fee Awards of 33.33% or Greater Within Tenth Circuit *and* Table 2: Examples of Fee Awards of 33.33% or Greater Outside Tenth Circuit, Exhibit D hereto.

*Tr.*, 2021 WL 3076910, at \*8; *see also Montgomery* 2021 WL 1339305, at \*7 n. 6 (approving a fee request of 31.47% and citing twelve cases from districts in the Tenth Circuit awarding fees in the range of 30% to 40%). A one-third fee here is consistent with fees awarded in similar cases.

### 3.  The requested fee is consistent with a customary fee. (Factor 5)

"Class actions typically involve a contingent fee arrangement because it insulates the class from the risk of incurring legal fees and shifts that risk to counsel." *Nakamura*, 2019 WL 2185081, at \*2 (quoting *Nieberding v. Barrette Outdoor Living, Inc.*, 129 F. Supp. 3d 1236, 1250 (D. Kan. 2015)). In complex contingent fee cases, one-third of the recovery is par or lower than a standard fee arrangement. *See id.* at \*3 (33% "is within the range of customary fees awarded in similar cases" and "some courts in the Tenth Circuit have awarded fees based on 40% of the common fund."). In fact, "[f]ees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingency fee basis." *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d at 1257 (citing *Robles v. Brake Masters Sys., Inc.*, No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at \*19 (D.N.M. Jan. 31, 2011)); *Acevedo*, 2019 WL 6712298, at \*5. Courts in this Circuit consistently find that "a one-third fee is customary in contingent-fee cases, and indeed that figure is often higher for complex cases or cases that proceed to trial." *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at \*5; *Nieberding*, 129 F. Supp. 3d at 1250 (recognizing a one-third fee of the common fund was "well within the range typically awarded in class actions."); *Anderson v. Merit Energy Co.*, 2009 WL 3378526, at \*3 ("The customary fee to class counsel in a common fund settlement is approximately one-third of the economic benefit bestowed on the class.").

"[A] contingent fee of one-third of the settlement amount in a class action is standard in this Court and other district courts in the Tenth Circuit." *Cisneros,* 2022 WL 2304146, at \*8. Here, the proposed fee award is comfortably within the customary fee range. *See Anderson Living*

*Tr.*, 2021 WL 3076910, at *8 (40% fee was within customary fee range); *see also Montgomery*

2021 WL 1339305, at *7 n. 6 (collecting cases).

### 4. These cases presented difficult factual issues and raised novel and complex questions of law. (Factor 2)

"Courts emphasize the risk undertaken by counsel" in awarding fees, with "complex cases

justify[ing] higher fees, and simple cases lower fees." *Been v. O.K. Indus., Inc.*, CIV-02-285-

RAW, 2011 WL 4478766, at *7 (E.D. Okla. Aug. 16, 2011), *report and recommendation*

*adopted*, CIV-02- 285-RAW, 2011 WL 4475291 (E.D. Okla. Sept. 26, 2011).

In terms of complexity and difficulty, the ACH Opioids Litigation certainly satisfies this

*Johnson* factor. These cases presented complex and novel issues of law. The ACH Opioids

Litigation has consisted of federal and state RICO claims, which require a high burden of proof

and present both factual and legal challenges. In this RICO class action against the Settling

Defendants, for example, there was a risk that Plaintiffs would not be able to establish the

elements of their claims, prove damages, or protect any award on appeal.  Moreover, the state

law claims presented throughout the ACH Opioids Litigation have raised novel issues of law,

which required appeal to the supreme courts of Alabama, Missouri, Arizona, Maine, and

Arkansas, for example. Burns Decl. at ¶ 47.

### 5. Plaintiffs' team of attorneys have substantial experience in prosecuting high-stakes, complex litigation and pursued the case with extraordinary skill, zeal, and expertise. (Factors 3 & 9)

As discussed, this complex litigation raised exceptionally difficult factual and legal

issues. Prior to the Settlements, Interim Settlement Class Counsel had litigated these cases

aggressively for nearly eight years, engaging in voluminous document and deposition discovery,

as well as extensive motion practice. Guiding these cases through years of intense litigation and

then complex negotiation to a successful settlement with the Settling Defendants required the

sustained effort of many highly experienced and respected lawyers in the fields of tort law, RICO, and class action litigation. Plaintiffs have been represented by some of the nation's top law firms, including, but not limited to, Barrett Law Group P.A.; Cuneo Gilbert & LaDuca, LLP; Farmer Cline & Campbell, PLLC; Burns Charest LLP; Taylor Martino, P.C.; and Clifford Law Offices, P.C., consisting of highly experienced attorneys with stellar reputations earned over decades of legal practice.[25] Burns Decl. at ¶¶ 4-5.

