# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

SAN MIGUEL HOSPITAL CORPORATION,
d/b/a ALTA VISTA REGIONAL HOSPITAL,
*on behalf of itself and all others similarly situated*,

       Plaintiffs,

       v.                                                    No. 1:23-cv-00903 KWR/JFR

PUBLIX SUPERMARKET, INC., HENRY SCHEIN, INC.,
WALGREEN CO., WALGREEN EASTERN CO., INC.,
CVS PHARMACY, INC., CVS Rx Services, Inc.,
CVS ORLANDO FL DISTRIBUTION, LLC,
WALMART, INC., *f/k/a Wal-Mart Stores, Inc.,*
ALBERTSONS COMPANIES, INC., ALBERTSONS, LLC,
SAFEWAY, INC., GIANT EAGLE, INC.,
HBC SERVICES COMPANY, KROGER LIMITED
PARTNERSHIP I, KROGER LIMITED PARTNERSHIP II,
THE KROGER CO., HIKMA PHARMACEUTICALS, INC.,
INDIVIOR, INC., ET AL.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon the following motions to dismiss:

- Defendant Publix Super Market, Inc's Supplemental Motion to Dismiss for Lack of Jurisdiction (Doc. 201);

- Distributor Defendant Henry Schein, Inc.'s Motion to Dismiss and Supporting Brief (Doc. 207);

- The Pharmacy Defendants'[1] Motion to Dismiss and Supporting Brief (Doc. 208);

_____

[1] The "Pharmacy Defendants" include various entities of Walgreens, CVS, Walmart,

- Defendant Indivior Inc.'s Supplemental Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 211);

- Manufacturer's[2] Motion to Dismiss (Doc. 212);

- Hikma's Supplemental Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 213);

- Giant Eagle's Supplemental Motion to Dismiss (Doc. 214); and

- Kroger Limited Partnership I's ("KLP I") and Kroger Limited Partnership II's ("KLP II") Motions to Dismiss (Docs. 215, 216).

Plaintiff, a corporation operating a Las Vegas, New Mexico hospital, asserts a single RICO or RICO conspiracy claim in this putative class action related to the manufacture, distribution, or dispensing of opioids. Plaintiff asserts an approximately 30-year unlawful enterprise between dozens of pharmaceutical manufacturers, distributors, and pharmacies. Plaintiff asserts that Defendants (1) misrepresented the safety, addictiveness, and efficacy of opioids in order to generally increase opioid sales, and (2) failed to implement sufficient suspicious order monitoring system to weed out illegitimate prescriptions, impede the abuse of opioids, and impede diversion of opioids. As part of this RICO claim, Plaintiff alleges that Defendants committed the following predicate acts: (1) violation of federal mail or wire fraud statutes, (2) violation of the federal Controlled Substances Act, and (3) violation of the New Mexico Controlled Substances Act.

---

Albertsons Companies, Inc., (together with Albertsons LLC and Safeway Inc, ("Albertsons")), Giant Eagle, Inc. and HBC Services Company (together with Giant Eagle, Inc., "Giant Eagle"), Publix Super Markets, Inc, and Kroger Limited Partnership I, Kroger Limited Partnership II, and The Kroger Co. The Kroger Co. participated in the Pharmacy Defendants' Motion to Dismiss (Doc. 208). The parties stipulated to dismissal of the separate entities Kroger Limited Partnership I ("KLP I") and Kroger Limited Partnership II ("KLP II"). *See* Doc. 237.

[2] The "Manufacturer Defendants" include Defendants Hikma Pharmaceuticals, Inc. (Hikma) and Indivior, Inc ("Indivior").

Defendants[3] challenge every element of Plaintiff's RICO claim under Rule 12(b)(6), assert the complaint should be dismissed for violation of the statute of limitations, assert that the complaint fails to comply with Rule 8, and also state that:

- the Court lacks subject matter jurisdiction as to Defendants Publix and Giant Eagle, as Plaintiff failed to allege injuries stemming from their conduct; and

- the Court lacks personal jurisdiction over Defendants Publix and Giant Eagle.

As explained below, the complaint fails to state a claim for the following alternate reasons:

- Plaintiff failed to meet the statute of limitations as to this 30-year-old RICO enterprise;

- Plaintiff failed to state a claim as to causation or failed to state a cognizable injury, as:

  - Plaintiff failed to show proximate causation under RICO, as it does not plausibly plead a direct injury;

  - Plaintiff failed to show a cognizable injury as to its business or property as required under RICO, and its claims are derivative of its patients' personal injury claims; and

  - Plaintiff pleaded intervening causes.

- Plaintiff failed to plausibly allege that each Movant committed a pattern of racketeering activity (two or more predicate acts) to establish liability under § 1962(c);

- Plaintiff failed to plausibly allege that each Movant conspired to violate RICO under § 1962(d);

- The complaint violates Rule 8; and

- Plaintiff has failed to plausibly allege personal jurisdiction over Publix and Giant Eagle.

---

[3] When the Court uses the term "Defendants" in the opinion, it generally refers to the defendants at issue in the pending motions, and not other defendants such as the settling defendants, unless context suggests otherwise.

Therefore, for the reasons stated below, the three primary motions to dismiss alleging failure to state a claim (Docs. 207, 208, and 212) are **GRANTED IN PART**. Publix's and Giant Eagle's motions to dismiss for lack of personal jurisdiction (Doc. 201 and 214) are **GRANTED IN PART.** Hikma's supplemental motion to dismiss (Doc. 213) is **GRANTED**. Indivior's supplemental motion to dismiss (Doc. 211) is **DENIED** as moot. Because the Kroger entities KLP I and KLP II were dismissed by stipulation (Doc. 237), their pending motions to dismiss (Docs. 215, 216) are **DENIED AS MOOT**.

Therefore, the claims against Publix and Giant Eagle are dismissed without prejudice for lack of personal jurisdiction. The claims against the remaining Movants are dismissed for failure to state a claim, or alternatively for violation of Rule 8.

## BACKGROUND

This is a RICO case stemming from the manufacture, distribution, and sale of opioid products. Plaintiff is an acute care hospital in Las Vegas, New Mexico, and brings this putative class action on behalf of "all acute care hospitals in the United States" that treated patients with Opioid Use Disorder ("OUD") within four years of the filing date. First Amended Complaint ("FAC"), Doc. 145 at ¶¶ 30 and 1160. Plaintiff asserts a single claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a federal statute that authorizes private parties to bring civil suits against persons that (1) are associated with an enterprise and (2) engaged in a pattern of racketeering activity. Plaintiff alleges that dozens of opioid manufacturers, distributors, and pharmacies were part of a thirty-year opioid criminal enterprise, which operated with the goal to unlawfully increase the sale of opioids.

Plaintiff alleges that it was injured by treating opioid patients without full compensation from private insurers and governmental programs. It asserts that providing medical services to

patients with opioid use disorder is more complicated or expensive than providing medical services to other patients, FAC at ¶¶ 20, 1093-94, 1102, and that insurers and governmental programs do not fully cover these alleged increased costs. *Id*. at ¶¶ 20, 1093.

Plaintiff alleges two main theories of liability. Under its fraud theory, Plaintiff asserts that the defendants deceptively marketed prescription opioids by misleading the public about their benefits and downplaying their risks, including the risk of addiction, in order to illegitimately increase demand for opioids. Under its unlawful distribution theory, Plaintiff alleges that Defendants breached their duties to maintain suspicious order monitoring ("SOM") systems to identify, report, and stop suspicious orders of prescription opioids, leading them to distribute excessive quantities of opioids that were not medically justified. *Id.* at ¶¶ 2, 632, 1180, and 1186.

## DISCUSSION

## I.    Plaintiff alleges a single claim, asserting a violation of RICO under § 1962(c) and a conspiracy to violate RICO under § 1962(d).

Plaintiff alleges that Defendants violated the civil RICO statute under § 1962(c) and conspired to violate RICO under § 1962(d). 18 U.S.C. § 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [from] conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To plead a valid RICO claim, a plaintiff must plausibly allege that a defendant (1) conducted or participated in the affairs "(2) of an enterprise (3) through a pattern (4) of racketeering activity." *George v. Urb. Settlement Servs*., 833 F.3d 1242, 1248 (10th Cir. 2016); *Tal v. Hogan,* 453 F.3d 1244, 1269 (10th Cir. 2006). RICO also has a causation element. Under RICO's "by reason of" requirement under 18 U.S.C. § 1964(c), "to state a claim ... the plaintiff is required to show that a RICO predicate offense 'not only was a

'but for' cause of [its] injury, but was the proximate cause as well.'" *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014).

An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or groups of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" generally consists of the criminal offenses listed in 18 U.S.C. § 1961(1). A "pattern" involves two or more acts, sometimes called "predicate acts," of racketeering activity. *Id.* § 1961(5).

Plaintiffs also allege a violation of 18 U.S.C. § 1962(d) in the alternative. That subsection makes it illegal "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." *Id.* "We presume Congress intended to use the term in its conventional sense, and certain well-established [conspiracy] principles follow." *Salinas*, 522 U.S. at 63, 118 S.Ct. 469. "To obtain a conspiracy conviction, the government must prove: (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) (citing *United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009)). " 'A conspiratorial agreement ... need not be express so long as its existence can plausibly be inferred from the defendant['s] words and actions and the interdependence of activities and persons involved.' " *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1211 (10th Cir. 2020) (quoting *United States v. Smith*, 413 F.3d at 1273). *"*Interdependence exists where 'each coconspirators activities constituted essential and integral steps toward the realization of a common, illicit goal.' " *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995).

As explained below, Plaintiff failed to plausibly allege a § 1962(c) violation, as it failed to plausibly allege (1) causation or an injury and (2) two or more predicate acts by each defendant to warrant liability against each Defendant under § 1962(c). Moreover, Plaintiff's complaint clearly showed a statute of limitations violation on the face of the complaint.

Because Plaintiff failed to plausibly plead a § 1962(c) violation, the conspiracy claim also fails. Moreover, Plaintiff failed to plausibly plead a conspiracy to violate RICO.

## II.    **Defendants' request for dismissal for Rule 8 violations.**

Defendants assert that Plaintiff's complaint should be dismissed under Rule 8. *See* Schein Motion to Dismiss, Doc. 207 at 14.[4] The Court denies this request as moot, as it concludes that Plaintiff has failed to state a claim under Fed. R. Civ. P. 12(b)(6), as explained below. However, the Court discusses Plaintiff's Rule 8 violations below and its impact on the Court's review of the complaint under Rule 12(b)(6). Alternatively, assuming dismissal under Rule 12(b)(6) is not appropriate, the Court would dismiss the complaint under Rule 8 with prejudice, after considering the *Ehrenhaus* factors.

A complaint "must contain (1) a short and plain statement of the grounds for the court's jurisdiction, ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought." Fed. R. Civ. P. 8(a))]. The philosophy of Rule 8(a) is reinforced by Rule 8(d)(1), which provides that "[e]ach allegation must be simple, concise, and direct." Taken together, Rules 8(a) and (d)(1) underscore the emphasis placed on clarity and brevity by the federal pleading rules. Vague or unintelligible pleadings violate Rule 8.

---

[4] When the Court cites to the parties' briefing, such as motions or responses, it refers to the page numbers generated by CM/ECF, which appear at the top of the page. When pinpoint citing to the First Amended Complaint, the Court cites to the Plaintiff's numbered paragraphs in its First Amended Complaint, Doc. 145.

The twin purposes of a complaint are to give the opposing parties fair notice of the basis for the claims against them so that they may respond and to allow the Court to establish whether the allegations, if proven, show that the plaintiff is entitled to relief. *See Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1480 (10th Cir. 1989). The requirements of Fed. R. Civ. P. 8 are designed to meet these purposes. *See TV Communications Network, Inc. v. ESPN, Inc.*, 767 F. Supp. 1062, 1069 (D. Colo. 1991), *aff'd*, 964 F.2d 1022 (10th Cir. 1992). Plaintiffs must allege in a clear, concise, and organized manner what each defendant did to them, when the defendant did it, how the defendant's action harmed them, what specific legal right they believe the defendant violated, and what specific relief is requested as to each defendant. *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) (citations omitted).

"Prolixity of a complaint undermines the utility of the complaint." *Knox v. First Sec. Bank of Utah*, 196 F.2d 112, 117 (10th Cir. 1952) ("The purpose of [Rule 8(a)] is to eliminate prolixity in pleading and to achieve brevity, simplicity, and clarity."). "Thus, we have held that a complaint can run afoul of Rule 8 through unnecessary length and burying of material allegations in 'a morass of irrelevancies.'" *Baker v. City of Loveland*, 686 F. App'x 619, 620 (10th Cir. 2017), *quoting in part Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007). "In its sheer length, [Plaintiff] has made [its] complaint unintelligible 'by scattering and concealing in a morass of irrelevancies the few allegations that matter.'" *Mann*, 477 F.3d at 1148 (complaint, which was 83 pages, was unintelligible due to its length), *quoting in part Garst*, 328 F.3d at 378.

Moreover, a plaintiff must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as

distinguished from collective allegation...." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008).