Of course, it was not only Plaintiffs and the Settlement Classes that have been well-represented in this litigation. "In evaluating the quality of representation by Class Counsel, the Court should also consider the quality of opposing counsel." *Lunsford v. Woodforest Nat'l Bank*, No. 1:12-CV-103- CAP, 2014 WL 12740375 at *13 (N.D. Ga. May 19, 2014); *see also Chieftain Royalty Co. v.. XTO Energy, Inc.*, 2018 WL 2296588, at *5 (E.D. Okla. Mar. 27, 2018) ("[T]he fact that Class Counsel litigated such difficult issues against the vigorous opposition of highly skilled defense counsel and obtained a significant recovery for the Settlement Class further supports the fee request in this case."); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *5 ("Litigation of this case required great skill in a highly specialized field (third factor), against highly skilled opposing counsel, and plaintiffs' attorneys, who had great experience and superior national reputations, demonstrated great skill throughout (ninth factor)."); *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d at 1256 ("Given the high quality of defense counsel, there was simply no way that this case could have been prosecuted successfully without a high level of skill exhibited on the part of Class Counsel." (internal quotations and citation omitted)). Defendants have been vigorously represented throughout this litigation by some of the nation's most experienced litigators from several of the nation's top law firms, including, but not limited

---

[25] *See supra*, Section II.

42

to: Wachtell, Lipton, Rosen & Katz; Williams & Connolly; Cravath, Swaine & Moore LLP; Reed Smith; Jenner & Block LLP; Covington & Burling LLP; O'Melveny & Myers LLP; Morgan, Lewis & Bockius LLP; and Kirkland & Ellis LLP. The ACH Opioids Litigation demanded—and received—a team of experienced, diligent, highly skilled, and reputable attorneys to meet the challenges from Defendants' well-qualified and well-funded opposing counsel. That Interim Settlement Class Counsel obtained a favorable settlement against such well-represented defendants, confirms the reasonableness of the requested fee award.

### 6. The fee being contingent on obtaining relief for the class and the significant risk undertaken by counsel justifies the fee request. (Factor 6)

Along with the results obtained, the degree of risk associated with the litigation of a complex contingent fee case is among the most significant of the *Johnson* factors. *See Cecil*, 2018 WL 8367957, at *8 ("Courts consistently recognize that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."). When Interim Settlement Class Counsel brought the ACH Opioids Litigation cases, they knew, no matter how much they believed in the actions' merits, "there would be no fee without a successful result and that such a result would be realized only after lengthy and difficult effort." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 356 (N.D. Ga. 1993). "This factor weighs in favor of the requested attorneys' fees award, because '[s]uch a large investment of money [and time] place[s] incredible burdens upon . . . law practices and should be appropriately considered." *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d at 1256 (citing *Feerer v. Amoco Prod. Co.*, No. 95–0012, 1998 U.S. Dist. LEXIS 22248, at *33 (D.N.M. May 28, 1998)); *Been v. O.K. Indus., Inc.*, 2011 WL 4478766, at *9 ("Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success.").

Thus, Plaintiffs' counsel assumed a very real risk that they would "advance all expenses and attorney time to litigate a hard-fought case against highly experienced counsel hired by [defendants] with ample resources," without ever receiving any compensation for their time and expense. *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *4; *see also Lane v. Page*, 862 F. Supp. 2d at 1256 ("Class counsel assumed the risk that the litigation would yield no recovery and for five years have received no compensation for the time and expenses they have spent during the course of the litigation."). That risk deserves to be compensated. "Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result." *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) (en banc); *see also Freebird, Inc. v. Merit Energy Co.*, No. 10-1154-KHV, 2013 WL 1151264, at *4 (D. Kan. Mar. 19, 2013) ("The contingent fee nature of the representation . . . supports the requested award [because it] shifts the risk of loss from plaintiff to plaintiff's counsel.").