As an example, the Tenth Circuit affirmed the dismissal of a prolix complaint which group pleaded allegations, noting as follows: "[b]uried in the amended complaint are allegations that might alert particular defendants to allegations of wrongdoing. But other allegations appear to lump all of the defendants together, without saying who did what or identifying conduct that would trigger liability. Thus, the district court properly dismissed the amended complaint." *Baker v. City of Loveland*, 686 F. App'x 619, 621 (10th Cir. 2017). Here, Plaintiff asserts a 300-page complaint with 1200 factual paragraphs involving dozens of defendants over a thirty-year period. Many allegations appear to be irrelevant to whether Plaintiff states a RICO claim. Moreover, Plaintiff often collectively pled the actions of Defendants, or argued that Defendants acted through third parties, without demonstrating that the actions of the third-parties should be attributable to each defendant. In this case that was not appropriate, as it impeded the ability of the Defendants and the Court to determine whether Plaintiff plausibly alleged each element of the RICO claim as to each Movant.

Thus, Plaintiff's Rule 8 violations have impeded its ability to determine whether Plaintiff states a claim under Rule 12(b)(6). District courts have no duty to search the record to support a party's arguments. *See Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) ("[I]t is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without ... depending on the trial court to conduct its own search of the record."); *see also Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [the plaintiff's] arguments for him."). "The reason for this requirement is obvious: 'Judges are not like pigs, hunting for truffles buried in briefs.' " *McKinzy*

*v. I.R.S.*, 367 F. App'x 896, 897 (10th Cir. 2010) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995)). Rather, this is squarely the job of the parties and their attorneys. *Upchurch v. Wastequip, LLC*, No. 21-7055, 2022 WL 4099433, at *5 (10th Cir. Sept. 8, 2022) ("the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record."), *cert. denied*, 143 S. Ct. 814, 215 L. Ed. 2d 68 (2023), *citing Garrett*, 425 F.3d at 840.

Therefore, due to the prolixity of the complaint, the Court will rely on the citations provided by the Plaintiff in its response to the Defendants' arguments. In other words, the Court will not *sua sponte* search the complaint for support where Plaintiff has not pinpoint cited to the complaint in the specific section of the response which is in opposition to the Defendants' specific arguments. For example, in determining whether Plaintiff has plausibly alleged that each defendant committed two or more predicate acts, the Court will review Plaintiff's relevant arguments in its response and the citations to the complaint therein. *See, e.g.* Doc. 234 at 21-38.

Alternatively, assuming dismissal under Rule 12(b)(6) for the reasons stated below were not appropriate, the Court would dismiss the complaint as to the Movants under Rule 8 with prejudice. The Tenth Circuit has stated that a district court may dismiss a complaint under Rule 8 with prejudice after considering the *Ehrenhaus* factors. *Nasious v. Two Unknown B.I.C.E. Agents, at Arapahoe Cnty. Just. Ctr.*, 492 F.3d 1158, 1162 (10th Cir. 2007). Specifically, "[t]hese criteria include (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." *Id.*

*First*, Defendants have been prejudiced by the prolix 300-page complaint asserting allegations against dozens of defendants and third parties over a thirty-year period. As explained above and below, due to the prolixity of the complaint, it is difficult to determine the factual allegations relevant to each defendant, and whether Plaintiff has plausibly alleged each element of the RICO claim as to each defendant. "This court has long recognized that defendants are prejudiced by having to respond to pleadings as wordy and unwieldy as [the] pleading remains." *Nasious,* 492 F.3d at 1162–63 (addressing first *Ehrenhaus* factor as to Rule 8 violation).

*Second*, Plaintiff's pleading has sufficiently interfered with the judicial process to warrant dismissal. As noted above, Plaintiff's 300-page complaint asserted against dozens of defendants, asserts many seemingly irrelevant facts which make it difficult to determine whether Plaintiff has stated a claim. The Tenth Circuit has noted that a prolix complaint interferes with the judicial process sufficient to satisfy the second *Ehrenhaus* factor. *Nasious*, 492 F.3d at 1162–63.

*Third*, as to the third and fourth factors, Plaintiff is culpable and received sufficient warnings in advance. In the first round of motions to dismiss, defendants raised the prolixity issues. *See, e.g.,* Doc. 95 at 37 (explaining that Plaintiff's "prolix" allegations fail to identify specific acts of fraud by specific defendant and the circumstances surrounding those acts, lumping together dozens of defendants."). Thereafter, Plaintiff filed the First Amended Complaint. Although Plaintiff amended its complaint without the court ruling on the first round of motions to dismiss, the first round of motions gave Plaintiff additional notice of the defects in its complaint. In the second round of motions to dismiss, Defendants again raised the prolixity issues and addressed Rule 8. Schein's Mot., Doc. 207 at 14-15. In response, Plaintiff did not request leave to amend the complaint to comply with Rule 8. *See* Pl.'s Resp., Doc. 234 at 114-116.

11

*Fourth*, as to the fifth *Ehrenhaus* factor Plaintiff does not propose lesser sanctions in the face of the motion to dismiss for Rule 8 violations, such as leave to amend. *Id.* Rather, Plaintiff asserts that the length of the complaint is necessary to adequately present its claim. Plaintiff has already amended its complaint following the first round of motions to dismiss.

Therefore, on alternative grounds discussed above, the Court concludes it is appropriate to dismiss Plaintiff's complaint under Rule 8 as to the Movants.

## III.  <u>Plaintiff failed to plausibly plead causation or a cognizable injury under RICO</u>.

Plaintiff also failed to plausibly plead causation or a cognizable injury under RICO. To satisfy causation under a civil RICO claim, a plaintiff must plausibly allege both but-for and proximate causation. *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 654 (2008). Defendants assert that Plaintiff has alleged only (1) indirect injuries insufficient to establish proximate causation, (2) injuries which are derivative of patients' personal injuries, and (3) injuries which are not based on an injury to property or business. *See, e.g.,* Pharmacy Defs'. Mot., Doc. 208 at 7-16.  The Court agrees. As explained below, Plaintiff's complaint should be dismissed on causation or lack of injury grounds for the following alternate reasons:

- Plaintiff failed to plausibly plead a direct injury to satisfy proximate causation;

- Plaintiff's asserted injuries are generally derivative of personal injuries to patients and are not generally injuries to property or business; and

- Plaintiff pleaded intervening causes.

### A.  **Plaintiff failed to plausibly plead a direct injury to establish proximate causation.**

Defendants assert that Plaintiff failed to plausibly plead proximate causation, primarily asserting that Plaintiff failed to plead a direct injury. Plaintiff seeks compensation for treating

opioid users, who were the direct victims of the alleged conspiracy, as it was allegedly only partially reimbursed by insurance or governmental programs.  The Court agrees with Defendants and concludes that Plaintiff failed to plead a direct injury.

Under RICO's "by reason of" requirement under 18 U.S.C. § 1964(C), "to state a claim ... the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014).  Proximate causation "requires some direct relation between the injury asserted and the injurious conduct alleged." *Johnson v. Heath*, 56 F.4th 851, 870 (10th Cir. 2022) (internal quotation marks and citation omitted).

To establish the causation element for a § 1964(c) claim, Plaintiff must plausibly plead that defendants' RICO violation was a but-for and proximate cause of the injury *to its business or property*. *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 889 (10th Cir. 2017), *citing* Bridge, 553 U.S. at 654, 128 S.Ct. 2131. "Proximate cause is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.' " *Bridge*, 553 U.S. at 654, 128 S.Ct. (citation omitted). It is a way of " 'label[ing] generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts,' with a particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.' " *Id*.

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S. Ct. 1991, 1998, 164 L. Ed. 2d 720 (2006). In addition to the closeness of the relationship between the asserted injury and the Defendant's conduct, the Court must consider public policy considerations that reflect " 'ideas of what justice demands, or

of what is administratively possible and convenient.' " *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)). The Court should consider the following policy considerations:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311 (internal citations omitted). The Supreme Court has instructed that " 'no need [exists] to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly.' " *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 889 (10th Cir. 2017) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006)).

Plaintiff asserts that Defendants (1) misrepresented the safety, effectiveness, and addictiveness of opioids, and (2) failed to implement monitoring systems to detect and stop shipments of suspicious orders, both of which were designed to unlawfully flood the market with prescription opioids.  FAC at ¶¶ 11-12, 206, 245-248, 287-390, 628-36, 656-94, 1101, 1105. Although Plaintiff pleads a variety of injuries, all of them merely describe the various unreimbursed costs of treating opioid users.  FAC at ¶¶ 1101, 1102. Plaintiff asserts it was injured as follows by Defendants' actions:

- increased, unreimbursed costs of, or operational losses resulting from, treating patients with opioid use disorder, or otherwise not being compensated for services provided FAC ¶¶ 1087-1100, 1102(a), (b);

- increased operational costs of providing services *Id.*;

- purchase of opioid products by the hospital, which was a direct target of Defendants' marketing, FAC ¶ 1101;

- costs of training personnel in treatment of drug overdoses and the application of naloxone; FAC ¶ 1102(f);

- costs associated with staff burnout, including, fatigue, anger, addiction, and suicide FAC ¶ 1102(h);

- costs of providing additional personnel to respond to security concerns created by those suffering from OUD and other forms of opioid dependency FAC ¶1102(i);

- costs of purchasing and maintaining additional equipment and supplies necessitated by the increased demands and expanded services provided in response to opioids FAC ¶1102(j); and

- costs of providing special programs beyond ordinary hospital services FAC 1102(k).

*see generally* FAC at ¶¶ 1087-1102. Here, Plaintiff pleaded a variety of ways it was injured by treating patients who use or used opioids.  Plaintiff alleges that it was not fully compensated for these increased costs by private insurers or governmental programs. However, the Court finds that Plaintiff merely pleads various ways it has incurred costs from treating patients who suffered injuries from using opioids.

"A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient". *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9-10, 15 (2010). When "[m]ultiple steps" separate the predicate offense from the injury, proximate causation generally does not extend "beyond the first step." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9-10, 15 (2010) "The general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Holmes*, 503 U.S., at 271–

272, 112 S.Ct. 1311. This general tendency "applies with full force to proximate cause inquiries under RICO." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 10, 130 S. Ct. 983, 989, 175 L. Ed. 2d 943 (2010).  Defendants assert the following steps lie between Defendants' actions and the Plaintiff's injury:

> (1) [Defendants] deceptively marketed or unlawfully distributed FDA-approved opioid medications, which caused:
> (2) some doctors to write "medically inappropriate" opioid prescriptions, which caused:
> (3) some patients to "abuse" some of those medications, as well as the rise of a criminal black market for opioids, which caused:
> (4) some of Plaintiff's patients to suffer opioid-related conditions, which caused:
> (5) some of those patients or their insurers to fail to pay in full for treatment provided by Plaintiff—including for conditions having nothing to do with opioid use (or, alternatively, caused Plaintiff to earn less for such treatment than if the patient did not have OUD), which caused:
> (6) Plaintiff to suffer revenue "shortfall[s]" and to incur costs for "training personnel," maintaining "special facilities" and "equipment," and addressing "staff burnout."

Doc. 212 at 24, citing FAC at ¶¶ 2, 12, 15-17, 20, 615, 1088-1102; *see also* Doc. 208 at 20; Doc. 207 at 25; FAC at ¶ 209 (alleging that "opioid users . . . buy black-market prescription opioids[] or turn to drugs like heroin"); *id.* at ¶ 251 (alleging increased prescribing by doctors); *id.* at ¶¶ 676-84 (discussing prescribing and dispensing requirements). Whether or not all of these steps are accurate, it is clear here that Plaintiff seeks additional compensation for treating personal injuries to third parties (opioid users), which at least goes beyond the "first step" and is therefore too indirect or remote to establish proximate causation.

Moreover, the direct-relation test bars RICO claims when the plaintiff's losses are "purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133, 134 S. Ct. 1377, 1390–91, 188 L. Ed. 2d 392 (2014), *quoting in part Holmes, supra,* at 268–269, 112 S.Ct. 1311; see, *e.g., Hemi Group, LLC v. City of New York,* 559 U.S. 1, 10–11, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010).

Circuit courts of appeal have repeatedly rejected claims by plaintiff-hospitals or third-party payors alleging under RICO that tobacco companies "engaged in a conspiracy" to "misle[a]d the public about … the health risks of smoking," causing the hospitals and payors to expend "significant resources treating [] tobacco users." *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 432-33 (3d Cir. 2000); *see Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 961 (9th Cir. 1999) (payors sued for "costs they [] incurred treating their participants' and beneficiaries' smoking- related illnesses," alleging tobacco companies "engaged in a covert scheme to defraud the public" about "the health risks of smoking"). In those cases, as here, the plaintiff-hospitals sought recovery of the costs of treating the victims, smokers (or here, opioid users).