While Interim Settlement Class Counsel have always believed in the importance and merit of the RICO and other claims asserted in this litigation, they had no illusions when they commenced these actions that the trail would be either short or smooth. Interim Settlement Class Counsel knew the claims they were asserting—for example, that the Defendants participated in a conspiracy that resulted in an epidemic of opioid addiction throughout the United States— would be time-consuming and resource-intensive to develop and prove. Burns Decl. at ¶ 42. Counsel further knew these cases would require years of discovery, extensive motion practice, substantial dispositive motions challenges, and difficult and lengthy trials on the merits. *Id.* Counsel were well-aware, moreover, that their claims would have to survive difficult challenges at several different stages of the case—on motions to dismiss, on motions for summary judgment,

at trials, or on appeal—and that there was thus "a substantial risk of no recovery." *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1114 (D. Kan. 2018). Counsel nevertheless devoted the enormous time and resources necessary to obtain the relief provided by the Settlements for the Settlement Classes.

### 7. Interim Settlement Class Counsel's expended time and labor were enormous. (Factor 1)

As one might expect given the important and complex factual and legal issues presented by this litigation, Interim Settlement Class Counsel devoted an enormous amount of time and effort to their representation of the Settlement Classes. Specifically, Interim Settlement Class Counsel and their co-counsel dedicated over 211,938 hours resulting in over $137.7 million of lodestar. Burns Decl. at ¶ 44. Interim Settlement Class Counsel had to investigate and develop novel factual and legal theories, review millions of pages of documents, take and defend numerous depositions, and more. *Id.* at ¶ 27. Motion practice has been extensive, including motions to dismiss, discovery disputes, and summary judgment. And a substantial amount of the work preparing for and leading up to trial in Alabama—including briefing on summary judgment and expert witnesses—was completed by the time the Settlement with Distributor Defendants was reached. *Id.* at ¶ 28. Moreover, Interim Settlement Class Counsel's lodestar does not include the substantial amount of time and effort they will continue to expend through the Settlement approval and claims process. This factor, though of lesser importance in a common fund case, favors the requested fee.

### 8. Given the enormous time and resource commitments, and the significant risk to develop and litigate the ACH Opioids Litigation, few attorneys would have been willing to take it on. (Factor 10)

Simply put, "the time and effort that th[ese] case[s] ha[ve] taken and the complexity of the issues would make it undesirable to many attorneys." *Acevedo*, 2019 WL 6712298; *Lane v. Page*,

862 F. Supp. 2d at 1258; *Been v. O.K. Indus., Inc.*, 2011 WL 4478766, at *10 (finding that the time and effort expended in an expensive litigation made a class action undesirable for class counsel). Here, this factor too weighs in support of the reasonableness of the proposed fee.

> ### 9.  The demands of this case precluded Interim Settlement Class Counsel from other employment.  (Factor 4)

Finally, attorneys' fees are justified where the engagement "precluded or reduced [the attorneys'] opportunity for other employment." *Brown*, 838 F.2d at 455. "This guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson*, 488 F.2d at 718. "It is, of course, always true that while an attorney is spending time on one case, he is not spending the same time on another case." *Wiggins v. Roberts*, 551 F. Supp. 57, 61 (N.D. Ala. 1982).

The ACH Opioids Litigation has involved years of nearly non-stop document discovery and scores of depositions, punctuated by numerous contentious discovery disputes. Interim Settlement Class Counsel expended enormous time and effort drafting multiple complaints, opposing motions to dismiss, responding to motions for summary judgment, as well as completing a significant portion of pretrial schedule and trial preparation work in Alabama state court. Interim Settlement Class Counsel worked diligently to negotiate the Settlement Agreements with the Settling Defendants, an effort that required Interim Settlement Class Counsel to address and resolve many legal, factual, and administrative questions that arose during the negotiation process. For Interim Settlement Class Counsel, the significant commitment of time and resources required to litigate these cases (of necessity) limited their ability to pursue numerous other engagements. This significant opportunity cost has been incurred for nearly eight

years, and will continue to be incurred beyond final approval, as Interim Settlement Class Counsel fulfill their obligation to ensure proper distribution of the Settlement proceeds and address any issues that arise following final approval. Burns Decl. at ¶ 43. This factor undoubtedly supports the requested fee. *See, e.g., In re Syngenta*, 357 F. Supp. 3d. at 1113 ("plaintiffs' counsel have confirmed that the demands of this litigation . . . precluded other employment for these attorneys (factor 4)."); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *5 ("The amount of time expended over a protracted period leaves little doubt that these attorneys were forced to forego other work during this case").