Federal circuit courts rejected those RICO claims against tobacco companies, concluding that hospital-plaintiffs failed the direct relation test because they sought to recoup unpaid medical expenses that were "derivative of alleged injuries to individual smokers." *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001); *see Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999) ("[The payors'] damages are entirely derivative of the harm suffered by plan participants as a result of using tobacco products."); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849 (6th Cir. 2003) (dismissing RICO claim because damages were "contingent on harm to third parties"). The claims were derivative because, "without any injury to smokers, plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers." *Or. Laborers-Emps. Health*, 185 F.3d at 963. The claims thus lacked the required "direct link between the alleged misconduct of defendants and the alleged damage to plaintiffs." *Id.* "As defendants point out, however, *all* of plaintiffs' claims rely on alleged injury to smokers-without any injury to smokers,

plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers. Thus, there is no "direct" link between the alleged misconduct of defendants and the alleged damage to plaintiffs." *Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999).

For example, in *Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696, 702 (9th Cir. 2001), a plaintiff-hospital system brought RICO claims against tobacco companies, seeking compensation for the unreimbursed costs of treating patients suffering from tobacco-related illnesses. *Id.* at 700. The plaintiff-hospitals contended that tobacco companies concealed and mispresented the addictive nature and health risks of nicotine. *Id*. The Court of Appeals for the Ninth Circuit concluded that the plaintiff-hospitals failed to allege proximate cause for an injury, as there was no direct link between the tobacco companies' conduct and the plaintiff's injuries, as the plaintiff-hospitals' injuries were derivative of the injuries suffered by smokers. *Id.* at 701, 703.

These tobacco cases are directly on point. Here, Plaintiff seeks compensation for the variety of costs stemming from treating the personal injuries of opioid users. Without any injury to opioid users, Plaintiff would not have incurred the additional expense in treating opioid users. The opioid users were directly injured by the Defendants' conduct. Thus, there is no direct link between the alleged misconduct of Defendants and the alleged damages to Plaintiff.

Moreover, although not a RICO case, the Maine Supreme Court held that hospital corporations asserting actions for recovery of the costs of treating opioid users did not plausibly state proximate cause. *E. Me. Med., Ctr. v. Walgreen Co. et al.,* 2025 ME 10, ¶ 15 ("the fundamental shortcoming in the Hospitals' cause of action is that the Hospitals have not directly

suffered the harm that they allege has been caused by the wrongful conduct of Opioid Sellers – opioid use disorder, including misuse, addiction, and dependency.").

Alternatively, to the extent the Court should apply the three-factor test under *Holmes*, the Court concludes that Plaintiff's injuries are too remote from the wrongful acts. The Court applies the following three-factor "remoteness" test: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. *See Holmes*, at 269–70, 112 S.Ct. 1311 (applying test to RICO claim).

As to the first factor, there are clearly more direct victims who can be counted on to vindicate the law as private attorneys general. The direct victims are opioid users. Multiple types of plaintiffs, including opioid users and governmental entities have filed suits against opioid manufacturers, distributors, and dispensers. This weighs heavily in favor of barring Plaintiff's action. *See, e.g., Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 964 (9th Cir. 1999) (noting that smokers were more direct victims than hospitals which treated smokers); *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1076 (D.C. Cir. 2001) (smokers had more direct claims and can be counted on to deter wrongdoing by asserting their theories of recover).

As to the second factor, it will be difficult to ascertain the amount of Plaintiff's damages attributable to the wrongful conduct as opposed to other independent factors, and it would require speculation. *Bridge*, 553 U.S. at 654 (court should inquire into the difficulty in "ascertain[ing] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent,

factors."). Plaintiff's damages generally stem from alleged costs of treating opioid users which were not fully reimbursed by insurers or governmental programs. Plaintiff asserts it has lower recovery or rate of realization from private and general insurance, as treating opioid users is more complex than non-opioid users. Plaintiff alleges a variety of different costs stemming from treating opioid users, as noted above. *See* FAC at ¶¶ 1101, 1102. Considering the variety of injuries asserted by Plaintiff, it would be difficult to determine the amount of damages attributable to the wrongful conduct as distinct from other independent factors.  Other independent factors include but are not limited to physicians exercising their independent medical judgment in prescribing opioids, opioid users' actions, illegal drug trafficking, patients and insurers failing to fully pay for services, and the financing mechanisms of modern healthcare.  FAC at ¶ 1094. The Court would also have to consider the change in opioid usage in the event Defendants did not misrepresent the addictiveness and health risks of opioids. *Ass'n of Washington Pub. Hosp. Districts*, 241 F.3d at 703. Calculating the extent to which the various factors caused Plaintiff's injury "would entail considerable speculation" which weighs heavily against Plaintiff.  *Id.* at 702-03.

As to third factor, it is highly likely that double recovery would occur.  As expressly pleaded in Plaintiff's complaint, numerous opioid cases have been filed and settled including by opioid users and governmental entities. Allowing this case to proceed would "require complex rules for apportioning damages between potential plaintiffs removed from the alleged wrongdoing by different levels of injury, as well as create a very real possibility of duplicative recoveries against the defendants. The need for complex rules apportioning damages arises because other indirectly injured parties might also sue. As a result, courts would be required to allocate damages among various classes of directly and indirectly injured parties who are removed from the alleged torts by varying degrees and would be required to do so in a manner that protects the [opioid]

industry from being held repeatedly liable for the same alleged wrongdoing." *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1075 (D.C. Cir. 2001) (tobacco RICO case).  For example, Plaintiff would have to demonstrate how many opioid users would have not used opioids prescribed by doctors if neither the users nor doctors were given fraudulent material, how much healthier the users would have been, and the savings the hospital would have realized by not treating the opioid users. *See Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 441 (3d Cir. 2000). Here, there is no "need to grapple with [such] problems," since any "directly injured victims[*i.e.*, hospital patients injured by opioid use] can generally be counted on to vindicate the law" by suing in their own right. *Holmes*, 503 U.S. at 269-70.

Thus, the *Holmes* factors weigh toward finding that Plaintiff's alleged injury is too remote from the Defendants' wrongful conduct.

Opioid over-purchase injury.  Aside from the above long list of treatment related injuries, Plaintiff also asserts that it was injured by purchasing opioids from Defendants.  FAC at ¶¶ 1101, 1102(d).  Defendants argued that there was no proximate causation for this alleged injury. Plaintiff does not specifically argue in its response that there is proximate causation for the alleged injury of selling opioids directly to the hospital. *See* Response, Doc. 234 at 100-110. On this basis alone, the Court finds this argument conceded and declines to *sua sponte* analyze whether there is proximate caution for the direct sale of opioids.[5]

---

[5] Courts routinely deem an issue "waived" when a party fails to respond to a movant's substantive argument. *See, e.g., Rock Roofing, LLC v. Travelers Cas. & Sur. Co.*, 413 F. Supp. 3d 1122, 1128 (D.N.M. 2019) (plaintiff's failure to respond to defendant's argument waived the issue); *Zane v. Kramer*, 195 F. Supp. 3d 1243, 1256 (W.D. Okla. 2016) (plaintiff waived claim where he did not respond to argument raised in defendants' summary judgment motion); *Palmer v. Unified Gov't of Wyandotte Cty./Kan. City, Kan.*, 72 F. Supp. 2d 1237, 1250–51 (D. Kan. 1999) ("[T]he court deems plaintiff's failure to respond to an argument raised in defendants' papers tantamount to an express abandonment of any such claim."). Here, each of the Defendants argued that there was no proximate causation for the injury of direct sale of opioids to Plaintiff.  Defendant did not address

Alternatively, only if the Court is required to analyze whether Plaintiff plausibly alleged proximate causation for the sale opioids directly to the hospital (without specific argument by Plaintiff), the Court finds there is a lack of proximate causation. Plaintiff alleges that it has purchased and *continues* to purchase opioids marketed and sold by Defendants. FAC at ¶¶ 1101, 1102(d). Plaintiff alleges that Defendants marketed their opioid products directly to Plaintiff and other hospitals. Plaintiff appears to assert a fraudulent marketing campaign, which is subject to Rule 9(b)'s heightened pleading standard. Plaintiff pleaded that had it known about the risks of opioids, it would not have purchased opioids in the amounts it did. The Court concludes that Plaintiff has failed to allege a plausible injury or causation as to the direct sale of opioids for each of the following alternate and independent reasons.

*First*, the opioid purchasing injury suffers from the same deficiencies identified above, and is merely another form of treatment for patients' personal injuries. Plaintiff did not consume the opioids, but instead used them to treat patients. Doc. 234 at 107 (explaining that it prescribed opioids to its patients and purchased opioids to treat patients). The injured party would be the patient, not the hospital. *Sidney Hillman Health Ctr.*, 873 F.3d at 576 ("initial losers from the promotional scheme" were patients whose "health and financial costs c[a]me first in line temporally," not subsequent payors). Therefore, the direct victim is the patient to whom Plaintiff prescribed or dispensed the opioids, not the Plaintiff.

---

this argument. Doc. 234 at 100-110; *See* Reply, Doc. 241 at 14 (noting that Plaintiff did not address defendants' argument on direct purchase of opioid injury); *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007)("As we have frequently noted, we are loath to reverse a district court for refusing to do the litigant's job."). Although the Court recognizes that Plaintiff was tasked with responding to numerous arguments raised by the Defendants, Plaintiff is ultimately responsible as it filed a 300-page complaint against numerous defendants for alleged unlawful actions spanning 30 years.

*Second,* in the alternative, Plaintiff did not allege any loss or injury resulting from purchasing the opioids to treat patients, such as a financial loss. Plaintiff did not allege that it paid for opioids and used them in treating patients, but was unreimbursed. Plaintiff did not allege it suffered any loss, or was otherwise injured, such as in using the opioids. Plaintiff does not allege that it administered these medications for free or failed to recover the purchase cost of the medication. Generally, Plaintiff asserts it was reimbursed for its costs. FAC at ¶¶ 20, 1093, 1094, 1096.

*Third,* alternatively, Plaintiff does not identify which of the remaining defendants sold the opioids to it or directly marketed the opioids to it. *See* FAC at ¶1101. Because of this group pleading, there is insufficient factual detail to tell whether any defendant currently in the case or any enterprise member sold the opioids to Plaintiff, and whether their alleged illegal acts proximately caused Plaintiff to purchase the opioids from them or an enterprise member. For example, Plaintiff expressly pleads that the retail pharmacy defendants self-distributed opioid medication to their own retail stores and sold opioids to consumers, not hospitals. FAC at ¶¶ 113, 115, 664. Plaintiff does not allege that Defendant Schein sold opioids to it or marketed opioids to it. *See* Doc. 207 at 23 n. 15; FAC at ¶¶ 611-26. Finally, Plaintiff does not allege that any of the remaining manufacturer Defendants, Hikma or Indivior, sold or marketed opioids to it. Even assuming defendants may be liable without having sold opioids to Plaintiff (which plaintiff did not argue in its response section on proximate causation, Doc. 234 at 100-110), the Court finds that Plaintiff has not pointed to sufficient facts to plausibly allege that a defendant or enterprise member directly marketed and sold opioids to it.

*Fourth,* alternatively, Plaintiff summarily asserts that Defendants *directly* sold and marketed opioids to it. FAC at ¶ 1101. But it does not plead any facts to support a fraud claim

under Rule 9(b).  *See* FAC at ¶1101. Moreover, its response does not cite to factual allegations in

the complaint which satisfy the Rule 9(b) standard.  *See* Response, Doc. 234 at 100-110.

*Fifth,* alternatively, Plaintiff failed to show but-for causation for its opioid purchase injury.

Plaintiff expressly alleged that it continues to purchase opioids even after knowing of the

misrepresentations.  FAC at ¶ 1101.  Even assuming that reliance is not an element of mail fraud

under a civil RICO claim, the affirmative pleading of a lack of reliance may still vitiate proximate

cause.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658, 128 S. Ct. 2131, 2144, 170 L.

Ed. 2d 1012 (2008) (examining first-party reliance as to mail or wire fraud claim asserted in a civil

RICO action).  It is well-established that one "who claim[s] that false advertising injured them"—

but "continue[s] to pay" for the promoted medication—is "neither" a "victim[] of the allegedly

false advertising" nor "injured by reason of" that advertising. *Teamsters Loc. 237 Welfare Fund v.*

*AstraZeneca Pharms. LP*, 136 A.3d 688, 696 (Del. 2016).

Therefore, for each of these alternate reasons, Plaintiff's over-purchase injury theory also

fails.