## VII.   THE COURT SHOULD AWARD PLAINTIFFS' COUNSEL'S EXPENSES AND NOTICE AND ADMINISTRATIVE COSTS

### A.  Plaintiffs' Counsel's Expenses

Interim Settlement Class Counsel request the Court also award the reasonable expenses incurred in successfully prosecuting and resolving the ACH Opioids Litigation against the Settling Defendants. "As with attorney fees, an attorney who creates or preserves a common fund for the benefit of a class is entitled to receive reimbursement of all reasonable costs incurred . . . in addition to the attorney fee percentage." *Vaszlavik v. Storage Tech. Corp.*, No. 95-B-2525, 2000 WL 1268824, at *4 (D. Colo. Mar. 9, 2000) (citation omitted); *see Candelaria v. Health Care Serv. Corp.*, No. 2:17-cv-404-KG-SMV, 2020 WL 6875828 at *4 (D.N.M. 2020) (in addition to awarding the cost of hiring a settlement administrator, court awarded class counsel all "actual out-of-pocket litigation expenses and costs incurred in prosecuting th[e] case"). Rule 23(h) authorizes courts to reimburse counsel for "non-taxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). And the Settlement Agreements expressly authorize Interim Settlement Class Counsel to seek "reimbursement of expenses incurred in connection with prosecuting the Action and the Other Actions brought by the Class Representatives," *e.g.*

Distributor Settlement Agreement (ECF No. 276-1) at VIII(A), and provides that these expenses "shall be paid from the Settlement Funds." *Id.*

Interim Settlement Class Counsel and their co-counsel have collectively incurred $35,330,637.54 in reasonable expenses. Burns Decl. at ¶ 48. These expenses include items typically borne by clients in non-contingent fee litigation, such as filing fees, expert costs, court reporting services and transcripts, document management, travel, electronic research, photocopying, overnight delivery, phone charges, and mediation fees, among others.[26] *Id.* at ¶ 49. All expenses were directly related and necessary to Interim Settlement Class Counsel's prosecution of the ACH Opioids Litigation, and typical of large, complex actions such as this. *Id.* Interim Settlement Class Counsel and their co-counsel have advanced or incurred these expenses and maintained careful records to document them. *Id.* at ¶ 50. These expenses are summarized in the Declaration of Warren Burns and its attached exhibits. Interim Settlement Class Counsel request that these expenses be assessed amongst the approved Settlements proportional to their respective total Settlement Funds contribution.

## B. Notice and Administrative Costs and Mechanisms for Submitting Future Expenses

In addition, the Notice and Claims Administrators, A.B. Data and Cherry Bekaert have incurred costs and submitted corresponding invoices totaling $311,757.66 for implementation of the Class notice plan commenced on November 20, 2024, pursuant to the Court's October 30, 2024 Orders. Burns Decl. at ¶¶ 52-53. Interim Settlement Class Counsel requests the Court approve and order payment from the Settlement Funds of $72,569.85 to A.B. Data and $239,187.81 to Cherry

---

[26] *See In re Bank of America Wage and Hour Employment Litig.*, 10-MD-2138-JWL, 2013 WL 6670602, at *4 (D. Kan. Dec. 18, 2013) (awarding class counsel expenses "typically borne by clients in non-contingent fee litigation") (citing *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1257 (10th Cir. 1998)).

Bekaert for these necessary case expenses, and that these expenses be assessed amongst the approved Settlements proportional to their respective total Settlement Funds contribution. Interim Settlement Class Counsel request that Notice and Claims Administrators and the Escrow Agent be allowed to submit itemized statements of fees and expenses for the Court's approval on a monthly basis.