Generally, Plaintiff alleges that it was not sufficiently compensated for treatment of opioid

patients by private insurance and government programs. However, to the extent Plaintiff argues

that it was injured by patients not paying for treatment and medical services, including opioids

provided by the Plaintiff, and seeks compensation from the Defendants for these unpaid medical

bills, its claim still fails on proximate causation grounds. The Court believes compensation for

unpaid medical bills in this case would be too indirect and would result in a complicated remedial

scheme to adequately apportion damages between patients and hospitals.  *See, e.g., in re Nat'l*

*Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 769 (N.D. Ohio 2020). "If hospitals are damaged

by patients not paying their medical bills, their remedy… should be to seek compensation from the patients who are not paying those bills." *Id.*

Finally, in the alternative, the Court notes that the proximate cause directness analysis is complicated by several independent or intervening causes. Plaintiff has pleaded multiple intervening and independent causes, including prescribing by doctors exercising medical judgment, the criminal conduct of drug dealers and pill mills, the failure of third parties to fully pay for the cost of medical treatment, and the choices of opioid users. FAC at ¶¶ 209, 220, 285, 526, 618, 653, 866, 793, 841, 909, 1105, 1171. For example, the Second Circuit held that physician prescription cuts the causal chain, even when a physician is fed misleading information by the manufacturer. *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 90 (2d Cir. 2015). Here, Plaintiff affirmatively pleaded that Defendants were not the only source of medical information to prescribers. As explained above in the statute of limitations analysis, Plaintiff pled that for many years medical literature had exposed the addictiveness and dangerousness of opioids. Moreover, Plaintiff affirmatively pleaded the existence of criminal markets and pill mill prescribers who unlawfully prescribed opioids. *See Henry v. Merck & Co., Inc.*, 877 F.2d 1489, 1495 (10th Cir. 1989) ("When the intervening act is intentionally tortious or criminal, it is more likely to be considered independent."). This intervening causes cut the causal chain. Even assuming these are not independent or intervening events sufficient to cut the causal chain, they are expressly pleaded steps which further attenuate the directness of Defendants' misconduct to Plaintiff's losses.

Therefore, for the many alternate reasons stated above, Plaintiff has failed to plausibly allege proximate causation.

**B.    Alternatively, Plaintiff's alleged injuries are generally derivative of personal injuries and are not injuries to business or property.**

RICO requires that the Plaintiff be "injured in [its] business or property."  18 U.S.C. § 1964(c). It thus excludes claims for personal injuries, including pecuniary losses flowing therefrom, or losses which are derivative of personal injuries. *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 564 (6th Cir. 2013); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 885 (10th Cir. 2017) (recognizing that civil RICO claim may not be asserted for personal injuries.); *Ryder v. Hyles,* 27 F.4th 1253, 1257 (7th Cir. 2022); *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988) ("[T]he ordinary meaning of the phrase 'injured in his business or property' excludes personal injuries, including pecuniary losses therefrom."); *Magnum v. Archdiocese of Phila.*, 253 F. App'x 224, 227 (3d Cir. 2007) ("losses which flow from personal injuries are not property under RICO"). Courts have rejected RICO claims for "pecuniary losses flowing from a non-cognizable injury." *Bowen v. Adidas Am., Inc.,* 84 F.4th 166, 178 (4th Cir. 2023). As explained above, Plaintiff's alleged injuries flow from treating personal injuries suffered by third parties.  Plaintiff seeks further compensation for treating these personal injuries.  Thus, Plaintiff fails to state a claim as its claims are generally derivative of personal injuries, and are not injuries to business or property.

**IV.    <u>Statute of Limitations bars this action</u>.**

Alternatively, assuming Plaintiff had plausibly alleged proximate causation and a cognizable injury, it is clear on the face of the complaint that the claim against the thirty-year alleged enterprise violates the statute of limitations.  Moreover, Plaintiff did not plausibly allege that the statute of limitations should be tolled, such as under a fraudulent concealment theory.[6]

---

[6] Plaintiff did not argue that any other tolling theory applied besides fraudulent concealment. *See* Doc. 234 at 113. The Court therefore assumes other tolling theories do not apply.

**A.    Statute of limitations violation is clear on the face of the complaint.**

Even assuming Plaintiff had plausibly alleged causation and an injury, Plaintiff's claims are barred by the statute of limitations. Despite alleging a thirty-year RICO enterprise, Plaintiff did not file this case until October 16, 2023.  As noted below, RICO claims have a four-year statute of limitations. The Court concludes that the statute of limitations clearly began running before October 16, 2019.

 "Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss when the dates given in the complaint make clear that the right sued upon has been extinguished." *Torrez v. Eley*, 378 F. App'x 770, 772 (10th Cir. 2010); *Aldrich v. McCulloch Props., Inc.,* 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980).

A civil federal RICO action is subject to a four-year limitations period. *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008). Plaintiff filed this case on October 16, 2023. Publix, Giant Eagle, and Schein assert that the claims against them were not asserted until the Amended Complaint was filed on March 15, 2024, and the claims are only timely if the statute of limitations began to run after March 15, 2020.  Plaintiff does not dispute this assertion in its response or argue any relation back theory applies. Defendants assert that Plaintiff's claim accrued more than four years prior to those dates, and the limitations period for the RICO claim ran before this case was filed. *See, e.g.,* Doc. 212 at 39.

Generally, a claim accrues when the injury occurs, whether or not it is discovered (the "injury-occurrence rule").  *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1275 (10th Cir. 2014). In "exceptional" cases, a claim may accrue when the Plaintiff knew of the injury or should have known of the injury in the exercise of reasonable diligence (the "injury-discovery rule").  *Id*.; *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008). Here, the Tenth

Circuit has not yet decided which rule applies in civil RICO cases. *Id.* Under either rule, the Court concludes that Plaintiff's civil RICO claim accrued prior to October 16, 2019.

The injury-discovery rule only " 'protects plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing a causal link between the injury and [the cause of the injury] are in the control of the tortfeasor or otherwise not evident.' " *Bayless,* 749 F.3d at 1242 (quoting *Plaza Speedway,* 311 F.3d at 1267) *quoted in Kirchhefer*, 764 F.3d at 1277. Here, Plaintiff has not argued or explained why the injury-discovery rule should apply here, or explained why this is an "exceptional case" meriting the application of the injury discovery rule. Therefore, the Court will apply the default injury-occurrence rule.

"The Supreme Court defined a civil RICO 'injury' as the 'harm from the predicate acts' that constitute racketeering activity." *Kirchhefer*, 764 F.3d at 1277–78, *quoting in part Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495, 87 L.Ed.2d 346 (1985). A RICO predicate act includes "any act which is indictable under ... section 1343 (relating to wire fraud)," as well as the felonious manufacturing or dealing in a controlled substance, or dealing in a controlled substance which is chargeable under state law. 18 U.S.C. § 1961(1)(A), (B), (D). Discovery of an "injury" requires only knowledge of the harm resulting from the predicate act, not *who* has committed the harm. *Kirchhefer*, 764 F.3d at 1277–78.

Here, the complaint is clear that the injury occurred well before October 2019. Plaintiff alleges a thirty-year RICO enterprise (1) designed to misrepresent the safety, addictiveness, and efficacy of opioids to increase opioid sales generally and (2) which failed to implement adequate suspicious order monitoring systems to limit diversions and the filling of illegitimate prescriptions. Plaintiff alleges Defendant committed the following predicate acts: (1) mail or wire fraud; (2)

violation of the Federal Controlled Substance Act, and (3) violation of the New Mexico Controlled Substances Act.

Plaintiff alleges it suffered a loss or injury due to the increased costs of treating opioid patients. It alleges that treating opioid patients is more complex and expensive, but those increased expenses are not reimbursed by insurers or governmental programs. This results in a decrease in the realization rate or an increase in the unreimbursed costs of treating opioid patients. Plaintiff also alleges that it purchased a greater quantity of opioids from defendants as a result of the misrepresentations. Plaintiff alleges these injuries were caused by the Defendants' (1) misrepresentations regarding the safety, efficacy, and addictiveness of opioids and (2) failure to implement or effectively operate suspicious order monitoring systems.

Plaintiff clearly pleaded on the face of the complaint that both its injuries and losses, as well as the cause of those injuries or losses, occurred well before October 2019. As explained below, Plaintiff listed numerous misrepresentations before October 2019 by the Defendants which allegedly increased the market for opioids. Moreover, Plaintiff's losses coincided with the purchase of opioids and the treatment of opioid patients, which occurred before October 2019. Therefore, under the injury-occurrence rule, it is clear that injuries occurred well before October 2019.

Alternatively, even assuming the Court were required to apply the injury-discovery rule, the Court concludes that a hospital corporation exercising reasonable diligence would have discovered the injury prior to October 2019. "[A] plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable [plaintiff] of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury." *Kroenlien Trust,* 764 F.3d at 1280, *quoting Mathews,* 260 F.3d at 251 & n. 15; *see also Sterlin v. Biomune Sys.,* 154 F.3d 1191,

1201 (10th Cir.1998) (noting that the limitations period in securities fraud actions begins to run "once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud"). "The plaintiff need not discover *all* elements of the fraudulent scheme to be on notice of the potential of fraud." *Kroenlien Tr.,* 765 F.3d at 1279-80; *See Ebrahimi v. E.F. Hutton & Co.,* 852 F.2d 516, 523 (10th Cir.1988) ("Inquiry notice is triggered by evidence of the *possibility* of fraud; it does not require full exposition of the fraud itself." (emphasis added) (citations omitted)).

"Once a plaintiff has inquiry notice of facts that would suggest to a reasonable person that he has been injured, the plaintiff has a duty to commence a diligent investigation concerning that injury." *Kroenlein Tr.,* 764 F.3d at 1280, *citing Dodds v. Cigna Sec.,* 12 F.3d 346, 350 (2d Cir. 1993) ("[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." (citations and internal quotation marks omitted)); *see also Arvayo,* 766 F.2d at 1421–22 ("[O]nce the plaintiff [is] informed as to the probable connection between his [injury] and [its cause]," the burden is on the plaintiff to "discover not only whether [defendants] breached a duty to him, *but also to discover in the first instance whether there was a causal connection between their actions, or inactions, and his injury*." (citations omitted)) (emphasis added).

When a RICO plaintiff "does begin or has begun to inquire once the duty arises," the court must determine "when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date. But when a RICO plaintiff makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (10th

Cir. 2014) (internal citation and quotation mark omitted). Moreover, "to know you've been injured and make no effort to find out by whom is the very laxity that statutes of limitations are designed to penalize." *Id.*, *quoting Cancer Found., Inc. v. Cerberus Capital Mgmt., LP,* 559 F.3d 671, 676 (7th Cir.2009).

The injury-discovery rule does not require that a plaintiff have sufficient knowledge to identify all elements of the claim. Discovery of an injury only requires knowledge of the harm, not who committed the harm. *Kroenlien Trust,* 764 F.3d at 1278. Moreover, Plaintiff need not have discovered a pattern of racketeering activity. *Id.*

Plaintiff asserts it was injured by increased costs from treating patients with opioid-related conditions, and it was injured because it bought opioids at greater volumes due to the Defendants' misrepresentations.

As recounted below, Plaintiff pleaded on the face of the complaint facts that demonstrate it should have discovered the injury well before October 16, 2019. Plaintiff expressly pled that opioid prescriptions increased beginning years or decades before 2019. *See, e.g.*, *id.*, ¶ 15 (noting that "[t]he rise in prescription opioid overdose deaths started in the *1990s*") (emphasis added); *id.* ¶ 17 (citing a study from *2015* documenting the link between prescription opioids and opioid use disorder); *id.* ¶ 244 (referencing a *2013 FDA* letter that acknowledged a "positive association between high-dose opioid use and risk of overdose and or/ overdose mortality"); *id.* ¶ 250 (discussing the conditions associated with opioid use and citing studies from *2014* or earlier); *id.* ¶ 617 (referring to a 2016 report that found that "[o]pioid pain reliever prescribing has quadrupled since *1999* and has *increased in parallel* with [opioid] overdoses") (emphasis added); *id.* ¶ 1100 (estimating that 1.5 million persons went to the ER in *2017* with issues relating to opioid use disorder).

Plaintiff pleaded that its increased operational costs or losses, and purchasing of opioids, coincided with the increased opioid prescriptions. *Id.* at ¶ 1093 (alleging that operational losses coincided with increased supply of prescription opioids); *see also id. at* ¶ 19 (citing a 2018 study for the proposition that substance abuse issues impose health care costs on hospitals like Plaintiff's). Plaintiff cited to three studies issued before 2019 demonstrating the greater workload and complexity of opioid-dependent patients. FAC at ¶ 1092. Plaintiff alleged that it must expend more resources to treat opioid-dependent patient. It alleges that the ratio of payments received to charges billed is lower for opioid-dependent patients. FAC at ¶ 1093. Plaintiff alleges that the financing mechanisms of health care sets rates for types of treatment. If a treatment for a patient suffering from OUD is more complicated or expensive than for other patients, then realization rates decline. FAC at ¶ 1094. Plaintiff alleges that a hospital is funded generally by fixed fees for particular treatments, whether that patient suffers from OUD or not. *Id.*

Moreover, an entity has the duty to check its books and notice any discrepancies or losses. *See, e.g., Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (10th Cir. 2014) (a plaintiff had inquiry notice by the fall of 2005 based on discrepancies in the statements, invoices, and beer sales, even if he did not know he was the victim of theft, and a reasonable inquiry would have revealed that the losses were due to theft).