Finally, Interim Settlement Class Counsel propose a mechanism for compensating the Special Master Hon. Thomas Hogan. From time to time, on approximately a monthly basis, the Special Master and his counsel shall file under seal an itemized statement of fees and expenses.[27] Such itemized statements may include confidential communications between the Special Master and the Court and others; accordingly, the Court shall maintain these itemized statements under seal and they shall not be made available to the public or counsel. Instead, the Special Master and his counsel shall also file with the itemized statements a summary statement which shall list only the total amount billed, which summary shall not be filed under seal, and shall contain a signature line for the Court accompanied by the statement "Approved for Disbursement." If the Court determines the itemized statement is regular and reasonable, the Court will sign the corresponding summary statement and have it entered on the docket. The Escrow Agent shall then remit to the Special Master and his counsel approved fees from the Settlement Funds within 10 calendar days after Court approval.

The Court should approve an award of Interim Settlement Class Counsel's and their co-counsel's expenses in the amount of $35,330,637.54, with the interest earned on that amount at

---

[27] The Special Master will be compensated for his services at the rate of $500 per hour, plus reimbursement of all ordinary and necessary expenses. The Special Master's counsel, Taft Stettinius & Hollister LLP, will be compensated at its standard hourly rates, plus reimbursement of all ordinary and necessary expenses, as described in its engagement letter with the Special Master.

the same rate earned on the Settlement Funds, and order payment to A.B. Data in the amount of $72,569.85, payment to Cherry Bekaert in the amount of $239,187.81. Additionally, Class Plaintiffs ask that the Court grant the proposed mechanism for payment of Special Master Hon. Thomas Hogan and allow the Notice and Claims Administrators and the Escrow Agent to submit itemized statements of fees and expenses for the Court's approval on a monthly basis.

## CONCLUSION

For the reasons above and in the supporting declarations, Class Plaintiffs respectfully request the Court grant Class Plaintiffs' Motion for Final Class Certification, Appointment of Class Counsel, Final Approval of Settlements, Approval of Plan of Allocation, and Award of Attorneys' Fees and Expenses and to enter the proposed orders, submitted in Word format herewith.

Dated: December 21, 2024                Respectfully submitted,

                                        */s/ Warren T. Burns*
                                        Warren Burns *(pro hac vice)*
                                        Darren Nicholson *(pro hac vice)*
                                        BURNS CHAREST LLP
                                        900 Jackson Street, Suite 500
                                        Dallas, Texas 75202
                                        (469) 904-4550
                                        wburns@burnscharest.com
                                        dnicholson@burnscharest.com

                                        Korey A. Nelson *(pro hac vice)*
                                        BURNS CHAREST LLP
                                        365 Canal Street, Suite 1170
                                        New Orleans, Louisiana 70130
                                        (504) 799-2845
                                        knelson@burnscharest.com

                                        Christopher A. Dodd
                                        DODD LAW OFFICE, LLC
                                        500 Marquette Avenue NW, Suite 1330
                                        Albuquerque, New Mexico 87102
                                        (505) 475-2932

chris@doddnm.com
brooke@doddnm.com

Steve Martino *(pro hac vice)*
TAYLOR MARTINO, P.C.
51 St. Joseph Street
Mobile, Alabama 36602
(251) 433-3131
SteveMartino@taylormartino.com

John W. (Don) Barrett *(pro hac vice)*
David McMullan, Jr. *(pro hac vice)*
Richard Barrett *(pro hac vice)*
Sterling Aldridge *(pro hac vice)*
BARRETT LAW GROUP, P.A.
P.O. Box 927
Lexington, Mississippi 39095
(662) 834-2488
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
rrb@rrblawfirm.net
saldridge@barrettlawgroup.com

Charles J. LaDuca *(pro hac vice)*
David L. Black *(pro hac vice)*
Monica Miller *(pro hac vice)*
Jennifer E. Kelly *(pro hac vice)*
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
(202) 789-3960
charles@cuneolaw.com
dblack@cuneolaw.com
monicam@cuneolaw.com
jkelly@cuneolaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2024, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court and served to all counsel of record via the Court's CM/ECF system.

*/s/ Warren T. Burns*
Warren T. Burns