Additionally, Plaintiff expressly pled facts which assert that Defendants' misrepresentations occurred before 2019. It also pleaded facts which should have alerted a reasonably diligent entity to the misrepresentations before October 2019. As explained below, (1) Governmental reports, (2) Governmental enforcement actions (i.e., civil and criminal actions against enterprise members), (3) published news articles, and (4) putative class actions asserting these same claims on behalf of hospitals, all expressly stated before 2019 that certain opioid

manufacturers or distributors misrepresented the efficacy, safety, or addictiveness of opioids, or otherwise violated the CSA. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) ("It is unremarkable that courts consider the extent of media coverage in deciding when inquiry notice for securities fraud claims was triggered."); *Rochelle v. Marine Midland Grace Trust Co.,* 535 F.2d 523, 532 (9th Cir.1976) ("Information in public records or published by the news media may be so massive that investors will not be heard to say that they remained ignorant of the financial plight of the corporation involved...."); *Sterlin v. Biomune Sys.,* 154 F.3d 1191, 1204 (10th Cir. 1998) ("The district court correctly ruled that the *Barron's* article, as a whole, created sufficient "storm warnings" to put a reasonable investor on notice of the possibility of fraudulent activity.").[7] These inquiry notice cases are clear that published reports regarding government action may be considered as establishing inquiry notice. *Sterlin*, 154 F.3d at 1197.

As explained below, a reasonably diligent hospital would have recognized, based on this publicly available information, that it purchased opioids from defendants based upon misrepresentations of defendants. In other words, a reasonably diligent hospital would have discovered (1) the injury (purchasing unnecessary opioids) and (2) the cause of that injury (defendants' misrepresentation regarding the safety and addictiveness of opioids) well before October 2019. At the very least, this was sufficient for Defendants to begin investigating the possibility of fraud.

Plaintiff alleges that Defendants engaged in an enterprise beginning in the 1990s. FAC at ¶1171(1)(b). Defendants intentionally engaged in a misinformation campaign that opioids were

---

[7]  In applying inquiry notice to the statute of limitations in civil RICO cases, the Tenth Circuit expressly applies case law from securities actions involving inquiry notice, including *Sterlin*. *See Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (10th Cir. 2014). Therefore, the Court assumes it is appropriate to apply those securities cases involving inquiry notice as well.

safe and effective in treating chronic pain in order to increase overall opioid sales. *See* FAC at ¶¶ 221, 222. By 2003, the DEA found that Purdue's aggressive methods exacerbated Oxycontin's widespread abuse, and Purdue had deliberately minimized the risks associated with the drug. FAC at ¶ 4(g). This was recited in a New Yorker article published in 2017. *Id.* at n.3.

The rise of prescription opioid overdose deaths started in the 1990s. *Id.* at ¶ 15. In an article published in 2017, opioid misuse following a prescription of opioids for chronic pain was between 2%-20% and addiction was between 8% to 12%. FAC at ¶ 17. In a 2014 article, 75% of heroin users reported that their initial drug use was through prescription opioids. FAC at ¶ 18. In a 2016 study, approximately half of people receiving opioids long term in a primary care setting struggled with addiction. FAC at ¶ 208.

Plaintiff listed eleven alleged misrepresentations in its complaint. Plaintiff expressly alleged that most of these statements were exposed as false in published studies or other published articles before 2019. *See* FAC at ¶¶ 223-275. For example, Plaintiff alleged that Defendants' misrepresentation regarding doctor-shopping patients was rebutted in a 2014 article. FAC at ¶ 238. Moreover, in 2013 the FDA exposed the danger high-dose opioids posed over lower doses. FAC at ¶ 244. In 2009 and 2016, it was published that opioid patients' long-term function, including their general health, mental health, and social functioning declined, and opioids fail to control pain. FAC at ¶¶ 247, 248. Between 2013 through 2016, it was exposed that opioids have risks which are greater than NSAIDS, such as hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness, neonatal abstinence, and fatal interactions with alcohol. FAC at ¶¶ 249-250. The CDC published guidelines in 2016 stating that no studies supported the assertion that abuse-deterrent formulations were safer. FAC at ¶ 255.

In 2018, a United States Senate committee published a report noting that ostensibly neutral front groups overstated the benefits and understated the risks of using opioids to treat chronic pain. FAC at ¶ 291. In that published report, a 2017 Senate investigation found that manufacturing defendants paid millions of dollars' worth of contributions to these various groups. FAC at ¶ 294.

In 2017, the National Institute of Heath issued a report on how drug marketing influences prescriptions. FAC at ¶ 611. Citing to 2015 and 2016 studies, Plaintiff alleged that increasing number of opioid prescriptions led to increased rates of opioid misuse because there is a parallel relationship between availability of prescription opioids, the diversion or abuse of these drugs, and associated adverse outcomes. Thus, the opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications." FAC at ¶ 615. Citing to a 2016 CDC report, Plaintiff alleged that an increase in prescriptions leads to increased rates of overdose. FAC at ¶ 617. The CDC concluded that reining in prescription opiates for chronic pain is critical to reverse the opioid epidemic. In a 2018 congressional hearing, Mckesson's CEO admitted that it should have identified issues with abuse and diversion in supplying certain pharmacies. FAC at ¶ 758. In 2013, the DEA announced that Walgreens filled customer prescriptions that it knew or should have known were not for legitimate medical use. FAC at ¶ 834

Plaintiff alleged in detail numerous DEA and government enforcement actions against various alleged enterprise members, all of which occurred and were publicized years before October 2019. FAC at ¶¶ 896-946.

In 2007, enterprise member Purdue pleaded guilty to misbranding Oxycontin, with the intent to defraud or misled, and marketing Oxycontin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance. FAC at ¶¶ 471-473.

Plaintiff alleged that its expenses or injuries were incurred while treating opioid patients, which began in the late 1990s. Plaintiff, a sophisticated corporation, knew this through the lower realization rate. FAC at ¶¶ 1093, 94. Moreover, the complaint cites to articles published before 2019 noting the increased costs of treating patients. *Id.* at ¶¶ 19, 1092.

Moreover, a putative class action was filed in November 2017 involving hospital-plaintiffs asserting a RICO claim on behalf of hospitals which treated opioid patients. *Sw. Miss. Reg'l Med. Ctr. et al. v. AmerisourceBergen Drug Corp., et al.*, No. 5:17-CV-145-KS-MTP, ECF No. 1 (S.D. Miss. Nov. 30, 2017). That case was transferred to a multi-district litigation case. Conditional Transfer Order, *Sw. Miss. Reg'l Med. Ctr. et al. v. AmerisourceBergen Drug Corp., et al.*, No. 5:17-CV-145-KS-MTP, ECF No. 1 (J.P.M.L. Dec. 12, 2017). Another hospital in New Mexico filed suit in 2019. *See Lovelace Health System, Inc. v. Purdue Pharma L.P., et al.*, 1:19-op-45458-DAP (N.D. Ohio June 14, 2019). The New Mexico Attorney General filed an opioid lawsuit in 2017 against Purdue Pharma and others styled: *State of New Mexico, Ex Rel., Hector Balderas, Attorney General v. Purdue Pharma L.P., et al.*, Case No. D-101-CV-2017-02541 (First Judicial District Court for the County of Santa Fe, New Mexico). These cases clearly placed Plaintiff on inquiry notice of its claims, or alternatively, demonstrate that Plaintiff should have been aware of its claim prior to October 16, 2019.

In sum, based on Plaintiff's own allegations, it was known well before October 2019 that opioids were addictive and dangerous, and a reasonable hospital buying opioids to use in patient treatment would know that defendants had misrepresented the safety, efficacy, and addictiveness of opioids before October 2019. A reasonable hospital would have investigated its injuries before October 16, 2019. *See Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1281 (10th Cir. 2014) ("The standard is an objective one, and a reasonable business owner equipped

36

with the knowledge of loss would undertake an investigation to determine the cause of loss instead of waiting almost two years to take any action at all."). Whether or not Plaintiff knew facts supporting every element of a RICO claim, it knew or should have known though the exercise of reasonable diligence that it was injured by the misrepresentations regarding opioids well before October 2019. The statute of limitations begins running even if Plaintiff did not know who exactly was responsible for its injuries or whether there was a pattern of racketeering activity.

**B. Separate accrual rule does not apply here.**

Despite the clear violation of the statute of limitations above, Plaintiff asserts that the statute of limitations period began running after October 16, 2019 under the separate accrual rule, as some predicate acts occurred after that date. The Court disagrees.

The Court notes that Plaintiff does not expressly argue that the continuing violation rule applies here, and instead argues that the separate accrual rule applies. *See* Pl.'s Resp., Doc. 234 at 112. Plaintiff also does not argue that the continuing conspiracy exception applies here. Moreover, Plaintiff does not allege that its allegations "are based on information acquired only in recent years" *Dummar*, 543 F.3d at 622. Therefore, the Court will only analyze the separate accrual rule and assumes these other rules or exceptions do not apply here.

Plaintiff argues that "a pattern of RICO activity causes a continuing series of separate injuries", meaning that the "separate accrual" rule applies for each injury. Pl.'s Resp., Doc. 234 at 112. Plaintiff does not allege that the injuries it suffered after October 16, 2019 are separate or distinct from the injuries it suffered before October 16, 2019.

"[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90, 117 S. Ct. 1984, 1990–91, 138 L. Ed. 2d 373 (1997) (analyzing

RICO statute). "Similarly, some Circuits have adopted a "separate accrual" rule in civil RICO cases, under which the commission of a separable, new predicate act within a 4–year limitations period permits a plaintiff to recover for the additional damages caused by that act. But…the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.*

First, Plaintiff failed to plausibly plead that Defendants committed a predicate act after October 16, 2019. Plaintiff does not identify in its response with specificity what predicate act, done by which defendant, occurred in October 2019 or thereafter. Because Plaintiff has asserted a 300-page complaint with approximately 1200 factual paragraphs, the Court declines to search the record on Plaintiff's behalf. Plaintiff does not point to any plausibly pled predicate acts occurring in the limitations period and the Court declines to apply the separate accrual or continuing violation rules.

Rather, Plaintiff pled that the vast majority of alleged illegal acts or misrepresentations by the defendants occurred well before 2019 and stopped well before 2019. For example, Plaintiff alleges unlawful distribution activity by CVS and Walgreens until 2014, by Albertsons until 2016, and by Walmart until 2018. FAC at ¶¶ 664, 775–90, 807.

Second, even if Plaintiff had shown a predicate act occurred after October 16, 2019, this would not restart the limitations clock. Almost all of the alleged predicate acts in this case occurred well before 2019. Any acts occurring in or after 2019 do not appear to be independent acts. In *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, the Tenth Circuit held that a civil RICO claim filed in August 2011 was time-barred even though the predicate acts (theft of merchandise) continued into the four-year limitations period. 764 F.3d at 1271-73, 1280-81.

Therefore, Plaintiff has not shown that the separate accrual rule should apply here.

**C. Plaintiff does not plausibly plead or argue tolling pursuant to fraudulent concealment.**

Plaintiff argues that the statute of limitations was tolled due to fraudulent concealment.  As explained below, the Court concludes that Plaintiff has not demonstrated that equitable tolling for fraudulent concealment is appropriate here. Equitable tolling for fraudulent concealment requires "(1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action." *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1281–82 (10th Cir. 2014)*, quoting Dummar,* 543 F.3d at 621 (citations omitted). The Plaintiff must show that the defendants prevented it from "knowing [an] element of [its] RICO claim." *Id.* at 622.

Generally, a plaintiff has no burden to plead allegations rebutting affirmative defenses, such as statute of limitations defenses.  However, where the statute of limitations violation is clear on the face of the complaint, Plaintiff bears the burden of establishing a factual basis for tolling or estoppel. *Chrisco v. Holubek*, 711 F. App'x 885, 888 (10th Cir. 2017), *citing Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980) ("While the statute of limitations is an affirmative defense, when the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute.") (citations omitted); *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1282 (10th Cir. 2014) (although resolved on summary judgment, the Tenth Circuit noted that "Kroenlein did not plead allegations of fraudulent concealment in its complaint, but even if it had, it would have been futile."); *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008) ("Dummar has made no attempt on appeal to show that he pleaded the elements of fraudulent concealment.").

*Aldrich* held that a plaintiff bears the burden of pleading a factual basis for tolling the statute where, as here, the statute limitations violation is clear on the face of the complaint. *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980).

Plaintiff does not expressly plead in its complaint that fraudulent concealment should toll the statute of limitations or plead facts that demonstrate tolling is appropriate. Moreover, Plaintiff's response brief does not analyze the fraudulent concealment factors or demonstrate that it satisfied these factors in its complaint. *See* Doc. 234 at 111-113. On this basis alone, the Court denies Plaintiff's fraudulent concealment tolling argument.

Plaintiff broadly cites to the First Amended Complaint as evidence it plead fraudulent concealment. FAC at ¶¶ 948-1086, 1171-94. This falls short of carrying its burden. Plaintiff's argument does not explain how Defendants prevented them from knowing an element of the claim. Moreover, none of these cited allegations address fraudulent concealment tolling the statute of limitations. Plaintiff does not allege that Defendants successfully concealed the fraud. Moreover, Plaintiff does not plausibly allege successful concealment through October 2019, as Plaintiff has expressly alleged that the dangers of opioids were publicly known well before October 2019.

Even assuming Plaintiff pleaded successful concealment by the defendants, Plaintiff does not at all allege that it acted diligently or that through the exercise of due diligence it could not have known it might have a cause of action. *See, e.g., Dummar v. Lummis*, 543 F.3d 614, 623 (10th Cir. 2008) (noting that plaintiff "has also not alleged the due diligence necessary to satisfy the third element. The Complaint is completely silent as to any efforts that [plaintiff] made to uncover his cause of action during the first 26 years after the probate trial."). Here, as in *Dummar,* the complaint appears to be completely silent on Plaintiff's due diligence or efforts made to uncover the cause of action. Plaintiff does not cite in its response to which allegations in the 300-page

complaint demonstrates it acted diligently. *See* Pl.'s Resp., Doc. 234 at 110-114. Considering Plaintiff's allegations span over thirty years, "[t]he absence of an allegation regarding how and when [Plaintiff] learned of the alleged misconduct forecloses a claim that [the Defendant's] fraudulent concealment prevented [Plaintiff] from discovering [the Defendant's] involvement until … four years before filing suit." *Dummar*, 543 F.3d at 622. Plaintiff also did not allege that its allegations "are based on information acquired only in recent years." *Id.* at 622-23.  On this basis alone, Plaintiff failed to carry its burden to plausibly plead fraudulent concealment.[8]

**V.    Plaintiff did not plausibly allege that each Defendant committed predicate acts to support liability under § 1962(c).**

Alternatively, Plaintiff has not plausibly alleged a pattern of racketeering activity by each defendant, *i.e.* that each defendant committed two or more predicate acts, to support a civil RICO claim under § 1962(c).

"Racketeering activity" generally consists of the criminal offenses listed in 18 U.S.C. § 1961(1). A "pattern" involves two or more acts, sometimes called "predicate acts," of racketeering activity, "the last of which occurred within ten year… after the commission of a prior act of racketeering activity." *Id.* § 1961(5).  Plaintiff generally alleges (1) violations of the mail and wire fraud statutes; (2) violations of the federal CSA, including alleged reporting requirements, and (3) violations of New Mexico Controlled Substances Act. Plaintiff did not plausibly allege that each defendant committed two or more predicate acts.

Plaintiff asserts that it need only allege that the *enterprise* committed two or more predicate acts, and it need not show that a defendant itself committed two predicate acts.  In support of that

---

[8] Moreover, as explained above in detail, Plaintiff expressly pleaded allegations suggesting that Defendants' misleading statements or misrepresentations were revealed well before 2019, and Defendants' role in the opioid epidemic was well-known and acknowledged before 2019.

assertion, however, Plaintiff cites to *conspiracy* case law under § 1962(d). The Court disagrees

with Plaintiff. A defendant must commit two or more predicate acts to face liability under §

1962(c). *Salinas v. United States*, 522 U.S. 52, 62, 118 S. Ct. 469, 476, 139 L. Ed. 2d 352 (1997)

(explaining that a substantive RICO claim under § 1962(c) requires that a defendant have

committed two or more predicate acts, but a conspiracy claim under § 1962(d) does not have the

same requirement). To be sure, Plaintiff need not show that each defendant committed a predicate

act to support a conspiracy claim under § 1962(d). *Id.* ("There is no requirement of some overt act

or specific act in the [RICO conspiracy] statute...."). But that is not relevant to whether a defendant

is liable under § 1962(c). The plain language of § 1962(c) states that "[i]t shall be unlawful for any

person… to conduct or participate in the conduct of such enterprise' affairs through a pattern of

racketeering activity." § 1962(c).

Each defendant argued that Plaintiff failed to show they committed a pattern of

racketeering activity. As explained above, the Court will not search the 300-page complaint on

Plaintiff's behalf to determine whether it plausibly asserts a predicate act. Rather, the Court will

consider whether Plaintiff's response demonstrates or cites to portions of the complaint

establishing a predicate act. *See* Pl.'s Resp., Doc. 234 at 21-38 (portion of Plaintiff's response

addressing predicate acts). The Court concludes it does not. As explained below, Plaintiff failed

to plausibly allege that each of the Movants committed a pattern of racketeering activity to support

a civil RICO claim under § 1962(c).

### A.    Mail and Wire Fraud.

Plaintiff alleges that certain defendants committed the predicate act of mail and wire fraud.

Mail and wire fraud under sections 18 U.S.C. §§ 1341 and 1343 may constitute racketeering

activity or predicate acts. *See* § 1961(1)(B). To establish the predicate act of wire fraud Plaintiffs

must allege "(1) the existence of a scheme or artifice to defraud *or* obtain money or property by false pretenses, representations or promises," and (2) the use of interstate wire, radio or television communications in furtherance of the scheme to defraud. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 892 (10th Cir.1991) (emphasis added). *See United States v. Kennedy,* 64 F.3d 1465, 1475 (10th Cir.1995).

Actionable fraud under wire or mail fraud consists of "(1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation… and [7] injury." *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006). "[A] misleading omission also may establish the intent to defraud under the mail and wire fraud statutes." *Clinton v. Sec. Benefit Life Ins. Co., 63 F.4th 1264, 1283* (10th Cir. 2023). Intent may be inferred from a variety of circumstantial evidence, including the defendant's knowledge of false statements. *United States v. Smith,* 133 F.3d 737, 753 (10th Cir. 1997).

"The particularity requirement of Rule 9(b), Federal Rules of Civil Procedure, applies to claims of mail and wire fraud" in a RICO action. *Id.*, *citing Robbins v. Wilkie,* 300 F.3d 1208, 1211 (10th Cir.2002); *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 989–90 (10th Cir.1992); *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1362 (10th Cir.1989) ("thus, we hold that Rule 9(b) requires particularity in pleading RICO mail and wire fraud."). "[B]ecause Fed. R. Civ. P. 9(b) requires a plaintiff to plead mail and wire fraud with particularity, the plaintiff must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016), *quoting in part Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000). A plaintiff asserting "fraud must also identify the purpose of the mailing

within the defendant's fraudulent scheme." *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992). However, under the mail or wire fraud statutes, there is no requirement for first-party reliance. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648-49 (2008); *see also Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirement of 'justifiable reliance' plainly has no place in the mail, wire, or bank fraud statutes") (cleaned up, quoted in *Bridge*).

Plaintiff does not plausibly allege that any of the remaining Movants committed a predicate act of mail or wire fraud.

Plaintiff's prolix pleading makes it difficult to identify specific acts of alleged fraud committed by specific defendants and the circumstances surrounding those alleged acts under Rule 9(b). For some of the alleged fraudulent statements, Plaintiff lumps dozens of companies together. Under these circumstances, this is improper group pleading. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (complaint's use of "the collective term 'Defendants'" made it "impossible" "to ascertain what particular wrongs each defendant is "alleged to have committed."); *George*, 833 F.3d at 1256 (applying Rule 9(b) to mail and wire fraud predicate acts under RICO). For other statements, Plaintiff does not identify which specific defendant uttered the misrepresentation.

<u>Schein</u>.  As to Defendant Schein, Plaintiff's response does not point to any allegations in the complaint which plausibly allege that Defendant Schein committed the predicate act of wire or mail fraud. *See* Response, Doc. 234 at 24-27. Plaintiff does not identify any false statements made by Defendant Schein, much less argue how it plausibly alleged Defendant Schein violated the mail or wire fraud statutes. Plaintiff does not identify the time, place, and contents of the false statements, the identity of the party making the false statements, the consequences thereof, or the injuries resulting from the false statement.  Fed. R. Civ. P. 9(b).

<u>Pharmacy Defendants</u>.  In its response, Plaintiff failed to cite to factual allegations showing with particularity under Rule 9(b) that a Pharmacy Defendant committed wire or mail fraud. *See* Response, Doc. 234 at 24-26 (portion of Plaintiff's response brief addressing alleged mail and wire fraud predicate acts).

Plaintiff cites to statements over several decades, from 1997 to 2019, but for some statements it does not identify in the response who made the statement or how they are attributable to a Pharmacy Defendant.  *See* Doc. 234 at 24-26. Plaintiff does explain how statements plausibly allege the wire or mail fraud elements above.

Plaintiff cites to one statement by Walgreens and two statements by Walmart.  Plaintiff does not cite to any statements by the other pharmacy defendants, such as CVS, Albertsons, Safeway, Giant Eagle, HBC, or Publix.  *See* Doc. 234 at 24-26.

Plaintiff cites to a statement by Walgreens in an April 2011 settlement agreement with the DEA that it would maintain a compliance program to detect and prevent diversion of controlled substances.  Doc. 234 at 25.  Plaintiff points to allegations suggesting that this compliance program failed, but does not demonstrate this statement was false, or show it constituted mail or wire fraud under the standard cited above.

Plaintiff cites to an alleged statement by Walmart in January 2009 in which a spokesperson said that the fine Walmart paid for violating record-keeping regulations was limited to discrepancies in records involving a small number of pharmacies in Texas.  Doc. 234 at 26. Plaintiff fails to explain how this is a false statement, or how this statement constitutes mail or wire fraud. *Id.*

However, Plaintiff cites to a statement by Walmart in a 2019 press release that within the next sixty days it would restrict initial acute opioid prescriptions to a seven-day supply and in

January 2020 it would require e-prescriptions for controlled substances.  Plaintiff plausibly alleged a mail or wire fraud predicate act.

Manufacturing Defendants (Hikma and Indivior).  Plaintiff in its response does not cite to any false or fraudulent statement by Defendants Hikma or Indivior, or argue or explain why any statement should be attributed to them. *See* Response, Doc. 234 at 24-26. Even assuming these third-party statements could be attributable to Hikma or Indivior, Plaintiff failed to plead fraud with particularity under Rule 9(b). Therefore, the Court concludes that Plaintiff has failed to demonstrate that Hikma or Indivior committed wire or mail fraud.

In its response, Plaintiff did not demonstrate that Defendants are liable for the statements of third parties under any theory, including an agency theory.

## B.    Federal Controlled Substances Act.

Plaintiff alleges that Defendants committed the predicate act of "*felonious* manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance… punishable under any law of the United States." § 1961(1)(D) (emphasis added). Plaintiff's response identifies two theories of liability: (1) Defendants violated the reporting requirements to the DEA and (2) Defendants failed to maintain effective suspicious order monitoring systems ("SOM") to identify and halt shipment of suspicious orders. Response, Doc. 234 at 31-38.

Plaintiff asserts that the failure to report suspicious orders is a predicate act under RICO. As explained below, the Court concludes that violation of the reporting requirements of the CSA is not a predicate act under RICO, as it not the felonious manufacturing, selling, or otherwise dealing in a controlled substance punishable under the laws of the United States. § 1961(1)(D). Under 21 U.S.C. § 843(a)(4)(A), it is unlawful for any person to intentionally "furnish false or

fraudulent material information in, or omit any material information from, any application, report,

record, or other document required to be made, kept, or filed under this subchapter or subchapter

II." *Id.* § 843(a)(4)(A). The statute also criminalizes use of a communication facility to facilitate

commission of a drug felony:

> It shall be unlawful for any person knowingly or intentionally to use any
> communication facility in committing or in causing or facilitating the commission
> of any act or acts constituting a felony under any provision of this subchapter or
> subchapter II. Each separate use of a communication facility shall be a separate
> offense under this subsection.

21 U.S.C. § 843(b). Each violation is punishable by "imprisonment of not more than 4 years."

*Id.* § 843(d)(1).

First, the plain language of § 1961(1)(D) does not include as a predicate act the failure to

adequately report suspicious orders under 21 U.S.C. § 843(a)(4). Rather, it states that the felonious

manufacturer, selling, or otherwise dealing in controlled substances punishable by law is a

racketeering activity.

Second, reporting of suspicious orders was not required by statute until 2018, and would

not have constituted unlawful dealing punishable under the laws of the United States. *See, e.g.*

*United States v. Amerisource Bergen Corp.*, No. CV 22-5209, 2023 WL 7311183, at \*18 (E.D. Pa.

Nov. 6, 2023); *United States v. Walmart Inc.*, No. CV 20-1744-CFC, 2024 WL 1051017, at \*2 (D.

Del. Mar. 11, 2024) ("the CSA did not require the Attorney General to promulgate § 1307.04(b)

or any of the reporting requirements set forth in § 1307.04(b). It necessarily follows that the

reporting requirements in § 1307.04(b) were not "required under" the CSA. Thus, a failure to

comply with the reporting requirements of § 1301.74(b) during the Distribution Violations Period

was not unlawful under § 842(a)(5) and did not trigger civil penalties under § 842(c)(1)(B).").

In 2018 and thereafter, distributors were required to "design and operate a system to

identify suspicious orders for the registrant" and "upon discovering a suspicious order or series of

orders, notify" the DEA. 21 U.S.C. § 832(a)(1), (3).  Plaintiff asserts that the knowing failure to

provide accurate suspicious order reports following 2018 is a RICO predicate act.  Plaintiff in its

response does not cite to any plausibly alleged failure to reports after October 24, 2018.  *See* Doc.

234 at 31-38.

Plaintiff appears to assert that failing to halt suspicious orders or shipments of opioids, or

failing to implement effective controls to monitor suspicious orders, constitutes a predicate act.

The Pharmacy Defendants argued in detail that violation of certain regulations does not amount to

*felonious* "drug dealing" to constitute a predicate act. Doc. 208 at 36-48. Plaintiff did not engage

with this argument or demonstrate that violation of certain regulations constitutes the predicate act

of "drug dealing" under the federal CSA sufficient to constitute a predicate act under RICO.  *See*

Doc. 234 at 31-38.  Therefore, for the reasons identified by the Pharmacy Defendants, Plaintiff has

failed to show that the alleged violations of regulations in this case constitute the felonious dealing

of controlled substances.  *See* Pharmacy Defendants' Motion, Doc. 208 at 36-48.

Plaintiff asserts that Defendants unlawfully dispensed opioids.  Knowingly or intentionally

manufacturing, distributing, or dispensing a controlled substance "except as authorized" by the

federal CSA is a violation of the CSA. 21 U.S.C. § 841(a). A prescription for controlled substance

must be issued for a legitimate medical purpose by a practitioner acting in the usual course of their

professional practice, and pharmacists must properly dispense controlled substances.  *United

States v. Otuonye*, 995 F.3d 1191, 1196 (10th Cir. 2021). A person may be held liable for *knowingly*

distributing, prescribing, or dispensing without a legitimate medical purpose or doing so outside

the usual course of professional medical practice.  *United States v. Wilson*, 98 F.4th 1204, 1217–

18 (10th Cir. 2024); *United States v. Wilson*, 98 F.4th 1204, 1217–18 (10th Cir. 2024) (noting that

practitioner "can be prosecuted under § 841 when their activities fall outside the usual course of

professional practice… "or when their prescriptions are not for a legitimate medical purpose.")
(internal citations and quotation marks omitted); *United States v. Otuonye*, 995 F.3d 1191, 1196
(10th Cir. 2021) (referencing regulations and concluding that a "pharmacist violates the CSA by
distributing controlled substances in a manner inconsistent with the usual course of contemporary
medical practice."); *Ruan v. United States*, 597 U.S. 450, 450, 142 S. Ct. 2370, 2371, 213 L. Ed.
2d 706 (2022) (referencing regulations in analysis of whether distribution or dispensing of
controlled substance was authorized).  The Court addresses whether Plaintiff plausibly alleged that
each Movant unlawfully dispensed opioids below.

Schein.  In its response, Plaintiff did not cite to any allegations in its complaint that Schein
unlawfully distributed or otherwise controlled substances in violation of CSA to constitute a
predicate act under § 1961(1)(D)). *See* Response, Doc. 234 at 31-38.  Plaintiff does not cite in its
response to any allegations plausibly alleging that it failed to report suspicious orders.

Manufacturing Defendants (Hikma, Indivior).  In its response, Plaintiff did not cite to any
allegations in its complaint that Hikma or Indivior unlawfully manufactured, distributed or
otherwise dealt in controlled substances in violation of CSA to constitute a predicate act under
1961(1)(D)). *See* Response, Doc. 234 at 31-38. Plaintiff does not cite in its response to any
allegations plausibly alleging that Hikma or Indivior failed to report suspicious orders.

Pharmacy Defendants. In its response, Plaintiff identifies several settlements by CVS,
Walgreens, Walmart, and Albertsons, and Giant Eagle resolving alleged unlawful dispensing.
Doc. 234 at 31-38.  But Plaintiff does not set forth the factual allegations underlying those
settlements for the Court to determine whether the Pharmacy Defendants engaged in felonious
dealing in controlled substances to constitute a predicate act under § 1961(1)(D).  The mere fact
of a settlement does not demonstrate liability for a predicate act.  *See, e.g.,* Fed. R. Evid. 408.

Plaintiff alleges that Defendants failed to implement adequate systems of monitoring suspicious orders. As explained above, the Pharmacy Defendants extensively addressed the interplay of the regulations, whether Plaintiff plausibly alleged a violation of those regulations, and whether the violation of those regulations can constitute felonious dealing under § 1961(1)(D). Doc. 208 at 36-48. Plaintiff did not address those arguments. *See* Pl.'s Resp., Doc. 234 at 32-33 n.51.

Moreover, all of the alleged unlawful dispensing cited in Plaintiff's response as establishing a predicate act (Doc. 234 at 31-38) occurred well before October 2019. The Pharmacy Defendants raised the statute of limitations issue as to these predicate acts, which Plaintiff did not address. Doc. 234 at 31-38.

## C.    New Mexico Controlled Substances Act.

Plaintiff alleges that Defendants committed the predicate act of violating New Mexico's Controlled Substances Act. 18 U.S.C. § 1961(1)(A) defines "racketeering activity" to include any "dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year." Because New Mexico makes it illegal to improperly deal in controlled substances as defined in Section 102 of the Controlled Substances Act, violations of New Mexico's CSA constitute a RICO predicate act. *See* N.M. Rev. Stat. 1978 §§ 30-31-2(E), 30-31-22, 31-18-15. However, Plaintiff has not plausibly alleged that any Defendant violated the New Mexico CSA in New Mexico.

Initially, it appears that the complaint does not even mention the New Mexico CSA or assert that the violation of the New Mexico CSA constitutes a predicate act. The closest Plaintiff comes to is a reference to "state controlled substance laws." FAC at ¶ 1180(e). The Court

concludes that this does not provide "clear notice of the factual basis of [any] predicate acts." *Cayman Expl. Corp.*, 873 F.2d at 1362.

Under New Mexico law, a person unlawfully traffics in a controlled substance if they manufacture, distribute, or sell a controlled substance, or possess a controlled substance with the intent to distribute in a manner not authorized by the state CSA, a violation of which is punishment by more than one year imprison. NMSA §§ 30-31-2-, 31-18-15. Plaintiff has not argued that New Mexico's CSA reach extends outside New Mexico. Rather, Plaintiff has limited its argument to alleged acts within New Mexico. *See* Response, Doc. 234 at 29-31. Therefore, the Court will analyze whether Plaintiff has demonstrated that each defendant violated the statute in New Mexico.

Schein. Plaintiff does not plausibly allege that Defendant Schein violated the New Mexico CSA. Its response does not point to any allegations demonstrating that Schein violated the New Mexico CSA. Doc. 234 at 27-31.

Manufacturing Defendants (Hikma and Indivior). Plaintiff alleges that Defendant Hikma settled claims brought by the New Mexico attorney general that it deceptively marketed its opioid pain medications and failed to monitor or prevent shipment of suspicious orders. Doc. 234 at 31. But Plaintiff does not provide the factual allegations underlying the settlement for the Court to determine whether Plaintiff plausibly alleges a violation of the New Mexico Controlled Substances Act to constitute a predicate act.

Plaintiff cites to no allegations in its response regarding Defendant Indivior. Doc. 234 at 27-31.

Pharmacy Defendants. Here, Plaintiff generally cites to a large amount of opioids dispensed by certain pharmacies, including Walgreens, Walmart, and Albertsons. Response, Doc.

234 at 30-31. But Plaintiff does not explain how the distribution of a large amount of opioids, by itself, constitutes a violation of New Mexico's controlled substances Act.

Plaintiff alleged that Defendant Albertsons received a letter of admonition from the DEA for dispensing practices between 2006 and 2014. Doc. 234 at 30-31. But Plaintiff does not set forth the factual allegations underlying the letter of admonition or explain how these admonitions plausibly state a New Mexico CSA violation.

To the extent relevant, the Court notes that Plaintiff has not alleged any predicate acts within the statute of limitations period. *See* Doc. 234 at 30-31.

**D.    Plaintiff failed to allege that defendants each committed two predicate acts within ten years of each of other to support § 1962(c) liability.**

In sum, Plaintiff's response brief (Doc. 234) has failed to show it plausibly alleged that any of the Defendants committed a pattern of racketeering activity, *two* or more predicate acts within ten years of each other.

To the extent Plaintiff has plausibly alleged a predicate act by a defendant, Plaintiff has not plausibly alleged any predicate acts within the statute of limitations period. Moreover, if any defendant had committed a predicate act or pattern of racketeering activity, that cannot be imputed to other defendants to impose liability under § 1962(c).

**VI.    <u>Plaintiff did not state a plausible conspiracy to violate RICO under § 1962(d).</u>**

Plaintiff alleges that dozens of corporate entities conspired to violate RICO under § 1962(d) for the purpose of increasing opioid sales. FAC at ¶¶ 1192-95. That subsection makes it illegal "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." *Id.* "We presume Congress intended to use the term in its conventional sense, and certain well-established [conspiracy] principles follow." *Salinas*, 522 U.S. at 63, 118 S.Ct. 469. "To obtain

a conspiracy conviction, the government must prove: (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) (citing *United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009)). " 'A conspiratorial agreement ... need not be express so long as its existence can plausibly be inferred from the defendant['s] words and actions and the interdependence of activities and persons involved.' " *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1211 (10th Cir. 2020) (quoting *United States v. Smith*, 413 F.3d at 1273). *"*Interdependence exists where 'each coconspirators activities constituted essential and integral steps toward the realization of a common, illicit goal.' " *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995).

"If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law." *Tal v. Hogan*, 453 F.3d 1244, 1270 (10th Cir. 2006), *citing Condict v. Condict*, 826 F.2d 923, 927 (10th Cir.1987) ("[A]ny claim under § 1962(d) based on a conspiracy to violate the provisions of 18 U.S.C. § 1962(a), (b), or (c) must necessarily fall if the substantive claims are themselves deficient."). Here, because Plaintiff failed to plead a plausible § 1962(c) claim, it also failed to plead a conspiracy claim under § 1962(d). *Tal*, 453 F.3d at 1270, *citing Condict v. Condict*, 826 F.2d 923, 927 (10th Cir.1987).

Alternatively, Plaintiff has not plausibly alleged facts supporting a conspiracy to violate RICO. Each Defendant asserted that Plaintiff had failed to plausibly allege a RICO conspiracy. *See, e.g.,* Doc. 207 at 44-45. It appears Plaintiff did not expressly or separately address this argument in its 118-page response. *See* Doc. 234 at 2-3 (table of contents). Plaintiff's response does not point to which factual allegations it believes shows that each Defendant agreed to conspire to violate § 1962(c). Plaintiff in its response does not point to which facts in the complaint show

that dozens of alleged enterprise members or defendants (1) agreed to violate the law, (2) had knowledge of the objectives of the conspiracy, (3) knowingly and voluntarily were involved in the conspiracy, and (4) acted interdependently with other co-conspirators.

In its response to the personal jurisdiction argument, Plaintiff asserted that the Court has personal jurisdiction under a conspiracy theory. *See* Response, Doc. 234 at 93. In support of the existence of a conspiracy, Plaintiff points to FAC at ¶¶ 1195-98. But these citations merely summarily allege a conspiracy, without pointing to factual allegations which plausibly allege that each Defendant agreed to violate RICO. Plaintiff also cites to paragraphs 1172-79 and 1181-1194 of its First Amended Complaint but does not explain how these paragraphs satisfy the conspiracy elements above. These factual allegations are generally group pleaded. Here, there are dozens of alleged enterprise members or defendants, and these factual allegations are pleaded in a manner which does not make it possible to determine which defendants conspired to violate RICO. Although group pleading is not *per se* prohibited, in the context of this case, where there are dozens of defendants and a prolix complaint of 300 pages with allegations spanning thirty years, it is impossible to determine whether Plaintiff plausibly alleged each conspiracy element for each defendant.

## VII.    **Personal Jurisdiction.**

Defendants Publix and Giant Eagle[9] filed motions to dismiss for lack of personal jurisdiction. *See* Docs. 201 and 214.[10] Defendants Giant Eagle and Publix assert that this court

---

[9] As noted above, "Giant Eagle" includes HBC Service Company.

[10] Publix and Giant Eagle also assert that there is a lack of standing because Plaintiff failed to allege that they caused it harm, *i.e.*, failed to plausibly allege an injury or causation. The Court interprets this argument as a failure to state a claim, which has been addressed elsewhere. *See Safe Streets*, 859 F.3d at 887 (holding that "RICO standing" is determined under "the usual pleading-stage inquiry: whether the plaintiff has plausibly pled a cause of action under RICO").

may not exercise personal jurisdiction over them because they have insufficient contacts with New Mexico as neither operated in New Mexico, or distributed or dispensed opioids in New Mexico. Doc. 201 at 5-8, Doc. 214 at 7-8. Plaintiff appears to admit that the Court lacks jurisdiction over Publix and Giant Eagle under the traditional minimum contacts test. Rather, Plaintiff asserts this Court has jurisdiction over Giant Eagle and Publix under a (1) conspiracy theory of personal jurisdiction and (2) the RICO statute. As explained below, the Court disagrees and concludes it lacks jurisdiction over these two entities.

Giant Eagle is based in Pittsburgh, Pennsylvania, and operates supermarkets mostly in Pennsylvania, Ohio, Indiana, and Maryland. It does no business in New Mexico, has no stores or employees in New Mexico, and has never shipped opioids to New Mexico residents. Doc. 214, Miller Decl., Exhibit 1 at ¶¶ 3-11, 28-31. It has never transacted business with Plaintiff and its closest pharmacy is 1,200 miles away in Indiana. Plaintiff does not allege that it treated any patient suffering from OUD caused by Giant Eagle's opioids.

Similarly, Publix is a corporation based in Florida which operates supermarkets and pharmacies. Plaintiff does not allege that Publix sold opioids to Plaintiff. Publix is a Florida corporation with its principal place of business, books and records, and principal officer in Florida. Doc. 201, Scanlon Decl., Exhibit A at ¶¶ 5-8. Publix does not distribute opioids or operate pharmacies in New Mexico, and has no employees, officers, property, officers, or stores in New Mexico. It does not actively advertise or market its products in New Mexico. *Id.* at ¶¶9-12. Publix never sent opioids to patients in New Mexico. *Id.* at ¶¶ 13-14.

Plaintiff asserts that the Court may exercise personal jurisdiction over Publix and Giant Eagle on two grounds:

- a conspiracy theory of personal jurisdiction; and

- pursuant to the nationwide service of process provided under the RICO statute.

To demonstrate that personal jurisdiction is appropriate pursuant to a conspiracy, Plaintiff must demonstrate the following:

- a *prima facie* case of a conspiracy between the non-resident defendant (movants) and their co-defendants;

- the conspiracy is directed at or substantial steps in furtherance of the conspiracy are taken in the forum; and

-  the non-resident defendant's co-defendants have sufficient minimum contacts with the forum.

*See generally Hart v. Salois*, 605 F. App'x 694, 700 (10th Cir. 2015).  Plaintiff did not allege this basis for personal jurisdiction in its complaint.

*First*, it is unclear whether a conspiracy theory of personal jurisdiction exists without a showing of minimum contacts. *See Hart,* 605 App'x at 700; *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007) ("Due process requires [each defendant] itself have minimum contacts with [the forum].").

*Second,* as explained above, Plaintiff has failed to plausibly assert a conspiracy. To show a conspiracy, Plaintiff must plead factual allegations plausibly alleging "(1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) (citing *United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009)).  Plaintiff's response does not point to factual allegations plausibly alleging these elements.  *See* Response, Doc. 234 at 93-94.  Plaintiff failed to plausibly allege that Defendants Giant Eagle and Publix agreed to conspire with other defendants to violate

RICO. Plaintiff does not plead factual allegations suggesting knowing and voluntary involvement in the conspiracy. *See* Doc. 234 at 93-94. Plaintiff references alleged involvement in national trade organizations. But Plaintiff does not explain or demonstrate that Publix or Giant Eagle should be held accountable for those third-party trade organizations' alleged misleading statements.

Therefore, the Court concludes that Plaintiff has not carried its burden of demonstrating this Court has personal jurisdiction over Giant Eagle and Publix pursuant to a conspiracy.

Moreover, the RICO statute does not establish personal jurisdiction over Defendants Publix and Giant Eagle. The nationwide service of process provided for in the RICO statute grants personal jurisdiction pursuant to Section 1965(b) and (d). The RICO statute provides for nationwide service of process in a civil action as follows:

> (b) In any [RICO action] in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. 1965. "When a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006). As explained below, in this inquiry the Court looks to:

- Whether the court has personal jurisdiction over at least one of the non-resident defendant's co-defendants;

- Whether the court's exercising personal jurisdiction over the non-resident defendant serves the "ends of justice"; and

- Whether the court's exercise of personal jurisdiction comports with Fifth Amendment Due process.

*See generally Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006); *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015).

Fed. R. Civ. P. 4(k) provides that a federal court has personal jurisdiction to the extent authorized by a federal statute. "Before a federal court can assert personal jurisdiction over a defendant in a federal question case, the court must determine (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process." *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015) (internal quotation marks and citations omitted). In federal question cases "where jurisdiction is invoked based on nationwide service of process", the court must look to the due process considerations under the Fifth Amendment. *Id.* at 1318. That is, "in a federal question case where jurisdiction is invoked based on nationwide service of process, the Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant." *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000) (internal quotation marks and citation omitted). When a RICO claim is brought against at least one defendant over whom the Court has personal jurisdiction, the RICO Act permits any summons to be served "nationwide" over other defendants, if the "ends of justice" so require. *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1230–31 (10th Cir. 2006).

It is undisputed that the Court has personal jurisdiction over at least one of the co-defendants. FAC at ¶¶ 37-38, 40, 43, 62, 71-72, 79-81, 84-86, 95-97, 117-19, 123-25, 128-30, 134, 137-39, 142-44, 149-51, 157-59, 172-76, 191-93,

However, the Court concludes that Plaintiff has not demonstrated that the ends of justice factors favor exercising personal jurisdiction over movants Publix and Giant Eagle. The " 'ends of justice' is a flexible concept uniquely tailored to the facts of each case." *Cory v. Aztec Steel Bldg.,*

Case 1:23-cv-00903-KWR-JFR    Document 326    Filed 03/19/25    Page 59 of 64

*Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006). In analyzing the ends of justice, the Court should consider the remedial purpose of the RICO statute in eradicating organized crime, and should be mindful that the Court should liberally construe RICO to effectuate its remedial purpose. *Id.* Here, it would not serve the ends of justice to subject Publix and Giant Eagle to jurisdiction in New Mexico, especially where they have little to no contact with New Mexico and they had little alleged involvement in the opioid enterprise or conspiracy. Plaintiff does not allege that they dispensed opioids to New Mexico or that Plaintiff was injured by treating patients who used their opioids. Plaintiff points to their alleged involvement in third-party organizations which issued false or misleading statements, but Plaintiff does not establish that those alleged fraudulent statements should be attributed to Publix or Giant Eagle.

Finally, exercising personal jurisdiction here does not comport with Fifth Amendment due process. The Court must apply the Fifth Amendment Due Process clause "in a federal question case where jurisdiction is invoked based on nationwide service of process." *Peay,* 205 F.3d at 1212. In a federal question case, the "Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant." *Id.*[11] To defeat federal jurisdiction, a defendant must establish that the "chosen forum will make litigation ... gravely difficult and inconvenient" or, in other words, the forum district burdens the defendant with "constitutionally significant inconvenience." *Id.* (internal quotation marks omitted). The court looks to "non-exclusive factors in considering whether defendants have met this burden, such as (1) the extent of contact with the forum state, (2) the inconvenience of having to litigate in a foreign jurisdiction, (3) judicial economy, (4) the probable situs of the discovery proceedings, and (5) the nature of the defendant's

---

[11] The Tenth Circuit has expressly distinguished Fifth Amendment due process analysis from the Fourteenth Amendment minimum contacts test. *See Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015) (rejecting minimum contacts test in favor of Fifth Amendment due process test as to federal claim).

activities and its impact beyond [its] state's borders." *Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015).

*First,* Plaintiff does not allege that Publix or Giant Eagle had any contact with New Mexico. As explained above, neither Publix nor Giant Eagle operated in New Mexico, and they did not send opioids to patients in New Mexico. Moreover, there is no allegation that opioids caused OUD in patients treated by Plaintiff. Plaintiff does not establish that fraudulent statements by third parties should be attributed to Giant Eagle or Publix. Any fraudulent statements issued by third-parties were not directed at New Mexico.

*Second*, litigating in New Mexico, which is far away from Giant Eagle's or Publix's headquarters in Florida and Pittsburgh, is clearly inconvenient.

*Third*, judicial economy may weigh in favor of addressing all defendants in one class action. But this does not outweigh the other factors.

*Fourth*, Publix and Giant Eagle have demonstrated that the situs of the discovery proceedings does not appear to be in New Mexico. Doc. 201, Scanlon Decl., Exhibit A.

*Fifth*, Publix and Giant Eagle's activities did not appear to impact New Mexico. To the extent they unlawfully sold opioids, it was outside New Mexico. Plaintiff does not allege that it treated patients with OUD who used opioids illegal dispensed by Publix or Giant Eagle. Plaintiff points to certain false or misleading statements by third parties, but Plaintiff has not demonstrated that Publix or Giant Eagle controlled those entities, or that the statements of those entities should be imputed to Publix or Giant Eagle.

Weighing these non-exclusive factors, the Court concludes that exercising personal jurisdiction would violate Fifth Amendment due process.

In this personal jurisdiction analysis, district courts also consider whether Plaintiffs adequately pled a RICO claim. *Gibbs-Squires v. Urb. Settlement Servs.*, No. 14-CV-00488-MSK-CBS, 2015 WL 196217, at *4 (D. Colo. Jan. 14, 2015) (in determining whether court has personal jurisdiction as to RICO claim, district court considered whether plaintiff stated a RICO claim), *aff'd,* 623 F. App'x 917 (10th Cir. 2015) ("Plaintiffs failed to assert jurisdiction over them through an adequately pled RICO claim"); *see also Lynn v. Brown*, 803 F. Appx 156, 161 (10th Cir. 2020) (noting failure to colorably plead RICO claim establishes lack of subject matter jurisdiction). As explained above, Plaintiff failed to state a plausible RICO claim.

Therefore, the Court concludes that Plaintiff has not established personal jurisdiction over Giant Eagle and Publix under the RICO statute.  The claims against Publix and Giant Eagle are dismissed without prejudice for lack of personal jurisdiction.

Alternatively, even assuming the Court has personal jurisdiction over Defendants Publix and Giant Eagle, the RICO claim against them is dismissed for failure to state a claim for the reasons stated above.

## VIII.    Indivior's Motion for Failure to State a claim (Doc. 211).

Defendant Indivior asserts that Plaintiff's complaint failed to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) as its suboxone product and other similar products were not produced for treatment of pain but only for treatment of opioid use disorder. It asserts that (1) it did not participate in the opioid enterprise as it only sold treatments for opioid use disorder, (2) its products such as suboxone were not a cause of Plaintiff's injuries, and (3) it was not part of any alleged conspiracy.

Because the Court has dismissed the claims against Indivior for failure to state a claim as explained above, the Court denies Indivior's separate motion (Doc. 211) as moot.

**IX.    <u>Hikma's supplemental motion to dismiss (Doc 213)</u>.**

Defendant Hikma filed an individual, supplemental motion to dismiss, asserting that Plaintiff failed to state a RICO claim.  It asserts that it is a generic opioid manufacturer.  *See* Hikma's Mot., Doc. 213.

For largely the same reasons as stated above, the Court grants the motion.  As explained above, Plaintiff has generally not cited to any factual allegations demonstrating that Hikma (1) committed a predicate act, (2) proximately causing, (3) a cognizable injury to Plaintiff.

<strong>CONCLUSION</strong>

Plaintiff has failed to state a plausible federal RICO claim for each of the following alternate reasons:

(1) Plaintiff failed to meet the statute of limitations as to this 30-year-old RICO enterprise;

(2) Plaintiff failed plausibly allege the causation or injury elements as: (a) Plaintiff failed to show proximate causation under RICO, as it does not plead a direct injury; (b) Plaintiff failed to show an injury as to its business or property as required under RICO, and its claims are derivative of its patients' personal injury claims; and (c) Plaintiff pleaded intervening causes;

(3) Plaintiff failed to plausibly allege that each Movant committed a pattern of racketeering activity (two or more predicate acts) to establish liability under § 1962(c); and

(4) Plaintiff failed to plausibly allege that each Defendant conspired to violate RICO under § 1962(d).

The claims against the Movants are therefore dismissed for failure to state a claim.  Alternatively, the Court would dismiss the complaint with prejudice for violation of Rule 8.  Moreover, the Court concludes that Plaintiff failed to plausibly allege personal jurisdiction over

Publix and Giant Eagle. Therefore, the claims asserted against Publix and Giant Eagle are dismissed without prejudice.

**IT IS THEREFORE ORDERED** that the three central motions to dismiss for failure to state a claim (Docs. 207, 208, and 212) are **GRANTED IN PART**. The claims against the Movants (except for Publix and Giant Eagle) are dismissed.

**IT IS FURTHER ORDERED** that Publix's and Giant Eagle's motions to dismiss for lack of jurisdiction (Doc. 201 and 214) are **GRANTED IN PART.** The claims against Publix and Giant Eagle are dismissed without prejudice for lack of personal jurisdiction.[12]

**IT IS FURTHER ORDERED** that Giant Eagle's Motion to Dismiss (Doc. 209) is TERMINATED, as Giant Eagle filed a corrected motion (Doc. 214).

**IT IS FURTHER ORDERED** that Indivior's supplemental motion to dismiss (Docs. 211) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Hikma's supplemental motion to dismiss (Doc. 213) is **GRANTED**.

**IT IS FURTHER ORDERED** that Kroger Limited Partnership I's ("KLP I") and Kroger Limited Partnership II's ("KLP II") Motions to Dismiss (Docs. 215, 216) are **DENIED AS MOOT** in light of the stipulated dismissal.[13]

---

[12] Alternatively, assuming personal jurisdiction exists, the claims against Publix and Giant Eagle would be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or for violation of Rule 8.

[13] The Kroger Co. participated in the Pharmacy Defendants' Motion to Dismiss (Doc. 208). The parties stipulated to dismissal of Kroger Limited Partnership I ("KLP I") and Kroger Limited Partnership II ("KLP II"). *See* Doc. 237. The parties agreed to substitute The Kroger Co. for KLP I and II. *See* Doc. 237. The Kroger Co. is dismissed for the same reasons as the other Pharmacy Defendants.

_____/S/_____

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE